JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
PETER J. MCVEIGH
Attorneys
Environment & Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 2139
Washington, D.C. 20530

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA, )
                                  )
             Plaintiff, )
                                  )    Civil Action No. _____
      v. )
                                    )
THE STATE OF CALIFORNIA; GAVIN )  **AMENDED**
C. NEWSOM, in his official capacity as )  **COMPLAINT**
Governor of the State of California; THE )
CALIFORNIA AIR RESOURCES BOARD; )
MARY D. NICHOLS, in her official )
capacities as Chair of the California Air )
Resources Board and as Vice Chair and a board member )
of the Western Climate Initiative, Inc.; WESTERN )
CLIMATE INITIATIVE, INC.; JARED )
BLUMENFELD, in his official capacities as Secretary )
for Environmental Protection and as a board member )
of the Western Climate Initiative, Inc.; KIP LIPPER, )
in his official capacity as a board member of the )
Western Climate Initiative, Inc., and RICHARD )
BLOOM, in his official capacity as a board member )
of the Western Climate Initiative, Inc., )
                                  )
             Defendants. )

Plaintiff, the United States of America, alleges as follows:

**INTRODUCTION**

1.      The Constitution gives the federal government full and exclusive responsibility to conduct this nation's foreign affairs, representing as it does the collective interests of all its states and territories.

2.      As the Supreme Court has accentuated, "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941).

3.      Notwithstanding the breadth and exclusivity of the federal government's responsibility for foreign affairs, Defendants have pursued, or are attempting to pursue, an independent foreign policy in the area of greenhouse gas regulation.  Specifically, Defendants have intruded into the federal sphere by entering into a cap-and-trade agreement with the provincial government of Quebec, Canada (the "Agreement").  This intrusion complexifies and burdens the United States' task, as a collective of the states and territories, of negotiating competitive international agreements.  Moreover, California's actions, as well as the actions of those acting in concert with it, have had the effect of enhancing the political power of that state vis-à-vis the United States.  This is due not only to the effect of the Agreement itself but also stems from the fact that the Agreement could encourage other states to enter into similarly illegal arrangements.

4.      The design of the Constitution requires that the federal government be able to speak with one voice on behalf of the United States in matters of foreign affairs.  Allowing individual states in the Union to conduct their own foreign policy to advance their own narrow interests is thus anathema to our system of government and, if tolerated, would unlawfully enhance state power at the expense of the United States and undermine the United States' ability to negotiate competitive international agreements.

5.      Because the Agreement, together with certain related provisions of California law, violate the Constitution, this Court should declare them unlawful and enjoin their operation.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside here and because a substantial part of the acts or omissions giving rise to this Complaint arose from events occurring within this District.

8.      This Court has authority to provide the relief requested under 28 U.S.C. §§ 1345, 1651, 2201 and 2202, and under its inherent legal and equitable powers.

**THE PARTIES**

9.      Plaintiff, the United States of America, has full and exclusive responsibility to conduct the foreign policy of the nation.

10.      Defendant State of California is a state of the United States.

11.      Defendant Gavin C. Newsom is Governor of the State of California and is sued in his official capacity.

12.      Defendant California Air Resources Board ("CARB") is an agency of the State of California.  It has primary responsibility for implementation of the Agreement.

13.      Defendant Mary D. Nichols is Chair of CARB and Vice Chair and a voting board member of the Western Climate Initiative, Inc. (WCI), and is sued in her official capacities.

14.      Defendant WCI is a non-profit corporation organized under the laws of Delaware. WCI is headquartered in Sacramento, California.  *See* 2018 Tax Return, *available at* http://www.wci-inc.org/fr/docs/TaxForm-USA2018-EN-20190514.pdf at 1 (last visited Nov. 19, 2019).  According to its charter, its first purpose is "to provide technical and scientific advisory services to States of the United States and Provinces and Territories of Canada in the development and collaborative implementation of their respective greenhouse gas emissions

trading programs." Certificate of Incorporation of Western Climate Initiative, Inc., § 3, *available at* http://wci-inc.org/docs/Certificate_of_Incorporation.pdf (last visited Nov. 19, 2019).

15.     WCI is a state actor and an instrumentality of the governments of California, Quebec, and Nova Scotia. WCI's bylaws provide that the Class A voting board members representing the State of California must be "employee[s] or officer[s] of the state, named in accordance with the state's requirements." *See* By-Laws of the Western Climate Initiative, Inc., Art. IV, § 4.2(a), *available at* http://wci-inc.org/docs/WCI%20Inc%20Bylaws_10-11-2018.pdf (last visited Nov. 19, 2019). The Class B non-voting board members representing the State of California also must be "employee[s], officer[s] or elected officer[s] of the jurisdiction." *Id.* § 4.2.

16.     Defendant Jared Blumenfeld is the California Secretary for Environmental Protection and a voting board member of WCI, and is sued in his official capacities.

17.     Defendant Kip Lipper is an employee of the California State Senate and a non-voting board member of WCI, and is sued solely in his official capacity as a non-voting board member of WCI, not in his capacity as an employee of the California State Senate. Mr. Lipper was appointed to the board by the California Senate Rules Committee.

18.     Defendant Richard Bloom is a state assembly member and a non-voting board member of WCI, and is sued solely in his official capacity as a non-voting board member of WCI, not in his capacity as a member of the state assembly. Mr. Bloom was appointed to the board by the Speaker of the California Assembly.

19.     Defendants the State of California, Governor Newsom, CARB, Chair Nichols, WCI, Secretary Blumenfeld, Assembly Member Bloom, and Mr. Lipper are referred to collectively as "California" or as "Defendants."

**APPLICABLE LAW**

20.    The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Art. VI, cl. [2].

21.    The Constitution prohibits states from "enter[ing] into any Treaty, Alliance, or Confederation."  Art. I, § 10, cl. [1].

22.    The Supreme Court has recognized and held that, "[w]hen a State enters the Union, it surrenders certain sovereign prerogatives.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] *it cannot negotiate an emissions treaty with China or India . . . ."  Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (emphasis added).

23.    The Constitution prohibits states, "without the Consent of Congress," from "enter[ing] into any Agreement or Compact . . . with a foreign Power . . . ."  Art. I, § 10, cl. [3].

24.    The Constitution gives Congress "Power . . . [t]o regulate Commerce with foreign Nations . . . ."  Art. I, § 8, cl. [3].

25.    The Supreme Court has interpreted the Foreign Commerce Clause to have a negative application, in the sense that state laws that discriminate against, or impose an undue burden upon, foreign commerce, are unconstitutional even in the absence of federal legislation regulating the activity in question.  *See Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 310-13 (1994).

26.    Even aside from his military powers as the "Commander in Chief of the Army and Navy," Art. II, § 2, cl. [1], the Constitution vests broad responsibility for the conduct of foreign affairs in the President of the United States.

27.     The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id.* cl. [2].

28.     The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id.*

29.     The President "receive[s] Ambassadors and other public Ministers." *Id.* § 3.

30.     The Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id.*

31.     In short, "the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution." *Hines*, 312 U.S. at 62.

32.     Additionally, the Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the states that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise implicate the conduct of foreign policy. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418-20 (2003).

## THE UNITED STATES' FOREIGN POLICY

33.     Consistent with the Constitution's allocation of supremacy in the field of foreign policy to the federal government, *see Hines*, 312 U.S. at 62, the United States has demonstrated an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security. It has "in fact . . . addressed" these interwoven issues on a number of occasions. *Garamendi*, 539 U.S. at 421.

34.     In 1992, President George H. W. Bush signed, and the Senate unanimously approved, the United Nations Framework Convention on Climate Change ("UNFCCC"), which has as its "ultimate objective . . . stabilization of greenhouse gas concentrations in the

atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system. *Id.*, Art. 2.

35.     Being ratified by the President with the advice and consent of the Senate, the UNFCCC is law of the land. *See* Art. II, § 2, cl. [2]; Art. VI, cl [2].

36.     By adopting the UNFCCC, the federal government undertook to formulate foreign policy with respect to the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id.*, Art. 2.

37.     Under the UNFCCC, "[a]ll Parties," including the United States, "shall . . . . (b) [f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate climate change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases not controlled by the Montreal Protocol, and measures to facilitate adequate adaptation to climate change [and] (c) [p]romote and cooperate in the development, application and diffusion, including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of greenhouse gases not controlled by the Montreal Protocol in all relevant sectors . . . ." *Id.*, Art. 4.1(b), (c).

38.     The UNFCCC does not set binding limits on greenhouse gas ("GHG") emissions for individual countries. It contains no enforcement mechanism. Instead, it includes general obligations related to addressing climate change and creates a framework for cooperation by its Parties. Among other things, it contemplates the possibility of its Parties negotiating "protocols" or other specific international agreements in pursuit of its objective.

39.     One agreement under the UNFCCC is the Kyoto Protocol of 1997. This protocol provided for GHG emission reduction targets on UNFCCC Annex I parties, including the United

States.  The protocol placed heavier burdens on the Annex I parties than on other parties, including economically developing countries.

40.     Although the United States signed the protocol, President Clinton never submitted it to the Senate for advice and consent to ratification.  Instead, the Senate passed a unanimous resolution expressing specific concerns about the negotiations that would result in the Kyoto Protocol, and expressing general disapproval of any protocol or other agreement that would similarly provide for disparate treatment of economically developing countries.  S. Res. 98, 105th Cong. (1997).

41.     On December 12, 2015, the parties to the UNFCCC agreed to the Paris Climate Accord (the "Accord").[1]

42.     The Accord sets forth a goal of holding the increase in global average temperature to well below two degrees Celsius above pre-industrial levels and pursuing efforts to limit the increase to 1.5 degrees Celsius.  *Id.*, Art. 2(1)(a).

43.     The Accord tasks each nation with the responsibility to develop and communicate its own climate plans, referred to as "nationally determined contributions."  *Id.*, Art. 4.2.  Under its terms, a party may withdraw from the Accord one year after providing notice of intent to withdraw, but such notice may be given no earlier than three years after the Accord has entered into force for that country.  *Id.* at Art. 28.

44.     President Obama took executive action to sign the Accord in September 2016.

45.     On March 28, 2017, in Executive Order 13,783, President Trump set forth the United States' position on how it would seek to reconcile the nation's environmental, economic, and strategic concerns.

---

[1] We refer to the "Paris Agreement" as the "Paris Accord" to avoid confusion between that agreement and the Agreement that is the main focus of this Complaint.

46.     In that order, the President announced that, "[e]ffective immediately, when monetizing the value of changes in greenhouse gas emissions resulting from regulations, including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis), which was issued after peer review and public comment and has been widely accepted for more than a decade as embodying the best practices for conducting regulatory cost-benefit analysis."  Promoting Energy Independence and Economic Growth, Exec. Order No. 13,783, §5(c), 82 Fed. Reg. 16093, 16096 (Mar. 28, 2017).

47.     On June 1, 2017, President Trump announced that the United States intended to withdraw from the Accord.  President Trump said the United States would begin negotiations to either re-enter it or negotiate an entirely new agreement on terms more favorable to the United States.

48.     The President stated that withdrawal was necessary because, among other things, the Accord: (1) undermined the nation's economic competitiveness and would cost jobs; (2) set unrealistic targets for reducing GHG emissions while allowing China to increase such emissions until 2030; and (3) would have negligible impact in any event.

49.     On November 4, 2019, the United States deposited a notification of withdrawal from the Accord.  The withdrawal will take effect on November 4, 2020.

50.     On the day the United States gave this formal notice, the Secretary of State stated publicly that:

> The U.S. approach incorporates the reality of the global energy mix and uses all energy sources and technologies cleanly and efficiently . . . .  In international climate discussions, we will continue to offer a realistic and pragmatic model – backed by a record of real world results – showing innovation and open markets lead to greater prosperity, fewer emissions, and more secure sources of energy.  We will continue to work with our global partners to enhance resilience to the impacts of climate change and

prepare for and respond to natural disasters.  Just as we have in the past, the United States will continue to research, innovate, and grow our economy while reducing emissions and extending a helping hand to our friends and partners around the globe.

Michael R. Pompeo, Press Statement, On the U.S. Withdrawal from the Paris Agreement, *available at* https://www.state.gov/on-the-u-s-withdrawal-from-the-paris-agreement/ (last visited Nov. 19, 2019).  The policy described by the Secretary of State evinces the United States' integrated approach to environmental, economic, and national and energy security issues.

## CALIFORNIA'S FOREIGN POLICY

51.     In 2006, Arnold Schwarzenegger, Governor of California at the time, declared that California was a "nation state" with its own foreign policy.  Douglas A. Kysar & Bernadette A. Meyler, *Like a Nation State*, 55 U.C.L.A. L. REV. 1621, 1622 (2008) (quoting Governor Schwarzenegger).  He said this as Tony Blair, Prime Minister of the United Kingdom, stood by his side. *Id.  See also* Adam Tanner, *Schwarzenegger: California is 'Nation State' Leading World*, WASHINGTON POST (Jan. 9, 2007) ("'We are the modern equivalent of the ancient city-states of Athens and Sparta.  California has the ideas of Athens and the power of Sparta,' Schwarzenegger . . . told legislators . . . .  'Not only can we lead California into the future . . . we can show the nation and the world how to get there.  We can do this because we have the economic strength, the population, the technological force of a nation-state.'") (paragraph break omitted), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/01/09/AR2007010901427.html (last visited Nov. 19, 2019).  Governor Schwarzenegger's assertions about California's powers are demonstrably at odds with the state's "surrender[]" of "certain sovereign prerogatives" upon entering the Union. *Massachusetts*, 549 U.S. at 519.

52.     After the United States announced its intent to withdraw from the Accord, then-Governor Jerry Brown, Governor Schwarzenegger's successor, said "[i]t cannot stand, it's not right and California will do everything it can to not only stay the course, but to build more support

— in other states, *in other provinces, in other countries*." Georgetown Climate Center, States React to Trump's Decision to Abandon Paris Climate Agreement, Gov. Brown's comments to LA Times, *available at* https://www.georgetownclimate.org/articles/states-react-to-trump-s-decision-to-abandon-paris-climate-agreement.html (last visited Nov. 19, 2019) (emphasis added).

53.     In the wake of the United States' announcement that it intends to withdraw from the Accord — in part because it favors China — California (by or through one or more of the other Defendants) has entered into numerous bilateral alliances, confederations, agreements, or compacts on environmental issues with national and subnational governments in China.

54.     Indeed, mere days after President Trump announced the United States' intent to withdraw from the Paris Climate Accord, Jerry Brown, then-Governor of California, met in Beijing with China's President Xi Jinping to discuss environmental issues.

55.     In 2017, in what the states in question called a direct response to the United States' announcement that it intended to withdraw from the Accord, California and other states entered into the United States Climate Alliance, committing to reducing GHG emissions in a manner consistent with the goals of the Accord. *See* Attachment A at 12 (explaining that the United States Climate Alliance was founded "in response to President Trump's decision to withdraw from the Paris Agreement").[2]

56.     According to California, the state is a party to 72 active bilateral and multilateral "agreements" with national and subnational foreign and domestic governments relating to environmental policy. *See generally* Attachment A. Additionally, California avers that the purpose of these agreements is "to strengthen the global response to the threat of climate change

---

[2] Attachment A amalgamates text from https://www.climatechange.ca.gov/climate_action_team/partnerships.html (last visited Nov. 19, 2019).

Amended Complaint for Declaratory and Injunctive Relief                                    Page 11

and to promote a healthy and prosperous future for all citizens." https://www.climate change.ca.gov/climate_action_team/partnerships.html (last visited Nov. 19, 2019).

57.    In 2013, CARB on behalf of California entered into the predecessor of the Agreement with the provincial government of Quebec, Canada.  *See* Agreement Between the California Air Resources Board and the *Gouvernement du Québec* Concerning the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions.  The Agreement, as renegotiated in 2017, obliges California to work with Quebec "toward the harmonization and integration of [their] greenhouse gas emissions reporting programs and cap-and-trade programs for reducing greenhouse gas emissions."  *See* Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions at Art. 1 (attached hereto as Attachment B).

58.    The Agreement facilitates the California Global Warming Solutions Act of 2006, (AB 32), which requires the state to reduce its GHG emissions to their 1990 level by 2020 and to "*facilitate the development of integrated* and cost-effective regional, national, and *international greenhouse gas reduction programs*."  CAL. HEALTH & SAFETY CODE § 38564 (emphasis added).

59.    The Agreement facilitates a comparable program in Quebec.

### California's International "Cap and Trade" Agreement

60.    "Cap-and-trade" refers to a regulatory system that imposes a cap on GHG emissions, grants regulated entities "emission allowances"—entitling them to emit a specified quantity of GHGs—and creates a market in which regulated entities may buy and sell allowances.

61.    Before entering the Agreement, California had promulgated regulations to establish an internal cap-and-trade system in 2011.  *See* 17 Cal. Code Regs. ("CCR") §§ 95801-96022. However, California's regulations explicitly contemplated that "compliance instrument[s] issued

by an external greenhouse gas emissions trading system (GHG ETS) may be used to meet" the state's regulatory requirements. 17 CCR § 95940.

62.     When formulating its regulations in this fashion, California built its cap-and-trade system to permit expansion beyond state lines.

63.     Covered entities include manufacturers, electric power generation facilities, natural gas suppliers, importers of electricity and natural gas, intrastate pipelines and others whose annual GHG emissions equals or exceeds specific thresholds. *See id.* §§ 95811-12.  Upon information and belief, many covered entities have substantial interstate or foreign activities.

64.     The regulations establish three separate compliance periods: (1) 2013-2014; (2) 2015-2017; and (3) 2018-2020. *See id.* § 95840.  Under a complex formula, each covered entity has a compliance obligation for each compliance period.  The obligations call for a steady reduction in GHG emissions for each successive compliance period. *See id.* §§ 95850-95858.

65.     The regulations establish two types of "compliance instruments": greenhouse gas emissions allowances ("GHG allowances") and "offset credits." *See id.* § 95820.  One unit of each instrument authorizes a covered entity to emit up to one metric ton of $CO_2$ or $CO_2$-equivalent of any of the GHGs covered by the regulations. *See id.* § 95820(c).

66.     Under the regulations, CARB distributes GHG allowances to covered entities through various methods. *See*, *e.g.*, *id.* § 95890.  Covered entities may obtain additional allowances by purchasing them during periodic auctions, *see id.* §§ 95910-95915, or from other authorized parties, *see id.* §§ 95920-95922.

67.     A covered entity alternatively can obtain an offset credit by undertaking a project designed to remove $CO_2$ from the atmosphere. *See id.* § 95970(a)(1).

68.     The Agreement is one of political cooperation between California and Quebec.

69.     By the Agreement, California grants commercial privileges to Quebec.

70. The Agreement obligates California and Quebec to "consult each other regularly" and to "continue to examine their respective [cap-and-trade] regulations . . . to promote continued harmonization and integration of the Parties' programs." Attachment B at Arts. 3, 4.

71. The Agreement provides that "auctioning of compliance instruments by the Parties' respective programs shall occur jointly." *Id.*, Art. 9.

72. Under the Agreement, covered entities in California are authorized to trade emission allowances with covered entities in Quebec, and vice-versa, "as provided for under their respective cap-and-trade program regulations." *Id.*, Art. 7.

73. Under 17 CCR § 95940, "[a] compliance instrument issued by an external greenhouse gas emissions trading system (GHG ETS) may be used to meet the requirements [of California's cap-and-trade program] if the external GHG ETS and the compliance instrument have been approved pursuant to this section and [CCR] section 95941."

74. Under 17 CCR § 95941, CARB "may approve a linkage with an external GHG ETS after complying with relevant provisions of [California's] Administrative Procedure Act and after the Governor of California has made the findings required by [CAL. GOV. CODE § 12894(f)]."

75. Under 17 CCR § 95942(a), "[o]nce a linkage is approved, a compliance instrument issued by the approved external GHG ETS . . . may be used to meet a compliance obligation under [California's cap-and-trade program]."

76. Under 17 CCR § 95942(d), "[o]nce a linkage is approved, a compliance instrument issued by California may be used to meet a compliance obligation within the approved [e]xternal GHG ETS."

77. Under 17 CCR § 95942(e), "[o]nce a linkage is approved, a compliance instrument issued by the linked jurisdiction may be used to meet a compliance obligation in California."

78. Under 17 CCR § 95943(a)(1), "covered . . . entities may use compliance instruments issued by the [Government of Quebec] to meet their compliance obligation under [California's cap-and-trade program]."

79. In sum, under the Agreement, California agrees to accept compliance instruments issued by Quebec to satisfy compliance obligations in California, and Quebec agrees to accept compliance instruments issued by California to satisfy compliance obligations in Quebec. *See id.*, Art. 6.

80. This reciprocal undertaking demonstrates that the Agreement is binding.

81. Under the Agreement, the parties agree to consult with each other before making changes to their respective offset protocols or to their procedures for issuing offset credits. *See id.*, Art. 5.

82. The Agreement represents that it "does not modify any existing statutes and regulations" of either party. *Id.*, Art. 14.

83. The Agreement binds California and Quebec and memorializes a series of undertakings between the two jurisdictions.

84. If Quebec did not agree to accept compliance instruments issued by California to satisfy compliance obligations in Quebec, California would not accept compliance instruments issued by Quebec to satisfy compliance obligations in California.

85. California only accepts compliance instruments issued by governments other than California if those governments agree to accept California's laws and regulations for "linkage." *See* 17 CCR § 95940 ("A compliance instrument issued by an external greenhouse gas emissions trading system (GHG ETS) may be used to meet the requirements of this Article if the external GHG ETS and the compliance instrument have been approved pursuant to this section and section 95941."); *id.* § 95941 (CARB "may approve a linkage with an external GHG ETS after complying

with relevant provisions of [California's] Administrative Procedure Act and after the Governor of California has made the findings required by [CAL. GOV. CODE § 12894(f)].").

86.     The Agreement allows each party to withdraw, but requires a party to "endeavour to give 12 months['] notice of intent to withdraw" to the other party. *Id.*, Art. 17 (European spelling in original).

87.     The "Withdraw" provision exists because the Agreement is binding.

88.     Termination of the Agreement requires "written consent" of the parties and is not legally effective until "12 months after the last of the Parties has provided its consent . . . ." *Id.*, Art. 22.

89.     The Agreement is not equivalent to a trade mission to open new markets for California's products.  "Cap-and-trade" is a system of market restrictions.

90.     California desires that Quebec comply with the Agreement.  California expects Quebec to comply with the Agreement.

91.     If Quebec were to issue offsets that are not "real, additional, quantifiable, permanent, verifiable, and enforceable" – the "essential qualities" of an offset, *id.*, Art. 5, California would refuse to recognize such offsets for compliance with California's program. *Cf.* 17 CCR § 95941 (CARB "may approve a linkage with an external GHG ETS after complying with relevant provisions of [California's] Administrative Procedure Act and after the Governor of California has made the findings required by [CAL. GOV. CODE § 12894(f)]."); CAL. GOV. CODE § 12894(f)(1) (requiring the Governor to find that "[t]he jurisdiction with which the state agency proposes to link has adopted program requirements for greenhouse gas reductions, including, but not limited to, requirements for offsets, that are equivalent to or stricter than those required by [the analogous provisions of California law]").

92.     The Agreement discriminates among articles of foreign commerce.  Quebec is the only foreign country, state, or province that can issue allowances and offsets that California would currently accept.  Moreover, if other Canadian provinces, or other foreign nations, or subdivisions thereof, were to join California's and Quebec's regime, the result would be an even graver violation of the Constitution.

93.     An agreement that regulates the movement of articles of commerce between foreign jurisdictions is a treaty even if, like the Agreement, it restricts the quantity or volume of the articles that so move.  The Arms Trade Treaty is an example of such a treaty, in that it requires its signatories to take certain steps to limit the quantity and nature of arms that enter and leave such nations.  The Arms Trade Treaty, *available at* https://thearmstradetreaty.org/hyper-images/file/TheArmsTradeTreaty1/TheArmsTradeTreaty.pdf (last visited Nov. 19, 2019).

94.     The Agreement is not merely an aspirational or hortatory joint statement by California and Quebec because it sets forth a series of reciprocal obligations between the two jurisdictions.

95.     The Agreement memorializes California's acceptance of Quebec's offer to abide by the terms set forth therein, and vice versa.

96.     The Agreement memorializes the consideration that California and Quebec provide to each other in support thereof, which includes (but is not limited to) an acknowledgment that "the auctioning of compliance instruments by the Parties' respective programs shall occur jointly . . . ." Agreement, Art. 9.

97.     As of August 20, 2019, twenty joint auctions had taken place under the terms of the Agreement and its predecessor. *See* CARB, Auction Notices and Reports, *available at* https://ww3.arb.ca.gov/cc/capandtrade/auction/auction_notices_and_reports.htm (last visited

Nov. 19, 2019). According to CARB, another joint auction will take place on November 19, 2019. *See id.*

98. The Agreement further memorializes the consideration that California and Quebec provide to each other in support thereof, which includes (but is not limited to):

(a.) an acknowledgment that "[t]he Agreement may only be terminated by the written consent of all of the Parties." *Id.*, Art. 22.

(b.) an acknowledgment that "[w]ithdrawal from this Agreement does not end a Party's obligations under article 15 . . . which continue to remain in effect." *Id.*, Art. 17.

99. California agreed to be bound by Article 15 of the Agreement even if California or Quebec withdrew from the Agreement.

100. The Agreement does not constitute participation in the market by California to buy goods or services for itself because, although California creates, allocates, validates, and sells allowances and offsets, and although these allowances and offsets are articles of commerce, they are exclusively regulatory in nature, in that they limit the aggregate amount of carbon dioxide (and its equivalents) that covered entities may emit into the air.

101. California is regulating, not participating in the market because its cap-and-trade program does not depend on the state or any of its instrumentalities actually emitting carbon dioxide (or its equivalents) into the air.

102. Any role that California may have as a participant in the cap-and-trade market is purely incidental and does not vitiate its status as the regulator of that market.

103. As of September 2019, California acknowledged that it had received almost twelve *billion* dollars in proceeds from the sale of allowances since 2012. The specific figure was $11,796,013,586.66. *See* California Cap-and-Trade Program, Summary of Proceeds to California

and Consigning Entities, *available at* https://ww3.arb.ca.gov/cc/capandtrade /auction/proceeds_summary.pdf (last visited Nov. 19, 2019).

104. Defendant Newsom believes that the entities that purchase allowances at these auctions would not do so if they understood them to be supported only by California's and Quebec's aspirations.

105. Defendant Newsom believes and acts consistently with his belief that the Agreement is binding upon California and Quebec.

106. Defendant Nichols believes that the entities that purchase allowances at these auctions would not do so if they understood them to be supported only by California's and Quebec's aspirations.

107. Defendant Nichols believes and acts consistently with her belief that the Agreement is binding upon California and Quebec.

108. Upon information and belief, as part of the joint auction, entities purchase allowances in the form of bid lots consisting of 1,000 allowances divided in proportion to the quantity of California's and Quebec's contribution to the total amount. See CARB, Detailed Auction Requirements and Instructions, *available at* https://ww3.arb.ca.gov/cc/capandtrade/ auction/auction_requirements.pdf at pt. IX, p. 43 (page number known from Table of Contents) (last visited Nov. 19, 2019). As explained in CARB's auction guidance, for a simple case, if a joint auction "included 60 percent California 2019 vintage allowances and 40 percent Québec 2019 vintage allowances, each bid lot of 1000 allowances would include 600 California 2019 vintage allowances and 400 Québec 2019 vintage allowances." *Id.*

109. This blending of allowances issued by California and Quebec belies any claim that the Agreement is the equivalent of a trade mission or merely an aspirational or hortatory joint statement by California and Quebec.

110. The phrase "the Parties shall" appears twenty (20) times in the Agreement.

111. The phrase "each Party shall" appears four (4) times in the Agreement.

112. The phrase "each of the Parties shall" appears once in the Agreement.

113. The word "shall" appears over fifty (50) times in the Agreement, in a wide variety of contexts.

114. The ubiquity in the Agreement of the word "shall" and the phrases "the Parties shall," "each Party shall," and "each of the Parties shall" belies any argument that the Agreement does not bind California and Quebec.

115. Upon information and belief, California has a policy of continuing to recognize allowances or offsets generated by counterparties under the Agreement who withdrew therefrom.

116. Although the Canadian province of Ontario withdrew from the Agreement on or about July 3, 2018, California guaranteed the validity of compliance instruments issued by that government. *See* CARB, Linkage, September 2018 Update: Linkage with Ontario Cap-and-Trade Program, *available at* https://ww3.arb.ca.gov/cc/capandtrade/linkage/linkage.htm) (last visited Nov. 19, 2019).

117. Under 17 CCR § 95943, "[c]ompliance instruments issued by the Government of Ontario that are held in California covered entity, opt-in covered entity, and general market participant accounts . . . as of June 15, 2018 continue to remain valid for compliance and trading purposes."

118. Quebec has made a reciprocal undertaking. In addition to recognizing every emission allowance issued by California, Quebec recognizes "emission allowances issued by the Province of Ontario pursuant to the document O. Reg. 144/16[] . . . , [which] are deemed to be equivalent to the emission allowances issued" by Quebec. Regulation Respecting a Cap-and-Trade System for Greenhouse Gas Emission Allowances (chapter Q-2, r. 46.1, Appendix B.1(2)

(s. 37)) available at http://legisquebec.gouv.qc.ca/en/pdf/cr/Q-2,%20R.%2046.1.pdf (last visited Nov. 19, 2019).

119.    These undertakings demonstrate that the Agreement is not equivalent to a trade mission or a merely aspirational or hortatory joint statement by California and Quebec.

120.    California has undertaken to allow covered entities to hold allowances issued by Quebec as far into the future as 2030.  *See* Facts About Holding Limit for Linked Cap-and-Trade Programs, *available at* https://www.arb.ca.gov/cc/capandtrade/holding_limit.pdf at 2 (last visited November 19, 2019).

121.    Quebec has made a reciprocal undertaking.  *See id.  See also* Gouvernement du Québec, O.C. 1126-2017, 22 Nov. 2017, Environment Quality Act (chapter Q-2), *available at* http://www2.publicationsduquebec.gouv.qc.ca/dynamicSearch/telecharge.php?type=1&file =103198.pdf, *archived at* [https://perma.cc/TK8M-VSWS] (last visited Nov. 19, 2019).

122.    After the United States filed the Complaint in this action, Defendants Governor Newsom and Chair Nichols took steps to reassure market participants that California would continue its cap-and-trade agreements and international agreements.

123.    Defendant Newsom issued a statement that "[f]or years our state has proudly participated in a number of environmental partnerships that tackle the devastating effects of climate change to our health and economy."  Press Release, Office of Governor Gavin Newsom, Governor Newsom Statement on Trump Administration's Attack on California's Landmark Cap-and-Trade Program, *available at* https://www.gov.ca.gov/2019/10/23/governor-newsom-statement-on-trump-administrations-attack-on-californias-landmark-cap-and-trade-program (last viewed Nov. 19, 2019).

124.    Defendant Newsom believes that the Agreement between California and Quebec constitutes a partnership between California and Quebec.

125.    Defendant Nichols issued a statement that: "Nothing in this complaint changes the current operation of the cap-and-trade program: We will continue to implement it, *including scheduled auctions and compliance requirements*."  Press Release, CARB Chair Mary D. Nichols Responds to Federal Cap-and-Trade Lawsuit, *available at* https://ww2.arb.ca.gov/news/carb-chair-mary-d-nichols-responds-federal-cap-and-trade-lawsuit (last visited Nov. 19, 2019) (emphasis added).

126.    Defendant Nichols issued this statement to reassure potential participants in the allowance auctions that California does and will still accept allowances issued by Quebec to satisfy California compliance obligations.

127.    Defendant Nichols issued this statement to reassure potential participants in the Allowance auctions that California will continue to be bound by the Agreement.

128.    These undertakings and statements demonstrate that California is continuing to implement the Agreement with Quebec, and California desires Quebec to continue to implement the Agreement with California.

129.    In its ratification of the Agreement, Quebec describes it as "an international agreement."  Gouvernement du Québec, O.C. 1181-2013, 12 Nov. 2013, Environment Quality Act (chapter Q-2) (seventh Whereas clause), *available at* http://www2.publicationsduquebec.gouv.qc.ca/dynamicSearch/telecharge.php?type=1&file=3100.pdf (last visited Nov. 19, 2019).

130.    In this ratification, Quebec also describes the Agreement as "an important international commitment" that requires Quebec to take certain steps.  *Id.* (eighth Whereas clause).

131.    The Agreement and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) have the effect of undermining the ability of the federal government as a whole, and the President in particular, of properly reconciling

protection of the environment, promotion of economic growth, and maintenance of national and energy security.

132.    The Agreement and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) have the effect of undermining the ability of the federal government as a whole, and the President in particular, to speak for the United States with one voice on a variety of complex and sensitive subjects of foreign policy.

133.    The Agreement and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) have the effect of undermining the President's ability to negotiate competitive international agreements in the area of environmental policy.  This is particularly true if California were to make similar arrangements with other foreign powers, or if other states were to do so, in the absence of a declaration by this Court that such arrangements violate the Constitution.  *See*, *e.g.*, WCI's 2018 Tax Return ("Currently, the Board of Directors includes officials from the Provinces of Quebec, Novia [sic] Scotia and the State of California.  The support provided can be expanded to other jurisdictions that join in the future.") (reformatted into sentence case), *available at* http://www.wci-inc.org/fr/docs/TaxForm-USA2018-EN-20190514.pdf at pt. III, § 4a (last visited Nov. 19, 2019).

134.    Upon information and belief, governors of states other than California have spoken to the government of Quebec about the possibility of linking their cap-and-trade program to Quebec's.

135.    Unless and until this Court declares unconstitutional the Agreement and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) and enjoins their operation, these provisions will have the effect of harming the United States' ability to manage its relations with foreign states.

## WESTERN CLIMATE INITIATIVE, INC.

136.    In the Agreement, the parties acknowledge that they are "participants of [the] Western Climate Initiative, Inc. (WCI, Inc.), a non-profit corporation incorporated in October 2011, providing administrative and technical services to its participants to support and facilitate the implementation of their cap-and-trade programs for reducing greenhouse gas emissions." Attachment B (second "WHEREAS" clause).

137.    The Governors of California and several other states, along with the premiers of Quebec and several other Canadian provinces, formed or joined the Western Climate Initiative in February 2007 and thereafter for the purpose of establishing a regional North American carbon market. *See* Western Climate Initiative, Design Recommendations for the WCI Regional Cap-and-Trade Program (Sept. 23, 2008, corrected Mar. 13, 2009) (introductory letter from "The WCI Partners") ("Design Recommendations"), *available at* http://www.environnement. gouv.qc.ca/changements/carbone/documents-WCI/modele-recommande-WCI-en.pdf (last visited Nov. 19, 2019); Western Climate Initiative, Design for the WCI Regional Program at 22 (Jul. 2010) (section on "Linking Programs") ("Design for the WCI Regional Program"), *available at* http://www.environnement.gouv.qc.ca/changements/carbone/documents-WCI/cadre-mise-en-oeuvre-WCI-en.pdf (last visited Nov. 19, 2019).

138.    California and its partners intended that the regional market would serve as a model for adoption by the national governments of the United States and Canada. *See* Design Recommendations at 1.

139.    One of the reasons for creating the regional market was to influence the foreign policies of the national governments. *See id.*

140.    In 2008, the Western Climate Initiative published design recommendations for a regional cap-and-trade program. *See id.*

141.   In 2010, it released its design for the regional program.  *See* Design for the WCI Regional Program.  In November 2011, the Western Climate Initiative formed WCI to further California's and Quebec's commitment to linking their cap-and-trade programs.  *See* Western Climate Initiative News Release, Western Climate Initiative Jurisdictions Establish Non-Profit Corporation to Support Greenhouse Gas Emissions Trading Programs (Nov. 10, 2011), *available at* http://westernclimateinitiative.org/index.php?option=com_content&view=category&layout=blog&id=6&Itemid=6 (last visited Nov. 19, 2019).

142.   In February 2012, CARB and WCI entered into an agreement that acknowledges that they (and other "[p]artner jurisdictions") "established [WCI] to provide coordinated administrative and technical support to linked emissions trading programs implemented by the [participating] jurisdictions."  Agreement 11-415 Between Air Resources Board and Western Climate Initiative, Incorporated, Exhibit A ("Agreement 11-415," attached hereto as Attachment C).

143.   Agreement 11-415 enables political cooperation between California and Quebec.

144.   Entry into Agreement 11-415 grants commercial privileges among California and Quebec.

145.   On March 16, 2017, the Office of the Attorney General of California advised Peter Krause, California's Legal Affairs Secretary, that "[a]ny jurisdiction that wishes to link with the California Program . . . will need to be a member of WCI, Inc. and will use the California-developed infrastructure for the combined Programs."  Letter from Robert W. Byrne, Senior Assistant Attorney General, to Peter Krause, Legal Affairs Secretary (Mar. 16, 2017), *available at* https://ww3.arb.ca.gov/cc/capandtrade/linkage/linkage.htm ("Attorney General's Advice to Governor Concerning Program Linkage") (last visited Nov. 19, 2019).

146.    In Agreement 11-415, CARB and WCI further acknowledge that WCI "enables cap-and-trade programs to be administered at a lower cost than would be possible with independent administration by each of the WCI [p]artner jurisdictions." *Id*.

147.    According to Agreement 11-415, WCI "provides a framework that can be expanded as more jurisdictions implement their respective programs." *Id.* Nova Scotia became a participating jurisdiction in the WCI in 2018. *See* Funding Agreement at 16, *available at* http://wci-inc.org/docs/Nova%20Scotia%20Funding%20Agreement_for%20web%20posting.pdf (last visited Nov. 19, 2019). "Nova Scotia intends to have regulations in effect in 2018 to establish its cap and trade program that could ultimately be linked to those in place in . . . Quebec and California." *Id.* at 1.

148.    Upon information and belief, WCI serves California, Quebec, and Nova Scotia jointly, not individually, and thus violates the Constitution by complicating and burdening the United States' task of regulating foreign commerce and negotiating competitive international agreements.

149.    By the nature of its work and its contractual obligations to participants in the Agreement, WCI is an "other person[] . . . in active concert or participation" (within the meaning of the Federal Rules of Civil Procedure) with the other Defendants to this suit and is aiding and abetting the other Defendants' unlawful actions. As a result, in order for complete relief to be afforded to the United States, WCI must be subject to any injunctive relief that is ordered in this case against the other Defendants.

150.    Provision of joint service by WCI to its member states occurs because of the stated "integrated" nature of the programs, and the proof of such joint service is in the possession and control of Defendants, most particularly WCI.

151.   Since California's and Quebec's cap-and-trade programs were integrated through linkage, WCI has claimed that the WCI partnership "represents the largest carbon market in North America, and the only one developed and managed by governments from two different countries."  WCI, Annual Report – 2018: Activities and Accomplishments at 1, *available at* http://www.wci-inc.org/docs/AnnualReport-2018-20190514f-EN.pdf (last visited Nov. 19, 2019).

## DECLARATORY RELIEF

152.   The United States incorporates by reference the allegations in Paragraphs 1 to 151.

153.   There is an actual controversy between the United States and Defendants with respect to the constitutionality of the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43).

154.   This Court has authority under 28 U.S.C. § 2201(a) to declare the legal rights and obligations of the parties with respect to the constitutionality of the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43).

155.   Because the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) violate the Constitution, this Court should declare them unlawful.

## FIRST CAUSE OF ACTION—TREATY CLAUSE

156.   The United States incorporates by reference the allegations in Paragraphs 1 to 151.

157.   The Constitution prohibits states from "enter[ing] into any Treaty, Alliance, or Confederation."  Art. I, § 10, cl. [1].

158. The Supreme Court has recognized and held that, "[w]hen a State enters the Union, it surrenders certain sovereign prerogatives.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] *it cannot negotiate an emissions treaty with China or India . . . ."* *Massachusetts*, 549 U.S. at 519 (emphasis added).

159. The Agreement is such an emissions treaty.

160. The Agreement constitutes a "Treaty, Alliance, or Confederation" in violation of the Treaty Clause.

## SECOND CAUSE OF ACTION—COMPACT CLAUSE

161. The United States incorporates by reference the allegations in Paragraphs 1 to 151.

162. The Constitution prohibits states, "without the Consent of Congress," from "enter[ing] into any Agreement or Compact . . . with a foreign Power . . . ."  Art. I, § 10, cl. [3].

163. If the Agreement is not a "Treaty, Alliance, or Confederation" under the Treaty Clause, the Agreement is an "Agreement or Compact . . . with a foreign Power" under the Compact Clause.

164. Because Congress has not given its consent to the Agreement, nor have Defendants sought such consent, the Agreement and supporting California law as applied violate the Compact Clause.

## THIRD CAUSE OF ACTION—FOREIGN AFFAIRS DOCTRINE

165. The United States incorporates by reference the allegations in Paragraphs 1 to 151.

166. The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made,

under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. [2].

167. Even aside from his military powers as the "Commander in Chief of the Army and Navy," Art. II, § 2, cl. [1], the Constitutions vests broad responsibility for the conduct of foreign affairs in the President of the United States.

168. The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id.* cl. [2].

169. The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id.*

170. The President "receive[s] Ambassadors and other public Ministers." *Id.* § 3.

171. The Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id.*

172. In short, "the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution." *Hines*, 312 U.S. at 62.

173. The Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the states that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise implicate the conduct of foreign policy. *See Garamendi*, 539 U.S. at 418-20.

174. The Agreement, Agreement 11-415, and supporting California law fall outside the area of any traditional state interest.

175. By adopting the UNFCCC, the federal government undertook to formulate foreign policy with respect to the "stabilization of greenhouse gas concentrations in the

atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id.*, Art. 2.

176. Upon information and belief, the Agreement could have the effect of undermining or complicating the United States' relations with Canada if a dispute were to arise between California and Quebec as to the validity or quantity of allowances and offsets issued by one and expendable in the other.

177. Upon information and belief, the Agreement could have the effect of undermining or complicating the United States' relations with Canada if a dispute were to arise between California and Quebec as to the proper method of enforcing the terms of one jurisdiction's program against entities located in the other.

178. Defendants' actions individually and collectively interfere with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' participation in UNFCCC and announcement of its intention to withdraw from the Accord, and are therefore preempted.

## **FOURTH CAUSE OF ACTION—FOREIGN COMMERCE CLAUSE**

179. The United States incorporates by reference the allegations in Paragraphs 1 to 151.

180. The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. [2].

181. The Constitution gives Congress "Power . . . [t]o regulate Commerce with foreign Nations . . . ." Art. I, § 8, cl. [3].

182.    The Supreme Court has interpreted the Foreign Commerce Clause to have a negative application, in the sense that state laws that discriminate against, or impose an undue burden upon, foreign commerce, are unconstitutional even in the absence of federal legislation regulating the activity in question. *See Barclays Bank PLC*, 512 U.S. at 310-13.

183.    The credits and offsets that covered entities may trade under the Agreement and supporting California law constitute articles of commerce.

184.    Under the Agreement, 17 CCR §§ 95940-43, and Agreement 11-415, these credits and offsets may only be imported from Quebec to California or exported from California to Quebec.

185.    The Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564, and 17 CCR §§ 95940-43) discriminate among categories of foreign commerce on their face or as applied.

186.    California has no legitimate public interest in discriminating among categories of foreign commerce.

187.    The Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) impose a substantial and undue burden on foreign commerce.

## **PRAYER FOR RELIEF**

Wherefore, the United States prays that the Court enter judgment against Defendants and award the following relief:

a.    a declaration that the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) violate the Constitution of the United States;

b.     a permanent injunction against the operation and implementation of the

Agreement, Agreement 11-415, and supporting California law as applied (including CAL.

HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) and against all other persons or

entities acting in active concert with Defendants to maintain the force and operation of the

Agreement;

c.     the costs of suit; and

d.     such additional relief as the Court deems just and proper.

<div style="margin-left:50%">

Respectfully submitted,

_____
/s/ Paul E. Salamanca
JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
PETER J. MCVEIGH
Attorneys
Environment & Natural Resources Division
U.S. Department of Justice

</div>