JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
R. JUSTIN SMITH
PETER J. MCVEIGH
STEVEN W. BARNETT
Attorneys
Environment & Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 2139
Washington, D.C. 20530

Attorneys for the United States

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 2:19-cv-02142-WBS-EFB |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF UNITED STATES OF** |
| v. | ) | **AMERICA'S NOTICE OF MOTION,** |
| | ) | **MOTION FOR SUMMARY JUDGMENT,** |
| THE STATE OF CALIFORNIA; GAVIN | ) | **AND BRIEF IN SUPPORT THEREOF** |
| C. NEWSOM, in his official capacity as | ) | |
| Governor of the State of California; THE | ) | |
| CALIFORNIA AIR RESOURCES BOARD; | ) | |
| MARY D. NICHOLS, in her official | ) | |
| capacities as Chair of the California Air | ) | |
| Resources Board and as Vice Chair and a | ) | |
| board member of the Western Climate | ) | |
| Initiative, Inc.; WESTERN | ) | |
| CLIMATE INITIATIVE, INC.; JARED | ) | Date:      January 13, 2020 |
| BLUMENFELD, in his official capacities as | ) | Time:      1:30 p.m. |
| Secretary for Environmental Protection and as | ) | Courtroom: 5 (14th Floor) |
| a board member  of the Western Climate | ) | Judge:      Hon. William B. Shubb |
| Initiative, Inc.; KIP LIPPER, in his official | ) | |
| capacity as a board member of the Western | ) | |
| Climate Initiative, Inc., and RICHARD | ) | |
| BLOOM, in his official capacity as a board | ) | |
| member of the Western Climate Initiative, | ) | |
| Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on Monday, January 13, 2020, or as soon thereafter as the matter may be heard in Courtroom 5 of the above-entitled Court (Hon. William B. Shubb presiding), located at 501 "I" Street, Sacramento, California 95814, Plaintiff United States of America (the "United States") will move for summary judgment, as set forth below.

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 260(a), "a party [may] move for summary judgment at any time, *even as early as the commencement of the action*." Fed. R. Civ. P. 56 (Advisory Committee Notes to 2009 Amendment) (emphasis added). Because there is no genuine dispute as to any material fact related to the claims on which the United States moves, and it is entitled to judgment as a matter of law, the United States hereby expeditiously seeks summary judgment against all Defendants. This motion is based on the following brief, on the supporting evidence filed concurrently herewith, on the arguments of counsel that may be made at any hearing on this matter, and on all relevant documents on file in this action.

# TABLE OF CONTENTS

Page

NOTICE OF MOTION ........................................................................................................ ii

MOTION FOR SUMMARY JUDGMENT ........................................................................ ii

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION .............................................................................................................. 1

I.  BACKGROUND ........................................................................................................... 3

    A.    California's foreign policy. ................................................................... 3

    B.    The United States' foreign policy. ..................................................... 10

    C.    Procedural history. ............................................................................. 12

SUMMARY OF ARGUMENT ........................................................................................ 12

ARGUMENT .................................................................................................................... 13

I.    The Agreement violates the Article I Treaty Clause.......................................... 14

    A.    The Agreement is a "Treaty" for purposes of the Article I Treaty Clause because it constitutes a political alliance. .................................. 14

    B.    The Agreement is a binding instrument. ............................................ 16

II.    The Agreement at a minimum violates the Compact Clause........................... 18

    A.    The Agreement is a "Compact" under the Compact Clause because of its emphatically non-local character. ............................................... 18

    B.    The United States' decision to withdraw from the Paris Agreement supports the instant action......................................................... 26

CONCLUSION ................................................................................................................ 27

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*Am. Elec. Power Co. v. Connecticut*,
5
   564 U.S. 410 (2011).............................................................................26

6

*American Ins. Assn. v. Garamendi*,
   539 U.S. 396 (2003)....................................................................2, 3, 21

7

*Anderson v. Liberty Lobby, Inc.*,
8
   477 U.S. 242 (1986)....................................................................13, 14

9

*B. Altman & Co. v. United States*,
   224 U.S. 583 (1912).............................................................................16

10

*Baker v. Carr*,
11
   369 U.S. 186 (1962)..............................................................................2

12

*City of Milwaukee v. Illinois*,
   451 U.S. 304, (1981).............................................................................26

13

*Crosby v. National Foreign Trade Council*,
14
   530 U.S. 363 (2000)...................................................................3, 21, 22

15

*Dames & Moore v. Regan*,
   453 U. S. 654 (1981).............................................................................22

16

*Electric Cooperative Corp. v. Arkansas Public Service Commission*,
17
   461 U.S. 375, (1982).............................................................................27

18

*Garcia v. Texas*,
   564 U.S. 940 (2011).............................................................................17

19

*Hines v. Davidowitz*,
20
   312 U.S. 52 (1941)...................................................................2, 22, 26, 27

21

*International Paper Co. v. Ouellette*,
   479 U.S. 481 (1986).............................................................................25

22

*Ludecke v. Watkins*,
23
   335 U.S. 160 (1948)...........................................................................1, 16

24

*Made in the USA Found. v. United States*,
   242 F.3d 1300 (11th Cir. 2001)..........................................14, 15, 16

25

*Massachusetts v. EPA*,
26
   549 U.S. 497 (2007)...........................................................................1, 14

27

*Movsesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012)..............................................................2

28

*NLRB v. Noel Canning*,
  134 S. Ct. 2550 (2014) ..................................................................... 23

*Northeast Bancorp, Inc. v. Board of Governors of Federal Reserve System*,
  472 U.S. 159 (1985) ......................................................................... 24

*Swoger v. Rare Coin Wholesalers*,
  803 F.3d 104 (9th Cir. 2015) .............................................................. 3

*United States Steel Corp. v. Multistate Tax Comm'n*,
  434 U.S. 452 (1978) ............................................................... 13, 14, 25

*United States v. Curtiss Wright Export Corp.*,
  299 U.S. 304 (1936) ....................................................................... 1, 16

*United States v. Pink*,
  315 U.S. 203 (1942) ......................................................................... 16

*Virginia v. Tennessee*,
  148 U.S. 503 (1893) ...................................................................passim

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ......................................................................... 24

*Zivitovsky v. Kerry*,
  135 S. Ct. 2076 (2015) ..................................................................... 23

**Constitutional Provisions**

Art. 1, § 10, cl. 1 ..........................................................................passim

Art. I, § 10, cl. 3 ..........................................................................passim

Art. II, § 2, cl. 2 ............................................................................... 10

Art. VI, § 2, cl 2 ............................................................................... 10

**Statutes**

33 U.S.C. § 535a ............................................................................... 23

72 Stat. 1701 .................................................................................... 23

Act of Jul. 24, 1968, Pub. L. No. 90-419, 82 Stat. 414 ....................... 23

Act of Jun. 25, 1949, ch. 246, 63 Stat. 271, 272 ............................... 22

Act of Sept. 2, 1958, Pub. L. No. 85-877, § 1 ................................... 23

CAL. HEALTH & SAFETY CODE § 38564 .........................................5, 18

S.J. Res. 13, 110th Cong., Pub. L. No. 110-171, 121 Stat. 2467 (2007) ............................ 23

**Regulations**

17 Cal. Code Regs. § 95811, 95812, 95820, 95820(c), 95890, 95922, 95970(a)(1) ...........7

17 Cal. Code Regs. § 95940.................................................................................5, 18

17 Cal. Code Regs. § 95943......................................................................................18

17 Cal. Code Regs. § 95993........................................................................................5

17 Cal. Code Regs. §§ 95801-96022 ...................................................................4, 5, 7

17 Cal. Code Regs. §§ 95850-95858 ...........................................................................7

17 Cal. Code Regs. §§ 95910-95915 ...........................................................................7

17 Cal. Code Regs. §§ 95920-95922 ...........................................................................7

82 Fed. Reg. 16093 (Mar. 28, 2017)..........................................................................11

82 Fed. Reg. 16096 (Mar. 28, 2017)..........................................................................11

**Court Rules**

Fed. R. Civ. P. 56....................................................................................................ii

Fed. R. Civ. P. 56(a) Advisory Committee Notes to 2009 Amendment.......................iii, 13

Local Rule 260(a)......................................................................................................ii

**Federal Documents**

Michael R. Pompeo, Press Statement, On the U.S. Withdrawal from the Paris Agreement, *available at* https://www.state.gov/on-the-u-s-withdrawal-from-the-paris-agreement/ (last visited Dec. 11, 2019) ........................................................................27

Promoting Energy Independence and Economic Growth, Exec. Order No. 13,783..........11

S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into force Mar. 21, 1994) ..........10

Statement by President Trump on the Paris Climate Accord, Jun. 1, 2017, *available at* https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (last visited Dec. 11, 2019) .........................................................1, 2, 12

The Great Lakes Basin Compact: Hearing on S. 2688 Before the Subcomm. on the Great Lakes Basin of the S. Comm. on Foreign Relations, 84th Cong. 14 (1956)...................23

**Periodicals**

Adam Tanner, Schwarzenegger: California is 'Nation State' Leading World, Washington Post (Jan. 9, 2007), *available at* http://www.washingtonpost.com/wp-

dyn/content/article/2007/01/09/AR2007010901427.html (last visited Dec. 11, 2019) ... 5, 20

Douglas A. Kysar & Bernadette A. Meyler, *Like a Nation State*, 55 U.C.L.A. L. REV. 1621 (2008) ................................................................................................ 5, 20

Duncan B. Hollis, *Elusive Foreign Compact, The*, 73 Mo. L. Rev. 1071 (Fall 2008) ....... 22

Javier C. Hernández & Chris Buckley, Xi Jinping and Jerry Brown of California Meet to Discuss Climate Change, N.Y. Times (June 6, 2017), *available at* https://www.nytimes.com/2017/06/06/world/asia/xi-jinping-china-jerry-brown-california-climate.html (last visited Dec. 11, 2019) .................................... 21

**Other Materials**

Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions available at https://ww3.arb.ca.gov/cc/capandtrade/linkage/2017_linkage_agreement_ca-qc-on.pdf (last visited Dec. 11, 2019) ...................................................................... passim

Archived – Cap and trade, *available at* https://www.ontario.ca/page/cap-and-trade (last visited Dec. 11, 2019) ............................................................................ 7

California Cap-and-Trade Program, Cap-and-Trade Auctions and Reserve Sales Financial Services Administration (Aug. 24, 2018), *available at* https://ww3.arb.ca.gov/cc/capandtrade/auction/forms/financial_services _administration_faq.pdf (last visited Dec. 11, 2019) .............................................................................................. 9

California Cap-and-Trade Program, Summary of Proceeds to California and Consigning Entities, *available at* https://ww3.arb.ca.gov/cc/capandtrade/auction/proceeds_summary.pdf (last visited Dec. 11, 2019) ........................................ 8

California Tropical Forest Standard: Criteria for Assessing Jurisdiction-Scale Programs that Reduce Emissions from Tropical Deforestation, *available at* https://ww3.arb.ca.gov/cc/ghgsectors/tropicalforests/ca _tropical_forest_standard_english.pdf (last visited Dec. 11, 2019) ............................... 5

CARB, Auction Notices and Reports, *available at* https://ww3.arb.ca.gov/cc/capandtrade/auction/auction_notices_and_reports.htm (last visited Dec. 11, 2019) ........ 8

CARB, Chapter 5: How Do I Buy, Sell, and Trade Compliance Instruments?, *available at* https://ww3.arb.ca.gov/cc/capandtrade/guidance/chapter5.pdf (last visited Dec.10, 2019) ................................................................................................ 9

CARB, Detailed Auction Requirements and Instructions, *available at* https://ww3.arb.ca.gov/cc/capandtrade/auction/auction_requirements.pdf at pt. IX, p. 43 (last visited Dec. 11, 2019) ................................................................. 9

CARB, Final Environmental Analysis for the Strategy for Achieving California's 2030 Greenhouse Gas Target (Nov. 30, 2017) (2017 AB 32 Scoping Plan, Attachment A: Environmental and Regulatory Setting), *available at* https://ww3.arb.ca.gov/cc/scopingplan/2030sp_appf_finalea.pdf (last visited Dec. 11, 2019) ............................ 4

CARB, Linkage, September 2018 Update: Linkage with Ontario Cap-and-Trade Program, *available at* https://ww3.arb.ca.gov/cc/capandtrade/linkage/linkage.htm (last visited Dec. 11, 2019) ...................................................................................................17

Climate Change Partnerships, Working Across Agencies and Beyond Borders, *available at* https://www.climatechange.ca.gov/climate_action_team/partnerships.html (last visited Dec. 11, 2019) .........................................................................................2, 20, 21

Facts About Holding Limit for Linked Cap-and-Trade Programs, *available at* https://www.arb.ca.gov/cc/capandtrade/holding_limit.pdf at [2] (last visited Dec. 11, 2019) ................................................................................................................. 7

THE FEDERALIST NO. 4 (John Jay) (Clinton Rossiter ed., Signet 2003)..............................2

Letter from Robert W. Byrne, Senior Assistant Attorney General, to Peter Krause, Legal Affairs Secretary, Mar. 16, 2017, *available at* https://ww3. arb.ca.gov/cc/capandtrade/linkage/linkage.htm (Attorney General's Advice to Governor Concerning Program Linkage) (last visited Dec. 11, 2019) .........................................24

Regulation Respecting a Cap-and-Trade System for Greenhouse Gas Emission Allowances (chapter Q-2, r. 46.1, Appendix B.1(2) (s. 37)) *available at* http://legisquebec.gouv.qc.ca/en/pdf/cr/Q-2,%20R.%2046.1.pdf (last visited Dec. 11, 2019) ................................................................................................................6

Welcome to WCI CITSS, *available at* https://www.wci-citss.org/ (last visited Dec. 11, 2019) ................................................................................................................9

Western Climate Initiative, Design for the WCI Regional Program at 22 (Jul. 2010) (section on "Linking Programs") ("Design for the WCI Regional Program"), *available at* http://www.environnement.gouv.qc.ca/changements/carbone/documents-WCI/cadre-mise-en-oeuvre-WCI-en.pdf (last visited Dec. 11, 2019) .................................................6

Western Climate Initiative, Design Recommendations for the WCI Regional Cap-and-Trade Program (Sept. 23, 2008, corrected Mar. 13, 2009) (introductory letter from "The WCI Partners") ("Design Recommendations"), *available at* http://www.environnement. gouv.qc.ca/changements/carbone/documents-WCI/modele-recommande-WCI-en.pdf (last visited Dec. 11, 2019) ...............................................................................6

**INTRODUCTION**

In *Massachusetts v. EPA*, the Supreme Court wrote, "When a State enters the Union, *it surrenders certain sovereign prerogatives*.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] *it cannot negotiate an emissions treaty with China or India . . . .*" 549 U.S. 497, 519 (2007) (emphasis added).  The Constitution simply forbids states to enter into agreements with foreign powers that would usurp the federal government's responsibility for foreign affairs.  *See* Art. I, § 10, cl. 1, 3.  Yet California's Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions of 2017 with the Canadian province of Quebec is just such an unconstitutional agreement.  The text, structure, and history of the Constitution bar states from having their own foreign policy.  California's Agreement with Quebec further compounds the constitutional injury because it has the effect of undermining the United States' foreign policy.

As the Supreme Court has repeatedly recognized, the President is "the guiding organ in the conduct of our foreign affairs."  *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948).  He is "the constitutional representative of the United States with regard to foreign nations."  *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936).  Thus, as to foreign policy, the President possesses "plenary and exclusive power" in conducting foreign affairs "as the sole organ of the federal government in the field of international relations."  *Id.* at 320.  And the President has concluded as a matter of the United States' foreign policy that the Paris Agreement of 2015 relating to climate change, including the emission of greenhouse gases – which falls directly into the same area as California's Agreement with Quebec – "disadvantages the United States to the exclusive benefit of other countries, leaving American workers — who I love — and taxpayers to absorb the cost in terms of lost jobs, lower wages, shuttered factories, and vastly diminished economic production."   Statement by President Trump on the Paris Climate Accord, Jun. 1, 2017, *available at* https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (last visited Dec. 11, 2019) (Plaintiff United States of America's Statement of Undisputed Facts ("SUF") ¶ 8 (filed concurrently herewith)).  On this basis he has stated that the

United States would "begin negotiations to reenter either the Paris Accord or a really entirely new transaction on terms that are fair to the United States, its businesses, its workers, its people, its taxpayers." *Id.* On November 4, 2019, the United States submitted formal notification of its withdrawal from the Paris Agreement. *See* SUF ¶ 11. Interfering in and contrary to the foreign policy of the United States, California is continuing its own international greenhouse gas Agreement and conducting its own foreign policy. And it has admitted that it pursues initiatives such as these in "response to President Trump's decision to withdraw from the Paris Agreement." *See* Climate Change Partnerships, Working Across Agencies and Beyond Borders, *available at* https://www.climatechange.ca.gov/climate_action_team/partnerships.html (last visited Dec. 11, 2019) (second "Multilateral Agreement") (explaining why California and other states formed the United States Climate Alliance) (SUF ¶¶ 13, 16).

The Constitution gives the federal government exclusive responsibility to conduct our nation's foreign affairs. *See Hines v. Davidowitz*, 312 U.S. 52, 63 (1941). This is to ensure the United States speaks with one voice on the international stage and to enable the federal government to negotiate competitive agreements on behalf of the nation as whole. *See Baker v. Carr*, 369 U.S. 186, 211 (1962). As John Jay presciently wrote in 1787, foreign powers could take advantage of our country if they found "each State doing right or wrong, as to its rulers may seem convenient[,] or split into three or four independent and probably discordant republics or confederacies, one inclining to Britain, another to France, and a third to Spain, and perhaps played off against each other by the three, what a poor, pitiful figure will America make in their eyes!" THE FEDERALIST No. 4, at 44 (John Jay) (Clinton Rossiter ed., Signet 2003) (internal parentheses omitted).

Indeed, the Supreme Court has previously invalidated California laws less invidious and conflicting with United States foreign policy than this. *See American Ins. Assn. v. Garamendi*, 539 U.S. 396, 424 (2003); *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1077 (9th Cir. 2012) ("Because California Code of Civil Procedure section 354.4 does not concern an area of traditional state responsibility and intrudes on the field of foreign affairs entrusted exclusively to the federal government, we hold that section 354.4 is preempted."). Once again, "if the

1  [California] law is enforceable the President has less to offer and less economic and diplomatic

2  leverage as a consequence." *Garamendi,* 539 U.S. at 424 (quoting *Crosby v. National Foreign*

3  *Trade Council*, 530 U.S. 363, 377 (2000)) (bracket insert original).  So this Court "need not get

4  into any general consideration of limits of state action affecting foreign affairs to realize that the

5  President's maximum power to persuade rests on his capacity to bargain for the benefits of access

6  to *the entire national economy* without exception for *enclaves fenced off willy-nilly by inconsistent*

7  *political tactics*."  *Crosby v. National Foreign Trade Council*, 530 U.S 363, 381 (2000) (emphasis

8  added).

9        The rules of civil procedure allow a plaintiff to move for summary judgment before the

10  defendant has answered; indeed, even at "the commencement of a case."  Fed. R. Civ. P. 56(a)

11  Advisory Committee Notes to 2009 Amendment.   And California's facially unconstitutional

12  Agreement with Quebec and related public statements and documents speak for themselves.  No

13  discovery on the moved-for claims is necessary or appropriate.   No delay or extending civil

14  proceedings are needed.  *See Swoger v. Rare Coin Wholesalers*, 803 F.3d 1045, 1048 (9th Cir.

15  2015) (affirming district court's denial of further discovery) ("The court also observed that since

16  the primary issue on summary judgment was a pure question of law, further depositions were

17  unlikely to be helpful.").  The United States respectfully requests the Court grant its motion for

18  summary judgment on its first and second claims and hold that California's Agreement is barred

19  by the Constitution.[1]

## I. BACKGROUND

21     **A.    California's foreign policy.**

22        By California's own statements, it has set out to address "a global problem."  According

23  to Defendant California Air Resources Board ("CARB"):

24        Climate change is a global problem. *GHGs are global pollutants, unlike criteria air*
        *pollutants and toxic air contaminants, which are pollutants of regional and local*
25        *concern.*  Whereas pollutants with localized air quality effects have relatively short

---

27  [1]The United States does not abandon its remaining two causes of action.  It simply presents
    these two causes of action today to promote expeditious resolution of the case.

atmospheric lifetimes (about one day), GHGs have long atmospheric lifetimes (one to several thousand years).  GHGs persist in the atmosphere for long enough time periods to be dispersed around the globe. . . . The quantity of GHGs in the atmosphere that ultimately result in climate change is not precisely known, but is enormous; *no single project alone would measurably contribute to an incremental change in the global average temperature, or to global, local, or micro climates.*

CARB, Final Environmental Analysis for the Strategy for Achieving California's 2030 Greenhouse Gas Target (Nov. 30, 2017) (2017 AB 32 Scoping Plan, Attachment A: Environmental and Regulatory Setting, at 24-25) (emphasis added), *available at* https://ww3.arb.ca.gov/cc/scopingplan/2030sp_appf_finalea.pdf (last visited Dec. 11, 2019) (SUF ¶¶ 24-26).

For purposes of this case, "cap-and-trade" describes a regulatory system that sets out to address what California identifies as "a global problem."  The system at issue here imposes an aggregate cap on emission of greenhouse gases ("GHGs") into the air from a defined geographic area.  California then sells or grants "allowances" that entitle holders thereof to emit a specified quantity of GHGs into the air in that geographic area.  The law also creates a secondary market in which such allowances are bought and sold.  It is thus both a regulatory policy and a trade agreement that differ from federal foreign policy.

Although allowances are bought and sold – *in the millions* – like hog bellies, they also represent incremental permits.  The allowances are precisely calibrated promises by the government to establish and enforce limits on emissions.  In other words, although sophisticated, *cap-and-trade is undeniably regulatory*.  The allowances that make cap-and-trade possible are entirely derivative of the political process.  If California and Quebec did not possess the coercive powers uniquely marking them out as governments to punish entities that emit GHGs beyond their allowances, neither the allowances themselves nor the market in which they are traded would exist.

California first adopted regulations to establish an internal cap-and-trade program in 2011.  *See* 17 Cal. Code Regs. ("CCR") §§ 95801-96022 (SUF ¶ 33).  But from the beginning, California intended its program to transcend national boundaries.  This demonstrated that the goal of the Agreement and similar initiatives has little to do with local concerns.  For example, the California Global Warming Solutions Act (AB 32), enacted in 2006, requires Defendant CARB to "facilitate

1    the development of integrated . . . *regional, national, and international* greenhouse gas reduction

2    programs." *Id.* (codifed at CAL. HEALTH & SAFETY CODE § 38564) (emphasis added) (SUF ¶ 23).

3    Similarly, 17 CCR § 95940, adopted in 2011 along with California's internal program, anticipates

4    that "compliance instrument[s] issued by an *external* greenhouse gas emissions trading system . . .

5    may be used to meet" the state's regulatory requirements, provided the external system satisfies

6    certain criteria. *Id.* § 9540 (emphasis added) (SUF ¶ 43). Also in 2011, CARB adopted regulations

7    to facilitate links between California's program and initiatives in developing countries to protect

8    tropical forests. *See, e.g., id.* § 95993 (providing that credits "may be generated from . . . Reducing

9    Emissions from Deforestation and Forest Degradation (REDD) Plans").[2]

10          These agreements reflect California's extraterritorial aspirations. In fact, California's

11    journey toward a meeting-of-the-minds with Quebec started in 2006 with the passage of AB 32,

12    noted above. In that year, then-Governor Arnold Schwarzenegger declared that California was a

13    "nation state" with its own foreign policy. Douglas A. Kysar & Bernadette A. Meyler, *Like a*

14    *Nation State*, 55 U.C.L.A. L. REV. 1621, 1622 (2008) (quoting the Governor's remarks on

15    California's "own foreign policy" with respect to climate) (SUF ¶ 19). He said this with British

16    Prime Minister Tony Blair at his side. *See id.* Not long after, he said "[w]e are the modern

17    equivalent of the ancient city-states of Athens and Sparta. California has the ideas of Athens and

18    the power of Sparta . . . . Not only can we lead California into the future . . . we can show the

19    nation and the world how to get there. We can do this because we have the economic strength, the

20    population, the technological force of a nation-state." Adam Tanner, Schwarzenegger: California

21    is 'Nation State' Leading World, Washington Post (Jan. 9, 2007) (paragraph break omitted),

22    *available at* https://www.washingtonpost.com/wp-dyn/content/article/2007/01/09/AR200701090

23    1427.html (last visited Dec. 11, 2019) (SUF ¶ 20).

24

25    _____

26    [2]On September 19, 2019, CARB adopted criteria for evaluating REDD Plans, although it has yet
      to approve a formal link with any such plan. See California Tropical Forest Standard: Criteria for
      Assessing Jurisdiction-Scale Programs that Reduce Emissions from Tropical Deforestation,

27    *available at* https://ww3.arb.ca.gov/cc/ghgsectors/tropicalforests/ca_tropical_forest_standard_
      english.pdf (last visited Dec. 11, 2019) (SUF ¶ 44).

28

Beginning in February 2007, the governors of several states, including California, along with the premiers of several provinces, including Quebec, formed or joined the Western Climate Initiative, the parent of Defendant Western Climate Initiative, Inc., to establish a North American market to regulate GHGs.  *See* Western Climate Initiative, Design Recommendations for the WCI Regional Cap-and-Trade Program (Sept. 23, 2008, corrected Mar. 13, 2009) (introductory letter from "The WCI Partners") ("Design Recommendations"), *available at* http://www.environnement.gouv.qc.ca/changements/carbone/documents-WCI/modele-recommande-WCI-en.pdf (last visited Dec. 11, 2019); Western Climate Initiative, Design for the WCI Regional Program at 22 (Jul. 2010) (section on "Linking Programs") ("Design for the WCI Regional Program"), *available at*  http://www.environnement.gouv.qc.ca/changements/carbone/documents-WCI/cadre-mise-en-oeuvre-WCI-en.pdf (last visited Dec. 11, 2019) (SUF ¶¶ 28-29).

In 2008, Western Climate Initiative released its design recommendations.  This was followed in 2010 by its actual design for a transnational program.  *See* Design Recommendations, *supra*; Design for the WCI Regional Program, *supra.* (SUF ¶¶ 29-30).   The design called for linkage of markets across jurisdictions to, among other things, increase liquidity and create economies of scale.  *See* Design for the WCI Regional Program, *supra*, at 22.  (SUF ¶ 31).  Smaller jurisdictions, like Quebec, would be able to link to larger ones, like California.  This linkage would stabilize the smaller states' own systems and, in some cases, make them viable.  *See id.* (SUF ¶ 32).

In October 2011, California adopted its internal program on the basis of Western Climate Initiative's design.  Quebec followed suit in December 2011.  Regulation Respecting a Cap-and-Trade System for Greenhouse Gas Emission Allowances (chapter Q-2, r. 46.1, Appendix B.1(2) (s. 37)) *available at* http://legisquebec.gouv.qc.ca/en/pdf/cr/Q-2,%20R.%2046.1.pdf (last visited Dec. 11, 2019) (SUF ¶ 45).  In November 2011, between these events, Western Climate Initiative formed Defendant Western Climate Initiative, Inc. ("WCI") to facilitate linkage of the two programs.  (SUF ¶ 46).

Although California's cap-and-trade program has many moving parts, they ultimately reflect the description set forth above. *See* 17 CCR §§ 95801-96022 (SUF ¶ 33). "Covered entities" include manufacturers, generators of electrical power, suppliers of natural gas, and others whose annual output of GHGs equals or exceeds specific thresholds. *See id.* §§ 95811, 95812. For each metric ton of $CO_2$ or $CO_2$ equivalent that a covered entity emits into the air, it must "surrender" a "compliance instrument." *See id.* § 95820(c) (SUF ¶ 35). There are two types of such instruments: "allowances" and "offset credits." *See id.* § 95820 (SUF ¶ 36). CARB distributes allowances to covered entities through various methods, *see, e.g., id.* § 95890, but the limits become stricter over time. *See id.* §§ 95850-95858. Covered entities may obtain additional allowances by buying them at periodic auctions, *see id.* §§ 95910-95915, or from other authorized parties, *see id.* §§ 95920-95922 (SUF ¶ 37). They can also obtain offset credits by undertaking projects (such as forestry projects) designed to remove $CO_2$ from the atmosphere, *see id.* § 95970(a)(1) (SUF ¶ 39). Covered entities are also permitted to "bank" instruments, *see id.* § 95922, although California restricts the total number an entity may hold at one time. *See* Facts About Holding Limit for Linked Cap-and-Trade Programs, *available at* https://www.arb.ca.gov/cc/capandtrade/holding_limit.pdf at 2 (last visited Dec. 11, 2019) (SUF ¶ 40). Covered entities may bank compliance instruments through 2030. *Id.* (SUF ¶ 41).

The current Agreement, as renegotiated in 2017, integrates California's program with that of Quebec in a virtually seamless web.[3]  In fact, the word "harmonize," or one of its cognates, appears *thirty-seven times* in the Agreement. SUF ¶ 50. Among many other things, the Agreement requires the parties to evaluate their programs on a continuous basis to "promote continued harmonization and integration." *Id.*, Art. 4 (SUF ¶ 51). And, although the Agreement allows a

---

[3]The current agreement, as renegotiated in 2017, is available at https://ww3.arb.ca.gov/cc/capandtrade/linkage/2017_linkage_agreement_ca-qc-on.pdf (last visited Dec. 11, 2019) (SUF ¶ 45). This document is entitled "Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions" and is referred to herein as "the Agreement." Ontario was briefly a party to the Agreement but withdrew in July 2018. *See* Archived – Cap and trade, *available at* https://www.ontario.ca/page/cap-and-trade (last visited Dec. 11, 2019) (SUF ¶ 70).

party to "*consider* making changes to its . . . program," it goes on to provide that "any proposed changes or additions *shall be discussed between the Parties*." *Id.*, Art. 4 (SUF ¶ 52) (emphasis added). It even provides that, where differences arise between "elements" of the parties' programs, "the Parties shall determine if such elements need to be harmonized for the proper functioning and integration of the programs." *Id.* (SUF ¶ 53). The parties also agree to consult with each other before making changes to the "offset components" of their programs. *See id.*, Art. 5 (SUF ¶ 54).

The Agreement even establishes a mechanism for the resolution of differences. *See id.*, Art. 20 ("If approaches for resolving differences . . . cannot be developed in a timely manner through staff workgroups, the Parties shall constructively engage through the Consultation Committee, and if needed with additional officials of the Parties, or their designees."); *id.*, Art. 13 (establishing the Consultation Committee) (SUF ¶ 55). On technical issues, the parties agree to rely on Defendant WCI. *See id.*, Art. 12 (noting that WCI "was created to perform such services") (SUF ¶ 56). Finally, the Agreement provides that "auctioning of compliance instruments by the Parties' respective programs shall occur jointly." *Id.*, Art. 9 (SUF ¶ 57). In short, what we have here is a complex, highly integrated *regulatory apparatus*.

Implementation of the Agreement is punctuated by joint auctions, which have been many in number. In fact, as of August 20, 2019, twenty such auctions had taken place under the Agreement and its predecessor. See CARB, Auction Notices and Reports, *available at* https://ww3 .arb.ca.gov/cc/capandtrade/auction/auction_notices_and_reports.htm (last visited Dec. 11, 2019) (SUF ¶ 58). These are major pecuniary events. As of September 2019, California reported that it had received almost twelve *billion* dollars in proceeds from the sale of allowances since 2012. (The specific figure was $11,796,013,586.66.) *See* California Cap-and-Trade Program, Summary of Proceeds to California and Consigning Entities, *available at* https://ww3.arb.ca.gov/cc/capand trade/auction/proceeds_summary.pdf (last visited Dec. 11, 2019) (SUF ¶ 38).

Given the scope of this operation, these auctions are complex. Allowances are sold in lots of 1000, divided to reflect California's and Quebec's relative contribution. *See* CARB, Detailed Auction Requirements and Instructions, *available at* https://ww3.arb.ca.gov/cc/capandtrade/

auction/auction_requirements.pdf at pt. IX, p. 43 (see Table of Contents for page number) (last visited Dec. 11, 2019) (SUF ¶ 59).  As CARB illustrates, if a joint auction "included 60 percent California 2019 vintage allowances and 40 percent Québec 2019 vintage allowances, each bid lot . . . would include 600 California 2019 vintage allowances and 400 Québec 2019 vintage allowances." *Id.*  (SUF ¶ 60).  Notably, buyers do not know the exact mix of the allowances that they purchase because "serial numbers are not available to account holders."  *See* CARB, Chapter 5: How Do I Buy, Sell, and Trade Compliance Instruments?, *available at* https://ww3.arb.ca.gov /cc/capandtrade/guidance/chapter5.pdf at 28 (last visited Dec. 11, 2019) (SUF ¶ 61).  Trades are facilitated through the Compliance Instrument Tracking System Service ("CITSS"), which monitors accounts and compliance.  *See* Welcome to WCI CITSS, *available at* https://www.wci-citss.org/ (last visited Dec. 11, 2019) (SUF ¶ 62).  Purchases are currently settled through Deutsche Bank.  *See* California Cap-and-Trade Program, Cap-and-Trade Auctions and Reserve Sales Financial Services Administration (Aug. 24, 2018), *available at* https://ww3.arb.ca.gov/cc/capand trade/auction/forms/financial_services _administration_faq.pdf (last visited Dec. 11, 2019) (SUF ¶ 63).

Under the Agreement, covered entities in California are authorized to trade instruments with covered entities in Quebec, and vice-versa, "as provided for under [the parties'] respective cap-and-trade program regulations."  Agreement, Art. 7 (SUF ¶ 64).  Also under the Agreement, California agrees to accept instruments issued by Quebec to satisfy its regulatory requirements, and Quebec agrees to reciprocate.  *See id.,* Art. 6 (SUF ¶ 65).

The text and high degree of mutual commitment exhibited in the Agreement belies any claim that the Agreement is without legal force or effect.  On the contrary, the Agreement specifies that it "shall enter into full force and effect" and that the English and French version of the text "have the same legal force."  *Id.*, Arts. 22, 23.  In fact, the word "shall" appears *over fifty times* in the Agreement, in a wide variety of contexts.  (SUF ¶ 66).  Moreover, termination of the Agreement requires unanimous consent of the parties and is not legally effective until "12 months after the last of the Parties has provided is consent to the other Parties."  *Id.*, Art. 22  (SUF ¶ 67).  In the

event of either withdrawal or termination, a party's "obligations under article 15 regarding confidentiality of information . . . continue to remain in effect." *Id.,* Art. 17 (SUF ¶ 68).   The enormous sums paid for allowances and their bankability until 2030 also refute any claim that the Agreement is merely hortatory.   In short, the text, operation, and forensic architecture of the Agreement foreclose any serious claim that it is anything short of a binding instrument.

### B.        The United States' foreign policy.

The United States is a party to the United Nations Framework Convention on Climate Change of 1992 ("UNFCCC").   (SUF ¶¶ 1-2).   This has as its "ultimate objective . . . stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system.   S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into force Mar. 21, 1994), Art. 2 (SUF ¶ 3).   Being ratified by the President with the advice and consent of the Senate, the UNFCCC is law of the land.   See U.S. CONST., Art. II, § 2, cl. [2]; Art. VI, § 2, cl [2].   (SUF ¶ 2).

By entering into the UNFCCC, the federal government undertook obligations to its foreign treaty partners with respect to the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."   1771 U.N.T.S. 107, Art. 2.   (SUF ¶ 3).   Under the UNFCCC, "[a]ll Parties," including the United States, are obliged to "(b) [f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate climate change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases not controlled by the Montreal Protocol, and measures to facilitate adequate adaptation to climate change [and] (c) [p]romote and cooperate in the development, application and diffusion, including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of greenhouse gases not controlled by the Montreal Protocol in all relevant sectors . . . ." *Id.*, Art. 4.1(b), (c) (SUF ¶ 4).

In 2015, various Parties to the UNFCCC adopted the Paris Agreement of 2015.   (SUF ¶ 5). Under the Paris Agreement, the parties are to prepare and communicate intended "nationally

determined contributions" that describe plans or targets related to the reduction of GHG emissions, and periodically report progress on such contributions.  (SUF ¶ 6).  The United States joined the Paris Agreement, which President Obama entered into as an executive agreement rather than as an Article II treaty by and with the advice and consent of the Senate.

On March 28, 2017, in Executive Order 13,783, President Trump set forth the United States' position on how it would seek to reconcile the nation's environmental, economic, and strategic concerns, both domestically and at the international level.  In that order, the President announced that, "[e]ffective immediately, when monetizing the value of changes in greenhouse gas emissions resulting from regulations, *including with respect to the consideration of domestic versus international impacts* and the consideration of appropriate discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis), which was issued after peer review and public comment and has been widely accepted for more than a decade as embodying the best practices for conducting regulatory cost-benefit analysis."  Promoting Energy Independence and Economic Growth, Exec. Order No. 13,783, § 5(c), 82 Fed. Reg. 16093, 16096 (Mar. 28, 2017) (emphasis added) (SUF ¶ 7).  Thereafter, President Trump announced that the United States would withdraw from the Paris Agreement.  (SUF ¶ 8).  The President's stated reasons were many.  They included that the Paris Agreement:

- "could cost America as much as 2.7 million lost jobs by 2025,"
- "punishes the United States . . . while imposing no meaningful obligations on the world's leading polluters,"
- "[allows] China . . .  to increase these emissions by a staggering number of years — 13,"
- "makes [India's] participation contingent on receiving billions and billions and billions of dollars in foreign aid from developed countries," and
- "disadvantages the United States to the exclusive benefit of other countries, leaving American workers — who I love — and taxpayers to absorb the cost in terms of lost jobs, lower wages, shuttered factories, and vastly diminished economic production . . . ."

1  Statement by President Trump on the Paris Climate Accord, Jun. 1, 2017, *available at* https://www.
2  whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (last
3  visited Dec. 11, 2019) (SUF ¶ 9).  For these reasons, among others, President Trump declared the
4  United States would "negotiate a new deal that protects our country and its taxpayers." *Id.*  (SUF
5  ¶ 10).   On November 4, 2019, the United States formally noticed of its withdrawal from the Paris
6  Agreement.  In accordance with the terms of the Paris Agreement, the United States' withdrawal
7  will become effective on November 4, 2020.

8      **C.      Procedural history.**

9      The United States filed its Complaint on October 23, 2019, ECF No. 1, and an Amended
10  Complaint on November 19, 2019, ECF No. 7.  On November 22, 2019, this Court, per District
11  Judge John A. Mendez, approved a Stipulation and Order extending the time for all Defendants to
12  answer or move to dismiss Plaintiff's Complaint or Amended Complaint to January 6, 2020.  ECF
13  No. 11.  In this same stipulation and order, all Defendants agreed to waive any objection to the
14  form or adequacy of service of process.

15      The Amended Complaint states four causes of action.  They are predicated upon the Treaty
16  Clause, the Compact Clause, the Foreign Affairs Doctrine, and the Dormant Foreign Commerce
17  Clause, respectively.  To facilitate expeditious resolution of this case and to conserve the Court's
18  resources, the United States moves for summary judgment only on the first two causes of action
19  at this time.  Although the United States sees the remaining two causes of action as equally
20  dispositive and likewise sufficient to justify the relief requested, disposition of the first two claims
21  requires no lengthy civil proceedings.  These claims can be expeditiously and summarily
22  adjudicated based on the Constitution, California's Agreement, and the undisputed record
23  regarding other statements and admissions by California and its officials.

24                    **SUMMARY OF ARGUMENT**

25      The Agreement flatly violates the Treaty Clause of Article I of the Constitution.  California
26  and Quebec are operating a massive, integrated regulatory apparatus that lacks a connection to any
27  traditional local interest.  The two jurisdictions do not share a border.  Indeed, at their closest point,

28

they are separated by approximately 2500 miles.  They are not building a bridge across a body of water that they both adjoin.  Nor are they pursuing fleeing suspects into each other's territory.  They have formed a purely political pact, which the Article I Treaty Clause forbids.

The political character of the Agreement is undisputable from both its text and its history.  It sets up a complex alliance, complete with administrative support.  This effectuates the two jurisdictions' shared regulatory policy.  The Agreement regulates the movement of articles of commerce (albeit articles that are entirely regulatory in nature) between the two jurisdictions.  And the Agreement enhances the authority of the Golden State vis-à-vis that of the United States by usurping part of the United States' exclusive role in formulating this nation's foreign policy and undermining the President's practical and express authority to negotiate more favorable agreements for the United States as a whole.

The Supreme Court has held that the word "Treaty" in the Article I Treaty Clause is best understood as applying to agreements "of a political character."  *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893) (attributing this understanding to Justice Story).  *See also United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 463 (1978) (emphasis added) (noting Justice Story's theory that "[t]reaties, alliances and confederations . . . generally connote military *and political* accords and are forbidden to the States").  The Agreement is precisely such a device.

But even if the Agreement did not constitute a "Treaty, Alliance, or Confederation," it certainly constitutes a compact with Quebec.  This is similarly forbidden by the Compact Clause, given its lack of congressional consent.  Although the Supreme Court has held that an agreement involving purely local concerns does not trigger the Compact Clause, this principle cannot save the Agreement, given its lack of a connection to a discernible local interest.

### ARGUMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  Here, as elaborated below, there is no genuine dispute as to any material fact regarding the Agreement.  The Agreement is facially a politically oriented "Treaty."  At a minimum, it is a congressionally unauthorized "Compact."  The United States is entitled as a matter of law to judgment declaring the Agreement invalid.

## I.       The Agreement violates the Article I Treaty Clause.

The Constitution expressly forbids states to enter into treaties.  In exchange for the advantages of a unified foreign policy, the states give up the right to take their own approach to military or political relations with other countries.  As the Supreme Court has held, "[w]hen a State enters the Union, *it surrenders certain sovereign prerogatives*.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] *it cannot negotiate an emissions treaty with China or India*."  *Massachusetts*, 549 U.S. at 519 (emphasis added).  Yet entering into an emissions treaty with a foreign government (here, the government of Quebec) is exactly what California has done.

### A.  The Agreement is a "Treaty" for purposes of the Article I Treaty Clause because it constitutes a political alliance.

California may strain to deny that its Agreement with Quebec is a treaty.  But this is a legal, not a factual, question—or at least a mixed question of law and undisputed fact.  *See Virginia*, 148 U.S. at 519.  And analysis of the Agreement's terms reveals one of political alliance between the two jurisdictions.  Although the Constitution does not define the term "Treaty" or distinguish it from the terms "Alliance," "Confederation," "Agreement" or "Compact," *see Made in the USA Found. v. United States*, 242 F.3d 1300, 1305 (11th Cir. 2001), the Supreme Court has said more than once that the term, as it is used in the Article I Treaty Clause, is best understood as applying to agreements "of a political character."  *Virginia*, 148 U.S. at 519 (discussing the term in the context of a Compact Clause challenge); *United States Steel*, 434 U.S. at 463 (same).  The Agreement is a device "of a political character" in this sense.  California has no more proprietary or quasi-proprietary interest in Quebec's approach to regulating GHG emissions than does any

1   other state in the Union, any more than Texas has a proprietary (or quasi-proprietary) interest in

2   how much water pollution factories of Alberta discharge.  In both cases, foreign policy is properly

3   left to the federal government, to which the Constitution entrusts the interests of the nation as a

4   whole, as opposed to the parochial interests of any one state.

5       To elaborate, the Supreme Court explained in *Virginia* that the phrase "treaty, alliance, or

6   confederation" applies "to treaties *of a political character*; such as [among other things] treaties

7   of *confederation*, in which the parties are leagued for *mutual government [and] political co-

8   operation*, and . . . treaties . . . conferring . . . general commercial privileges."  148 U.S. at 519

9   (emphasis added).  The Agreement meets this definition with room to spare.  In addition to being

10  freighted with "a political character," it confederates the laws of the two jurisdictions in an

11  important area of commercial policy (with billions of dollars trading hands).  It plainly establishes

12  a "league for mutual government" in that area.  As noted above, California and Quebec have

13  committed themselves across a wide menu of subjects, not only to coordinate what they do, but

14  also not to depart from their integrated activities without scrupulous consultation.  *See* Agreement,

15  Arts. 3-7, 9, 12-13, 17, 20, 22 (SUF ¶¶ 51-57, 67-69).  The Agreement also meets *Virginia*'s

16  definition of a treaty by creating an exclusive market for the purchase and sale of certain articles

17  of commerce, albeit articles that are entirely regulatory in nature.[4]

18      To be sure, a device like the Agreement would not necessarily need to be entered into under

19  the Article II treaty power, as opposed to as an executive agreement, if it were entered into by the

20  federal government.  *See generally Made in the USA Found.,* 242 F.3d at 1305.  In other words,

21  "the [Supreme] Court has never decided what sorts of international agreements, if any, might

22  require Senate ratification."  *Id.*  But the precedents and practices of the federal government under

23  the Treaty Clause of Article II do not carry over to judging what state actions are barred by the

24  Treaty Clause of Article I.  This distinction arises for several reasons.  Most importantly, the

25

---

26  [4]In arguing that the Agreement violates the Article I Treaty Clause, the United States does not
    concede that California has the capacity to enter into a treaty with Quebec governed by
27  international law.  Under international law, only nation-states may enter into treaties, and the
    Article I Treaty Clause bars California from entering into a treaty in any event.

28

Constitution explicitly allocates to the President an enormous span of authority with respect to foreign affairs. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936); *Made in the USA Found.*, 242 F.3d at 1313 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948) ("The Supreme Court has repeatedly recognized that the President is the nation's 'guiding organ in the conduct of our foreign affairs,' in whom the Constitution vests 'vast powers in relation to the outside world.'"). The President may enter into certain categories of executive agreements pursuant to this authority, as well as pursuant to authority provided by statute. *See*, *e.g.*, *United States v. Pink*, 315 U.S. 203 (1942) (President's recognition of Russian government and assignment of claims pursuant to the Litvinov Assignment was binding on State courts); *B. Altman & Co.* v. *United States*, 224 U.S. 583, 601 (1912) (recognizing the validity of commercial agreement authorized by statute but not entered into pursuant to the Article II Treaty Clause). There is no comparable assignment of authority to the states.

## B. The Agreement is a binding instrument.

Defendants may try to suggest that the Agreement lacks legal force or significance. But such self-serving attempts at rebranding do not change the essential political character of California's mutual commitments with Quebec. As a matter of text, the Agreement knits the two jurisdictions into a virtually seamless regulatory body. Under Article 4, California undertakes to conform its regulations as much as possible – and certainly in every material respect – to those of Quebec. California and Quebec commit "to promote continued harmonization and integration of the Parties' programs." Agreement, Art. 4.. (SUF ¶¶ 49-52). Indeed, if California even "*consider[s]* making changes to its . . . program," it must "discuss" such "proposed changes or additions" with Quebec. *Id.* (emphasis added) (SUF ¶ 52). The same goes for "proposed changes" to the "offset component" of its program. *Id.*, Art. 5 (SUF ¶ 54). Also, as noted above, the word "shall" appears over fifty times in the Agreement, and the phrase "the parties shall" appears twenty times. (SUF ¶ 66). The ubiquity of this word and this phrase demonstrates that the Agreement is not merely hortatory or aspirational.

Even the Agreement's provisions for withdrawal and termination underscore its binding nature. To be sure, parties may withdraw. But the Agreement's formal "withdrawal" provision actually proves there are legally binding commitments between the two jurisdictions that must be withdrawn from. In other words, being able to *withdraw* from an agreement—even unilaterally, at any time—does not mean that the jurisdictions are not obliged ***now*** to abide by a common set of principles and terms *before withdrawing*. Anyone who has ever played chess and eventually resigned mid-game knows this. *See Garcia v. Texas*, 564 U.S. 940, 944 (2011) (Breyer, J., dissenting) (noting that, "[a]lthough the United States ha[d] . . . given notice of withdrawal from the Optional Protocol, . . . that withdrawal [did] not alter the binding status of its prewithdrawal obligations"). In addition, termination of the Agreement requires unanimous consent of the parties and is not legally effective until "12 months after the last of the Parties has provided is consent to the other Parties." Agreement, Art. 22 (SUF ¶ 67). Finally, even with withdrawal or termination, a party's certain "***obligations*** under article regarding confidentiality of information . . . continue to ***remain in effect***." *Id.,* Art. 17 (SUF ¶ 68). Thus, the plain text of the Agreement reflects beyond dispute that California is in a legally binding agreement with Quebec at the moment.

The binding nature of the Agreement can also be seen in its operation. As noted above, various entities have expended *billions* of dollars for California's allowances. CARB further contemplates that covered entities may bank instruments *until 2030*. A trading platform that entails the exchange of billions of dollars, the retention of an investment bank to settle accounts, and the banking of valuable allowances of a regulatory nature a decade into the future is the antithesis of a nonbinding instrument.

This same binding dynamic can be observed in California's response to Ontario's withdrawal from the Agreement in 2018. Ontario was briefly a tri-party participant in this trading regime. But it recently dropped out. Notwithstanding Ontario's decision not to participate in the integrated market any longer, *California wrapped its arms around Ontario's allowances, and still does*. *See* CARB, Linkage, September 2018 Update: Linkage with Ontario Cap-and-Trade Program, *available at* https://ww3.arb.ca.gov/cc/capandtrade/linkage/linkage.htm (last visited

Dec. 11, 2019) (SUF ¶¶ 70-71); 17 CCR § 95943, "[c]ompliance instruments issued by the Government of Ontario that are held in California covered entity, opt-in covered entity, and general market participant accounts . . . as of June 15, 2018 continue to remain valid for compliance and trading purposes.").

The binding nature of the Agreement is also exemplified by the trajectory of California's "own foreign policy" since the enactment of AB 32 in 2006.   Thirteen years ago, California set out to establish a cap-and-trade program that could extend beyond its borders.   *See* CAL. HEALTH & SAFETY CODE § 38564 (codifying AB 32) (emphasis added) (instructing Defendant CARB to "facilitate the development of integrated and cost-effective *regional, national, and international* greenhouse gas reduction programs") (SUF ¶ 23).   In addition, California's 2011 regulations implementing AB 32 explicitly contemplated that that "compliance instrument[s] issued by an *external* greenhouse gas emissions trading system (GHG ETS) may be used to meet" the state's regulatory requirements.   17 CCR § 95940 (emphasis added).   California cannot credibly argue that it is not bound by something that it has been committing itself to since 2006.

**II.     The Agreement at a minimum violates the Compact Clause.**

If for any reason the Agreement did not violate the Article I Treaty Clause, and surely it does, then the Agreement must violate the Compact Clause.   (In fact, it violates both.)   This latter clause forbids states to "enter into any Agreement or Compact . . . with a foreign Power" without congressional approval.   U.S. CONST., Art. I, § 10, cl. 3.   Congress has not given its consent to the Agreement.   Nor have Defendants even asked Congress for that consent.   The Agreement thus also runs afoul of the Compact Clause.

**A.   The Agreement is a "Compact" under the Compact Clause because of its emphatically non-local character.**

Article I, Section 10, of the Constitution contemplates two categories of agreements that states might seek to enter: (1) "Treat[ies], Alliance[s], [and] Confederation[s]," from which states are categorically precluded; and (2) "Agreement[s] [and] Compact[s]," which states may enter with Congress' approval.   *Id.* cl. [1] (Treaty Clause); cl. [3] (Compact Clause).   In *Virginia v.*

*Tennessee*, discussed above in connection with the Treaty Clause, the Supreme Court also recognized a category of compacts or agreements that do not require congressional consent because of their local nature.  *See* 148 U.S. at 518-19.  In that case, the Court held that only domestic compacts or agreements affecting the status of the federal government *as* the federal government (*i.e.*, implicating states' authority vis-à-vis that of the United States) require congressional consent.  As Justice Field wrote for the Court in that case, "it is evident that the [Compact Clause] is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States."  *Id.* at 519.

Notably, however, Justice Field preceded this statement with four concrete examples of the kind of intensely local cooperation between states that would not implicate the clause.  Not one comes close to California's integrated cap-and-trade agreement with an international sovereign:

> *If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York which the latter [S]tate might desire to acquire as a site for a public building*, it would hardly be deemed essential for the latter [S]tate to obtain the consent of Congress before it could make a valid agreement with Virginia for the purchase of the land.

*Id.* at 518 (emphasis added).

> *If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie Canal*, it would hardly be deemed essential for that State to obtain the consent of [C]ongress before it could contract with New York for the transportation of the exhibits through that [S]tate in that way.

*Id.* (emphasis added).

> *If the bordering line of two States should cross some malarious and disease-producing district*, there could be no possible reason, on any conceivable public grounds, to obtain the consent of [C]ongress for the bordering [S]tates to agree to unite in draining the district, and thus removing the cause of disease.

*Id.* (emphasis added).

> *So, in case of threatened invasion of cholera, plague, or other causes of sickness and death*, it would be the height of absurdity to hold that the threatened [S]tates could not unite in providing means to prevent and repel the invasion of the pestilence

without obtaining the consent of [C]ongress, which might not be at the time in session.

*Id.* (emphasis added).  In each of these examples, two adjoining states are exercising their police powers in traditional, entirely local ways to promote the health, safety or welfare of their population.  All four examples fall far short of implicating the prerogatives of the United States.  (In the actual case, Virginia and Tennessee were trying to fix a common boundary.  *See id.* at 504.)

Even if *Virginia*'s recognition of a category of agreements that do not implicate the Compact Clause applies beyond the domestic arena, California's Agreement with Quebec could not possibly qualify.  This is evident for a number of reasons.

First, the Agreement is about as "local" as the United Nations.  California and Quebec do not share a border.  They are not seeking to abate a nuisance that affects them in some entirely localized way, apart from every other state or province of Canada.  By its own admission and by the totality of its actions, California has made clear that it is pursuing its "own foreign policy."  Kysar & Meyler, *supra* (quoting Governor Schwarzenegger) (SUF ¶ 19).  The Agreement is simply one example among many of California's aspirations as a "nation-state."  Adam Tanner, *supra* (quoting Governor Schwarzenegger) (SUF ¶ 20).  According to California, the state is a party to *seventy-two* active bilateral and multilateral "agreements" with national and subnational foreign and domestic governments relating to environmental policy alone.  *See* Climate Change Partnerships, Working Across Agencies and Beyond Borders, *available at* https://www.climate change.ca.gov/climate_action_team/partnerships.html (last visited Dec. 11, 2019) (amalgamating agreements) ("Climate Change Partnerships") (SUF ¶ 16).  California states that the purpose of these agreements is "to strengthen the global response to the threat of climate change and to promote a healthy and prosperous future for all citizens."  *Id.*

California's would-be "own foreign policy" is particularly detrimental to the United States' foreign policy on climate change issues, including in the context of the currently declared policy with respect to the Paris Agreement.  Indeed, on June 6, 2017, mere days after President Trump announced the United States' intent to withdraw from the Paris Agreement, Jerry Brown, then-Governor of California, met in Beijing with China's President Xi Jinping to discuss environmental

issues.  *See* Javier C. Hernández & Chris Buckley, *Xi Jinping and Jerry Brown of California Meet to Discuss Climate Change*, N.Y. Times (June 6, 2017), *available at*  https://www.nytimes.com/2017/06/06/world/asia/xi-jinping-china-jerry-brown-california-climate.html   (last visited Dec. 11, 2019) (SUF ¶ 14).  Also in 2017, in what the states in question called a direct response to the United States' announcement that it intended to withdraw from the Paris Agreement, California and other states entered into the United States Climate Alliance, committing to reducing GHG emissions in a manner consistent with the goals of the Paris Agreement.  See Climate Change Partnerships, *supra* (second "Multilateral Agreement") (explaining that the United States Climate Alliance was founded "in response to President Trump's decision to withdraw from the Paris Agreement") (SUF ¶ 13).   In short, California's broad and elaborate diplomatic footprint overwhelms any claim that the Agreement responds to any discrete, truly-local interest.

Second, and directly implicating *Virginia*, the Agreement could complexify the federal government's ability to negotiate competitive agreements in the foreign arena with the entirety of the economy at its back.  Diplomacy is often a matter of leverage and the possession of multiple options.  Indeed, this is why the Supreme Court has invalidated previous California pretensions to address international problems.  Two decades ago, California passed legislation requiring any insurer doing business in that State to disclose information about all policies sold in Europe between 1920 and 1945. *See Garamendi*, 539 U.S. at 401.  However well-intentioned this attempt to seek justice for the victims of the Nazi genocide residing within California may have been, the Supreme Court recognized that these efforts conflicted with the policies being pursued by the Federal Government pursuant to treaties of the United States.  The legislation "'compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims against European companies arising out of World War II." *Id.* at 424 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000)).  "Quite simply, if the [California] law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Garamendi*, 539 U.S.at 424.

The Supreme Court's logic is as applicable to California's latest foray into foreign policy as it was then.   If California (and follow-on states) can deprive the federal government of some of those options, our nation's ability – and particularly the President's ability – to forge agreements and other diplomatic solutions that optimize benefits for the entire country would be compromised. *See Crosby,* 530 U.S. at 381  (emphasis added) ("We need not get into any general consideration of limits of state action affecting foreign affairs to realize that the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to *the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics*."); *Dames & Moore v. Regan*, 453 U. S. 654, 673 (1981) (describing the President's control of funds valuable to another country as a "bargaining chip"); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.").   Under *Virginia*, an arrangement that "tend[s] to the increase of political power in the [S]tates, which may encroach upon or interfere with the just supremacy of the United States," violates the Compact Clause, absent congressional consent.  148 U.S. at 519.  This language controls here, assuming *arguendo* that *Virginia* applies outside the domestic context.

Third, legislative practice supports the conclusion that the Agreement runs afoul of the Compact Clause.  To wit, Congress has often addressed itself to compacts between states and provinces of Canada, many far less momentous, and far more local in nature, than the Agreement at issue here.  *See generally* Duncan B. Hollis, *Elusive Foreign Compact, The*, 73 Mo. L. Rev. 1071, 1076 (Fall 2008) ("Congress has consented to foreign compacts in only four narrowly defined categories: (a) bridges; (b) fire fighting; (c) highways; and (d) emergency management.").  In 1949, for example, it gave preliminary consent to the Northeastern Interstate Forest Fire Protection Compact.  *See* Act of Jun. 25, 1949, ch. 246, 63 Stat. 271, 272 ("Subject to the consent of the Congress of the United States, any province of the Dominion of Canada which is contiguous with any member state may become a party to this compact by taking such action as its laws and

the laws of the Dominion of Canada may prescribe for ratification.").  Similarly, it approved a compact for the construction of a highway between Minnesota and Manitoba in 1958.  *See* Act of Sept. 2, 1958, Pub. L. No. 85-877, § 1, 72 Stat. 1701, 1701.  As recently as 2007, Congress approved the International Emergency Management Assistance Memorandum of Understanding, which provides a structure for northeastern states and nearby Canadian provinces to anticipate and respond to disasters and other emergencies.  *See* S.J. Res. 13, 110th Cong., Pub. L. No. 110-171, 121 Stat. 2467 (2007).  *See also* 33 U.S.C. § 535a (International Bridge Act) (giving preliminary consent to agreements between states and Canadian and Mexican governmental units on an issue of local concern, subject to approval by the Secretary of State).

Congress has also declined to approve the international aspects of a proposed compact intended to protect the Great Lakes.  In 1956, the Department of State testified against including Ontario and Quebec in a proposed Great Lakes Basin Compact on the following grounds:

> As a matter of principle, the Department would oppose any interstate compact which affects foreign relations unless there is a showing of a specific local situation appropriate for handling by the local authorities.  Here there is no such local situation.  The matter is of national interest, and clearly involves foreign relations . . . .  The proposal is for an international compact, not for an interstate compact.  This is not the sort of activity which was intended to be covered by the compact provision of the Constitution.  Matters of international negotiation and agreement should be under national control as the Constitution contemplates and requires.

The Great Lakes Basin Compact: Hearing on S. 2688 Before the Subcomm. on the Great Lakes Basin of the S. Comm. on Foreign Relations, 84th Cong. 14, 17 (1956) (statement of Willard B. Cowles, Deputy Legal Adviser, Department of State) (SUF ¶ 17).  Twelve years later, Congress provided its consent to the Great Lakes Basin Compact, but only with respect to states and explicitly denying consent for the compact to include Canadian provinces as parties to the Compact.  *See* Act of Jul. 24, 1968, Pub. L. No. 90-419, 82 Stat. 414, 419.

Congress's course of conduct and prior judgment that far lesser agreements with Canadian provinces require Congressional approval should be accorded weight.  *See Zivitovsky v. Kerry*, 135 S. Ct. 2076, 2091 (2015) (quoting *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014) (emphasis deleted) ("In separation-of-powers cases this Court has often 'put significant weight upon

historical practice.'")); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them."). Against these precedent, the Agreement unquestionably has all the indicia of a binding compact subject to the clause.

In *Northeast Bancorp, Inc. v. Board of Governors of Federal Reserve System*, the Supreme Court identified the indicia of a compact. They are: (1) establishment of a joint organization; (2) mutually dependent action; (3) restriction on unilateral modification or repeal of operative laws; and (4) reciprocal limitations. 472 U.S. 159, 175 (1985). The Agreement easily meets this test. First, not only does it rely on WCI for technical support, *see* Agreement, Art. 12, but it also establishes a "Consultation Committee" to "resolve . . . differences" between the parties, *id.*, Art. 13.[5] Second, third, and fourth, and as noted extensively above, the Agreement requires the parties to conform their programs to the point where they are knitted into a virtually seamless regulatory apparatus. *See id.,* Art. 4 (requiring the parties to "continue to examine their respective regulations . . . to promote continued harmonization and integration of [their] programs"); *id.* (requiring the parties to take certain steps "where a difference between certain elements of the Parties' programs is identified"); *id.* (emphasis added) (providing that, although "[a] Party *may consider* making changes to its . . . program[]," "any proposed changes or additions shall be discussed between the Parties"); *id.*, Art. 5 (imposing the same duty of consultation with respect to "any proposed changes" in the "offset components" of a program); *id.*, Art. 6 (providing that "mutual recognition of the Parties' compliance instruments shall occur") (SUF ¶¶ 49-54, 65).

The same can be said about the disjunctive factors set forth in *United States Steel*. That case looked to: (1) whether the arrangement "purport[s] to authorize the member States to exercise

---

[5] *See* Letter from Robert W. Byrne, Senior Assistant Attorney General, to Peter Krause, Legal Affairs Secretary, Mar. 16, 2017, at 9 (emphasis added) ("*Any jurisdiction that wishes to link with the California Program . . . will need to be a member of WCI, Inc.* and will use the California-developed infrastructure for the combined Programs."), *available at* https://ww3.arb.ca.gov/cc/capandtrade/linkage/linkage.htm (Attorney General's Advice to Governor Concerning Program Linkage) (last visited Dec. 11, 2019) (SUF ¶ 47).

1   any powers they could not exercise in its absence"; (2) whether "each State retains *complete*

2   *freedom* to adopt or reject the rules and regulations of the [joint organization]"; and (3) whether

3   "each State is free to withdraw at any time." 434 U.S. at 473 (emphasis added). As to the first

4   factor, California cannot credibly argue that, in the absence of the Agreement, it could compel

5   Quebec – as one example among many – to "discuss[]" any proposed changes to its cap-and-trade

6   program before adopting them. Agreement., Art. 4 (emphasis added) (providing that, although

7   "[a] Party *may consider* making changes to its . . . program[]," "any proposed changes . . . *shall be*

8   *discussed* between the Parties") (SUF ¶ 52). *Cf. International Paper Co. v. Ouellette*, 479 U.S.

9   481, 495 (1986) (precluding states from using their common law to "do indirectly what they could

10   not do directly – regulate the conduct of out-of-state sources"). As to the second factor, the

11   Agreement is premised on the parties having already harmonized their regulatory schemes, and,

12   so long as California remains a party to the Agreement, it is obliged to "discuss[]" with Quebec

13   "any proposed changes" that it "may consider" to its program, Agreement., Art. 4, and to "consult

14   with" Quebec if a "difference between certain elements of the Parties programs is identified," *id.*

15   (SUF ¶ 52). This is not an example of "complete freedom to adopt or reject the rules and

16   regulations of the [joint organization]." *United States Steel*, 434 U.S. at 473. To be sure, these

17   "rules and regulations" may literally have their provenance in California, or in Quebec, or in WCI,

18   but once they are adopted as the conforming principles of the Agreement, they acquire an obvious

19   stickiness that California cannot disavow – nor would it, if it wants the covered entities that spend

20   billions of dollars for allowances to have confidence in the system it has helped ordain. Finally,

21   although withdrawal from the Agreement is technically possible – except with respect to Article

22   15, regarding confidentiality – such an act is not a credible option, given the billions of dollars in

23   allowances at stake and the covered entities' blindness as to whose allowances they hold. In any

24   case, the Supreme Court used the disjunctive to lay out the factors in *United States Steel*,

25   connecting them with the word "nor." Thus, only one of the three factors need apply for the

26   Agreement to qualify as a "Compact" under that case. As the foregoing analysis demonstrates,

27   however, all three apply in this situation.

28

**B.  The United States' decision to withdraw from the Paris Agreement supports the instant action.**

Defendants may argue that the United States' decision to withdraw from the Paris Agreement leaves no foreign policy in the area of GHGs for the Agreement to impair.  This is a red herring.  It is also demonstrably untrue.

This argument is a red herring (*i.e.*, beside the point) because the federal government does not need to take affirmative acts to occupy a field of foreign relations.  The Constitution instead entrusts the federal government with "full and ***exclusive*** responsibility for the conduct of affairs with foreign sovereignties . . . ."  *Hines*, 312 U.S. at 63 (bold emphasis added).

This argument is demonstrably untrue because the federal government in fact has taken affirmative steps in the area of GHG regulation and international relations.  They just are not the steps that California's current elected officials claim to prefer.  *Cf. Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011) (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 324 (1981)) ("[T]he relevant question for purposes of displacement is 'whether the field has been occupied, not whether it has been occupied in a particular manner.'").  For example, even after withdrawing from the Paris Agreement, the United States will remain a party to the UNFCCC, and engage with foreign countries on matters related to climate change and GHG emissions in meetings of the parties to that agreement and in other fora.   Moreover, the President's very decision to withdraw from the Paris Agreement constitutes an exercise and implementation of foreign policy.  When the President Trump first announced that the United States intended to withdraw from the Agreement on June 1, 2017, he stated that withdrawal was necessary because, among other things, the Agreement: (1) undermined the nation's economic competitiveness and would cost jobs; (2) set unrealistic targets for reducing GHG emissions while allowing China to increase such emissions until 2030; and (3) would have negligible impact in any event.  SUF ¶¶ 8-9.  Further, on November 4, 2019, when the United States deposited notification of its withdrawal from the Agreement with the United Nations, the Secretary of State stated publicly that:

> The U.S. approach incorporates the reality of the global energy mix and uses all energy sources and technologies cleanly and efficiently . . . . In international

climate discussions, we will continue to offer a realistic and pragmatic model – backed by a record of real world results – showing innovation and open markets lead to greater prosperity, fewer emissions, and more secure sources of energy. We will continue to work with our global partners to enhance resilience to the impacts of climate change and prepare for and respond to natural disasters. Just as we have in the past, the United States will continue to research, innovate, and grow our economy while reducing emissions and extending a helping hand to our friends and partners around the globe.

Michael R. Pompeo, Press Statement, On the U.S. Withdrawal from the Paris Agreement, *available at* https://www.state.gov/on-the-u-s-withdrawal-from-the-paris-agreement/ (last visited Dec. 11, 2019) (SUF ¶ 12).  The policy described by the Secretary of State evinces the United States' integrated approach to the environment, the economy, and national security.

Even if the Constitution did not allocate "full and exclusive" responsibility for foreign affairs to the federal government, *Hines,* 312 U.S. at 63, which is not the case, the United States still would not need to take any particular action in the affirmative to bar states from acting in this area.  Instead, as the Supreme Court recognized in Arkansas *Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 384 (1982) (emphasis original), "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate."  Thus, even if it were true that United States foreign policy at this time were no policy on international emission of greenhouse gas emissions—and that is certainly not true, given the President's statements and the United States' continued participation in the UNFCCC—that still would not empower California to act in this field.

**CONCLUSION**

For the foregoing reasons, the undisputed facts are that California is a member of a treaty—or at least an unauthorized compact—or both—with the Canadian province of Quebec.  Because this is barred by the Constitution, the Court should enter summary judgment in favor of the United States.  The Court should issue a declaration that the Agreement and supporting California law (as applied) are invalid.

1    Dated: December 11, 2019.

2

3                                                Respectfully submitted,

4                                                /s/  Paul E. Salamanca
                                                 JONATHAN D. BRIGHTBILL
5                                                Principal Deputy Assistant Attorney General
                                                 PAUL E. SALAMANCA
6                                                PETER J. MCVEIGH
                                                 R. JUSTIN SMITH
7                                                STEVEN W. BARNETT
                                                 Attorneys
8                                                Environment & Natural Resources Division
                                                 U.S. Department of Justice
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28