1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   NICHOLAS W. VAN AELSTYN, Cal. Bar No. 158265
3  nvanaelstyn@sheppardmullin.com
   ZACHARY NORRIS, Cal. Bar No. 268616
4  znorris@sheppardmullin.com
   Four Embarcadero Center, 17th Floor
5  San Francisco, California 94111-4109
   Telephone:   415.774.2970
6  Facsimile:   415.434.3947

7  Attorneys for Intervenor-Defendant
   INTERNATIONAL EMISSIONS TRADING
8  ASSOCIATION

9

10               **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF CALIFORNIA**

12  THE UNITED STATES OF AMERICA,          Case No. 2:19-cv-02142-WBS-EFB

13          Plaintiff,                     The Hon. William B. Shubb

14       v.

15  THE STATE OF CALIFORNIA; GAVIN C.      **INTERNATIONAL EMISSIONS**
   NEWSOM, in his official capacity as     **TRADING ASSOCIATION'S**
16  Governor of the State of California; THE   **OPPOSITION TO PLAINTIFF'S**
   CALIFORNIA AIR RESOURCES BOARD;         **MOTION FOR SUMMARY JUDGMENT**
17  MARY D. NICHOLS, in her official
   capacities as Chair of the California Air   Date:        March 9, 2020
18  Resources Board and as Vice Chair and a   Time:        1:30 p.m.
   board member of the Western Climate     Courtroom:   5
19  Initiative, Inc.; WESTERN CLIMATE
   INITIATIVE, INC.; JARED BLUMENFELD,
20  in his official capacities as Secretary for
   Environmental Protection and as a board
21  member of the Western Climate Initiative,
   Inc.; KIP LIPPER, in his official capacity as a
22  board member of the Western Climate
   Initiative, Inc., and RICHARD BLOOM, in his
23  official capacity as a board member of the
   Western Climate Initiative, Inc.,

24          Defendants.

25

26

27

28

1

**TABLE OF CONTENTS**

2  I. INTRODUCTION ................................................................................................ 6

3  II. STATEMENT OF FACTS ................................................................................... 8

4        A.    California's Cap-and-Trade System .......................................................... 8

5        B.    The Linkage of the Programs and the Related Agreement ..................... 11

6  III. ARGUMENT ..................................................................................................... 12

7        A.    Standard of Review. .............................................................................. 12

8        B.    The Agreement is Not a Treaty. ............................................................ 13

9              1.    The Agreement Does Not Have a Political Character................. 13

10             2.    The Agreement is Not a Legally Binding Instrument. ............... 15

11             3.    The Agreement Does Not Provide a Method of Redress For the Parties or Market Participants. .................................................... 17

12

13       C.    The Agreement Does Not Require Congressional Consent Under the Compact Clause. ................................................................................... 19

14             1.    The Agreement Does Not Possess the Requisite Indicia of a Compact...... 20

15                   a.    The Agreement Lacks Mutual Consideration. ................ 20

16                   b.    The Harmonization Lacks Other Indicia of a Compact. ................ 21

17             2.    The Agreement Does Not Encroach Upon or Interfere With the Supremacy of the United States. .................................................................... 24

18

19                   a.    The Compact Clause Is Not Concerned With Geographic Proximity Or Local Interests. ........................................... 25

20                   b.    The Agreement Does Nothing To Hinder Foreign Negotiations. ... 25

21                   c.    The Supreme Court Has Roundly Rejected the Relevance of Historical Legislative Practice. ....................................... 26

22

23  IV. CONCLUSION ................................................................................................ 28

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Ins. Ass'n v. Garamendi*
    539 U.S. 396 (2003) ....................................................................................26

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ....................................................................................12

*BG Grp., PLC v. Republic of Argentina*
    572 U.S. 25 (2014) ................................................................................15, 16

*Bullfrog Films, Inc. v. Wick*
    847 F.2d 502 (9th Cir. 1988) .......................................................................17

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*
    690 F.2d 1240 (9th Cir. 1982) .....................................................................12

*Crosby v. Nat'l Foreign Trade Council*
    530 U.S. 363 (2000) ....................................................................................26

*Dames & Moore v. Regan*
    453 U.S. 654 (1981 ......................................................................................26

*Garcia v. Texas*
    564 U.S. 940 (2015) ....................................................................................16

*The Gillette Co. v. Franchise Tax Bd.*
    62 Cal. 4th 468 (Cal. 2015) ...................................................................22, 23

*Gross v. German Foundation Industrial Initiative*
    499 F. Supp. 2d 606 (D.N.J. 2007) ..............................................................19

*Herrera v. Wyoming*
    139 S. Ct. 1686 (2019) ................................................................................15

*Hill v. United Airlines*
    550 F. Supp. 1048 (D. Kan. 1982) ...............................................................17

*Hines v. Davidowitz*
    312 U.S. 51 (1941) ......................................................................................26

*Kanli v. Duke Univ.*
    No. 1:12CV63, 2012 WL 2366449 (M.D.N.C. June 21, 2012) .....................19

*In re Manual P.*
    215 Cal. App. 3d 48 (Cal. Ct. App. 1989) ....................................................22

*Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*
    472 U.S. 159 (1985) ................................................................................20, 21, 22

*Passante v. McWilham*
    53 Cal. 2d 264 (Cal. 1949) ...........................................................................21

*Patriot Sci. Corp. v. Korodi*
    504 F. Supp. 2d 952 (S.D. Cal. 2007) ...........................................................21

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996).........................................................................12

*Rranci v. Attorney Gen. of U.S.*
    540 F.3d 165 (3d Cir. 2008)...........................................................................17

*Ruhaak v. Comm'r*
    422 F. App'x 530 (7th Cir. 2011)...................................................................19

*Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning
    Council*
    786 F.2d 1359 (9th Cir. 1985)............................................................22, 23, 24, 25

*Sneed v. Chase Home Fin. LLC*
    No. 07CV0729LABAJB, 2007 WL 1851674 (S.D. Cal. June 27, 2007) .................................19

*Thacker v. Comm'r of Soc. Sec.*
    2012 U.S. Dist. LEXIS 76478 (E.D. Cal. 2012) ..............................................13, 24

*U.S. Steel Corporation v. Multistate Tax Commission*
    434 U.S. 452 (1977) ..............................................7, 8, 22, 24, 25, 26, 27, 28

*Virginia v. Tennessee*
    148 U.S. 503 (1893) ..............................................7, 13, 14, 15, 19, 20, 21

<u>Statutes</u>

Cal. Gov. Code § 12894(f) .................................................................................24

Cal. Health & Saf. Code
    § 38500 *et seq*...........................................................................................8
    § 38501(a), (b)..........................................................................................8
    § 38501(h) ................................................................................................9

<u>Other Authorities</u>

47 Fed. Reg.
    49322 ...................................................................................................11

17 Cal. Code Regs.
§ 94952(i) ................................................................................................24
§ 95801 *et seq.*...........................................................................................9
§§ 95940 – 95945 .....................................................................................11
§ 95942 ....................................................................................................24

available at https://ustr.gov/trade-agreements/free-trade-agreements/united-states-
mexico-canada-agreement/agreement-between (last accessed February 10,
2020)........................................................................................................17

available at https://ww3.arb.ca.gov/cc/capandtrade/ linkage/2017_ ...........................12

available at https://ww3.arb.ca.gov/cc/capandtrade/linkage/resolution13-7.pdf ..........12

available at https://www.nafta-sec-alena.org/Home/Texts-of-the-Agreement/North-
American-Free-Trade-Agreement (last accessed February 10, 2020) .......................17

Cuba. Duncan B. Hollis, *Unpacking the Compact Clause*, 88 Tex. L. Rev. 741
(2010) ......................................................................................................27

Fed. R. Civ. Proc.
56(c) ........................................................................................................12

Michael S. Greve, *Compacts, Cartels, and Congressional Consent*, 68 Mo. L. Rev.
285 (2003) ...............................................................................................20

U.S. Const. Article I, § 10, cl. 1.............................................................................13

U.S. Const. Article I, § 10, cl. 3.............................................................................19

U.S. – Singapore Free Trade Agreement, available at
https://ustr.gov/sites/default/files/uploads/agreements/fta/singapore/asset_uploa
d_file708_4036.pdf (last accessed February 10, 2020), § C ...................................18

World Bank Group, *Emissions Trading in Practice: A Handbook on Design and
Implementation* (2016), available at
https://openknowledge.worldbank.org/bitstream/handle/10986/23874/ETP.pdf
(last accessed February 10, 2020) ...................................................................10, 11

SMRH:4842-8460-8691.4
IETA'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# I.
## INTRODUCTION

The Motion for Summary Judgment (the "Motion") filed by Plaintiff the United States should be denied because it fails to demonstrate that the 2017 Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions (the "Agreement") constitutes a treaty or, in the alternative, a compact that interferes with federal supremacy.  The Agreement reflects a memorialization of California's intent to "examine its regulations" and to "consult," "discuss," and "confer" with the Canadian Province of Québec regarding how the two subnational sovereigns might further "harmonize and integrate" their respective Cap-and-Trade programs for the reduction of greenhouse gas ("GHG") emissions.  *See* Agreement, *passim*.  It does not "restrict, limit or otherwise prevail over . . . each Party's sovereign right and authority to adopt, maintain, modify, repeal, or revoke any of their respective program regulations or enabling legislation."  Agreement at 2.  As such, it is not a Treaty or a Compact under the U.S. Constitution.

A treaty is a binding political agreement that establishes mutual obligations enforceable under international law.  In arguing that the Agreement is a "treaty," the Motion strains to characterize the Agreement as being much more than it actually is, but its arguments are pure sophistry.  First, the Motion contends that the Agreement is an "emissions treaty," but the Agreement does not govern emissions at all.  To the contrary, the Agreement openly acknowledges that each party to the Agreement has *its own* GHG emissions reduction targets and *its own* Cap-and-Trade program, and that the Agreement is not intended to, and does not, alter those independent programs.  Next, the Motion argues that the Agreement establishes a "league for mutual government," but the Agreement does not create any joint legislative or regulatory body; rather, it unambiguously contemplates discussions between two separate sovereigns implementing "their respective Cap-and-Trade programs."  Agreement, 7th Whereas clause.  The Motion also contends that the Agreement is a binding instrument despite the facts that it:  (a) does not contemplate any exchange of valuable consideration, (b) permits unilateral withdrawal of any party at any time, and (c) does not provide any method of redress for the parties or for entities with

1  compliance obligations under either California or Québec's Cap-and-Trade programs.

2  Emblematic of the Motion's contorted logic, the Motion actually argues that the unilateral

3  withdrawal of one of the parties to the Agreement constitutes evidence that the Agreement is

4  binding.  To state such a proposition is to refute it.  The Agreement possesses none of the defining

5  characteristics of a treaty.

6       The Motion next argues that if the Agreement is not a treaty, then it "must violate the

7  Compact Clause."  Yet in over 230 years since the Constitution was enacted, and despite the fact

8  that states have entered into thousands of interstate and foreign agreements, not once has a court

9  ever invalidated a state agreement for lack of congressional consent under the Compact Clause.

10 The two-step test to determine when congressional consent is required under the Compact Clause

11 requires the Court first to assess whether the Agreement possesses the "indicia of a compact," and

12 if so, whether it will "encroach upon or interfere with the just supremacy of the United States."

13 *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893).  The Motion fails to satisfy either prong of the

14 Compact Clause test.

15      On the first prong, the Agreement lacks the indicia of a compact because it does not

16 establish a joint organization for regulatory purposes, the parties remain free to modify or repeal

17 their participation in the Agreement, and because the Agreement is not conditioned upon any

18 reciprocal actions by the parties for its effectiveness.  The Motion can be denied as to the Compact

19 Clause claim on that ground alone.

20      On the second prong, the Motion argues that the Agreement interferes with federal

21 supremacy because it addresses "non-local interests," but the Supreme Court emphatically rejected

22 this very position in *U.S. Steel Corporation v. Multistate Tax Commission*, 434 U.S. 452, 479 n.33

23 (1977).  The United States also vaguely insinuates that the Agreement could, in some undisclosed

24 manner, "complexify" its ability to negotiate foreign agreements.  But California's Agreement to

25 consult with Québec regarding California's domestic Cap-and-Trade program does not limit the

26 federal government's leverage or options in the international arena in any discernable way.  This

27 claim is hollow hyperbole.

28

The Motion then asks the Court to look to other agreements that were presented for congressional consent. But the *U.S. Steel* Court rejected the relevance of precisely this sort of evidence, pointing out that those examples "may simply reflect consideration of caution and convenience on the part of the submitting States." 434 U.S. at 471 ("These other Compacts are not before us. We have no occasion to decide whether congressional consent was necessary to their constitutional operation, nor have we any reason to compare those Compacts to the one before us.")

In short, the Agreement reflects the intention of California and Québec to work together to facilitate the orderly and efficient implementation of their respective, domestic Cap-and-Trade programs. Although these programs were designed to serve the GHG emission reduction policies of each sovereign, they also established GHG emission markets in which many private entities participate, including many of IETA's members. Despite all of its puffery and pontification, the Motion does not present any valid grounds to set aside the Agreement. It substitutes political diatribe for legal analysis and threatens to harm the interests of market participants. The Plaintiff's Motion for Summary Judgment should be denied.

## II.
## STATEMENT OF FACTS

### A.    California's Cap-and-Trade System

In 2006, the California Legislature enacted the California Global Warming Solutions Act of 2006, California Health and Safety Code sections 38500 *et seq*., popularly known as "AB 32." AB 32 is supported by legislative findings that global warming poses a "serious threat" to the "economic well-being, public health, natural resources, and the environment of California," and will have "detrimental effects on some of California's largest industries." Cal. Health and Safety Code § 38501(a), (b). To counter those threats to California's economy and environment, AB 32 requires California to reduce its GHG emissions to 1990 levels by the year 2020. *Id*. at § 38550. In 2016, the California Legislature set a more ambitious goal, requiring GHG reductions to 40 percent below 1990 levels by 2030. *Id*. at § 38566.

1    AB 32 designated the California Air Resource Board ("CARB") as the state agency

2  charged with monitoring and regulating sources of GHG emissions in California, and instructed

3  CARB to "design emissions reduction measures to meet the statewide emissions limits for

4  greenhouse gases . . . in a way that minimizes costs and maximizes benefits for California's

5  economy . . . ."  Cal. Health & Safety Code § 38501(h).  Pursuant to this statutory mandate, after a

6  three-year public process that included hundreds of stakeholder meetings, workshops and

7  comments, CARB promulgated regulations that created a Cap-and-Trade system for reducing

8  GHG emissions from California sources effective January 2012.  17 Cal. Code Regs. §§ 95801

9  *et seq.*

10    California's Cap-and-Trade program is a market-based approach to reducing GHG

11  pollution.  The "cap" creates a limit on the total amount of GHG emissions from regulated sources

12  in California, including many of the members of Intervenor-Defendant International Emission

13  Trading Association ("IETA").  *See generally*, 17 Cal. Code Regs., Subarticle 7.  That total limit

14  declines over time to ensure that predetermined emission targets are met.  Regulated entities are

15  required to surrender one compliance instrument[1] for each metric ton of their allowed level of

16  carbon dioxide equivalent ("$CO_{2e}$") emissions within a compliance period.  *Id*. at § 95856.

17    CARB issues emission allowances to regulated entities, either for free or through auctions.

18  *See generally,* 17 Cal. Code Regs. Subarticles 9 & 10.  If a regulated entity does not need all the

19  allowances it has for a given compliance period (because, for example, it has succeeded in

20  reducing its GHG emissions below its allowed level), it can either "bank" those allowances or sell

21  them to another party.  *Id*. at Subarticle 11.  This is the "trade" aspect of the Cap-and-Trade

22  system, and it creates an incentive for regulated entities within the market to seek out GHG

23  emission reductions in a cost-effective manner.

24    The ability to sell compliance instruments to other businesses creates a market price for

25  pollution reductions.  It has also given rise to a thriving industry of brokerages, registries, and

26  investment firms that facilitate trading within this market; these market actors include several

27  _____

28  [1] There are two kinds of compliance instruments, emission allowances and offsets.  For brevity, we often refer only to allowances herein, but the emissions markets at issue here include both.

1    IETA members.  This in turn allows businesses within the market to achieve the maximum

2    emission reductions possible at the lowest cost.

3         The "compliance offset" provisions of California's Cap-and-Trade system create an

4    incentive for entities that are not directly regulated to undertake projects resulting in emission

5    reductions.  *See generally*, 17 Cal. Code Regs., Subarticle 13.  Compliance offsets are third-party

6    verified emission reductions that can be used to satisfy a certain percentage of a regulated entity's

7    emission reduction requirements.  CARB has approved six separate protocols for different kinds

8    of compliance offset projects, and numerous such projects have been created by a wide variety of

9    private, nonprofit and tribal entities.  Indeed, a significant component of the robust emission

10   markets referenced above consist of compliance offsets.  As just one of many examples, the

11   Inlandsis Fund, an IETA member based in Québec, has invested in over 30 CARB compliance

12   offset projects.  *See* https://fondsinlandsis.com/en/about-us/ (last visited February 6, 2020).

13        The flexible compliance aspect of California's Cap-and-Trade system enables regulated

14   entities, as well as California's society as a whole, to minimize the costs of achieving the statewide

15   GHG emissions target relative to more conventional, command-and-control regulatory

16   approaches.  By comparison, the policy tool of a carbon tax, which is popular among some

17   academic economists, is a blunt instrument.  While such a tax can set a price on carbon, it doesn't

18   specify emission reduction targets; that is left to the market, and those subject to the tax may

19   address their increased costs through means other than reductions in GHG emissions – *e.g.*, by

20   reducing wages.  By contrast, Cap-and-Trade programs specify the emission reductions goals and

21   let the market establish the price on carbon needed to generate those reductions.  In so doing, they

22   give regulated entities greater flexibility in how to achieve those goals and also incentivize the

23   participation of non-regulated entities.  These conclusions are supported by well-accepted

24   economic theory and the observed results of other emission trading systems ("ETSs").  As the

25   World Bank has noted, ETSs "limit total emissions while enabling emissions reductions to be

26   realized at the lowest possible cost, thereby "channel[ing] entrepreneurial activities and help[ing]

27   move economies toward a low-carbon, high-efficiency future."  World Bank Group, *Emissions*

28   *Trading in Practice: A Handbook on Design and Implementation* (2016)("*World Bank*

1  *Handbook*"), available at

2  https://openknowledge.worldbank.org/bitstream/handle/10986/23874/ETP.pdf (last accessed

3  February 10, 2020), p. 16 (footnotes omitted); *see also id.* at 25-28.  Here the "entrepreneurial

4  activities" that are channeled refers to the economic pursuits and interests of many entities,

5  including many that are members of IETA. [2]

6  **B.**      **The Linkage of the Programs and the Related Agreement**

7          Past practice has shown that the broader the market across which allowances can be

8  generated and traded, the more cost savings can be realized per unit of emissions reduction in a

9  Cap-and-Trade system.  As the *World Bank* also explained, linking ETSs "reduces aggregate

10  compliance costs.  Allowing two systems to trade emissions allowances increases efficiency in the

11  same way as trade between two companies.  The larger the difference in equilibrium allowance

12  prices between the linked systems, the greater the gains from trade.  Linking also increases market

13  liquidity and depth.  It may also promote price stability, allowing shocks to one part of the ETS to

14  spread across a larger number of participants."  *Id.* at 152; *see also id.* at 154-156.  To maximize

15  the cost effectiveness of compliance with its Cap-and-Trade program, CARB's regulations

16  implementing AB 32 included the ability to "link" California's Cap-and-Trade regulations with

17  other emission trading programs, *i.e.*, to provide that compliance instruments generated under

18  another jurisdiction's Cap-and-Trade program are accepted under California's Cap-and-Trade

19  program and *vice versa*.  17 Cal. Code Regs. §§ 95940 – 95945.

20          Following a lengthy public process in which many stakeholders including IETA

21  participated, CARB and the Governor of California made a series of findings required by statute

22  concerning linkage with Québec's program.  These included a finding that establishing a linkage

23

24  ─────────────────

25  [2] The Cap-and-Trade model was once popular with conservative lawmakers.  Ronald Reagan's EPA implemented a Cap-and-Trade system to phase-out leaded gasoline (47 Fed. Reg. 49322) and the Title IV

26  Program was signed into law by President George H. W. Bush.  Studies of the Title IV Program have concluded that allowance trading reduced compliance costs by as much as 50% relative to the cost of

27  command-and-control alternatives.  Curtis P. Carlson, *et al.*, *SO₂ Control by Electric Utilities: What are the Gains from Trade*, Journal of Political Economy, vol 108, No. 6 at pp. 1292-1326 (2000); Denny A.

28  Ellerman, *et al.*, *Markets for Clean Air: The U.S. Acid Rain Program*, Cambridge, UK: Cambridge Univ. Press (2000).

1  with Québec's Cap-and-Trade program would maximize total benefits to California including

2  emission reductions and cost-effectiveness.  CARB Resolution 13-7 (available at

3  https://ww3.arb.ca.gov/cc/capandtrade/linkage/resolution13-7.pdf, last accessed January 31,

4  2020).  This process culminated in April 2013 with the CARB Board adopting regulatory

5  amendments that linked California's program with Québec's, meaning that California would

6  accept Québec-issued compliance instruments for compliance with California's program.  *Id.*

7          In October 2017, CARB and Québec signed an agreement expressing the parties'

8  intentions to continue working collaboratively and jointly to harmonize and integrate the

9  California and Québec Cap-and-Trade programs.  Agreement (available at

10  https://ww3.arb.ca.gov/cc/capandtrade/ linkage/2017_linkage_agreement_ca-qc-on.pdf, last

11  accessed on January 31, 2020).  The Agreement replaced a similar instrument that had been

12  executed in 2013.  The Agreement added the Canadian Province of Ontario as a party, though

13  Ontario subsequently withdrew from the Agreement.

14          The Agreement provides for ongoing consultation to promote continued harmonization and

15  integration of the parties' respective Cap-and-Trade programs while acknowledging their

16  respective legislative and regulatory processes for programmatic changes.  *Id.*, Arts. 3-4.  It

17  acknowledges that the parties' respective Cap-and-Trade programs provide for mutual recognition

18  of compliance instruments.  *Id.*, Art. 6.

**III.**
**ARGUMENT**

19

20  **A.**    **Standard of Review.**

21          Summary judgment is appropriate "only if no genuine issue of material fact exists," and

22  only if the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c);

23  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Clipper Express v. Rocky Mountain Motor*

24  *Tariff Bureau, Inc.*, 690 F.2d 1240, 1250 (9th Cir. 1982). "In considering a motion for summary

25  judgment, the court may not weigh the evidence or make credibility determinations, and is

26  required to draw all inferences in a light most favorable to the non-moving party."  *Anderson v.*

27  *Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

28

1    **B.    <u>The Agreement is Not a Treaty</u>.**

2        The Article I Treaty Clause of the United States Constitution provides that "No State shall

3    enter into any Treaty, Alliance, or Confederation . . . ."  U.S. CONST. art. I, § 10, cl. 1.  Not all

4    international agreements between states or the U.S. Government, on the one hand, and foreign

5    sovereigns, on the other, qualify as treaties.  *Virginia v. Tennessee*¸ 148 U.S. 503, 519 (1893).

6    Rather, treaties possess the following fundamental characteristics:  (1) a political character;

7    (2) legally binding commitments; and (3) a method of redress.

8        The United States argues that the Agreement[3] is a treaty based on bald

9    mischaracterizations of that instrument's scope and function.  Although the Motion repeatedly

10    refers to the Agreement as an "emissions treaty," *see, e.g.*, Motion at 14:13, the document does not

11    govern emissions at all.  Rather, the Agreement expressly acknowledges that each party has its

12    own GHG reduction targets, its own reporting program, and its own Cap-and-Trade program.  *See*

13    Agreement at 2.  Contrary to the contrived arguments in the Motion, the Agreement does not

14    possess any of the essential features of a treaty.  Rather, the Agreement memorializes the parties'

15    intent to consult one another in an effort to ensure the compatibility of the parties' respective

16    Cap-and-Trade programs.

17        **1.    The Agreement Does Not Have a Political Character.**

18        Although the Motion contends that the Agreement has a "political character," Motion at

19    14:15-16:12, this position is supported only by conclusory statements and mischaracterizations of

20    the Agreement.  The Supreme Court has explained that treaties of a "political character" are those

21    such as "treaties of alliance for purposes of peace and war, and treaties of confederation, in which

22    the parties are leagued for mutual government, political co-operation, and the exercise of political

23    sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or

24

---

25    [3] The Motion focuses only on the Agreement.  It does not contend that California's regulations providing
26        for the linkage between California's and Québec's Cap-and-Trade programs somehow constitute a treaty
        in violation of the Treaty Clause.  The Plaintiff has therefore waived any such argument with respect to
27        the Motion.  *See Thacker v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 76478, *35 (E.D. Cal. 2012)
        (issues "not raised in Plaintiff's Opening Brief . . . deemed waived.").  In any event, there is no authority
        for the proposition that a State's domestic regulations can constitute a treaty and each argument presented
28        below is equally applicable to California's regulations as it is to the Agreement at issue in the Motion.

external political dependence, or general commercial privileges."  *Virginia*, 148 U.S. at 519.  The Agreement does not fit within any of these categories.

The Motion contends that the Agreement has a political character because "California has no more proprietary or quasi-proprietary interest in Québec's approach to regulating GHG emissions than does any other state."  Motion at 14:25-15:4.  This position mischaracterizes the function of the Agreement, which does not touch upon Québec's approach to regulating GHG emissions in any way.  Rather, "the objective of [the] Agreement is for the Parties to work jointly and collaboratively toward the harmonization and integration of the Parties' [GHG] emissions reporting programs and [Cap-and-Trade] programs."  Agreement, Article 1.

The Motion also argues that the Agreement "confederates the laws of the two jurisdictions" and "plainly establishes a 'league for mutual government.'"  Motion at 15:10-12. That term is not defined by the Supreme Court in *Virginia*, nor does the Motion shed any light on what would constitute such a league.  Instead, it supports this contention by pointing generally to eleven different articles of the Agreement, none of which comes close to establishing any sort of "mutual government":  Article 3 (parties will "consult each other regularly and constructively"); Article 4 (parties will "examine their respective regulations"); Article 5 (parties will "discuss" any changes to offset protocols of their programs); Article 6 (parties will "notify" each other of compliance instruments that must be voided); Article 7 (parties will "keep each other informed of any investigations"); Article 9 (acknowledging that joint auctions will occur "as provided for under [the parties'] respective Cap-and-Trade programs"); Article 12 (parties will "consult" one another before they use a service other than WCI for administrative and technical support); Article 13 (consultation committee established to "monitor implementation" of parties' programs and "recommend" improvements); Article 17 (parties may withdraw with notice); Article 20 (parties will "consult each other constructively to resolve differences"); and Article 22 (parties will notify each other soon regarding completed procedures).  In sum, these provisions reflect each party's good faith efforts to keep each other informed of any substantial changes to their respective domestic regulations.  Contrary to the Motion's sweeping statements, *none* of these provisions

1    even remotely set up any sort of system by which California and Québec mutually govern

2    anything.

3         The Motion also suggests, without citing any provision of the Agreement, that it "creat[es]

4    an exclusive market for the purchase and sale of certain articles of commerce."  Motion, at 15:15-

5    17.  This reflects a misunderstanding of the *Virginia* test, which provides that treaties confer

6    "*general* commercial privileges."  148 U.S. at 519 (emphasis added).  It also represents a

7    mischaracterization of the Agreement, which merely acknowledges that the parties will mutually

8    recognize compliance instruments "as provided for under their respective Cap-and-Trade program

9    regulations."  Agreement, Article 6; *see also id*. at 2 ("the Parties publicly adopted . . . their own

10   regulation(s) on their Cap-and-Trade programs").  The Agreement simply acknowledges that the

11   parties have each independently enacted regulations for the issuance, trading and surrender of *one*

12   *single* commodity – compliance instruments.  It does not create a set of general trade rules for all

13   or a substantial portion of goods and services that pass between California and Québec, and

14   therefore it is not a treaty under the test stated in *Virginia*.  148 U.S. at 519.

15        **2.    The Agreement is Not a Legally Binding Instrument.**

16        A treaty is a legally binding contract between two nations.  *See Herrera v. Wyoming*,

17   139 S. Ct. 1686, 1699 (2019) (A treaty is "essentially a contract between two sovereign nations.");

18   *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25 (2014) (same); *see also* Congressional

19   Research Service Library of Congress, 106th Cong., Treaties and Other International Agreements:

20   The Role of the United States Senate ("106th Cong. CRS") at 1 ("Under international law, a

21   'treaty' is any legally binding agreement between nations."); *id.* at 51 (a treaty is an "international

22   agreement" as "an agreement between two or more states or international organizations that is

23   intended to be legally binding and is governed by international law").  Further, a treaty or

24   international agreement must, *inter alia*, delineate obligations that are "clearly specified and

25   objectively enforceable."  106th Cong. CRS, at 50 n.20.

26        The Agreement contains no language to suggest that either California or Québec intended

27   for the document to be binding on either party.  It does not recite valuable consideration and no

28   consideration is exchanged.  *See*, Section III.C.1.a , *infra*.  Its language does not provide direction

1    that is either "clearly specified" or "objectively enforceable."  There are no provisions regarding

2    forum, choice of law, arbitration, nor any that create or otherwise reference any right to redress.

3    Indeed, the dispute resolution provision, entitled "Resolution of Differences," merely advises the

4    parties to "consult each other constructively," and, if that doesn't work, the parties are to try to

5    "constructively engage through the Consultation Committee."  Agreement, at Article 20.  That is

6    not the type of language used in a contract intended to bind the parties to a definite course of

7    conduct.[4]

8         On the other hand, numerous provisions indicate the parties did not intend the Agreement

9    to be legally binding.  The Agreement contemplates that the respective Cap-and-Trade programs

10   are linked only insofar as the "regulations adopted by each Party" within their own respective

11   jurisdictions, (Agreement at 2), but it "does not require or commit the Parties or their respective

12   regulatory or statutory bodies to create new statutes or regulations."  *Id.*, Article 14.  The

13   Agreement states that it "does not, will not and cannot be interpreted to restrict, limit or otherwise

14   prevail over . . . each Party's sovereign right and authority to adopt, maintain, modify, repeal or

15   revoke any of their respective program regulations or enabling legislation."  *Ibid*.  Any party may

16   withdraw from the Agreement at any time, but "shall endeavor to give 12 months' notice of intent

17   . . . [and] shall endeavor to match the effective date of withdrawal with the end of a compliance

18   period."  *Id.* at Article 17.

19        Curiously, the Motion argues that the Agreement's provision for unrestricted and unilateral

20   withdrawal somehow indicates that it *is* binding.  Motion at 17:1-10.  The fallacy of this

21   contention is self-evident, and the United States' citation of a dissenting opinion in *Garcia v.

22   Texas*, 564 U.S. 940 (2015), does little to help its illogical position.  Similarly, to the extent that

23   the Motion implies that that the confidentiality "obligations" of Article 14 impose some binding

24   obligation, one need only read Article 14 – which merely acknowledges that the laws of each

25

---

26   [4] In a clever sleight of hand, the Motion counts the number of times the Agreement uses the word "shall" and argues that usage is evidence of the binding obligations of the Agreement.  Motion at 16:23-26.  It

27   carefully avoids any mention of what the Agreement provides the parties "shall" do.  The many requirements that "the parties shall endeavor," "shall undertake to," "shall consult," "shall discuss,"

28   "shall notify," and "shall examine" fail to create any binding obligations.

1   jurisdiction already provide for the protection of confidential information – to refute that notion.

2   Perhaps most specious is the Motion's suggestion that Ontario's unilateral withdrawal from the

3   Agreement provides evidence that the Agreement is binding on the parties.  Motion at 17:22-18:4.

4   The fact that the United States must resort to arguments as attenuated as these provides perhaps

5   the best evidence that the Agreement imposes no binding obligations on the parties and is

6   therefore not a treaty.

7           **3.      The Agreement Does Not Provide a Method of Redress For the Parties or
                        Market Participants.**

8

9           Treaties typically provide some method of redress *vis-à-vis* the instrument itself.  *See, e.g.,*

10  *Rranci v. Attorney Gen. of U.S.*, 540 F.3d 165, 169 (3d Cir. 2008) (United Nations Convention on

11  Torture provides private cause of action to individuals who cooperate in the prosecution of human

12  traffickers); *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988) (film makers can sue

13  to enforce Beirut Agreement, which exempts certified materials from customs duties and licensing

14  requirements); *Hill v. United Airlines*, 550 F. Supp. 1048, 1054 (D. Kan. 1982) (Warsaw

15  Convention establishes uniform liability rules governing international air transportation).

16          Additionally, trade treaties in particular are designed to encourage private actors – such as

17  those that are IETA members – to import and export products from other private actors.  In order

18  to encourage trade, such treaties often require that the parties refrain from taking actions that

19  would adversely affect private actors.  Andrea K. Schneider, *Democracy and Dispute Resolution:*

20  *Individual Rights in International Trade Organizations*, 19 U. Pa. J. Int'l Econ. L. 587, 598 (1998)

21  ("Once states choose to join international trade organizations, the requirement of fair treatment for

22  noncitizens includes freedom from unfair taxation, unfair government regulation, unequal tariffs

23  and unequal nontariff barriers.  Basically, trade treaties provide a set of rights for private actors

24  against governments.")

25          For example, the North American Free Trade Agreement ("NAFTA"), available at

26  https://www.nafta-sec-alena.org/Home/Texts-of-the-Agreement/North-American-Free-Trade-

27  Agreement (last accessed February 10, 2020), and the United States-Mexico-Canada Agreement

28  ("USMCA"), available at https://ustr.gov/trade-agreements/free-trade-agreements/united-states-

1  mexico-canada-agreement/agreement-between (last accessed February 10, 2020), allow signatory

2  parties and private actors to dispute and vindicate certain rights, such as the denial of rights for

3  workers at a covered facility, the restriction of trade, the prohibition against the imposition of

4  customs duties and other discriminatory measures.  NAFTA sets forth detailed procedures for

5  resolving disputes, and even provides form complaints and motions that private parties affected by

6  the treaty may use to vindicate their rights in the appropriate tribunals.  NAFTA, Art 1904.

7  Similarly, Chapter 10 of the USMCA, entitled "Trade Remedies," enumerates specific

8  antidumping statutes that provide redress for affected private parties and the specific laws that

9  would apply to issues such as duty evasion.

10         Unlike these treaties, the Agreement does not contain any mechanism by which an affected

11  private party can institute a cause of action in any court or tribunal.  Affected market participants

12  do not receive any privately enforceable justiciable rights through the Agreement.  For example,

13  IETA members cannot sue Québec for violating the Agreement if Québec refuses to consult with

14  California before changing its program.  Unlike traditional trade treaties where the rights and

15  interests of individual businesses are contemplated and addressed directly by the provisions of the

16  treaty,[5] the Agreement does not prohibit California or Québec from creating legislation within

17  their respective jurisdictions that would adversely affect private actors.  Redress, if available,

18  would only be through California's and Québec's internal regulations, not through the Agreement.

19         The Motion argues that the Agreement's "legal force" is found in the provision in which

20  California and Québec "commit to promote continued harmonization and integration of the

21  Parties' programs."  Motion at 16:19-20.  Instruments in which parties simply make commitments

22  and declarations to further a common purpose are not treaties.  For example, the Universal

23  Declaration of Human Rights and the International Covenant on Civil and Political Rights are not

24

---

25  [5] *See, e.g.*, NAFTA at Chapter 11 (provides a mechanism for multinational corporations to sue

26  governments before an arbitration panel); USMCA Section 14.D.3 (a Mexican or U.S. investor can file a
    claim through arbitration for breaches by the respondent party in relation to national treatment, most

27  favored nation, and expropriation and compensation); U.S. – Singapore Free Trade Agreement, available
    at https://ustr.gov/sites/default/files/uploads/agreements/fta/singapore/asset_upload_file708_4036.pdf

28  (last accessed February 10, 2020), Section C (allows a private claimant investor to submit a claim to
    arbitration for any loss or damage arising out of a breach).

treaties imposing legal obligations; they are declarations in which signatory countries memorialize statements of common principles. *Ruhaak v. Comm'r*, 422 F. App'x 530, 532 (7th Cir. 2011); *Kanli v. Duke Univ.*, No. 1:12CV63, 2012 WL 2366449, at *2 (M.D.N.C. June 21, 2012); *Sneed v. Chase Home Fin. LLC*, No. 07CV0729LABAJB, 2007 WL 1851674, at *3 (S.D. Cal. June 27, 2007). Similarly, "joint statements" or "declarations" that express mutual intentions but do not establish legal obligations are not treaties under the Vienna Convention on the Law of Treaties. *Gross v. German Foundation Industrial Initiative*, 499 F. Supp. 2d 606, 659 (D.N.J. 2007) (citing, Report of the International Law Commission to the General Assembly, 1958 2 Y.B. Int'l Law Comm. 96-97 (1959)).

The Agreement does not include any enumerated repercussions for any actions, no recitations of consequences to either party, no binding methods of dispute resolution, no references to the particular laws that would govern in a dispute, nor any protocols put in place to protect the regulated entities' investments. The language of the Agreement is more akin to a "joint statement" or a declaration of the parties' intention to work in harmony. There is nothing remotely close to the "legal force" found in treaties such as NAFTA or the USMCA.

Thus, because the Agreement lacks any of the three fundamental characteristics of a treaty, this Court should deny the Motion as to the Treaty Clause cause of action.

**C.      The Agreement Does Not Require Congressional Consent Under the Compact Clause.**

The Compact Clause of the United States Constitution provides that "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State, or with a foreign Power . . .." U.S. CONST. art. I, § 10, cl. 3. The first thing to note is that the Compact Clause applies equally to agreements between states ("interstate agreements") and those between states and foreign powers ("foreign agreements").[6] The U.S. Supreme Court has long recognized that not all interstate agreements (and, by extension, foreign agreements) require congressional consent under the Compact Clause. *Virginia v. Tennessee*, 148 U.S. 503 (1893).

---

[6] Neither the text of the Commerce Clause nor the opinions of the U.S. Supreme Court differentiate between the two types of agreements. Here, the Motion does not contend that foreign agreements are treated any differently than interstate agreements. Consequently, for purposes of this Opposition, we assume that the law governing interstate agreements is equally applicable to foreign agreements.

1    Indeed, though states have entered into thousands of interstate agreements and foreign agreements,

2    ***no court has ever invalidated an agreement for lack of congressional consent under the***

3    ***Compact Clause***.  *See* Michael S. Greve, *Compacts, Cartels, and Congressional Consent*, 68 Mo.

4    L. Rev. 285, 289 & n.15 (2003).

5           The U.S. Supreme Court has developed a two-part test to determine whether an interstate

6    agreement or a foreign agreement requires congressional approval under the Compact Clause.  As

7    a threshold inquiry, the Court asks whether the arrangement has the "indicia of a compact."

8    *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 175

9    (1985).  If the arrangement lacks the indicia of a compact, then no Congressional approval is

10   required; but the opposite is not true.  If the arrangement does possess the indicia of a compact, the

11   Compact Clause requires congressional approval only if the compact also "may encroach upon or

12   interfere with the just supremacy of the United States."  *Virginia*, 148 U.S. at 519.

13           **1.      The Agreement Does Not Possess the Requisite Indicia of a Compact.**

14                   a.      <u>The Agreement Lacks Mutual Consideration.</u>

15           State agreements that do not involve the exchange of mutual consideration are

16   categorically excluded from the Compact Clause's congressional consent requirement.  *Virginia*,

17   148 U.S. at 520.  In *Virginia v. Tennessee*, the Court had to determine which of several different

18   agreements between Virginia and Tennessee, each concerning a boundary between the states, may

19   be considered a "compact or agreement."  The Court held that neither the creation of a joint

20   commission to mark the boundary between the states nor the legislative declaration that the line

21   was correct qualified as a "compact or agreement."  *Id*.  Instead, a "legislative declaration will take

22   the form of an agreement or compact when it recites some consideration for it from the other party

23   affected by it, for example, as made upon a similar declaration of the border or contracting State."

24   *Id*.  Consequently, the Court held that the States' ratification of the joint commission's

25   conclusions, "mutually made by each State in consideration of the ratification of the other," would

26   qualify as a compact requiring congressional consent *if* it also interfered with federal supremacy.

27   *Id*. at 520-21.

28

The Motion fails this threshold test.  Although it spends several pages arguing that the Agreement interferes with federal supremacy, it does not argue that the Agreement "recites some consideration" as required by *Virginia v. Tennessee*.  *See generally*, Motion at 18:15-25:27.  Further, the Agreement does not contemplate any exchange of value that can be considered consideration.  Rather, the Agreement acknowledges past actions unilaterally taken by the parties and expresses their mutual intent to "facilitate continued consultation . . . with the objective of maintaining and developing harmonized and integrated approaches that may be considered by each Party."  Agreement, Recitals ("the Parties publicly adopted *their own* greenhouse gas emissions reduction targets, *their own* regulation on greenhouse gas emissions reporting programs and *their own* regulation(s) on the Cap-and-Trade programs").  It is black-letter law that past acts, already performed, do not constitute valid consideration under the law.  *See*, *e.g.*, *Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952 (S.D. Cal. 2007); *Passante v. McWilham*, 53 Cal. 2d 264, 581 (Cal. 1949); *see also*, Williston on Contacts § 8:11 (4th ed. 2015).  Due to the failure of consideration alone, under *Virginia* the Agreement is not subject to the Compact Clause and the Motion fails as a matter of law.  148 U.S. at 520.

### b.    The Harmonization Lacks Other Indicia of a Compact.

Under *Virginia*, the absence of mutual consideration categorically removes an agreement from the reach of the Compact Clause.  148 U.S. at 520.  But the inverse is not necessarily true – the presence of mutual consideration is only one of several factors considered in determining whether an agreement requires congressional consent under the Compact Clause.  *Northeast Bancorp*, 472 U.S. at 175.

In *Northeast Bancorp*, the Court analyzed reciprocal state statutes in Massachusetts and Connecticut, each of which allowed the acquisition of in-state banks by out-of-state bank holding companies only where the other state accords equivalent reciprocal privileges.  472 U.S. at 162-68.  Analyzing those statutes, the Court opined that:

> We have some doubt as to whether there is an agreement amounting to a compact.  The two statutes are similar in that they both require reciprocity . . . , both legislatures favor the establishment of regional banking in New England, and there is evidence of cooperation among legislators, officials, bankers, and others in the two States in

> studying the idea and lobbying for the statutes. But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation.

472 U.S. at 175[7]; *accord The Gillette Co. v. Franchise Tax Bd.*, 62 Cal. 4th 468, 478-83 (Cal. 2015).

The Ninth Circuit interprets this language to create a threshold test involving three factors: "establishment of a joint organization for regulatory purposes; conditional consent by member states in which each state is not free to modify or repeal its participation unilaterally; and state enactments which require reciprocal action for their effectiveness." *Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1363 (9th Cir. 1985); *accord In re Manual P.*, 215 Cal. App. 3d 48, 66 (Cal. Ct. App. 1989). The Agreement lacks the indicia of a compact.

*First*, the Agreement does not "establish[] a joint organization for regulatory purposes." *Seattle Master Builders Ass'n*, 786 F.2d at 1363. Without any analysis, the Motion suggests that the WCI and the Consultation Committee are "joint organizations" established by the Agreement. Motion at 24:10-12. But the Compact Clause analysis looks only to the establishment of joint organizations that have some *regulatory* purpose. *U.S. Steel*, 434 U.S. at 457 (rejecting application of Compact Clause where administrative body was authorized to propose advisory regulations but had no independent regulatory authority). It is undisputed that neither the WCI nor the Consultation Committee have any authority to promulgate regulations or otherwise compel any action by the parties to the Agreement. In fact, the Motion admits that the WCI provides "technical support." Motion at 24:10. The Consultation Committee "monitor[s] the implementation" of the parties' respective Cap-and-Trade programs, "recommends measures" to improve harmonization of the programs, and "addresses any other issues" requested by the parties.

---

[7] The Court avoided deciding whether the statutes in question were compacts, concluding that even if they were, they posed no threat to federal supremacy and therefore no congressional consent was required. *Id.* at 175-76.

1  Agreement, Article 15.  Neither WCI nor the Consultation Committee are regulatory bodies, and

2  consequently the Agreement does not establish a joint organization for regulatory purposes.  *See*

3  *also*, *The Gillette Co*, 62 Cal. 4th at 481-83 ("Although the Compact established the Commission,

4  that body has no authority ordinarily associated with a *regulatory* organization.") (emphasis in

5  original).

6      *Second*, to the extent that the Motion suggests that California or Québec cannot unilaterally

7  modify or repeal their participation in the Agreement, *see, e.g.,* Motion at 25:20-23, that position

8  is belied by the unambiguous terms of the Agreement and facts that the Motion elsewhere admits.

9  Article 17 of the Agreement expressly permits a party to "withdraw from this Agreement by

10  giving written notice of intent to withdraw to the other Parties."  *See also* Agreement, Recitals

11  ("the present Agreement does not, will not and cannot be interpreted to restrict, limit of otherwise

12  prevail over . . . each Party's sovereign right and authority to adopt, maintain, modify, repeal or

13  revoke any of their respective program regulations or enabling legislation").  The Motion attempts

14  to sidestep this language by contending that, in practice, withdrawal is impossible due to market

15  participants' investment in allowances.  Motion at 25:22-23.  But elsewhere, the Motion openly

16  acknowledges that the Province of Ontario, previously a party to the Agreement, unilaterally

17  withdrew from the Agreement in 2018.  Motion at 17:22-18:4.  The parties' ability to withdraw at

18  any time militates against a finding that the Agreement is subject to the Compact Clause.

19      *Third*, the Motion has not pointed to any provisions of the Agreement "which require

20  reciprocal action for their effectiveness."  *Seattle Master Builders Ass'n*, 786 F.2d at 1363.  In

21  support of this prong, the Motion points only to provisions of the Agreement that compel the

22  parties to "examine" their regulations and "promote continued harmonization and integration" of

23  their Cap-and-Trade programs, to "take certain steps" where differences are identified, and to

24  "discuss" changes either party considers.  Motion at 24:12-21.  These provisions constitute

25  statements of intent that fall short of conditional reciprocal actions.

26      The Motion also resorts to the use of an incomplete quotation to imply that Article 6

27  requires the Parties to recognize each other's compliance instruments, Motion at 24:20-21, though

28  the full quotation makes clear that this mutual recognition is "provided for under their respective

Cap-and-Trade program regulations."  Agreement, Art. 6.  The Agreement does not either permit or require mutual acceptance of compliance instruments or other changes to the parties' respective Cap-and-Trade programs.  *Id.*, Art. 14 ("this Agreement does not . . . require or commit the Parties or their respective regulatory or statutory bodies to create new statutes or regulations").  Nothing in the Agreement evidences that reciprocal action is required for its effectiveness.

Notably, the Motion's sole focus is on the Agreement; it does not point to any California statute or regulation as evidence of reciprocity.  The Plaintiff has therefore waived any such argument with respect to the Motion.  *See Thacker v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 76478, *35 (E.D. Cal. 2012) (issues "not raised in Plaintiff's Opening Brief . . . deemed waived.").  Even if the Motion had raised this issue, California's regulations nowhere require reciprocity.  *See*, *e.g.*, 17 Cal. Code Regs. 94952(i) (providing that CARB's Executive Officer *may* suspend, revoke, or repeal an approved linkage if the linked jurisdiction has changed its Cap-and-Trade program).  Further, even if certain provisions of California statute or regulation could arguably be construed to contemplate some form of reciprocity, *see*, *e.g.*, Cal. Gov. Code § 12894(f) *and* 17 Cal. Code Regs. § 95942, the U.S. Supreme Court has made it abundantly clear that reciprocity alone is insufficient to require congressional consent.  *See U.S. Steel*, 434 U.S. at 469-70 ("several decisions of [U.S. Supreme Court] have upheld a variety of interstate agreements effected through reciprocal legislation without congressional consent").

Thus, because the Agreement lacks the requisite indicia of a compact, it is not subject to the Compact Clause.  This Court should deny the Motion as to the Compact Clause cause of action.

    **2.**    **The Agreement Does Not Encroach Upon or Interfere With the Supremacy of the United States.**

"Even if all the indicia of compacts are present, the only interstate agreements which fall within the scope of the compact clause are those 'tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States.'" *Seattle Master Builders Ass'n*, 76 F.2d at 1363, *quoting Cuyler v. Adams*, 449 U.S. 433, 440 (1981).  "The relevant inquiry must be one of impact on [the] federal structure." *U.S. Steel*, 434

1    U.S. at 471. "If the joint activity does not affect the federal sphere, no approval by Congress is

2    needed." *Seattle Master Builders Ass'n*, 76 F.2d at 1363. The Motion asserts three different

3    arguments that the Agreement impacts the federal structure, each of which has previously been

4    considered and rejected by the U.S. Supreme Court.

5                          a.    The Compact Clause Is Not Concerned With Geographic Proximity Or
                                 Local Interests.

6

7          *First*, the Motion attempts to introduce a geographic proximity element into the Compact

8    Clause analysis, arguing that congressional consent is required because "California and Québec do

9    not share a border" and they "are not seeking to abate a nuisance that affects them in some entirely

10   localized way." Motion at 20:9-21:11. But the Compact Clause does not concern itself with

11   geographic proximity and there is no "common border" requirement. *U.S. Steel*, 434 U.S. at

12   454 n.1. As just one example, in *U.S. Steel* the Supreme Court rejected a Compact Clause

13   challenge to the Multistate Tax Compact, the members of which included 21 different states

14   ranging from Alaska to Hawaii to Florida. *Ibid*. Surely, then, the Motion's suggestion that the

15   lynchpin of the Compact Clause analysis is whether the agreement is sufficiently "local" must be

16   rejected.

17         Further undermining the United States' position, *U.S. Steel* also held that it is "irrelevant"

18   whether an agreement may implicate non-local or federal *interests* where "the terms of the

19   Compact do not enhance the power of the member States to affect federal supremacy." *Id*. at

20   479 n.33 (distinguishing between "federal interests" and "federal supremacy"). Although the

21   Motion includes a lengthy non-sequitur that the Agreement does not "respond[] to any discrete,

22   non-local *interest*," Motion at 20:9-21:11 (emphasis added), it fails to identify any potential

23   interference with the federal *structure*. To the contrary, as was the case in *U.S. Steel*, here

24   "[f]ederal power in the relevant areas remains plenary." *Ibid*. The Agreement does nothing to

25   infringe upon federal authority over the states or foreign affairs. No federal action authorized

26   under the Constitution is foreclosed to the U.S. Government acting through Congress or the

27   treatymaking power.

28                          b.    The Agreement Does Nothing To Hinder Foreign Negotiations.

1    *Second*, the Motion asserts that the Agreement "could complexify the federal government's

2    ability to negotiate competitive agreements in the foreign arena with the entirety of the economy at

3    its back."  Motion at 21:12-22:17.  It is telling, however, that although the linkage between

4    California's and Québec's Cap-and-Trade systems has been in effect for over seven years, the

5    Motion does not identify a single tangible example of the "leverage" or "options" that the

6    Agreement denies the federal government.  Indeed, it is difficult to imagine what "options" the

7    Motion is referring to.  The United States remains free to negotiate any treaty of its choosing and,

8    if ratified by Congress, any such treaty would become the supreme law of the land.  This is

9    entirely consistent with the "federal structure."  *U.S. Steel*, 434 U.S. at 480 n.33 ("no action

10   authorized by the Constitution is foreclosed . . . to the Federal Government acting through

11   Congress or the treatymaking power.")

12   It is also telling that the Motion does not cite a single Compact Clause case supporting the

13   notion that a state agreement that might "complexify" the federal government's negotiations

14   would interfere with the federal structure.  All of the cases cited in support of this argument

15   involve preemption of state law by some specific federal enactment.  Motion at 21:12-22:13,

16   *citing American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) (California statute requiring

17   insurers to disclose information about policies sold in Europe between 1920 and 1945 was

18   preempted by executive agreements that made disclosure voluntary); *Crosby v. Nat'l Foreign*

19   *Trade Council*, 530 U.S. 363, 381 (2000) (Massachusetts law that barred state entities from buying

20   goods or services from those doing business with Burma was preempted by act of Congress);

21   *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (district court's orders of attachment against

22   Government of Iran and Iranian banks were extinguished by executive orders implementing

23   hostage agreement); *Hines v. Davidowitz*, 312 U.S. 51 (1941) (Pennsylvania Lien Registration Act

24   was preempted by federal Alien Registration Act).  These preemption cases have no bearing upon

25   the analysis here because the United States does not allege that the Agreement is preempted by

26   some federal law or enactment.

27          c.    <u>The Supreme Court Has Roundly Rejected the Relevance of Historical
             Legislative Practice.</u>

28

1    *Third*, the Motion contends that "legislative practice supports" that the Agreement requires

2    congressional approval under the Compact Clause, citing a few anecdotes involving state

3    agreements that were presented to Congress for approval.  Motion at 22:18-24:5.  This contention

4    is easily refuted, however, since the Supreme Court rejected precisely the same argument in

5    *U.S. Steel.*  There, appellant taxpayers argued that bilateral agreements involving the creation of an

6    administrative body had historically been submitted to Congress for approval.  *U.S. Steel*, 434

7    U.S. at 471.  The Supreme Court rejected the relevance of that argument, pointing out the past

8    practice "may simply reflect considerations of caution and convenience on the part of the

9    submitting States."  *Ibid.*  The Court continued:  "These other Compacts are not before us.  We

10   have no occasion to decide whether congressional consent was necessary to their constitutional

11   operation, nor have we any reason to compare those Compacts to the one before us."  *Id.* at

12   471 n.24.

13   The same reasoning is equally applicable here.  The various agreements that the Motion

14   discusses, which were presented to Congress and either approved or disapproved, are not before

15   this Court.  And while the United States may summarily characterize those agreements as "far

16   lesser," Motion at 23:24, the Motion does not attempt to conduct any comparison to the

17   Agreement.  Nor should it, since *U.S. Steel* definitively rejected the relevance of any such

18   "comparison test" under the Compact Clause.

19   To illustrate how absurd the United States' position is, for every "lesser" agreement that

20   was presented to Congress, one might identify an equally "greater" agreement that was not.  As

21   just one illustration, in 2003 Kansas reached an agreement with Cuba providing that Cuba would

22   purchase $10 million in goods from Kansas in exchange for Kansas lobbying to repeal federal

23   trade and travel sanctions against Cuba.  Duncan B. Hollis, *Unpacking the Compact Clause*,

24   88 Tex. L. Rev. 741, 741-42 (2010).  This agreement, wherein a state agreed to represent the

25   interests of a hostile foreign power before the U.S. Government, was not presented for

26   congressional approval under the Compact Clause.  *Ibid.*  By the Plaintiff's flawed reasoning, this

27   agreement and the many others like it indicate that the Agreement therefore "unquestionably"

28   *lacks* the indicia of a binding compact.  Motion at 24:4-5.  The U.S. Supreme Court rejected the

1  relevance of such evidence for good reason.  *U.S. Steel*, 434 U.S. at 471.

**IV.**
**CONCLUSION**

For the foregoing reasons, the United States' Motion for Summary Judgment should be denied.

Dated:  February 10, 2020          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By  _____/s/ Nicholas W. van Aelstyn_____
                  NICHOLAS W. VAN AELSTYN
                  ZACHARY M. NORRIS

                  Attorneys for Intervenor
            INTERNATIONAL EMISSIONS TRADING
                        ASSOCIATION