1  MATTHEW D. ZINN (State Bar No. 214587)
   PATRICK L. WOOLSEY (State Bar No. 32989)
2  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
3  San Francisco, California 94102
   Telephone:    (415) 552-7272
4  Facsimile:    (415) 552-5816
   Zinn@smwlaw.com
5  Pwoolsey@smwlaw.com

6  Attorneys for Defendant-Intervenors
   ENVIRONMENTAL DEFENSE FUND and
7  NATURAL RESOURCES DEFENSE COUNCIL

8  TIMOTHY J. O'CONNOR (State Bar No. 250490)
   ERICA A. MOREHOUSE MARTIN (State Bar No. 274988)
9  ENVIRONMENTAL DEFENSE FUND
   123 Mission Street, Floor 28
10 San Francisco, California 94105
   Telephone:    (415) 293-6050
11 Facsimile:    (415) 293-6051
   Toconnor@edf.org
12 Emorehouse@edf.org

13 Attorneys for Defendant-Intervenor
   ENVIRONMENTAL DEFENSE FUND
14
   (additional counsel listed on the following page)
15
                  UNITED STATES DISTRICT COURT
16     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

17 THE UNITED STATES OF AMERICA,            Case No. 2:19-cv-02142-WBS-EFB
18               Plaintiff,                   **INTERVENORS EDF & NRDC'S**
                                              **OPPOSITION TO PLAINTIFF'S**
         v.                                   **MOTION FOR SUMMARY JUDGMENT**
19
   THE STATE OF CALIFORNIA; GAVIN C.         Date:    March 9, 2020
20 NEWSOM, in his official capacity as       Time:    1:30 p.m.
   Governor of the State of California; THE
21 CALIFORNIA AIR RESOURCES BOARD;           The Hon. William B. Shubb
   MARY D. NICHOLS, in her official capacity
22 as Chair of the California Air Resources Board
   and as Vice Chair and board member of the
23 Western Climate Initiative, Inc.; JARED
   BLUMENFELD, in his official capacity as
24 Secretary for Environmental Protection and as
   a board member of the Western Climate
25 Initiative, Inc.; KIP LIPPER, in his official
   capacity as a board member of the Western
26 Climate Initiative, Inc.; and RICHARD
   BLOOM, in his official capacity as a board
27 member of the Western Climate Initiative,
   Inc.,
28               Defendants,

ENVIRONMENTAL DEFENSE FUND and
NATURAL RESOURCES DEFENSE
COUNCIL,

        Defendant-Intervenors,

INTERNATIONAL EMISSIONS TRADING
ASSOCIATION,

        Defendant-Intervenors.

     (additional counsel)

DAVID R. PETTIT (State Bar No. 67128)
NATURAL RESOURCES DEFENSE COUNCIL
1314 2nd Street
Santa Monica, California 90401
Telephone: (310) 434-2300
Facsimile: (310) 434-2399
Dpettit@nrdc.org

Attorneys for Defendant-Intervenor
NATURAL RESOURCES DEFENSE COUNCIL

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

      A.    California is already experiencing the devastating impacts of climate change. ................................................................................................3

      B.    California's cap-and-trade program is part of the first comprehensive climate change mitigation program in the United States. ........................4

      C.    California adapted its cap-and-trade program for coordination with other jurisdictions. ..........................................................................................6

      D.    California and Quebec coordinate their emission markets and allow other jurisdictions to join. ...................................................................7

      E.    Ontario abandoned the coordinated emissions market. ...........................8

      F.    The coordinated emissions trading market had been in operation for years before Plaintiff sued California. ..............................................9

SUMMARY JUDGMENT STANDARD ...............................................................................9

ARGUMENT .....................................................................................................................10

    I.    Plaintiff lacks standing to bring this action. ...............................................10

      A.    California's coordination with Quebec has not impeded the United States' planned withdrawal from the Paris Agreement. ...................12

      B.    California's coordination with Quebec would not limit the United States' "bargaining chips" in any future climate change negotiation. ...............14

      C.    Plaintiff has not shown standing based on any of its other claimed injuries. ........16

    II.    The coordinated market does not violate the Compact Clause because it does not encroach on federal supremacy. ..................................................18

      A.    The agreement does not allow California to exercise any power that it could not otherwise exercise. .........................................................19

      B.    The agreement does not delegate sovereign power to any other entity but rather preserves California's "sovereign right and authority." ...............20

      C.    California is entirely free to withdraw from the agreement and modify or repeal its regulations as it sees fit. ...........................................21

      D.    Effects on "federal interests" are insufficient. .......................................23

      E.    Congress's rejection of unrelated agreements is irrelevant. ...................23

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III.   Because the agreement does not rise to the level of a compact, it is, *a fortiori,* not a treaty..................................................................................................................24

IV.   Federalism considerations support rejecting Plaintiff's unprecedented attack on state innovation. ...........................................................................................................28

     A.   Plaintiff's unprecedented claims imperil a broad swath of state agreements and reciprocal legislation. ......................................................................................29

     B.   California's market coordination with Quebec advances the goal of California's cap-and-trade program to control greenhouse gas emissions at the lowest cost. ..............................................................................................................31

CONCLUSION............................................................................................................................34

ii

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Alcoa, Inc. v. Bonneville Power Admin.*,
    698 F.3d 774 (9th Cir. 2012) ............................................................... 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................. 10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................. 10

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
    529 F. Supp. 2d 1151 (E.D. Cal. 2008)................................................ 15

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) .............................................................................. 11

*DeFazio v. Hollister, Inc.*,
    636 F. Supp. 2d 1045 (E.D. Cal. 2009)........................................... 10, 11

*Exxon Mobil Corp. v. EPA*,
    217 F.3d 1246 (9th Cir. 2000) ............................................................... 13

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
    508 F. Supp. 2d 295 (D. Vt. 2007)....................................................... 15

*Juliana v. United States*,
    No. 18-36082, 2020 WL 254149 (9th Cir. Jan. 17, 2020) ..................... 3

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 10, 11

*Made in the USA Found. v. United States*,
    242 F.3d 1300 (11th Cir. 2001) ............................................................. 24

*Mauricio v. Daugaard*,
    895 N.W.2d 358 (S.D. 2017) ................................................................ 21

*Moon v. Rush*,
    69 F. Supp. 3d 1035 (E.D. Cal. 2014) .................................................. 10

*N.Y. State Nat. Org. for Women v. Terry*,
    704 F. Supp. 1247 (S.D.N.Y.) *aff'd as modified*, 886 F.2d 1339 (2d Cir. 1989) ....................... 10

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
    472 U.S. 159 (1985)................................................................. 18, 19, 20, 21

*New Hampshire v. Maine*,
    426 U.S. 363 (1976).............................................................................. 18

*New State Ice v. Liebmann,*
    285 U.S. 262 (1932) ............................................................................................. 28

*Pac. Merch. Shipping Ass'n v. Goldstene,*
    639 F.3d 1154 (9th Cir. 2011); ......................................................................... 13

*Paulsen v. CNF Inc.,*
    559 F.3d 1061 (9th Cir. 2009) .......................................................................... 11

*People of the State of N.Y. v. O'Neill,*
    359 U.S. 1 (1959) ......................................................................................... 19, 28

*Rocky Mountain Farmers Union v. Corey,*
    730 F.3d 1070 (9th Cir. 2013) ............................................................................ 3

*Rocky Mountain Farmers Union v. Corey,*
    913 F.3d 940 (9th Cir. 2019) .............................................................................. 4

*Scott v. Pasadena Unified Sch. Dist.,*
    306 F.3d 646 (9th Cir. 2002) ............................................................................ 10

*Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council,*
    786 F.2d 1359 (9th Cir. 1986) ......................................................... 18, 20, 21, 22

*SEC v. Todd,*
    642 F.3d 1207 (9th Cir. 2011) .......................................................................... 10

*Soremekun v. Thrifty Payless, Inc.,*
    509 F.3d 978 (9th Cir. 2007) ............................................................................ 10

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ......................................................................... 10, 11, 15

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ........................................................................................... 10

*Texas v. United States,*
    523 U.S. 296 (1998) ......................................................................................... 16

*U.S. Steel Corp. v. Multistate Tax Comm'n,*
    434 U.S. 452 (1978) ................................................................................... passim

*United States v. Carroll,*
    667 F.3d 742 (6th Cir. 2012) ............................................................................ 11

*United States v. City of Tacoma, Wash.,*
    332 F.3d 574 (9th Cir. 2003) ............................................................................ 11

*United States v. Lopez,*
    514 U.S. 549 (1995) ......................................................................................... 34

*United States v. Reeb,*
    433 F.2d 381 (9th Cir. 1970) ............................................................................ 26

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

*Virginia v. Tennessee,*
   148 U.S. 503 (1893) ............................................................................................. 18, 27

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................................................. 11, 14

*Wharton v. Wise,*
   153 U.S. 155 (1894) ....................................................................................... 24, 25, 27

*Williams v. Bruffy,*
   96 U.S. 176 (1877) ....................................................................................................... 2

*Wilshire Oil Co. of Cal. v. Costello,*
   348 F.2d 241 (9th Cir. 1965) ..................................................................................... 26


**STATE CASES**

*Cal. Chamber of Commerce v. State Air Res. Bd.,*
   10 Cal. App. 5th 604 (2017) ........................................................................................ 5

*Mauricio v. Daugaard,*
   895 N.W.2d 358 (S.D. 2017) ..................................................................................... 21

*McHenry County v. Brady,*
   163 N.W. 540 (N.D. 1917) ........................................................................................ 18


**FOREIGN CASES**

*Greenpeace Canada v. Minister of the Environment (Ontario),*
   2019 ONSC 5629 ................................................................................................... 8, 22


**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 10, cl. 1 ................................................................................................ 25


**STATE STATUTES**

1947 Cal. Stat. ch. 632, § 1 ................................................................................................. 28

2006 Cal. Stat. ch. 488 .......................................................................................................... 4

Ariz. Rev. Stat. Ann. § 28-3164(D) (2019) ....................................................................... 31

Ark. Code Ann. § 27-16-809 .............................................................................................. 31

Cal. Health & Safety Code § 38500 *et seq.* ......................................................................... 4

Cal. Health & Safety Code § 38501 ......................................................................... 4

Cal. Health & Safety Code § 38510 ......................................................................... 4

Cal. Health & Safety Code § 38550 ................................................................... passim

Cal. Health & Safety Code § 38560 ................................................................... 5, 15

Cal. Health & Safety Code § 38562 ................................................................... 5, 15

Cal. Health & Safety Code § 38564 ......................................................................... 6

Cal. Health & Safety Code § 38566 ...................................................... 4, 13, 14, 16

Cal. Health & Safety Code § 38570 ......................................................................... 5

Mich. Vec. Code § 257.302 ................................................................................... 31

**STATE REGULATIONS**

Cal. Code Regs., tit. 17, § 95802 ..................................................................... passim

Cal. Code Regs., tit. 17, § 95811 ..................................................................... passim

Cal. Code Regs., tit. 17, § 95812 ..................................................................... passim

Cal. Code Regs., tit. 17, § 95820 ............................................................................. 5

Cal. Code Regs., tit. 17, § 95821 ............................................................................. 5

Cal. Code Regs., tit. 17, § 95841 ..................................................................... passim

Cal. Code Regs., tit. 17, § 95850 ............................................................................. 5

Cal. Code Regs., tit. 17, § 95910 ............................................................................. 5

Cal. Code Regs., tit. 17, § 95940 ........................................................................ 6, 8

Cal. Code Regs., tit. 17, § 95941 ............................................................................. 6

Cal. Code Regs., tit. 17, § 95942 ............................................................................. 6

Cal. Code Regs., tit. 17, § 95943 ................................................................. 6, 7, 8, 9

Cal. Code Regs., tit. 17, §§ 95801-96022 ............................................................... 5

Cal. Code Regs., tit. 17, §§ 95910-95923 ............................................................... 5

Cal. Code Regs., tit. 17, §§ 95940-45 ................................................................. 6, 15

**RULES**

Fed. R. Civ. P. 56 ........................................................................................................ 9, 10

**TREATISES**

Laurence Tribe, *American Constitutional Law* 651 (3d ed. 2000) ........................................ 24

**MISCELLANEOUS**

Arts. of Confederation, art. VI, cl. 2 ..................................................................... 25

Bryan Garner, "Shall We Abandon Shall?" *ABA Journal* (Aug. 1, 2012) ................................ 26

Bryan Garner, *Garner's Modern American Usage* (3d ed. 2009) ........................................ 26

Carlson, *Designing Effective Climate Policy: Cap-and-Trade and Complementary Policies*
    (2012) 49 Harv. J. on Legis. 207 .................................................................. 5

Christian Flachsland, Robert Marschinski & Ottmar Edenhofer, *To Link or Not to Link: Benefits
    and Disadvantages of Linking Cap-and-trade Systems*, 9 Climate Policy 358 (2009) ............... 33

Dallas Burtraw et. al., Resources for the Future, *Linking By Degrees: Incremental Alignment of
    Cap-and-Trade Markets* 2 (April 2013) ........................................................... 32, 33

David Frum, *A Forgotten Legacy of George H. W. Bush,* The Atlantic (Dec. 3, 2018) ................. 5

Duncan B. Hollis, *The Elusive Foreign Compact*, 73 Mo. L. Rev. 1071 (2008) ....................... 31

Duncan B. Hollis, *Unpacking the Compact Clause*, 88 Tex. L. Rev. (2010) .......................... 29

Felix Frankfurter & James Landis, *The Compact Clause of the Constitution—A Study in
    Interstate Adjustments*, 34 Yale L.J. 685 (1925) ............................................... 24

James E. Krier & Edmund Ursin, *Pollution & Policy: A Case Essay on California and Federal
    Experience with Motor Vehicle Air Pollution, 1940-1975* (1977) ................................. 28

Joseph L. Sukek, *Vehicle Emissions, an Overview*, 48 J. Urb. L. 805, 816 (1971) ................... 28

Robert N. Stavins, *A Meaningful U.S. Cap-and-trade System to Address Climate Change* (2008)
    32 Harv. Envtl. L. Rev. 293 ..................................................................... 5

William H. Taft, IV, Legal Adviser of the U.S. Dep't of State, "Memorandum," in *Digest of
    United States Practice of International Law* 180, 185 (Sally J. Cummins & David P.
    Stewart, eds., 2001) ........................................................................... 18

# INTRODUCTION

California has had devastating first-hand experience with the consequences of climate change, including drought, wildfire, and sea level rise. In response, the State adopted the Nation's first and most comprehensive system for regulating the greenhouse gases ("GHGs") that contribute to climate change. It includes a cap-and-trade program designed with the advice of economic and policy experts to reduce GHG emissions at the lowest possible cost to regulated businesses. It allows those entities to make emission reductions when the reductions are cheap, and when reductions are expensive, it allows them to effectively purchase reductions from other entities for whom they are cheap. Cap and trade thus significantly reduces the cost of controlling GHG emissions, while providing incentives for innovation in emission control, which further reduces compliance costs.

Plaintiff United States attacks one element of this program: California's coordination of the emission market with the Canadian province of Quebec, which has adopted a similar cap-and-trade program. That coordination expands the opportunities for regulated businesses in California to trade with others and thus further lowers their cost of compliance. Given the concerns Plaintiff has expressed about the cost of GHG emission regulation (*e.g.,* Dkt. 12 at 9, 19, 34), one might think it would applaud this arrangement.

Instead, Plaintiff has taken the unprecedented step of suing a state under the Constitution's Article I Compact and Treaty Clauses based on a thinly articulated theory that the market coordination interferes with federal foreign policy interests. The first defect in their suit is foundational: the Executive Branch must show the "irreducible constitutional minimum" of standing to sue under Article III like any other plaintiff who invokes this Court's jurisdiction. But even assuming the asserted injuries are cognizable, Plaintiff has not alleged, let alone established, any connection between those interests and the coordinated market. Plaintiff has failed to show facts demonstrating that its asserted injuries are caused by California's coordination with Quebec or that an order of this Court could redress those harms. Plaintiff's real objection appears to be to California's entire program to reduce the state's GHG emissions, not the coordination of its emissions market with that of Quebec. That program long pre-dates California's coordination with Quebec, and it would continue with or without Quebec. It is plainly within the scope of the State's police power, and neither of Plaintiff's claims purports to challenge it. Any remedy Plaintiff might receive thus would fail to redress its alleged injury.

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

1   Even assuming it has standing, Plaintiff cannot prevail on either of the claims on which it seeks

2   summary judgment. Again, both claims are wholly unprecedented. No state agreement has *ever* been in-

3   validated under the Compact Clause, and none has been held to be an impermissible treaty since the Su-

4   preme Court recognized the invalidity of the Confederacy. *See Williams v. Bruffy*, 96 U.S. 176 (1877).

5   And the federal government has apparently never before sued a state under either provision.

6   Plaintiff's claims have as much merit as they do precedent. Recognizing that "every state cooper-

7   ative action touching interstate or foreign commerce implicates some federal interest," the Supreme Court

8   has held that an agreement can be a compact requiring congressional approval only if it *encroaches on*

9   *federal supremacy. U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 479 n.33 (1978). To do so,

10  it must enlarge a state's power at the expense of the federal government or delegate its sovereign power

11  to another entity. California's agreement with Quebec is explicit in refusing to do either. It merely ex-

12  presses the jurisdictions' intentions to operate their respective programs—adopted under their respective

13  police powers—in a coordinated fashion. It does nothing to prevent California from altering or abandoning

14  its program or the agreement itself. Indeed, Ontario, a former party to the same agreement, simply walked

15  away from the agreement without consequence.

16  If this market coordination does not sufficiently impair federal interests to be a compact, then it

17  certainly cannot be a treaty—an agreement that Congress would *lack power* to approve. The per se prohi-

18  bition on treaties necessarily reaches a far smaller subset of arrangements than does the Compact Clause;

19  only those that pose a direct and palpable threat to National unity can be beyond Congress's power to

20  authorize. California and Quebec's coordinated market in GHG emission allowances has no effect what-

21  soever on the federal government's ability to take any action on climate change, or more aptly here, to

22  continue to refuse to take any action.

23  That lack of precedent here does not reflect a dearth of other agreements like that between Cali-

24  fornia and Quebec. On the contrary, states have entered *hundreds* of agreements with foreign nations or

25  subnational jurisdictions on a broad sweep of subjects from environmental policy to promotion of com-

26  merce to reciprocal recognition of driver's licenses. Plaintiff's attack on the coordinated market could

27  imperil coordination as simple and important as a state's recognition of driver's licenses issued by Cana-

28  dian provinces.

2

1    Indeed, Plaintiff's claims threaten the state-level innovation that federalism fosters. California's

2    innovative cap-and-trade program and its coordination of that program with Quebec's is a quintessential

3    example of a state experimenting with new solutions to pressing social problems. The Supreme Court has

4    recognized that federalism encourages states' interjurisdictional cooperation as surely as it does unilateral

5    state action. The Court should thus be particularly reluctant to break new legal ground in a way that curtails

6    a state's ability to innovate in this way. Although the federal courts of course should not sit by when states

7    take action that genuinely threatens national unity or attempt to enlarge their sovereign reach, California's

8    coordination with Quebec falls far short of that.

9    The Court should decline Plaintiff's invitation to create new law greatly expanding the reach of

10    the Compact and Treaty Clauses at the expense of California's ongoing effort to protect its residents from

11    the effects of the climate crisis. California's work, including its coordination with a fellow subnational

12    jurisdiction, is well within the plenary police power that the Constitution leaves to the States. That this

13    Administration has ceded the field in the battle against climate change does not compel the State to do so

14    as well.

15                                    **BACKGROUND**

16    **A.    California is already experiencing the devastating impacts of climate change.**

17    Climate change "is occurring at an increasingly rapid pace" and "[c]opious expert evidence estab-

18    lishes that [an] unprecedented rise [in atmospheric carbon dioxide] stems from fossil fuel combustion and

19    will wreak havoc on the Earth's climate if unchecked." *Juliana v. United States*, No. 18-36082, 2020 WL

20    254149, at *3 (9th Cir. Jan. 17, 2020). As a result of GHG emissions, global average "[t]emperatures have

21    already risen 0.9 degrees Celsius above pre-industrial levels and may rise more than 6 degrees Celsius by

22    the end of the century. . . .This extreme heat is melting polar ice caps and may cause sea levels to rise 15

23    to 30 feet by 2100." *Id.*

24    California "faces tremendous risks from climate change." *Rocky Mountain Farmers Union v. Co-*

25    *rey*, 730 F.3d 1070, 1106 (9th Cir. 2013) ("*Rocky Mountain I*"). "With its long coastlines vulnerable to

26    rising waters, large population that needs food and water, sizable deserts that can expand with sustained

27    increased heat, and vast forests that may become tinderboxes with too little rain, California is uniquely

28    vulnerable to the perils of global warming." *Id.; see also Rocky Mountain Farmers Union v. Corey*, 913

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

F.3d 940, 945, 957 (9th Cir. 2019) ("*Rocky Mountain II*"). California is already experiencing these adverse climate impacts, including worsening wildfires, droughts, and extreme heat events. *See Rocky Mountain II*, 913 F.3d at 957–58 (noting that "in the past year California saw its forest fires threat increase in scope, intensity, duration, and damages, caused in part by the extensive droughts throughout the state").

The California Legislature has found that "[g]lobal warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California." Cal. Health & Safety Code ("HSC") § 38501. Climate change is expected to cause worsening air quality, threaten the state's future water supply, displace thousands of coastal businesses and residences, damage the state's natural environment, and increase "the incidences of infectious diseases, asthma, and other human health-related problems." *Id*. Furthermore, "[g]lobal warming will have detrimental effects on some of California's largest industries, including agriculture, wine, tourism, skiing, recreational and commercial fishing, and forestry." *Id*.

### B. California's cap-and-trade program is part of the first comprehensive climate change mitigation program in the United States.

California is also leading the Nation in responding to the this challenge. In 2006, the California Legislature adopted AB 32, the Global Warming Solutions Act, which mandates ambitious statewide reductions of GHG emissions. HSC § 38500 *et seq*.; 2006 Cal. Stat. ch. 488. AB 32, as amended, requires a reduction in California's GHG emissions to 1990 levels by 2020 and to 40 percent below 1990 levels by 2030. HSC §§ 38550, 38566. The Legislature tasked the California Air Resources Board ("CARB") with developing a comprehensive regulatory program to attain that goal. HSC §§ 38550, 38510.

After extensive consultation with experts and stakeholders, CARB concluded that the best means of reducing GHG emissions from large sources was a cap-and-trade program.[1] Cap-and-trade is a market-based mechanism that results in far lower compliance costs than traditional "command-and-control" regulation in which regulators specify emission reductions that each source must achieve. Cap-and-trade

---

[1] Beyond cap-and-trade, California has implemented a suite of complementary regulatory programs to achieve AB 32's GHG reduction goals, including tailpipe GHG emissions standards for vehicles, a Low Carbon Fuel Standard for transportation fuels, a Zero-Emission Vehicle standard mandating increased electric car sales, and energy efficiency standards for buildings and appliances. *See* CARB, *California's 2017 Climate Change Scoping Plan, Appendix H: Major Climate Statutes and Regulations* (Nov. 2017), *available at* <https://ww3.arb.ca.gov/cc/scopingplan/2030sp_apph_climatestatutesref_final.pdf>.

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

1   programs have long been well-recognized tools to efficiently reduce GHG emissions and other environ-

2   mental pollutants.[2] *See, e.g.,* Robert N. Stavins, *A Meaningful U.S. Cap-and-trade System to Address Cli-*

3   *mate Change*, 32 Harv. Envtl. L. Rev. 293 (2008); Ann E. Carlson, *Designing Effective Climate Policy:*

4   *Cap-and-Trade and Complementary Policies,* 49 Harv. J. on Legis. 207 (2012).

5           In 2011, CARB established California's cap-and-trade program under AB 32. Cal. Code Regs.

6   ("CCR"), tit. 17, §§ 95801-96022.[3] The program sets an annual statewide cap or emissions "budget" for

7   GHG emissions from all covered sources, a defined group of the largest individual GHG emitters in the

8   state.[4] HSC §§ 38560, 38562; CCR §§ 95802(a), 95811-95812, 95841. Each year CARB issues emissions

9   allowances, which are compliance instruments authorizing a regulated entity holding the allowance to

10  emit a certain amount of GHGs, in quantities equal to the total emissions budget allowed under the cap.

11  CCR §§ 95802(a), 95820(a)(1). CARB sells most of the available emissions allowances in quarterly auc-

12  tions.[5] *See id.* § 95910; *see also Cal. Chamber of Commerce v. State Air Res. Bd.*, 10 Cal. App. 5th 604

13  (2017).

14          Each regulated source must hold emissions allowances in a quantity sufficient to authorize its

15  emissions. CCR §§ 95802(a), 95820-95821, 95850. Regulated sources may trade those emissions allow-

16  ances on a private market. HSC § 38570; CCR §§ 95910-95923. Every three years, those sources must

17  surrender to CARB enough allowances to cover their total emissions over the prior three-year period. The

18  emissions cap predictably declines each year, so that the emissions budget declines over time. CCR §

19

20  _____

21  [2] Cap and trade was first employed in the bipartisan 1990 Clean Air Act Amendments to prevent acid rain
    by reducing emissions of sulfur dioxide. 42 U.S.C. §§ 7651-7651o; *see also* David Frum, *A Forgotten*

22  *Legacy of George H. W. Bush,* The Atlantic (Dec. 3, 2018), *available at* <https://www.theatlan-
    tic.com/ideas/archive/2018/12/george-h-w-bush-helped-reduce-acid-rain/577183/>.

23  [3] All further CCR citations are to Title 17.

24  [4] The cap covers only emissions attributable to California. CCR §§ 95811, 95841.

25  [5] There are two varieties of compliance instruments that regulated entities in California can use to meet
    their cap-and-trade compliance obligations: the emissions allowances discussed above and offset credits.

26  Offset credits are generated by third parties that undertake activities to remove a quantified amount of
    GHG emissions from the atmosphere, such as by planting trees or changing silvicultural or agricultural

27  practices. *See* CCR § 95970 *et seq.*; CARB, *Compliance Offset Program*, *available at*
    <https://ww3.arb.ca.gov/cc/capandtrade/offsets/offsets.htm>. These entities can then sell their offset cred-

28  its to regulated emitters. *Id.*

                                                    5

95841. By setting the cap below historical emission levels and requiring each regulated source to hold enough allowances to cover its emissions, the program creates demand for, and scarcity in, the allowances while producing flexibility that minimizes cost. The declining emissions cap ensures that statewide GHG emissions decrease over time.

### C.    California adapted its cap-and-trade program for coordination with other jurisdictions.

CARB must "consult with other states, and the federal government, and other nations to identify the most effective strategies and methods" to reduce GHG emissions. HSC § 38564. CARB thus included in the cap-and-trade regulations provisions authorizing coordination of the State's market in emission allowances with similar markets in other jurisdictions. This coordination may affect the techniques used to reduce emissions to or below the cap but does not affect the cap itself.  *See* CCR §§ 95940-45. With the Governor's authorization, CARB may decide to accept emission allowances issued by other jurisdictions, treating them as equivalent to CARB-issued allowances. CCR § 95940. However, that market coordination does not change the statewide emissions cap and does not alter the compliance obligations imposed on regulated entities in California under sections 95850 *et seq*.

Like the rest of the regulations implementing cap and trade, the market-coordination provisions were first promulgated in 2011. They provide a procedure for recognizing emissions allowances issued by other jurisdictions inside or outside the United States which may be used by California regulated sources to satisfy their obligations under state law. CCR § 95940. Section 95941 establishes a procedure for recognizing such "external" allowances. *Id.* § 95941. Section 95942 provides that once coordination between cap-and-trade programs has been approved, allowances issued by other jurisdictions may be used to meet compliance obligations within California. *Id.* § 95942(a), (e). The section also provides that California regulators must notify regulators in the other jurisdictions whenever they accept allowances issued by that jurisdiction and must provide data identifying those allowances. *Id*. § 95942(g). Section 95943 lists the external jurisdictions whose allowances are recognized in California. *Id.* § 95943(a).

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

**D.    California and Quebec coordinate their emission markets and allow other jurisdictions to join.**

Quebec launched a GHG cap-and-trade program in 2012, which took effect in 2013. Civil Code of Québec, *Regulation Respecting a Cap-and-Trade System for Greenhouse Gas Emission Allowances* (chapter Q-2, r. 46.1), *available at* <http://legisquebec.gouv.qc.ca/en/pdf/cr/Q-2,%20R.%2046.1.pdf>.

In June 2013, California amended its cap-and-trade regulations to coordinate the State's carbon market with that of Quebec, effective January 1, 2014. *See* CCR § 95943(a)(1). Quebec made equivalent changes to its own regulations. Civil Code of Québec, *Regulation Respecting a Cap-and-Trade System for Greenhouse Gas Emission Allowances* (chapter Q-2, r. 46.1), 78, App. B.1. Through these regulatory changes, each jurisdiction determined it would accept allowances from both programs for compliance purposes, allowing covered sources in each jurisdiction to trade compliance instruments with each other.

After amending their regulations, in September 2013, California and Quebec signed an agreement memorializing coordination of their programs. "Agreement between the Gouvernement du Québec and the California Air Resources Board concerning the harmonization of cap-and-trade programs for reducing greenhouse gas emissions" (2013), Dkt. 7 ¶ 57; Dkt. 26-1, Exh. F. In 2017, they entered a replacement agreement along with the Canadian province of Ontario. "Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions" (2017), Dkt. 7-2 (hereinafter "2017 agreement" or "agreement").

Like its 2013 predecessor, the 2017 agreement lays out the parties' expectations for the coordination of their programs. It states that the parties' objective is to "work jointly and collaboratively toward the harmonization and integration of the Parties' greenhouse gas emissions reporting programs and cap-and-trade programs," but highlights that such harmonization and integration is to be carried out independently by "each Party under its own statutory and regulatory authority." Dkt. 7-2 at 3 (Art. 1). The agreement includes provisions for offsets, recognition and trading of compliance instruments, accounting for emission reductions, and conduct of auctions. *Id.* at 6-8. However, at every turn, the agreement makes clear that these activities reflect the operation of the parties' "respective cap-and-trade programs." *Id.* at 2, 3, 4, 5, 6, 7, 8, 10.

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

1    California began accepting Quebec-issued emission allowances on January 1, 2014, CCR §

2    95943(a)(1), and it began holding joint allowance auctions with Quebec on November 25, 2014, *see*

3    CARB, *Auction Notices and Reports*, *available at* <https://ww3.arb.ca.gov/cc/capandtrade/auction/auc-

4    tion_notices_and_reports.htm>. Until this lawsuit was filed, the federal government had provided no com-

5    ments on California and Quebec's coordination, let alone suggested that California's acceptance of

6    Quebec-issued allowances was somehow harmful to the United States or required congressional approval.

7        California and Quebec's cap-and-trade programs rely on administrative support and technical ser-

8    vices provided by Western Climate Initiative, Inc., ("WCI, Inc.") a nonprofit organization incorporated in

9    2011. Dkt. 7 ¶ 141-142; Dkt. 12 at 14, 16. In 2012, WCI, Inc. entered an agreement with CARB to operate

10    a technical platform for emissions allowance auctions and a system to track compliance instruments. Dkt.

11    7 ¶ 142. However, WCI, Inc. has no policy-making, regulatory, or enforcement authority over cap-and-

12    trade programs in either jurisdiction. *See* Dkt. 7-3; *see also* CCR §§ 95940, 95943(a).

13    **E.    Ontario abandoned the coordinated emissions market.**

14        In 2016, Ontario established a cap-and-trade program for GHG emissions within its jurisdiction.

15    Government of Ontario, Climate Change Mitigation and Low-carbon Economy Act of 2016 (S.O. 2016,

16    c. 7), *available at* <https://www.ontario.ca/laws/statute/16c07>. In September 2017, CARB completed a

17    rulemaking proceeding to coordinate its cap-and-trade program with Ontario's program. *See* CCR §

18    95943(a)(2). Ontario then joined the 2017 agreement with California and Quebec. California began ac-

19    cepting Ontario-issued emissions allowances on January 1, 2018. *Id.* § 95943(a)(2).

20        In 2018, a newly elected provincial government unilaterally ended Ontario's cap-and-trade pro-

21    gram and abandoned the agreement. *See* CCR § 95943(a)(2); Cap and Trade Cancellation Act of 2018

22    (S.O. 2018, c. 13), *available at* <https://www.ontario.ca/laws/statute/S18013#s16>. In doing so, it simply

23    ignored the withdrawal process in the agreement. *See Greenpeace Canada v. Minister of the Environment

24    (Ontario)*, 2019 ONSC 5629 at 2, 4-5. However, California and Quebec's market coordination remains in

25    effect, CCR § 95943(a)(1), and the 2017 agreement remains in place. Moreover, despite Ontario's aban-

26    donment of the agreement, California continues to recognize, for purposes of compliance with its program,

27    Ontario allowances held by California entities when Ontario abandoned the coordinated market. CCR §

28

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

95943(a)(2); *see also* CARB, *Linkage, September 2018 Update: Linkage with Ontario Cap-and-Trade Program*, available at <https://ww3.arb.ca.gov/cc/capandtrade/linkage/linkage.htm>.

    **F.**    **The coordinated emissions trading market had been in operation for years before Plaintiff sued California.**

    Since California and Quebec agreed to coordinate in 2013, there have been 21 joint allowance auctions held under the 2013 and 2017 agreements. *See* CARB, *Auction Notices and Reports*, *available at* <https://ww3.arb.ca.gov/cc/capandtrade/auction/auction_notices_and_reports.htm>. On October 23, 2019, over eight years after California adopted its cap-and-trade program, seven years after California and Quebec finalized their respective regulations, six years since they entered the original Agreement, and three years into the Trump Administration, Plaintiff filed this lawsuit attacking the coordinated market, naming the State of California, several state officials, WCI, Inc., and four WCI board members as defendants. *See* Dkt. 1.

    Plaintiff's suit seeks declaratory relief and a permanent injunction to invalidate the 2017 agreement and, as applied, portions of California's cap-and-trade regulations that enable the market coordination with Quebec. Dkt. 1 at 17. Plaintiff alleges that these provisions of California law and the agreement violate the Treaty Clause, the Compact Clause, and the Foreign Commerce Clause of the United States Constitution, and that they are preempted by the President's foreign affairs power. Dkt. 1 at 14. On November 19, Plaintiff amended its complaint to add further allegations but no new claims. Dkt. 7.

    On December 23, Environmental Defense Fund, Inc. ("EDF") and Natural Resources Defense Council, Inc. ("NRDC") filed a motion to intervene as defendants. Dkt. 23. On January 6, 2020, the International Emissions Trading Association similarly moved to intervene. Dkt. 27. The Court granted both motions on January 15, 2020. Dkt. 35.

    On December 11, 2019, Plaintiff filed the instant motion seeking summary judgment only on its claims under the Compact and Treaty Clauses. Dkt. 12.

**SUMMARY JUDGMENT STANDARD**

    Summary judgment may be granted only if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Moon*

9

1  *v. Rush*, 69 F. Supp. 3d 1035, 1039 (E.D. Cal. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

2  (1986). "Where [it] will have the burden of proof on an issue at trial, the movant must affirmatively

3  demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v.*

4  *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Only if the moving party meets its initial burden

5  must the opposing party show a genuine issue for trial to defeat the motion. *Anderson v. Liberty Lobby,*

6  *Inc.*, 477 U.S. 242, 250 (1986). On a motion for summary judgment, "evidence must be viewed in the

7  light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that

8  party." *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011). A decision to grant summary judgment may be

9  based only on "facts that would be admissible in evidence at trial." Fed. R. Civ. P. 56(c).

10                                            **ARGUMENT**

11  **I.      Plaintiff lacks standing to bring this action.**

12          Article III of the Constitution restricts the jurisdiction of federal courts to "cases or controversies."

13  At the core of Article III's requirements is the "irreducible constitutional minimum of standing." *Lujan v.*

14  *Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing under Article III, "[t]he plaintiff must have

15  (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and

16  (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

17  1547 (2016).

18          Because standing is a fundament of this Court's jurisdiction, the Court must satisfy itself that

19  Plaintiff has standing before considering the merits of Plaintiff's motion. *See Steel Co. v. Citizens for a*

20  *Better Env't*, 523 U.S. 83, 88-89 (1998). "For a court to pronounce upon the meaning or the constitution-

21  ality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act

22  ultra vires." *Id.* at 101-02.

23          "The burden of establishing Article III standing remains at all times with the party invoking federal

24  jurisdiction." *DeFazio v. Hollister, Inc.*, 636 F. Supp. 2d 1045, 1072 (E.D. Cal. 2009) (quoting *Scott v.*

25  *Pasadena Unified Sch. Dist.*, 306 F.3d 646, 655 (9th Cir. 2002)). Moreover, because Plaintiff has filed a

26  motion for summary judgment, it may not assert its standing based on the "mere allegations" in the com-

27  plaint. *Lujan*, 504 U.S. at 561; *see also N.Y. State Nat. Org. for Women v. Terry*, 704 F. Supp. 1247, 1256

28  (S.D.N.Y.) (standing raised in opposition to summary judgment), *aff'd as modified*, 886 F.2d 1339 (2d

                                                  10

1    Cir. 1989). Because Plaintiff must establish standing as to each of its claims, it must show specifically that

2    it has standing to assert the claims on which it seeks summary judgment. *See Lujan*, 504 U.S. at 566 (at

3    summary judgment stage, standing requires "a factual showing of perceptible harm"); *Davis v. Fed. Elec-*

4    *tion Comm'n*, 554 U.S. 724, 734 (2008).

5            The Executive Branch has no wholesale exemption from Article III; it too must satisfy the "irre-

6    ducible constitutional minimum" of standing. Here, Plaintiff fails to demonstrate a causal connection be-

7    tween its alleged injuries and California's actions in coordinating with Quebec such that the injury is

8    "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*,

9    504 U.S. at 560-61). Furthermore, Plaintiff has failed to establish the element of redressability. It must be

10   "likely," and not merely speculative, that a would-be plaintiff's injury will be "redressed by a favorable

11   judicial decision." *Id.* at 1547 (citing *Lujan*, 504 U.S. at 560-561). To establish redressability, a plaintiff

12   must show that it "would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422

13   U.S. 490, 508 (1975). "[T]he redressability prong requires that plaintiffs have a stake in the recovery."

14   *DeFazio*, 636 F. Supp. 2d at 1072 (citing *Paulsen v. CNF Inc.*, 559 F.3d 1061 (9th Cir. 2009)). The federal

15   government is not exempt from either requirement. *See, e.g., United States v. City of Tacoma, Wash.*, 332

16   F.3d 574, 578–79 (9th Cir. 2003) (federal government satisfied elements of causation and redressability

17   and thus had standing, applying *Lujan* and *Steel Co.*); *United States v. Carroll*, 667 F.3d 742, 745–46 (6th

18   Cir. 2012) (federal government lacked standing where it established injury in fact but failed to show cau-

19   sation and redressability). It cannot show either here.

20           Plaintiff's motion and amended complaint suggest, in scattershot fashion, that California's coor-

21   dination with Quebec is somehow responsible for a variety of alleged injuries by interfering with the

22   President's conduct of foreign policy and the federal government's climate change policy, or lack thereof.

23   Plaintiff fails to point to evidence, as opposed to "mere allegations," demonstrating that any of its alleged

24   harms are caused by California's market coordination with Quebec. Nor has Plaintiff shown that the relief

25   it seeks would redress those injuries.

26

27

28

1

2

### A. California's coordination with Quebec has not impeded the United States' planned withdrawal from the Paris Agreement.

3

4

Plaintiff asserts that California has interfered with the President's plan to withdraw from the Paris

5

Agreement and undermined the federal policies behind the withdrawal. Dkt. 12 at 9-10, 18-20, 28-29, 34-

6

35; Dkt. 7 ¶¶ 41-44, 47-50, 52-55, 178. But it fails to show that California's coordination with Quebec

7

would cause these alleged injuries. Moreover, the relief that Plaintiff seeks from this Court would do

8

nothing to redress them.

9

The Paris Agreement is a multilateral climate change agreement concluded by the parties to the

10

United Nations Framework Convention on Climate Change ("UNFCCC") on December 12, 2015—years

11

after both California's cap-and-trade program and its market coordination with Quebec became effective.

12

Its goal is to limit global average temperature increases to less than 2 degrees Celsius above pre-industrial

13

levels and to seek to further limit the increase to 1.5 degrees Celsius. Paris Agreement, Art. 2(1)(a); Dkt.

14

7 ¶ 42; Dkt. 12-2, Ex. 3. Each party to the Agreement must develop and submit to the UNFCCC a "Na-

15

tionally Determined Contribution," which is a national plan for reducing GHG emissions and adapting to

16

the effects of climate change. Paris Agreement, Art. 4.2; Dkt. 7 ¶ 43. The United States submitted its

17

Nationally Determined Contribution to the UNFCCC on March 31, 2015, before the Paris Agreement was

18

finalized. President Obama took executive action to sign the Paris Agreement on September 3, 2016. Dkt.

19

7 ¶ 44.

20

The United States has not yet withdrawn from the Paris Agreement. The Agreement permits a

21

party to withdraw from the agreement one year after providing formal legal notice of intent to withdraw,

22

but prohibits giving such notice until three years after the Agreement has entered into force for that party.

23

Paris Agreement, Art. 28; Dkt. 7 ¶ 43. The United States did not give formal notice of its intent to withdraw

24

until November 4, 2019, three years after the Agreement's entry into force, and the United States' with-

25

drawal will not become effective until November 4, 2020. Dkt. 7 ¶ 49; Dkt. 12 at 20; Notice of United

26

States' Notification of Withdrawal from the Paris Agreement of 2015, *available at* <https://trea-
ties.un.org/doc/Publication/CN/2019/CN.575.2019-Eng.pdf>.

27

Plaintiff emphasizes a statement made by President Trump explaining his intention to withdraw

28

from the Paris Agreement. In a June 1, 2017 press conference, President Trump made a variety of

12

assertions that the United States' participation in the Paris Agreement would impose excessive costs on the United States while favoring other nations. Dkt. 12 at 19-20; Dkt. 7 ¶¶ 47-48. On November 4, 2019, Secretary of State Pompeo announced that the United States was depositing notification of the planned withdrawal from the Paris Agreement with the United Nations. Dkt. 12 at 34-35; Dkt. 7 ¶ 50.

Plaintiff fails to demonstrate how these statements show that California's market coordination with Quebec interferes with the United States' planned withdrawal from the Paris Agreement or undermines the federal policies that motivated the withdrawal. California's cap-and-trade program and the coordinated market with Quebec both antedate *all* of the events involving the Paris Agreement described above. The withdrawal is not tantamount to a decision that states may not continue to pursue GHG emissions reductions or do other things that might have enabled the United States to meet the commitments in its Nationally Determined Contribution under the Agreement. Even assuming California's reduction of GHG emissions were thought to be contrary to the Trump Administration's economic policy, Plaintiff has not challenged California's decision to reduce its emissions.[6] And California's emission reductions do not result from its coordination with Quebec.

If by withdrawing from the Paris Agreement, the Administration wishes to renege on the United States' prior commitment to reduce GHG emissions, the real cause of Plaintiff's alleged injury would be California's independent efforts to reduce those emissions, which would continue with or without its market coordination with Quebec. California has made clear that it would reduce GHG emissions before, during, and after the Paris Agreement, that the State would do so with or without reciprocity with Quebec, and that it would do so without cross-border trading of emissions allowances. *See* HSC §§ 38550, 38566; CCR §§ 95802(a), 95811-95812, 95841; Dkt. 7 ¶¶ 52, 55, 123, 125. California's decision to accept Quebec-issued emission allowances is not in any way the cause of California's emissions reductions.

None of the policy rationales articulated in President Trump's 2017 speech are affected by the challenged coordination between California and Quebec. *See* Dkt. 12 at 19; Dkt. 7 ¶ 48. The coordinated market has no effect on the GHG emissions of India or China, which remain bound by the Paris Agreement

---

[6] Of course California's decision to reduce its GHG emissions is well within the scope of the State's plenary police power. *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1181 (9th Cir. 2011); *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000).

13

whether or not this Court upholds California and Quebec's coordination. Nor has Plaintiff demonstrated that market coordination has any effect on United States relations with India and China. The coordinated market does not in any way contribute to the job losses or other costs that President Trump alleged would result from continued United States participation in the Paris Agreement. On the contrary, as discussed below, it is widely accepted that a broader cap-and-trade market is more cost-effective than a narrower one. *See infra* Section IV.B. Thus, if California's coordination with Quebec has any effect on the United States economy, it would be to *decrease* costs rather than increase them. In any event, even if Plaintiff thinks otherwise, it has failed to put on any evidence whatsoever to support a contrary conclusion. On summary judgment, it is Plaintiff's burden to do so.

Insofar as Plaintiff's alleged harm to the federal policy of withdrawal is caused not by California's market coordination with Quebec but rather by California's AB 32 emission reduction program generally, it would not be redressed by any relief that this Court could grant. Even if the Court were to enjoin the coordination between California and Quebec, they could and would still independently maintain their existing emission caps. Plaintiff has never argued that its Compact and Treaty Clause claims could provide a basis to invalidate California's statewide cap on GHG emissions and other GHG-emission-reduction measures, which came long before California's coordination with Quebec. *See* HSC §§ 38550, 38566; CCR §§ 95802(a), 95811-95812, 95841. The Court thus could craft no remedy that would touch the real source of Plaintiff's asserted injury. In short, Plaintiff cannot show that it would "benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508.

## B.   California's coordination with Quebec would not limit the United States' "bargaining chips" in any future climate change negotiation.

Plaintiff's motion suggests that the United States is harmed by California's market coordination with Quebec because the United States could no longer "trade" those emissions for emissions reductions by other countries in future international climate change negotiations. Dkt. 12 at 11, 29-30; Dkt. 7 ¶¶ 133, 135. However, here too, the alleged injury is not redressable. As discussed above, California's emissions reductions are not caused by California's coordination agreement with Quebec. The relief Plaintiff seeks from this Court would do nothing to prevent California from reducing its own emissions, and therefore would not redress Plaintiff's alleged injuries involving reduced bargaining power.

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

As an initial matter, Intervenors by no means concede that California's domestic GHG emission reductions have any adverse impact whatsoever on the federal government's international bargaining leverage. *See Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1187–88 (E.D. Cal. 2008) (finding that "[t]here is absolutely no reason in logic for any presumption that the efforts of California or any other state to reduce greenhouse gas emissions would interfere with efforts by the Executive Branch to negotiate agreements with other nations to do the same"); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 392-397 (D. Vt. 2007) (finding that Vermont regulation of GHG emissions from motor vehicles did not intrude on United States foreign policy and rejecting alleged reduction in federal bargaining power). Yet even assuming that Plaintiff could demonstrate that it suffered a decrease in bargaining power resulting from California's reduced emissions, those reductions are not caused by California's coordination with Quebec. California's reduction of GHG emissions does not depend on the emissions trading market, which reduces compliance costs for regulated parties, or on California's coordination with Quebec, or on the agreement memorializing the coordination. The driver of California's GHG emissions reductions is the statewide regulatory emissions limit in California law. HSC §§ 38550, 38560, 38562; CCR §§ 95802(a), 95811-95812, 95841. The California-Quebec coordination does not change anything else about California's program, including the State's emissions cap, the businesses in California that have compliance obligations, or the way those compliance obligations are determined, all of which are established by regulation. *See* CCR §§ 95940-95945. California's emissions reductions are not "fairly traceable to" California's coordination with Quebec. *Spokeo*, 136 S. Ct. at 1547. Plaintiff therefore fails to demonstrate causation.

Plaintiff's alleged loss of bargaining power would not be redressed by any relief that could be properly granted by this Court. The real cause of any purported reduced federal bargaining leverage would be California's GHG emissions cap (and other GHG-emission-reduction measures), not the State's coordination with Quebec. As discussed above in Section I.A, California could and would continue to reduce its GHG emissions even if the Court invalidated the State's agreement with Quebec and the California regulations authorizing recognition of foreign-issued emissions allowances. Neither of Plaintiff's claims at issue in this motion provides a legal basis for attacking California's emissions cap, which is unaffected by the agreement with Quebec. Although market coordination between California and Quebec reduces

15

compliance costs and generates benefits for both jurisdictions, *see infra* Section IV.B (discussing policy benefits), California will continue to exercise its regulatory authority to cap the state's GHG emissions even without such coordination. *See* HSC §§ 38550, 38566; CCR §§ 95802(a), 95811-95812, 95841. Therefore, Plaintiff's alleged injury is not redressable.

### C.    Plaintiff has not shown standing based on any of its other claimed injuries.

Plaintiff's remaining asserted injuries have no plausible cause whatsoever in the coordinated emission allowance market. The amended complaint alleges—on information and belief—that California's coordination with Quebec could undermine or complicate United States relations with Canada if a dispute were to arise between the two jurisdictions "as to the validity or quantity of allowances and offsets issued by one and expendable in the other" or "as to the proper method of enforcing the terms of one jurisdiction's program against entities located in the other."[7] Dkt. 7 ¶¶ 176-77.

"Whether framed in terms of ripeness or standing, [this] alleged injury is too speculative to give rise to a case or controversy as required by Article III." *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). "[C]laims that are based solely on harms stemming from events that have not yet occurred, and may never occur," are not justiciable because the plaintiffs raising such claims have not "suffered an injury that is concrete and particularized enough to survive the standing/ripeness inquiry." *Alcoa*, 698 F.3d at 793 (citation omitted).

Plaintiff's allegations on "belief" are just that: pure supposition. It has pointed to no evidence of an impending threat to United States-Canada relations caused by the coordinated market.[8] There is no evidence of any dispute or disagreement having arisen in their six years of market coordination, let alone a dispute that could have a material affect on the countries' relations. On the contrary, Ontario simply *repudiated* the agreement with California and Quebec without causing an international incident. *See supra*

---

[7] Allegations on information and belief, that is, allegations lacking foundation, would be inadequate to support standing even at the pleading stage. They are beyond inadequate at the summary judgment stage.

[8] Indeed, Plaintiff's generic objection is applicable to any agreement between a state and a foreign jurisdiction, of which there are hundreds. *See infra* Section IV.A.

16

1    Background Section E. Moreover, the agreement establishes a process for consultation to resolve any

2    disputes. Dkt. 7-2 at 5, 13 (Arts. 3, 13). Enjoining the agreement would thus do nothing to avoid misun-

3    derstanding.

4            Plaintiff also suggests that California's actions somehow impede the United States' participation

5    in the UNFCCC. Dkt. 7 ¶¶ 36, 175, 178. However, Plaintiff fails to show that California's coordination

6    with Quebec causes the alleged injury, or that Plaintiff's requested relief would do anything to redress it.

7            Ratified by the United States in 1992, the UNFCCC is a multilateral treaty with the goal of "sta-

8    bilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous

9    anthropogenic interference with the climate system." UNFCCC, Art. 2, *available at* <https://unfccc.int/re-

10   source/docs/convkp/conveng.pdf>; Dkt. 7 ¶ 34; Dkt. 12-2, Ex. 1. The UNFCCC does not set binding limits

11   on GHG emissions and contains no enforcement mechanism, as Plaintiff notes. Dkt. 7 ¶ 38. The UNFCCC

12   simply establishes a general framework for further cooperation by its parties to address climate change,

13   calling on countries to jointly develop programs to reduce GHG emissions and adapt to the effects of

14   climate change. UNFCCC, Art. 4.1(b), (c); Dkt. 12-2, Ex. 1.

15           Neither Plaintiff's complaint nor its motion explains how California's coordination with Quebec

16   serves to impede the United States' commitments under the UNFCCC. Plaintiff does not identify any

17   aspect of the UNFCC that disfavors or prohibits cooperation between subnational governments. In fact, it

18   is precisely the kind of subnational coordination that the UNFCC's signatories contemplated. To the extent

19   California's actions might in any way conflict with United States policy regarding the Nation's UNFCCC

20   commitments, that conflict would again stem from California's efforts to reduce its own GHG emissions

21   via state regulation, not its coordination with other jurisdictions. Plaintiff thus has failed to show either

22   causation or that the harm would be redressed by Plaintiff's request that the court invalidate California's

23   coordination with Quebec.

24           Finally, Plaintiff invokes Executive Order 13,783—which directs federal agencies in their perfor-

25   mance of cost-benefit analysis—as representative of federal policy on "how . . . to reconcile the nation's

26   environmental, economic, and strategic concerns." Dkt. 12 at 19; Dkt. 7 ¶ 45. California's coordination

27   with Quebec has no effect whatsoever on the federal policy represented by the Order, and Plaintiff does

28

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

not put on any evidence to demonstrate otherwise. Whether California and Quebec coordinate their carbon markets or not will not alter federal agencies' procedures for cost-benefit analysis.

**II.    The coordinated market does not violate the Compact Clause because it does not encroach on federal supremacy.**

Assuming Plaintiff has standing to assert it, Plaintiff's Compact Clause claim—unprecedented in so many respects—lacks merit. No court has ever invalidated an agreement between a state and a foreign jurisdiction. In fact, no court has ever invalidated *any* agreement under the Clause. And Intervenors have found no other case in which the United States has sued a state contending that a state agreement was an unauthorized compact.

Although the Supreme Court has never applied the Clause to agreements with foreign jurisdictions, it has repeatedly applied the Clause to uphold interstate agreements. *See, e.g., Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159 (1985); *U.S. Steel*, 434 U.S. at 452; *New Hampshire v. Maine*, 426 U.S. 363 (1976); *Virginia v. Tennessee*, 148 U.S. 503 (1893); *see also Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1363 (9th Cir. 1986). Given that the terms of the Clause are identical as to both types of agreement, the interstate agreement cases provide the controlling authority here.[9]

*Northeast Bancorp* and *U.S. Steel* represent the Court's most recent and most thorough applications of the Compact Clause test, respectively. The touchstone of the inquiry is whether an agreement "tends to increase the political power of the States in a way that 'may encroach upon or interfere with the just supremacy of the United States.'" *U.S. Steel*, 434 U.S. at 479 n.33 (quoting *Virginia*, 148 U.S. at 519); *see also id.* at 468; *Ne. Bancorp*, 472 U.S. at 175-76.

The factors applied by the Court demonstrate that California and Quebec's market coordination does not constitute a compact demanding congressional approval. *See id.* at 473; *Ne. Bancorp*, 472 U.S.

---

[9] Indeed, in *McHenry County v. Brady*, 163 N.W. 540 (N.D. 1917), the North Dakota Supreme Court applied the Compact Clause test as articulated in *Virgina v. Tennessee* to uphold an agreement between two North Dakota counties and a town in Manitoba. *Id.* at 544-47. The United States Department of State has come to the same conclusion. *See* William H. Taft, IV, Legal Adviser of the U.S. Dep't of State, "Memorandum," in *Digest of United States Practice of International Law* 180, 185 (Sally J. Cummins & David P. Stewart, eds., 2001), *available at* <https://2009-2017.state.gov/documents/organization/139600.pdf>.

18

at 175. It "does not purport to authorize the member States to exercise any powers they could not exercise in its absence." *U.S. Steel*, 434 U.S. at 473. "Nor is there any delegation of sovereign power . . .;" California "retains complete freedom to adopt or reject . . . rules and regulations" for its emissions market. *Id.* Finally, California "is free to withdraw at any time." *Id.*

California's actions in coordinating its carbon market with Quebec are entitled to "the full benefit of the presumption of constitutionality which is the postulate of constitutional adjudication." *People of the State of N.Y. v. O'Neill*, 359 U.S. 1, 6 (1959). Plaintiff has not carried its heavy burden to show that California has violated the Compact Clause.

### A. The agreement does not allow California to exercise any power that it could not otherwise exercise.

Like the Multistate Tax Compact upheld in *U.S. Steel*, California's agreement with Quebec has no impact on federal supremacy because it does nothing to enlarge California's authority relative to the federal government or any other state. *See* 434 U.S. at 473 (compact "does not purport to authorize the member States to exercise any powers they could not exercise in its absence"). To run afoul of the Clause, an agreement must involve "a threat of encroachment or interference [with federal supremacy] through *enhanced state power*." *Id.* at 479 n.33 (emphasis added); *see also id.* (covered compacts "enhance the power of the member States to affect federal supremacy").

The eighth recital in the agreement provides that "the Parties further recognize that the present Agreement does not, will not and cannot be interpreted to restrict, limit or otherwise prevail over relevant national obligations of each Party, if applicable." Dkt. 7-2 at 2. It thus expressly preserves the federal government's supremacy vis-à-vis the State.

Further, the agreement makes abundantly clear that the parties are doing nothing more than implementing the regulatory programs they have independently adopted under their respective police powers. Article 1 explains that the agreement's "objective" is to coordinate actions taken by "each Party under its own statutory and regulatory authority." *Id.* at 3; *see also id.* at 6 (Article 6; providing that California and Quebec will recognize emissions allowances issued by the other party "as provided for under their respective cap-and-trade program regulations"); *id.* at 7 (Article 7; covered entities in the two jurisdictions will trade instruments "as provided for under [the parties'] respective cap-and-trade program regulations"); *id.*

19

at 8 (Article 9; "auctioning of compliance instruments by the Parties' respective programs shall occur jointly . . . as provided for under their respective cap-and-trade programs").

The most Plaintiff can come up with to show otherwise is that "in the absence of the Agreement, [California] could [not] compel Quebec . . . to 'discuss[]' any proposed changes to its cap and trade program before adopting them."[10] Dkt. 12 at 33. Even assuming the agreement does allow California to "compel" such "discussion" (it does not), *see infra* Section III, Plaintiff does not attempt to show—nor could it—that this milquetoast example "enhances state power *quoad* the National Government." *U.S. Steel*, 434 U.S. at 473. In *U.S. Steel* the Court recognized that the Compact would give states greater bargaining power vis-à-vis the taxed corporations, but it emphasized that was not at issue: the question is whether the states were made better off at the expense of the federal government. *Id.* at 472-73.

Like the Compact in *U.S. Steel*, the agreement "does not purport to authorize the member States to exercise any powers they could not exercise in its absence" so as to enlarge California's authority at the expense of federal supremacy.

### B. The agreement does not delegate sovereign power to any other entity but rather preserves California's "sovereign right and authority."

The *U.S. Steel* Court then considered, and rejected, the argument that the Compact resulted in "delegation of sovereign power to the Commission." 434 U.S. at 473; *see also Ne. Bancorp*, 472 U.S. at 175 (finding no compact where "[n]o joint organization or body has been established to regulate regional banking"); *Seattle Master Builders*, 786 F.2d at 1363 (finding "establishment of a joint organization for regulatory purposes" to be an indicium of a compact). Here too, the agreement does not delegate any of California's authority, whether to WCI, Inc. or otherwise.

First, the role for WCI, Inc. recognized in the agreement falls far short of that of the Multistate Tax Commission in *U.S. Steel.* The Compact gave the Commission extensive responsibilities. 434 U.S. at 456-57. Nevertheless, the Court found that the Compact was not subject to the Clause, rejecting the plaintiffs' arguments that the Commission encroached on the federal supremacy over interstate commerce, *id.*

---

[10] Plaintiff asserts that this is "one example among many." Dkt. 12 at 33. Even if that were true, Plaintiff presumably would not have chosen this example of compelled "discussion" if a more compelling one were available.

20

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

at 473-76, and foreign relations, *id.* at 476-77, as well as arguments that it "impairs the sovereign rights of nonmember states," *id.* at 477-78.[11]

By contrast, the agreement describes WCI, Inc. as merely "providing administrative and technical services," which "support and facilitate" California and Quebec's respective cap-and-trade programs. Dkt. 7-2 at 2 (Recital 2). Article 12 also provides that the parties intend to "continue coordinating administrative and technical support through the WCI, Inc., an entity which was created to perform such services." Dkt. 7-2 at 9. The agreement provides no other role for WCI, Inc., nor does it assign any power or authority to it. California has no more delegated sovereign authority to WCI, Inc. than it has given such sovereignty to a contractor that operates state payroll systems or park concessions. *Cf. Mauricio v. Daugaard,* 895 N.W.2d 358, 365-66 (S.D. 2017) (organization created by multistate agreement provided service of creating educational assessments for curriculum standards adopted by states themselves and did not amount to a compact).

Plaintiff mischaracterizes this factor as simply "establishment of a joint organization." Dkt. 12 at 32. Of course if that were the test, the mere existence of the Multistate Tax Commission would have caused the compact in *U.S. Steel* to be covered by the Clause. To the contrary, the focus is on delegation of "sovereign power." *U.S. Steel*, 434 U.S. at 473; *Seattle Master Builders*, 786 F.2d at 1363 (referring to "establishment of a joint organization *for regulatory purposes*" (emphasis added)). WCI, Inc. wields no "sovereign power" and serves no "regulatory purposes"; its functions are purely administrative.

As explained below, under the agreement, California retains its plenary authority to maintain, modify, or abandon its own cap-and-trade program. *See infra* Section II.C. Like Multistate Tax Commission in *U.S. Steel*, WCI, Inc. can do nothing that the State has not authorized. *See* 434 U.S. at 457, 473 (Commission's functions entirely dependent on states' authorization).

**C.    California is entirely free to withdraw from the agreement and modify or repeal its regulations as it sees fit.**

Finally, like the states in *U.S. Steel*, California is "free to withdraw at any time" from the agreement. 434 U.S. at 473; *see also Ne. Bancorp*, 472 U.S. at 175 (finding no compact in part because "each

---

[11] Plaintiff has made no argument that the coordinated market affects the prerogatives of other states.

1   State is free to modify or repeal its law unilaterally"); *Seattle Master Builders*, 786 F.2d at 1363 (holding

2   that a compact requires that "each state is not free to modify or repeal its participation unilaterally"). Nor

3   does the agreement prevent California from changing or eliminating its regulations. California may choose

4   to adhere to the statement of its intentions in the agreement, but nothing *compels* it do so.

5        First, the agreement expressly allows the parties to withdraw at any time upon notice. Dkt. 7-2, at

6   11 (Article 17). The procedures provided in the agreement for withdrawal do not show that the parties are

7   not fully free to withdraw. *See id*. The terms for withdrawal—providing notice and "endeavour[ing]" to

8   give 12 months' notice and leave at the end of a compliance period—are minimal. In strong contrast, in

9   *U.S. Steel*, the parties to the compact could only withdraw "by enacting a repealing statute." 434 U.S. at

10  457. That is a far greater burden than any imposed by the agreement here.

11       Moreover, as Plaintiff acknowledges, the Province of Ontario summarily abandoned the agree-

12  ment. Dkt. 12 at 15, 25; *Greenpeace Canada*, 2019 ONSC 5629 at 2, 4-5. But Plaintiff misses (or obscures)

13  the real significance of that abandonment. Ontario peremptorily quit the agreement, simply ignoring the

14  supposedly binding procedure for withdrawal. *See Greenpeace Canada*, 2019 ONSC 5629, at 2, 4-5. On-

15  tario plainly did not view itself as bound by the withdrawal procedure in the agreement. That California

16  is "free to withdraw at any time" from the agreement supports the conclusion the agreement is not subject

17  to the Compact Clause. *See* 434 U.S. at 473.

18       Nor does the agreement prevent California from amending or repealing any statute or regulation.

19  The agreement explicitly disclaims any attempt to constrain the State's police power. Recital 8 dictates

20  that the agreement does not "restrict, limit or otherwise prevail over . . . each Party's sovereign right and

21  authority to adopt, maintain, modify, repeal or revoke any of their respective program regulations or ena-

22  bling legislation." Dkt. 7-2 at 2. And it provides that "this Agreement does not modify any existing statutes

23  and regulations nor does it require or commit the Parties or their respective regulatory or statutory bodies

24  to create new statutes or regulations in relation to this Agreement." *Id.* at 10 (Art. 14). These disavowals

25  could not be clearer. California and Quebec retain total, plenary control over their respective programs.[12]

26

27  ───────────

28  [12] Although this disclaimer applies only to California's authority over its "program regulations or enabling legislation," it did not need to be any broader, as the agreement touches no other aspect of California's "sovereign right and authority."

1    California continues to operate its own cap-and-trade program and may maintain, modify, or dis-

2    continue it as it sees fit in its sole discretion. That fact is fatal to Plaintiff's Compact Clause claim.

3    **D.    Effects on "federal interests" are insufficient.**

4    Plaintiff offers mere allegations of a variety of federal foreign policy interests that are supposedly

5    affected by the coordinated market. *See supra* Section I. Even if Plaintiff were correct that California and

6    Quebec's market coordination could impede those interests in some way, it falls far short of what Plaintiff

7    needs to show to invalidate the coordinated market under the Compact Clause.

8    In *U.S. Steel,* the Court made clear that it is not enough that a challenged agreement affects a

9    "federal interest." 434 U.S. at 479 n.33. "Absent a threat of encroachment or interference through en-

10   hanced state power, the existence of a federal interest is *irrelevant*." *Id.* (emphasis added). This is because

11   "every state cooperative action touching interstate or foreign commerce implicates some federal interest."

12   *Id*. The Court concluded that the Compact plainly "affect[ed] interstate and foreign commerce" but was

13   nonetheless not covered by the Clause because it did "not enhance the power of the member States to

14   affect federal supremacy in those areas." *Id.* "That there [wa]s a federal interest no one denies." *Id.*

15   All Plaintiff can muster here are vague allegations about the effect of California's market coordi-

16   nation on federal interests. It points to no interference with federal *supremacy* because it can identify no

17   expansion of state power caused by or associated with the coordinated market. This falls far short of the

18   showing required to invalidate the coordinated market under the Compact Clause.

19   **E.    Congress's rejection of unrelated agreements is irrelevant.**

20   Finally, Plaintiff emphasizes other agreements that Congress has apparently declined to authorize,

21   as if they show that congressional consent is required here. Dkt. 12 at 30-31. The Supreme Court in *U.S.*

22   *Steel* rejected precisely that argument. 434 U.S. at 469, 471 n.24. The states had repeatedly sought, but

23   fell short of, congressional approval for the same agreement at issue in that case. *Id.* at 456, 458 n.8; *see*

24   *also id.* at 486-87 (White, J., dissenting) (noting that bills to approve the Compact had been introduced 12

25   times over more than a decade). If Congress's repeated refusal to approve an agreement is not relevant to

26   whether *that very agreement* is subject to the Compact Clause, the fact that Congress has declined to

27   approve other, unrelated agreements cannot be relevant.

28

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

III.    **Because the agreement does not rise to the level of a compact, it is, *a fortiori*, not a treaty.**

The Constitution, as construed by the Supreme Court, recognizes three categories of agreements between states and other states or national or subnational jurisdictions: treaties, compacts, and mere agreements. "What the Framers saw as the precise definitions of treaties, alliances, confederations, agreements and compacts is largely lost to us now." Laurence Tribe, *American Constitutional Law* 651 (3d ed. 2000); *see also U.S. Steel*, 434 U.S. at 463; *Made in the USA Found. v. United States*, 242 F.3d 1300, 1305 (11th Cir. 2001); Felix Frankfurter & James Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685, 695 n.37 (1925) ("There is no self-executing test differentiating 'compact' from 'treaty.'"). However, the Constitution certainly suggests that they lie on a continuum: at one end are treaties, which are categorically prohibited, beyond even the ability of Congress to authorize; in the middle are compacts, which are permitted with congressional approval; and at the far end are simple agreements, which are permitted.

Where an agreement falls on this continuum is based on the extent of its departure, if any, from the ordinary allocation of powers to the states and the federal government. It is based on "the degree to which an agreement constrains federal or state sovereignty and submits United States citizens or political entities to the authority of bodies wholly or partially separate from the ordinary arms of federal or state government." Tribe, *Am. Constitutional Law* at 651. Accordingly, if California's coordination with Quebec is not a compact because it does nothing to expand California's authority at the expense of federal supremacy, *U.S. Steel*, 434 U.S. at 472-73, it certainly cannot be a treaty, which Congress would *lack power* to approve.

Plaintiff asserts that the agreement here is a treaty because it imposes binding obligations on California. Dkt. 12 at 24-26. This is neither correct nor important.

In *Wharton v. Wise*, 153 U.S. 155 (1894), the Supreme Court confronted a 1785 agreement between Virginia and Maryland granting reciprocal fishing rights in rivers and the Chesapeake, and which was clearly and severely binding and yet not a treaty. The states had entered the agreement before ratification of the Constitution, under the Articles of Confederation. *Id.* at 167. The Court was faced with the question whether the agreement violated the treaty provision of the Articles of Confederation, one closely similar to the Constitution's Treaty Clause: both refer to a "treaty," "alliance" and "confederation."

24

*Compare* U.S. Const. art. I, § 10, cl. 1 ("No State shall enter into any Treaty, Alliance, or Confederation . . . .") *with* Arts. of Confederation, art. VI, cl. 2 ("No two or more states shall enter into any treaty, confederation, or alliance whatever between them, without the consent of the united states, in congress assembled . . . ."). *U.S. Steel* thus held that the Articles of Confederation used "the same distinction between 'treaties, alliances and confederations' on the one hand, and 'agreements and compacts' on the other." 434 U.S. at 460 n.10.

The compact in *Wharton* demonstrates that the agreement here does not rise to the level of a treaty even if it were binding in some minor sense. The compact there was plainly and powerfully binding on each state and purported to limit the authority of each state's legislature to exit the compact:

> [E]very article, clause, matter, and thing therein contained shall be obligatory on this state and the citizens thereof, and shall be forever faithfully and inviolably observed and kept by this government and all its citizens according to the true intent and meaning of this compact; and the faith and honor of this state are hereby solemnly pledged and engaged to the state of Maryland and the government and citizens thereof that this law shall never be repealed or altered by the legislature of this commonwealth without the consent of the state of Maryland.

153 U.S. at 166.[13] Nevertheless, the Court concluded "the compact of 1785 was not prohibited by the articles of confederation. It was not a treaty, confederation, or alliance within the meaning of those terms as there used."[14] *Id.* at 171.

If the agreement in *Wharton* did not qualify as a treaty, California and Quebec's market coordination could not possibly qualify. Even if the agreement did create meager binding obligations to "discuss" this or "consider" that, *see* Dkt. 12 at 24, *Wharton* demonstrates that doing so falls far short of the degree of commitment required for a treaty. (Plaintiff fails to cite *Wharton*.)

In any event, the agreement is *not* binding. Again, Ontario's peremptory abandonment of the agreement demonstrates as much. Ontario did not even provide the notice contemplated by the withdrawal procedure. Ontario plainly did not consider itself "bound" by the agreement in any way. Further, Plaintiff has not alleged that Ontario suffered any repercussions whatsoever.

---

[13] The compact was enshrined in legislation adopted by each state. The quoted language is Virginia's version; Maryland adopted reciprocal language. 153 U.S. at 166.

[14] The Court did not consider whether it was a compact requiring congressional approval under the Constitution because it concluded that the Compact Clause did not apply to agreements entered by states before ratification of the Constitution. 153 U.S. at 171-72.

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

Plaintiff dutifully counts the word "shall" in the agreement, Dkt. 12 at 17, but that word does not mean what Plaintiff thinks it means. "'[S]hall' may sometimes be directory only, just as 'may' may be mandatory. The interpretation of these words depends upon the background circumstances and context in which they are used and the intention of the legislative body or administrative agency which used them." *United States v. Reeb*, 433 F.2d 381, 383 (9th Cir. 1970) (citing *Wilshire Oil Co. of Cal. v. Costello*, 348 F.2d 241, 243 (9th Cir. 1965)). Commentators have repeatedly emphasized the ambiguity in the word. *See* Bryan Garner, *Garner's Modern American Usage* 742 (3d ed. 2009) (referring to the "hopeless ambiguity" of the word); *see also* Bryan Garner, "Shall We Abandon Shall?" *ABA Journal* (Aug. 1, 2012), <http://www.abajournal.com/magazine/article/shall_we_abandon_shall>. Indeed, plainlanguage.gov, which refers to itself as "an official website of the United States government," says that "'Shall' is am-biguous, and rarely occurs in everyday conversation. The legal community is moving to a strong prefer-ence for 'must' as the clearest way to express a requirement or obligation." "Shall and Must," *plainlanguage.gov,* <https://plainlanguage.gov/guidelines/conversational/shall-and-must/> (last visited Feb. 3, 2020).

Nor does the confidentiality language present a Treaty Clause problem. *See* Dkt. 12 at 18. Article 15 addresses "confidentiality of information." Dkt. 7-2 at 10. Article 17 on "Withdrawal Procedure," states that "[w]ithdrawal from this Agreement does not end a Party's obligations under article 15 regarding confidentiality of information which continue to remain in effect." *Id.* at 11. But that provision also cannot be binding because a party may abandon the agreement—as Ontario did—without formally "withdraw-ing." In any event, the notion that an agreement to maintain confidential information submitted by regu-lated entities hardly poses a threat to national unity or federal sovereignty.

Emphasizing dictum from *Virginia,* which did not involve the Treaty Clause, Plaintiff focuses on whether the agreement is "of a political character."[15] Dkt. 12 at 22-23. It suggests, without support, that the agreement here must be "political" because it is not "proprietary." *Id.* at 22. It argues that "it

---

[15] In doing so, it takes pains to explain why the word "treaty" in Article I *must* mean something different from the word "treaty" in Article II to protect the broadest possible sweep—the "enormous span"—of the President's power to enter non-treaty executive agreements. Dkt. 12 at 23-24.

1    confederates the laws of two jurisdictions" and that "it plainly establishes a 'league for mutual govern-

2    ment.'" *Id.* This is more hyperbole.[16]

3        As described above, the agreement reflects each jurisdiction's independent intention to voluntarily

4    maintain its own regulations recognizing emission allowances issued by the other. It is no more a treaty

5    than the numerous agreements in which states have agreed to recognize drivers' licenses issued by Cana-

6    dian provinces. *See infra* Section IV.A. It "confederates" nothing and creates no "league" or "mutual

7    government": it gives Quebec no authority to regulate California residents, or vice versa.

8        *Wharton v. Wise* provides some guidance on this issue as well. It applied the language from *Vir-*

9    *ginia* that the Court relied on in *U.S. Steel* requiring a showing that the challenged agreement would "en-

10   croach upon or interfere with the just supremacy of the United States." 153 U.S. at 170 (quoting *Virginia*,

11   148 U.S. at 518-19). In concluding the compact between Maryland and Virginia was not a treaty, the Court

12   held that the compact's "execution could in no respect encroach upon or weaken the general authority of

13   congress under those articles [of confederation]." *Id.* at 170. As explained above, the coordinated market

14   does nothing to interfere with federal supremacy. Just as it is not a compact for that reason, it is not a

15   treaty either.

16       Finally, Plaintiff's Treaty Clause argument raises a serious separation of powers question. The

17   Treaty Clause requires the Court to draw a line between agreements that Congress may approve and those

18   it may not. If the Court concludes that the agreement between California and Quebec is a treaty, it is

19   declaring a limit on Congress's authority, preventing it from approving similar cooperative efforts in the

20   future. As noted below, states have entered a huge and diverse group of agreements with foreign nations.

21   *See infra* Section IV.A. A ruling under the Treaty Clause would place some of them beyond even Con-

22   gress's power to authorize—a power that Article I assigns to the Legislative Branch exclusively. Funda-

23   mental principles of judicial restraint should make the Court especially reluctant to take up Plaintiff's

24   invitation to break new legal ground when doing so would alter the allocation of power between the two

25   other coequal—and politically accountable—branches.

26

27   _____

28   [16] The Confederacy was formed by an impermissible treaty of the southern states, and the Supreme Court
     held it and its acts invalid on that basis under the Treaty Clause. *Williams v. Bruffy*, 96 U.S. 176, 177-78
     (1877). *That* is an agreement of a political character.

27

**IV.    Federalism considerations support rejecting Plaintiff's unprecedented attack on state innovation.**

The cap-and-trade program and the coordinated market are classic examples of the genius of federalism. The Founders intended that states be allowed to "try novel social and economic experiments without risk to the rest of the country," with the possibility that a state might develop a solution appropriate for adoption at the national level or by the other states. *New State Ice v. Liebmann*, 285 U.S. 262, 287 (1932) (Brandeis, J., dissenting). Since the mid-twentieth century, California has served as the quintessential "laboratory of democracy" in leading the development of air pollution policy. California's leadership began with efforts to regulate stationary pollution sources as early as 1947. *See* 1947 Cal. Stat. ch. 632, § 1; *see also* James E. Krier & Edmund Ursin, *Pollution & Policy: A Case Essay on California and Federal Experience with Motor Vehicle Air Pollution, 1940-1975,* at 62 (1977). It addressed automotive sources when it established crankcase emission standards in 1960. Krier & Ursin, at 146. By 1964, virtually every new car in the country included positive crankcase ventilation systems. *See* Joseph L. Sukek, *Vehicle Emissions, an Overview*, 48 J. Urb. L. 805, 816 (1971). California then enacted the nation's first tailpipe emissions standards in 1966. Krier & Ursin, at 175. The federal government followed suit by adopting the same standards, effective for 1968 model year cars. *Id.*

The Supreme Court has also recognized interstate cooperation as an example of the state-level innovation that federalism encourages. *See O'Neill*, 359 U.S. at 1. In upholding 42 states' adoption of reciprocal legislation for interstate transfer of witnesses, Justice Frankfurter penned a paean to interstate cooperation:

> The Constitution did not purport to exhaust imagination and resourcefulness in devising fruitful interstate relationships. It is not to be construed to limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States with a view to increasing harmony within the federalism created by the Constitution.

*Id.* at 6. The *O'Neill* Court emphasized that although the states acted reciprocally, the legislation "serves a self-protective function for each of the enacting States." *Id.* at 9.

Plaintiff's claims threaten this innovation. They risk invalidating many of the hundreds of agreements that states have entered with foreign jurisdictions to address a variety of cross-boundary concerns. And they would undo California's own innovative efforts to tackle the crisis of climate change.

28

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

### A.    Plaintiff's unprecedented claims imperil a broad swath of state agreements and reciprocal legislation.

California's market coordination with Quebec is only one of numerous partnerships between states and foreign governments that have developed over many decades. Many of these cross-border partnerships could be invalidated under Plaintiff's unprecedented theories.

Since the 1950s, at least 41 states have collectively entered into more than 300 written agreements with foreign governments. *See* Duncan B. Hollis, *Unpacking the Compact Clause*, 88 Tex. L. Rev. 741, 744, 750 (2010). These include more than 200 written agreements between states and foreign subnational governments, and more than one hundred agreements between states and foreign national governments.[17] *Id*. at 751–52.

These agreements cover a broad variety of topics, including agriculture, climate change, education, energy, environmental protection, homeland security, investment, military cooperation, sister-state relations, tourism, trade, transportation, and water management.[18] *Id*. at 754. The agreements vary widely in

---

[17] States have formed partnerships with national and subnational governments in Canada, Mexico, Australia, the United Kingdom, Israel, the Netherlands, Japan, Taiwan, China, and Moldova, among others. *Unpacking the Compact Clause*, 88 Tex. L. Rev. at 752.

[18] *See,* e.g., Memorandum of Principles and Procedures Between the Republic of Moldova and the State of North Carolina, Oct. 19, 2015, *available at* <https://www.sosnc.gov/documents/forms/Moldova_Partnership/NC_Moldova_Agreement_10_9_2015_English.pdf> (trade, environment, law enforcement, planning, cultural and academic exchange); Letter of Intent on Cooperation in Innovation, Economic and Entrepreneurship Development between the State of Georgia and the Province of Manitoba, Feb. 5, 2004, *available      at      * <https://www.gov.mb.ca/asset_library/en/documents/fedprovrelations/northamerica/loi_coop_econ_enterpren_develp_mb_georgia.pdf> (trade and innovation); Memorandum of Understanding between British Columbia and Washington State on Advancing the Innovation Economy, Environmental Protection, and Transportation Connectivity, Oct. 10, 2018, *available at* <https://www.governor.wa.gov/sites/default/files/BCWA_MOU_10.05.2018.pdf> (trade, environment, and transportation); Memorandum of Understanding on Economic and Environmental Co-operation Between the State of Illinois and the Province of Manitoba, Mar. 26, 2011, *available at* <https://www.gov.mb.ca/asset_library/en/documents/fedprovrelations/northamerica/mou_illinois_economic_environmental.pdf> (trade, tourism, transportation, technology, water, energy, crime prevention); Agreement for Regional Progress between Coahuila, Nuevo Leon, Tamaulipas and Texas, June 22, 2004, *available at* <https://www.sos.state.tx.us/border/forms/progress.pdf> (trade, technology); Minnesota-Manitoba Agreement on Educational Cooperation, Sept. 19, 1989, *available at* <https://www.gov.mb.ca/asset_library/en/documents/fedprovrelations/northamerica/Manitoba-Minnesota_Agreement_on_Educational_Cooperation.pdf> (education); Memorandum of Intent between Israel and New Jersey Concerning a Joint Israel-New Jersey Program to Promote the Establishment of Environmental Management Systems, Nov. 13, 1996, *available at* <http://www.state.nj.us/dep/dsr/Israel.PDF>
(footnote continued on next page)

29

form and function, encompassing (a) "joint declarations or statements of common policies,"[19] (b) agree-

ments to cooperate "via an action plan, or through the creation of some institutional entity,"[20] (c) "agree-

ments committing to a particular project or activity,"[21] and (d) "regulatory agreements laying out

normative expectations for participant behavior in particular areas."[22] Duncan B. Hollis, *The Elusive*

---

(environment); Letter of Intent Between the Ministry of Housing, Spatial Planning [of] the Netherlands and the Department of Environmental Protection, The State of New Jersey, June 5, 1998, *available at* <http://www.state.nj.us/dep/dsr/Netherlands.PDF> (environment); Memorandum of Understanding Between the State of Missouri & the Province of Manitoba on Their Shared Concerns About Water Transfers Between the Missouri & Hudson Bay Watersheds, Jan. 25, 2001, *available at* <https://news.gov.mb.ca/news/index.html?item=24909&posted=2001-01-25> (water); Great Lakes-St. Lawrence River Basin Sustainable Water Resources Agreement, Dec. 13, 2005, *available at* <https://www.ontario.ca/page/great-lakes-st-lawrence-river-basin-sustainable-water-resources-agreement> (water); MOU to Protect Water Resources Between the State of Minnesota and the Province of Manitoba, Man.-Minn., July 13, 2001, *available at* <https://www.gov.mb.ca/asset_library/en/documents/fedprovrelations/northamerica/mou_mb_minnesota_protect_water_resources_july_13_2001.pdf>) (water).

[19] *See,* e.g., Declaration of the Federated States and Regional Governments on Climate Change, Dec. 6, 2005, *available at* <https://www.theclimategroup.org/sites/default/files/archive/files/Montreal-Declaration-Signatories-as-of-Jan2010.pdf> (declaration by Quebec, Manitoba, Northwest Territories, Nanavut, State of Bavaria, Brussels-Capital, California, Catalonia, Connecticut, Maine, New Brunswick, New South Wales, Nova Scotia, Ontario, Scotland, South Australia, Upper Austria, Vermont, Victoria, Wallonia, Western Cape, Yukon, Burgenland, Carinthia, Wales, Flanders, Prince Edward Island, and North Rhine Westphalia to take action against climate change).

[20] *See,* e.g., Oil Spill Memorandum of Cooperation, June, 2001, *available at* <http://oilspilltaskforce.org/wp-content/uploads/2014/06/2001-OSTF-Memorandum-of-Cooperation.pdf> (agreement between British Columbia, Alaska, California, Hawaii, Oregon and Washington to cooperate on oil spill cleanups in the Pacific); Pacific States/British Columbia Oil Spill Task Force Mutual Aid Agreement; Aug. 24, 2011, available at <http://oilspilltaskforce.org/wp-content/uploads/2013/12/FINAL-2011-Mutual-Aid-Agreement.pdf> (formalizing mutual aid policy for oil spill response, building on 2001 agreement).

[21] *See,* e.g., Memorandum of Understanding Between the State of Alaska and the Ministry of Economic Affairs for the Republic of China (Taiwan) for the Production and Purchase of K-Fuel Coal, Sept. 16, 2004, *available at* <http://www.secinfo.com/d14D5a.15Z75.b.htm>.

[22] *See,* e.g., Memorandum of Understanding Between the Government of the State of Iowa of the United States of America and the Ministry of Foreign Affairs of the United Mexican States, Regarding Consular Notification and Access in Cases Involving Minors, Apr. 20, 2006, *available at* <https://dhs.iowa.gov/sites/default/files/17-C3_T12.pdf?010820200043> (creates procedural guidelines for Iowa authorities having custody of Mexican minors); Minnesota-Manitoba Agreement on Educational Cooperation, Sept. 19, 1989, *available at* <https://www.gov.mb.ca/asset_library/en/documents/fedprovrelations/northamerica/Manitoba-Minnesota_Agreement_on_Educational_Cooperation.pdf> (reciprocal agreement to offer in-state college tuition rates to students from other jurisdiction); Reciprocal Agreement Between the State of New York and Quebec Concerning Drivers' Licenses and Traffic Offenses, Feb. 4,

(footnote continued on next page)

*Foreign Compact*, 73 Mo. L. Rev. 1071, 1080–81 (2008). Under Plaintiff's claims, many of these agreements could be invalidated if they were to reflect policies disfavored by the President.

For example, Plaintiff's claims would threaten something as basic as states' coordination with foreign jurisdictions on reciprocal recognition of drivers' licenses. Many state statutes recognize the validity of drivers' licenses issued by foreign jurisdictions that provide reciprocity and contain provisions for reciprocal cooperation in reporting of traffic offenses. American Association of Motor Vehicle Administrators, *Foreign Reciprocity Resource Guide* 16-29 (2009), *available at* <https://www.aamva.org/WorkArea/DownloadAsset.aspx?id=820>. In some states, statutes authorizing such reciprocal recognition are accompanied by agreements with specific foreign jurisdictions which memorialize the states' intent to cooperate.[23] *Id*. at 17. Other state statutes authorize recognition of foreign drivers' licenses without any reciprocal agreement with foreign jurisdictions. *Id*. at 16; *see, e.g.*, Ariz. Rev. Stat. Ann. § 28-3164(D) (2019).

Plaintiff's claims would call into question these well-established state laws. If Plaintiff were correct that the Treaty or Compact Clauses prohibit California from recognizing foreign-issued emissions allowances, state regulations or agreements regarding reciprocal recognition of foreign-issued drivers' licenses would likely be threatened as well. Both cases involve a state's regulatory program that acknowledges the legitimacy of a permit—to drive or to emit—issued by a foreign jurisdiction. In both cases, the state must make a judgment about whether the foreign jurisdiction's criteria for issuance of that permit are consistent with the criteria in its own regulatory program.

### B.   California's market coordination with Quebec advances the goal of California's cap-and-trade program to control greenhouse gas emissions at the lowest cost.

California's cap-and-trade program limits harmful GHG emissions that threaten Californians and gives covered sources flexibility to meet regulatory requirements at the lowest cost. As noted above, a cap-and-trade program establishes an enforceable and declining aggregate limit ("cap") on GHG

---

1988, *available at* <http://legisquebec.gouv.qc.ca/en/ShowDoc/cr/C-24.2,%20r.%2016/> (regulating reciprocal recognition of drivers' licenses and traffic offense reporting).

[23] *See,* e.g., Reciprocal Agreement Between the State of New York and Quebec Concerning Drivers' Licenses and Traffic Offenses, *supra*; Ark. Code Ann. § 27-16-809 (authorizing state agency to enter reciprocal licensing agreements with foreign countries); Mich. Vec. Code § 257.302a (authorizing Michigan secretary of state to enter reciprocal agreements).

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

emissions from covered sources. *See, e.g.*, CCR §§ 95811-95812, 95841. At periodic intervals, each source must obtain an emissions allowance (or offset credit) for every ton of emissions. Because allowances can be traded and the cap predictably declines over time, the market ensures that the most cost-effective emission reduction opportunities are captured and provides a reliable economic incentive for innovation in emission reductions.[24] Cap and trade also allows regulated sources flexibility by giving them a choice between reducing emissions directly and procuring allowances or offsets from other sources. *Emissions Trading in Practice,* at 3, 7. Cap-and-trade systems create a virtuous cycle, as lower-cost compliance can enable increasingly ambitious emission limits.

Coordination of cap-and-trade programs provides an extension of the flexibility and cost-effectiveness inherent in cap and trade. A corollary of the economic rationale for cap-and-trade is that a larger market for GHG reductions will create economic, administrative, and environmental benefits for the market as a whole. Dallas Burtraw et. al., Resources for the Future, *Linking By Degrees: Incremental Alignment of Cap-and-Trade Markets* 2 (April 2013), *available at* <https://media.rff.org/documents/RFF-DP-13-04.pdf>. A market can become larger by expanding the categories of pollution sources covered—as California did by extending its cap-and-trade system to cover transportation fuels and natural gas starting in 2015—or by expanding its geographic coverage—as California did by coordinating its market with that of Quebec in 2014.

When a market is larger, it is more likely that lower-cost emissions reduction opportunities will be incorporated into the market, thus lowering the overall compliance cost. *Id.* For example, Quebec produces most of its electricity from clean hydropower, which has negligible GHG emissions and thus creates little opportunity for low-cost emissions reductions in the electricity generation sector. By contrast, California has a more carbon-intensive electricity generating system, which provides significant opportunities for relatively low-cost reductions in GHG emissions. Under the coordinated market, instead of reducing their

---

[24] Partnership for Market Readiness and International Carbon Action Partnership, World Bank Group, *Emissions Trading in Practice: A Handbook on Design and Implementation* 2-3, 16 (2016), *available at* <http://documents.worldbank.org/curated/en/353821475849138788/pdf/108879-WP-P153285-PUBLIC-ABSTRACT-SENT-PMRICAPETSHandbookENG.pdf>.

32

own emissions, regulated emissions sources in Quebec's electricity generation sector can purchase allowances from regulated entities in California that can reduce emissions more cheaply.

A coordinated market can also help create predictability and reduce seasonal fluctuations in carbon prices. Burtraw, *Linking by Degrees*, at 2. For example, if California experiences a drought and has less hydroelectric generating capacity than usual due to reduced river flows, it could increase the cost of emissions allowances in California as the state's power generation mix temporarily becomes more carbon-intensive. Regulated entities in California can then turn to cheaper, Quebec-issued emissions allowances because Quebec is unlikely to experience drought at the same time and may still have plentiful hydropower resources. Market coordination thus creates a cost buffer during conditions that could otherwise cause carbon prices to spike in California. *Id.*

Market coordination can increase flexibility for regulated businesses not only by lowering the overall cost of allowances—making them a more attractive compliance alternative—but also by increasing the number of emissions offset credits available in the market. *Id.* Another advantage of a larger market is the increased ease with which buyers can find sellers and vice versa, known as "liquidity," which reduces the transaction costs associated with trades.[25] Furthermore, coordination between cap-and-trade programs can reduce the costs to the jurisdictions of administrative activities like holding auctions, verifying the financial guarantees provided by bidders, and tracking allowances and offsets.[26]

Plaintiffs' claims threaten this innovation by preventing two jurisdictions from working in parallel to address one of the weightiest problems of our time. As discussed above, their arguments could invalidate a wide variety of agreements between states and other jurisdictions on a range of subjects from the simple to sophisticated. "[W]here the best solution is far from clear," as in attempting to meet the

---

[25] Christian Flachsland, Robert Marschinski & Ottmar Edenhofer, *To Link or Not to Link: Benefits and Disadvantages of Linking Cap-and-trade Systems*, 9 Climate Policy 358, 359 (2009); California Air Resources Board, *Staff Report: Initial Statement of Reasons for Proposed Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms to Allow for the Use of Compliance Instruments Issued by Linked Jurisdictions* 16 (May 9, 2012), *available at* <https://ww3.arb.ca.gov/regact/2012/capandtrade12/isormainfinal.pdf>.

[26] Burtraw, *supra,* at 2-3; CARB, *Request to Governor Brown Pursuant to SB 1018 - Discussions of Findings Required by Government Code Section 12894* 11 (Jan. 2013), *available at* <https://ww3.arb.ca.gov/regact/2012/capandtrade12/2nd15dayatta6.pdf>.

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB

generational challenge of climate change, the Constitution gives states latitude to experiment with new potential solutions. *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring).

For well over a decade, California has been developing innovative tools to protect its millions of residents from the catastrophic consequences of climate change, and the State's coordination with Quebec is one piece of that innovative program. The Constitution's federalist structure was designed to encourage exactly this kind of leadership. Plaintiff nevertheless asks this Court to reach out to invalidate that work with little to no supporting precedent. If federalism considerations are ever to play a role in courts' constitutional adjudication it must be in a case like this one, where the benefits of federalism are so clear and the case for countervailing constitutional values is so threadbare.

## CONCLUSION

For the foregoing reasons, Intervenors EDF and NRDC respectfully request that the Court deny the motion for summary judgment.

DATED:  February 10, 2020                     SHUTE, MIHALY & WEINBERGER LLP


                                              By:  _____/s/Matthew D. Zinn_____
                                                   MATTHEW D. ZINN

                                                   Attorneys for Defendant-Intervenors
                                                   ENVIRONMENTAL DEFENSE FUND and
                                                   NATURAL RESOURCES DEFENSE COUNCIL

INTERVENORS EDF & NRDC'S OPPOSITION TO PLAINTIFF'S MSJ
Case No. 2:19-cv-02142-WBS-EFB