XAVIER BECERRA
Attorney General of California
MICHAEL P. CAYABAN
Supervising Deputy Attorney General
PHILLIP M. HOOS, State Bar No. 288019
MICHAEL S. DORSI, State Bar No. 281865
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 Oakland, CA  94612-1492
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for State Defendants*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>          v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; THE CALIFORNIA AIR RESOURCES BOARD; MARY D. NICHOLS, in her official capacity as Chair of the California Air Resources Board and as Vice Chair and a board member of the Western Climate Initiative, Inc.; WESTERN CLIMATE INITIATIVE, INC.; JARED BLUMENFELD, in his official capacity as Secretary for Environmental Protection and as a board member of the Western Climate Initiative, Inc.; KIP LIPPER, in his official capacity as a board member of the Western Climate Initiative, Inc., and RICHARD BLOOM, in his official capacity as a board member of the Western Climate Initiative, Inc.,<br><br>                              Defendants. | 2:19-cv-02142-WBS-EFB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION**<br><br>Date:              March 9, 2020<br>Time:             1:30 PM<br>Courtroom:   5<br>Judge:           Honorable William B. Shubb<br>Trial Date:     Not Set<br>Action Filed:  10/23/2019 |

_____

[1] The State Defendants are State of California; Gavin C. Newsom, in his official capacity as Governor of the State of California; the California Air Resources Board; Mary D. Nichols, in her official capacity as Chair of the California Air Resources Board; and Jared Blumenfeld, in his official capacity as Secretary for Environmental Protection.

1

**TABLE OF CONTENTS**

2

                                                                                          **Page**

3

INTRODUCTION ................................................................................................. 1

4

BACKGROUND ................................................................................................... 3

I.   Factual Background ...................................................................................... 3

5

6

    A.   Cap-and-Trade Is a Well-Established, Market-Based Approach to Pollution
         Control Regarded by U.S. EPA, and Others, as Particularly Appropriate for
         Greenhouse Gas Emissions .................................................................... 3

7

    B.   CARB Adopted a Cap-and-Trade Regulation, to Reduce Statewide
         Greenhouse Gas Emissions .................................................................... 4

8

9

    C.   CARB's Cap-and-Trade Regulation Includes Several Features, Including
         the Ability to Link to Other Programs, that Facilitate Cost-Effective
         Emission Reductions ............................................................................... 6

10

    D.   California Linked Its Program with Quebec's Program by a Rulemaking
         Proceeding Completed in 2013 .............................................................. 7

11

12

    E.   California Linked Its Program, via Rulemaking, to Ontario's Program in
         2017, and the Three Jurisdictions Signed an Agreement to Continue
         Collaborating .......................................................................................... 9

13

    F.   Ontario Cancelled Its Cap-and-Trade Program, Effectively Unlinking It
         and Withdrawing from the 2017 Agreement, without Any Formal Notice ......... 12

14

II.  Procedural History ...................................................................................... 13

15

STANDARD FOR SUMMARY JUDGMENT ................................................... 13

16

ARGUMENT ...................................................................................................... 14

I.   The Challenged Agreement Is Not an Article I Treaty .............................. 15

17

18

    A.   The Article I Treaty Clause Prohibits Only Agreements with Substantial
         Consequences for Our Federal Structure, Such as Risks to National Unity ........ 15

19

    B.   The Challenged Agreement Is of Little to No Consequence to our Federal
         Structure, Does Not Threaten National Unity, and Is Not an Article I
         Treaty ..................................................................................................... 19

20

21

        1.   Rather than Linking the Cap-and-Trade Programs, the Agreement
             Simply Expresses the Parties' Intentions to Continue
             Communicating and Coordinating Regarding their Respective
             Programs ........................................................................................ 19

22

23

        2.   The Agreement's Expressions of Intent to Continue Coordination
             Regarding Independently Adopted Pollution-Control Programs
             Raise No Issues of Substantial Consequence for Our Federal
             Structure ........................................................................................ 22

24

25

    C.   Executive Branch Practice under Article II's Treaty Clause Supports the
         Conclusion that the 2017 Agreement Does Not Fall within Article I's
         Treaty Clause ......................................................................................... 23

26

    D.   Plaintiff's Assertions that the 2017 Agreement Is Binding Are Immaterial
         and Incorrect .......................................................................................... 24

27

28

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

II.    Neither the Challenged Agreement nor the Regulatory Provisions that Effectuate
Linkage Violate the Compact Clause ................................................................ 25

4

    A.    The Supreme Court Has Held that the Compact Clause Applies Only to
Agreements that Expand State Authority at the Expense of Federal

5

        Authority ................................................................................................ 26

6

    B.    Plaintiff Cannot Meet Its Burden of Establishing that the 2017 Agreement
or the Linkage Regulations Expand California's Political Power at the

7

        Federal Government's Expense ............................................................ 28

8

    C.    The Supreme Court's Foreign Affairs Preemption Cases, Including
Garamendi, Demonstrate that There Is No Interference with the Federal

9

        Government's Foreign Affairs Powers ................................................ 33

10

    D.    Defendants Are Also Entitled to Summary Judgment Because Neither the
Agreement nor the Linkage Regulations Bear the Indicia of a Compact ............ 38

11

        1.    Neither the Agreement Nor the Linkage Regulations Create a
Regulatory Organization ............................................................ 39

12

        2.    Neither the Agreement Nor the Linkage Regulations Limit CARB's
Authority to Change or Even Repeal Its Regulations ............................. 39

13

        3.    Neither the Agreement nor the Regulations Mandate the Kind of
Reciprocity that Constitutes an Indicia of a Compact ............................. 40

14

CONCLUSION .................................................................................................... 41

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

Memo. of Ps & As in Support of State Defendants' Cross-Motion for Summary Judgment and Opposition to
Plaintiff's Motion for Summary Judgment  (2:19-cv-02142-WBS-EFB)

1

**TABLE OF AUTHORITIES**

2

**Page**

3

4    CASES

5    *American Fuel & Petrochemical Manufacturers v. O'Keeffe*
6        903 F.3d 903 (9th Cir. 2018)...................................................................30

7    *American Insurance Association v. Garamendi*
         539 U.S. 396 (2003) ..............................................................2, 33, 34, 35
8
     *Anderson v. Liberty Lobby, Inc.*
9        477 U.S. 242 (1986).............................................................................13

10   *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*
         461 U.S. 375 (1983)...........................................................................37
11
     *Bode v. Barrett*
12       344 U.S. 583 (1953)........................................................................40, 41

13   *Cal. State Auto. Assn. Inter-Ins. Bureau v. Garamendi*
         6 Cal. App. 4th 1409 (1992) ..............................................................32
14
     *Celotex Corp. v. Catrett*
15       477 U.S. 317 (1986)...........................................................................13
16
     *Central Valley Chrysler-Jeep, Inc. v. Goldstene*
17       529 F. Supp. 2d 1151 (E.D. Ca. 2007)...............................................35

18   *Chae Chan Ping v. United States*
         130 U.S. 581 (1889)...........................................................................18
19
     *Crosby v. National Foreign Trade Council*
20       530 U.S. 363 (2000).................................................................33, 34, 35
21
     *Dames & Moore v. Regan*
22       453 U.S. 654 (1981)...........................................................................34

23   *Exxon Mobil Corp. v. EPA*
         217 F.3d 1246 (9th Cir. 2000)...........................................................30
24
     *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*
25       249 F.3d 1132 (9th Cir. 2001)...........................................................13
26
     *Fontana v. Haskin*
27       262 F.3d 871 (9th Cir. 2001)............................................................13

28

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Garcia v. Texas*
    564 U.S. 940 (2011)...............................................................................24

*Gray v. North Dakota Game and Fish Dept.*
    706 N.W.2d 614 (N.D. 2005)...............................................................25

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*
    508 F. Supp. 2d 295 (D. Vt. 2007).......................................................37

*Hines v. Davidowitz*
    312 U.S. 52 (1941).................................................................................35

*Holmes v. Jennison*
    39 U.S. 540 (1840).................................................................................15

*In re Manuel P.*
    215 Cal.App.3d 48 (Cal. Ct. App. 1989) .................................26, 27, 40, 41

*Made in the USA Found. v. United States*
    242 F.3d 1300 (11th Cir. 2001).............................................................19

*Massachusetts v. EPA*
    549 U.S. 497 (2007)...............................................................................21

*McHenry v. Brady*
    163 N.W. 540 (N.D. 1917).....................................................................27

*Medellin v. Texas,*
    552 U.S. 491 (2008)...............................................................................34

*Movsesian v. Victoria Versicherung AG*
    670 F.3d 1067 (9th Cir. 2012)...............................................................34

*Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*
    472 U.S. 159 (1985).................................................................29, 38, 39

*PTI, Inc. v. Philip Morris Inc.*
    100 F. Supp. 1179 (C.D. Ca. 2000).......................................................29

*S&M Brands, Inc. v. Caldwell*
    614 F.3d 172 (5th Cir. 2010)..................................................................29

*Saldana v. Occidental Petroleum Corp.*
    774 F.3d 544 (9th Cir. 2014)..................................................................19

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conserv. Planning*
        *Council*
4        786 F.2d 1359 (9th Cir. 1986) ................................................................39

5    *Soremekun v. Thrifty Payless, Inc.*
6        509 F.3d 984 (9th Cir. 2007) ..................................................................13

7    *Star Scientific Inc. v. Beales*
        278 F.3d 339 (4th Cir. 2002) ..................................................................29
8
    *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*
9        809 F.2d 626 (9th Cir. 1987) ..................................................................13

10    *The Mary & Susan*
        14 U.S. 46 (1816) ..................................................................................18
11
    *Tichenor v. Missouri State Lottery Comm'n*
12        742 S.W.2d 170 (Mo. 1988) ............................................................29, 33
13
    *Tulalip Tribes of Wash. v. Wash.*
14        783 F.3d 1151 (9th Cir. 2015) ................................................................13

15    *United States Steel Corporation v. Multistate Tax Commission*
16        434 U.S. 452 (1978) ..................................................................... *passim*

17    *Vibo Corp., Inc. v. Conway*
        594 F. Supp. 2d 758 (W.D. Ky. 2009) ....................................................29
18
    *Virginia v. Tennessee*
19        148 U.S. 503 (1893) ..................................................................... *passim*

20    *Walker v. Sumner*
        917 F.2d 382 (9th Cir. 1990) ..................................................................26
21
    *Wharton v. Wise*
22        153 U.S. 155 (1894) ..............................................................................17
23
    *Williams v. Bruffy*
24        96 U.S. 176 (1877) ......................................................................14, 15, 16

25    *Zivotofsky v. Kerry*
        576 U.S. 1 (2015) ..................................................................................37
26

27

28

v

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3  CONSTITUTIONAL PROVISIONS

4  U.S. Const., Article I, § 10, cl. 1 ............................................................14, 15

5  U.S. Const., Article I, § 10, cl. 3 ...............................................14, 15, 26, 27

6  U.S. Const., Article II, § 2, cl. 2 ..................................................................23

7  STATUTES & REGULATIONS

8  Cal. Gov. Code

9      § 12894(a)(2) .............................................................................................7
       § 12894(f) ..................................................................................................7

10

     Cal. Health & Safety Code

11     § 35801(a) ..................................................................................................4

12     § 35801(b) ..................................................................................................4
       § 38550 ..................................................................................................4, 21

13     § 38560 ..............................................................................................5, 8, 32
       § 38561(a) ..................................................................................................5

14     § 38562 .......................................................................................................8
       § 38562(c)(2) ..............................................................................................5

15     § 38564 .....................................................................................................25

16     § 38566 ..................................................................................................4, 21
       § 38570 .......................................................................................................8

17     § 38651 .......................................................................................................5

18   Cal. Code of Regs., Title 17

19     § 95802(a) ..................................................................................................5
       § 95802(a)(1) ..............................................................................................6

20     § 95821 .......................................................................................................6
       § 95840(a) ..................................................................................................5

21     § 95841 .......................................................................................................5
       § 95850(b) ..................................................................................................6

22     § 95851(b) ..................................................................................................6
       § 95854 .......................................................................................................6

23     § 95856(a) ..................................................................................................6

24     § 95910 .......................................................................................................9
       § 95911 .......................................................................................................8

25     § 95911(a)(5) .......................................................................................7, 20
       § 95922 .......................................................................................................6

26     § 95940 ................................................................................................7, 8, 9
       § 95942(a) ..................................................................................................7

27     § 95942(e) ..................................................................................................7
       § 95943(a) ..................................................................................................9

28

**TABLE OF AUTHORITIES**
(continued)

Page

§ 95943(a)(1)...............................................................................................8, 12, 20
§ 95943(a)(2)......................................................................................................9, 12

**OTHER AUTHORITIES**

*The Federalist No. 4* (John Jay) (Clinton Rossieter ed., Signet 2003)............................................16

Hearing on S. 2688 Before Subcomm. on the Great Lakes Basin of the S. Comm.
  on Foreign Relations, 84th Cong. at 16 (1956) (statement of Willard B.
  Cowles, Deputy Legal Advisor, Department of State) ...............................................31

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ..................16, 17, 18

Max Farrand, "The Commercial Privileges of the Treaty of 1803,"
  in 7 *The American Historical Review* 494 (1902)......................................................18

Michael Glennon & Robert Sloane, *Foreign Affairs Federalism: The Myth of
  National Exclusivity* (2016) ................................................................................14, 35

Restatement (Fourth) of Foreign Relations Law § 312...................................................24

William H. Taft, IV, Legal Adviser of the U.S. Dept. of State, "Memorandum,"
  in *Digest of United States Practice of International Law* (Sally J. Cummins &
  David P. Stewart, eds., 2001)..........................................................................14, 27

United States Department of State, *Treaties in Force: A List of Treaties and Other
  International Agreements of the United States in Force on January 1, 2019*.........................38

**INTRODUCTION**

In its motion for partial summary judgment, the United States (Plaintiff) challenges a 2017 agreement between California and Quebec under two rarely invoked constitutional provisions: Article I's Treaty Clause and the Compact Clause. The Treaty Clause categorically bars States from entering into "any Treaty, Alliance, or Confederation," while the Compact Clause requires congressional approval for "any Agreement or Compact with another State, or with a foreign Power." These Clauses apply only to a narrow range of state agreements. In fact, although States have entered into hundreds of agreements with other States and with foreign governments, few have been submitted for congressional approval or challenged in court. Indeed, the Supreme Court has rarely addressed these Clauses and has only once found an agreement—the Civil War Confederacy—unconstitutional under them. The 2017 agreement falls well outside the two narrow categories of Article I Treaties and Compacts and fits instead in the much larger third category—the "many matters … that can in no respect concern the United States." *Virginia v. Tennessee*, 148 U.S. 503, 518 (1893).

California and Quebec have chosen to link their respective cap-and-trade programs in order to expand compliance flexibility and cost-reduction opportunities for businesses regulated under their respective programs. Contrary to Plaintiff's suggestion, neither this link nor the 2017 agreement address emission levels. Also contrary to Plaintiff's suggestion, the link between the programs was established not by the 2017 agreement but by regulatory amendments adopted independently by each jurisdiction.

The agreement, signed after the linkage regulations were adopted, expresses the parties' intentions to continue communicating with each other regarding possible changes to their respective programs. This limited agreement to coordinate regarding locally adopted and locally applicable regulatory programs does not violate the Treaty Clause or the Compact Clause because it does not implicate the weighty matters, such as preserving national unity or protecting federal supremacy against an expansion of state power, at which those Clauses are aimed. Indeed, in *United States Steel Corporation v. Multistate Tax Commission*, 434 U.S. 452 (1978), the Supreme Court upheld a formalized, multi-state agreement created to advance a strikingly similar

1

1   objective—increased uniformity in state taxation of multi-state corporations—against such a

2   constitutional challenge.  The 2017 agreement is neither a Treaty nor a Compact, and Plaintiff's

3   summary judgment motion should be denied.

4       Defendants' cross-motion for summary judgment should be granted for the same reasons

5   and also because Plaintiff's Compact Clause challenge to the regulatory linkage provisions

6   adopted by the California Air Resources Board (CARB) fails as a matter of law.  (Plaintiff does

7   not allege these provisions constitute a Treaty.)  This claim, too, is foreclosed by *United States*

8   *Steel Corporation*, which held that a more consequential agreement concerning taxation of

9   interstate businesses fell outside the Compact Clause because the agreement (1) did not allow

10  States to exercise any powers that they did not already possess, (2) did not delegate any state

11  regulatory power, and (3) allowed states unfettered withdrawal.  The same is true of the linkage

12  regulations.  California is exercising only authority it already possessed: to expand compliance

13  options for California businesses regulated under a California air pollution control program.  The

14  linkage regulations do not delegate any regulatory power away from California, and each

15  jurisdiction retains its full, independent, sovereign authority to modify its own program, as

16  California has done through regulatory amendments adopted since linkage occurred.  Each

17  jurisdiction likewise retains its unfettered authority to repeal its linkage regulations and thereby

18  effectively withdraw, as demonstrated by Ontario (which had once linked its program to

19  California's and Quebec's) having done exactly that.

20      Moreover, neither the agreement nor the linkage regulations encroach upon federal power

21  with respect to foreign affairs.  Plaintiff asserts that the 2017 agreement (or perhaps the linkage

22  regulations) reduces the federal government's diplomatic leverage in some unspecified fashion by

23  eliminating some unidentified option.  These assertions are incorrect and insufficient as a matter

24  of law, and Plaintiff's repeated quotations from *American Insurance Association v. Garamendi*,

25  539 U.S. 396 (2003), do nothing to aid its Compact Clause claim.  This case is a far cry from the

26  state statute in *Garamendi* that (1) established an approach to settling Holocaust-era insurance

27  claims that directly conflicted with the particular mechanism the federal government had

28  expressly adopted to settle those same claims and (2) threatened substantial economic sanctions—

2

1  exclusion from the State's market—to enforce the State's approach.  Far from threating economic

2  sanctions, the linkage here is intended to *ease* compliance pressure on California businesses

3  subject to California regulations, and the federal government has not identified or even suggested

4  any conflicting mechanism.  Indeed, although the linkage with Quebec has been operational for

5  more than six years, Plaintiff has produced no evidence of any impact whatsoever on the federal

6  government or anything else.

7       Plaintiff's summary judgment motion should be denied, and summary judgment should be

8  entered for Defendants on both the Treaty Clause and Compact Clause causes of action.

9                                    **BACKGROUND**

10  **I.    FACTUAL BACKGROUND**

11       **A.    Cap-and-Trade Is a Well-Established, Market-Based Approach to
               Pollution Control Regarded by U.S. EPA, and Others, as Particularly

12             Appropriate for Greenhouse Gas Emissions**

13       Cap-and-trade programs are market-based approaches to regulation under which pollution

14  is controlled by an aggregate "cap" on the emissions of entities regulated by the program.  *See*

15  Declaration of Michael S. Dorsi (Dorsi Decl.), Exh. 1 at 1-1, 1-2.  The implementing agency

16  issues compliance instruments, often called "allowances," that represent an authorization "to emit

17  a specific quantity (e.g., 1 ton) of a pollutant."  *Id.* at 1-2.  To ensure emissions do not exceed the

18  cap, "[t]he total number of allowances [issued] equals the level of the cap," and regulated entities

19  "must surrender allowances equal to [their] actual emissions."  *Id.*

20       Allowances are tradeable; they may be bought and sold.  Accordingly, regulated entities

21  that can reduce their emissions inexpensively may sell "excess allowances."  *Id.* at 1-3.  Other

22  regulated entities will, generally, purchase allowances when the cost of doing so "is lower than

23  the cost to reduce a unit of pollution at their facility."  *Id.* at 1-3.  Thus, the ability to trade

24  allowances provides each regulated entity with the flexibility to "design its own compliance

25  strategy," using whatever combination of "emission reductions and allowance purchases or

26  sales … minimize[s] its compliance cost."  *Id.* at 1-2.

27       In short, the "cap" provides certainty concerning overall emissions levels, while the "trade"

28  allows regulated entities to determine the most cost-effective ways to achieve those levels.  *See*

3

Memo. of Ps & As in Support of State Defendants' Cross-Motion for Summary Judgment and Opposition to
Plaintiff's Motion for Summary Judgment (2:19-cv-02142-WBS-EFB)

1   *id.* at 1-2, 1-3.  For these reasons, cap-and-trade programs are regarded by the United States

2   Environmental Protection Agency (EPA) and others as providing both "a greater level of

3   environmental certainty" and "significant economic benefits" as compared to more traditional

4   environmental regulations.  *Id.* at 1-2, 1-3.

5        In 2003, EPA published a guide to designing cap-and-trade programs, in which it stated that

6   "[t]he theory of emission trading and the potential benefits of market-based incentives relative to

7   more traditional environmental policy approaches are well-established in the economic and policy

8   literature."  *Id.* at 1-1.  EPA described its own cap-and-trade program to reduce sulfur dioxide

9   emissions—a program required by a federal statute enacted in 1990—as "highly effective from an

10  environmental and an economic standpoint."  *Id.*  EPA also observed that "emissions trading

11  mechanisms are increasingly considered and used worldwide for the cost-effective management

12  of national, regional, and global environmental problems, including … climate change."  *Id.*  By

13  2006, one cap-and-trade program for greenhouse gas emissions—the European Union's Emission

14  Trading System—was set up, and another—the Regional Greenhouse Gas Initiative involving

15  several northeastern States—was publicly under development.  *See* State Defendants' Request for

16  Judicial Notice (RJN), Part I, ¶¶1–2.

17       **B.    CARB Adopted a Cap-and-Trade Regulation, to Reduce Statewide**
              **Greenhouse Gas Emissions**
18

19       In 2006, in Assembly Bill 32 (AB 32), the California Legislature found that climate change

20  "poses a serious threat to the economic well-being, public health, natural resources, and the

21  environment of California."  Cal. Health & Safety Code § 38501(a); *see also id.* § 38501(a), (b)

22  (finding, *inter alia*, risks to water supplies and water quality, threats to public health, and impacts

23  on "some of California's largest industries").  Recognizing that greenhouse gas emissions cause

24  climate change and, thus, create and exacerbate these threats to California, the Legislature

25  mandated that the State reduce its greenhouse gas emissions to 1990 levels by 2020.  *Id.* § 38550.

26  In 2016, the Legislature took the additional step of mandating that California reduce its emissions

27  to 40 percent below 1990 levels by the end of 2030.  *Id.* § 38566.

28

1    The Legislature tasked CARB with developing a plan and promulgating regulations to

2    achieve the mandated statewide emissions reductions.  *Id.* §§ 38561, 38560.  The Legislature

3    authorized CARB to design and adopt a cap-and-trade program as one of the regulations it would

4    promulgate to reduce greenhouse gas emissions.  *Id.* § 38562(c)(2).

5    In 2008, CARB prepared and finalized a Scoping Plan to "outlin[e] the State's strategy to

6    achieve the 2020 greenhouse gas emissions limit" established by the Legislature.  Dorsi Decl.,

7    Exh. 2 at ES-1; *see also* Cal. Health & Safety Code § 38561(a).  Based on extensive research and

8    public participation, Dorsi Decl., Exh. 2 at E-2, E-3, 9, CARB concluded that achieving the

9    statewide emissions limits could "best be accomplished through a cap-and-trade program along

10   with a mix of complementary strategies that combine market-based regulatory approaches, other

11   regulations, voluntary measures, fees, policies, and programs."  *Id.* at 15.  Following the Scoping

12   Plan, CARB promulgated several regulatory measures to reduce greenhouse gas emissions from a

13   variety of sources, including a Low Carbon Fuel Standard, more stringent emissions standards for

14   various types of vehicles and engines, and a cap-and-trade regulation.  Declaration of Rajinder

15   Sahota (Sahota Decl.) ¶ 9.

16   CARB proposed its cap-and-trade regulation in October 2010, drawing on design

17   recommendations from the Western Climate Initiative[2] and other information gathered from

18   research, public participation, and consultation with experts from diverse fields.  Sahota Decl., ¶¶

19   15-19; Dorsi Decl., Exh. 3 at 2.  Subsequently, the Board adopted the cap-and-trade regulation in

20   October 2011.  Sahota Decl., ¶20; Dorsi Decl., Exh. 4.  The program's compliance obligations for

21   regulated sources began on January 1, 2013.  Cal. Code Regs., tit. 17, § 95840(a).

22   California's cap-and-trade program reflects the general cap-and-trade program structure

23   described above.  CARB establishes yearly caps, called "budgets," for the total greenhouse gas

24   emissions of all regulated sources (called "covered entities").  *Id.* §§ 95841, 95802(a).  These

25   emission budgets decline each year in order to require emission reductions from covered entities.

26         [2] This Initiative, which is distinct from Defendant Western Climate Initiative, Inc. (a non-

27   profit corporation), was a somewhat informal "collaboration of independent jurisdictions working
together … to tackle climate change."  Sahota Decl., ¶ 13.  The Initiative produced design
recommendations for cap-and-trade programs.  Sahota Decl., ¶ 15.

28

5

1   *See id.* § 95841.[3]  CARB issues allowances—"authorization[s] to emit up to one metric ton of

2   carbon dioxide equivalent" greenhouse gases—in quantities equal to the emissions budget for a

3   given year.  *Id.* §§ 95802(a), 95802(a)(1).  Covered entities may trade these allowances and other

4   compliance instruments and are required to acquire and surrender eligible compliance instruments

5   equivalent to the metric tons of greenhouse gases they emit.  *Id.* §§ 95850(b), 95856(a).[4]

6       **C.     CARB's Cap-and-Trade Regulation Includes Several Features, Including
            the Ability to Link to Other Programs, that Facilitate Cost-Effective**
7       **Emission Reductions**

8           Beyond the flexibility provided by the ability to trade allowances, CARB's cap-and-trade

9   regulation contains additional cost-containment features.  Sahota Decl., ¶¶ 24-25.  For example, it

10  allows the "banking" of allowances, meaning covered entities can acquire allowances in earlier

11  years (when prices may be lower) and use them for compliance in later years (when prices may be

12  higher due to more stringent emission budgets).  Sahota Decl., ¶ 24; *see also* Cal. Code Regs., tit.

13  17, § 95922.

14          Another cost-containment measure is the aspect of the program at issue in this case:  the

15  ability to expand the market(s) for compliance instruments by linking to other, similar cap-and-

16  trade programs.  When it adopted its cap-and-trade regulation in 2011, CARB concluded that a

17  California-only program would function well but recognized, at the same time, that linking with

18  other, similar programs would "provide an additional cost containment mechanism" for covered

19  entities.  *See* Dorsi Decl, Exh. 5 at 193.  Accordingly, CARB designed California's cap-and-trade

20  regulation to include a "framework for linkage" which would allow CARB to link to another

21  jurisdiction's program through a later rulemaking proceeding.  *Id.*; Cal. Code Regs., tit. 17,

22

23          [3] The budget set by CARB in 2015 was actually larger than the 2014 budget, but this
    enlargement did not indicate an increase in emissions.  Rather, it reflected expansion of the
24  program to include suppliers of natural gas and transportation fuels in the program (and the
    budget) beginning in 2015.  *See* Cal. Code of Regs., tit. 17, §§ 95841, 95851(b).
25          [4] Covered entities may surrender "offsets" for a small portion (four to eight percent) of
    their compliance obligation.  Cal. Code of Regs., tit. 17, §§ 95821, 95854.  Like an allowance, an
26  "offset" authorizes a metric ton of emissions, but, unlike an allowance, an offset corresponds to
    emissions reductions by a source not covered by the program.  *See* Cal. Code Regs., tit. 17, §
27  95802(a).  In essence, an offset is a mechanism that allows a covered entity to pay a non-covered
    entity to reduce or remove emissions.  Because the use of offsets is limited under California's
28  program, and for purposes of brevity and simplicity, the discussion here focuses on allowances.

6

1    § 95940.  The regulation adopted in 2011 included this framework for future linkage but did not

2    actually link to any other program.  *Id.*

3        Under this framework, linkage means (1) that CARB would accept the allowances (or other

4    compliance instruments) issued by the linked jurisdiction as essentially equivalent to CARB-

5    issued instruments and (2) that CARB would conduct coordinated allowance auctions with the

6    other jurisdiction.  Cal Code Regs., tit. 17, §§ 95940, 95942(a), (e), 95911(a)(5).  Linkage would

7    not alter anything else about the programs, including their caps (or emissions budgets).  Sahota

8    Decl., ¶ 25.  Because linkage would expand the available cost-reduction opportunities, many

9    covered sources supported CARB's inclusion of the framework for linkage and urged CARB to

10   actually link to other programs quickly.  Sahota Decl., ¶ 26; *see also* Dorsi Decl., Exh. 5 at 142,

11   167, 175, 191, 192.

12       After CARB adopted the linkage framework, but before CARB had linked to any other

13   program, the California Legislature "establish[ed] new oversight and transparency over [cap-and-

14   trade] linkages."  Cal. Gov. Code § 12894(a)(2).  Accordingly, California law provides that

15   CARB may not link to another program "unless [CARB] notifies the Governor that [it] intends to

16   take such action and the Governor, acting in his or her independent capacity, makes [four]

17   findings," including that "[t]he jurisdiction with which the state agency proposes to link has

18   adopted program requirements for greenhouse gas reductions … that are equivalent to or stricter

19   than those required" by California's Legislature.  *Id.* § 12894(f).[5]

20   **D.    California Linked Its Program with Quebec's Program by a Rulemaking**
          **Proceeding Completed in 2013**

21

22       On April 19, 2013, after the Governor made the requisite findings described above and after

23   a public rulemaking proceeding, CARB adopted amendments to its cap-and-trade regulation to

24
         _____

25       [5] This finding is important, from a cap-and-trade design perspective, because programs
     with less stringency that are less constraining will tend to have lower allowance prices (due to
26   excess supply and/or lower demand).  Sahota Decl., ¶ 30.  Lower allowance prices blunt
     incentives to reduce emissions.  *Id.*  Also, if regulated sources in jurisdictions with stringent caps
27   could simply buy allowances cheaply from jurisdictions with much less stringent caps, it would
     undermine the more stringent cap and the degree of emissions constraint it was intended to
28   provide.  *Id.*  This finding, thus, protects the environmental integrity of the programs.  *See id.*

7

Memo. of Ps & As in Support of State Defendants' Cross-Motion for Summary Judgment and Opposition to
Plaintiff's Motion for Summary Judgment (2:19-cv-02142-WBS-EFB)

1   link to a similar program adopted by Quebec.  Sahota Decl., ¶¶ 33-34, 40; Dorsi Decl., Exh. 6;

2   *see also* Cal. Code Regs., tit. 17, § 95943(a)(1).[6]  By operation of these regulatory amendments,

3   the linkage with Quebec took effect January 1, 2014.  Cal. Code Regs., tit. 17, § 95943(a)(1).  As

4   a result, for the last six years, CARB has accepted Quebec-issued compliance instruments for

5   compliance with CARB's cap-and-trade program, and parties regulated under either program may

6   buy and sell allowances and other compliance instruments with each other.  *Id.*; *see also id.*

7   § 95940.  CARB and Quebec also conduct joint allowance auctions.  *Id.* § 95911.[7]

8          Nothing about this linkage otherwise altered either jurisdiction's program or either

9   jurisdiction's authority to amend its program or to terminate linkage.  Sahota Decl., ¶¶ 42-43.

10  CARB remains the agency to which the California Legislature has delegated rulemaking authority

11  for California's cap-and-trade program and upon which the Legislature imposed certain criteria

12  regarding any such program.  Cal. Health & Safety Code §§ 38560, 38562, 38570.

13         In September 2013, approximately five months after it adopted the regulatory amendments

14  linking to Quebec's program, CARB and California's Governor signed an agreement with

15  Quebec, reflecting both jurisdictions' intentions to continue coordinating with regard to their

16  respective cap-and-trade programs.  *See* Am. Compl., ¶ 57; *see also* Dorsi Decl., Exh. 8.  The

17  agreement expressly recognized that each jurisdiction's program would continue to be governed

18  by its regulations, noting particularly that linkage activities—including acceptance of each other's

19  compliance instruments, joint auctions, and cross-program trading—would occur "as provided for

20  under their respective cap-and-trade program regulations."  Dorsi Decl., Exh. 8 (Articles 6, 7, 8).

21  The agreement also expressly recognized that it did not "modify any existing laws and

22  regulations" and that each party retained its "sovereign right and authority to adopt, maintain,

23         [6] These amendments were approved by the California Office of Administrative Law and
    filed with the California Secretary of State on June 24, 2013 and, by operation of California
24  Government Code Sections 11343.4, became effective on October 1, 2013.  Dorsi Decl., Exh 7.
    As noted, however, pursuant to the text of the regulation, the linkage became operational on
25  January 1, 2014.  Cal. Code Regs., tit. 17, § 95943(a)(1).
           [7] The auctions are conducted jointly in the sense that California and Quebec make their
26  respective allowances available at the same time, and in the same auction venue, and conform
    their bidding and winning parameters.  Sahota Decl., ¶ 52.  However, there is no joint account
27  where allowances are held prior to distribution to winning bidders.  *Id.*  After each auction,
    California and Quebec separately transfer their respective allowances into the winning bidders'
28  accounts.  *Id.*

8

1    modify or repeal any of their respective program regulations." *Id.* (Article 13 and 14th

2    WHEREAS clause).

3        As reflected in the agreement, CARB and Quebec use the technical and administrative

4    services of the Western Climate Initiative, Inc. (WCI, Inc.), a non-profit corporation formed in

5    2011 by the then-participants in the Western Climate Initiative, to support their cap-and-trade

6    programs.  Sahota Decl., ¶¶ 50-51, 53, 55, 57; Dorsi Decl., Exh. 12.  WCI, Inc. developed and

7    administers a technical platform that CARB and Quebec use to jointly auction allowances.[8]

8    Sahota Decl., ¶ 51.  WCI, Inc. also developed and maintains a computer system that, like banking

9    software, keeps track of allowances and other compliance instruments.  *Id.*  WCI, Inc. provides

10   these services under contract and for remuneration, and CARB had begun using WCI, Inc.'s

11   services in 2012, before it linked its program to Quebec's.  *See* ECF No. 7-3; *see also* Sahota

12   Decl., ¶ 53.  WCI, Inc. has no policy-making, regulatory, or enforcement authority, and plays no

13   role in deciding whether California or Quebec will accept each other's compliance instruments.

14   Sahota Decl., ¶ 57; *see also* Cal. Code of Regs., tit. 17, §§ 95940, 95943(a).

15       **E.    California Linked Its Program, via Rulemaking, to Ontario's Program in**
16       **2017, and the Three Jurisdictions Signed an Agreement to Continue**
         **Collaborating**

17       On July 27, 2017, after the Governor made the requisite findings, CARB completed a

18   rulemaking proceeding and adopted regulatory amendments to link its cap-and-trade program

19   with Ontario's, with that linkage becoming operational on January 1, 2018.  Sahota Decl., ¶¶ 62-

20   64; Dorsi Decl., Exh. 9; *see also* Cal. Code Regs., tit. 17, § 95943(a)(2).[9]  In September 2017, the

21   governments of California, Quebec, and Ontario signed an agreement, again reflecting the parties'

22   intentions to continue coordinating their respective programs.  Am. Compl., Attachment B (ECF

23   No. 7-2) (2017 agreement).  That 2017 agreement replaced the 2013 agreement between

24   California and Quebec.  *See id.* at 3.

25   _____

26       [8] The majority of California allowances are made available through these quarterly
     auctions; some allowances are provided to regulated parties at no cost.  *See* Cal. Code Regs., tit.
27   17, § 95910.
         [9] California's Office of Administrative Law approved the amendments and filed them
28   with the California Office of the Secretary of State on September 18, 2017, with an effective date
     of October 1, 2017.  Dorsi Decl., Exh. 10.

9

1    Like its predecessor, the 2017 agreement is of limited reach. Far from linking the

2    programs, the 2017 agreement expressly notes that the links between the programs—mutual

3    recognition of compliance instruments, joint auctions, and cross-program trading—were

4    effectuated by, and would be governed by, each party's respective regulations. *Id.* at 2 & Arts. 6,

5    7, 9; *see also id.* at 2 (recognizing "that the harmonization and integration of [the parties'] cap-

6    and-trade programs are to be attained by means of regulations adopted by each Party"). The

7    agreement also explicitly states that it "does not modify any existing statutes and regulations

8    [and] does [not] require or commit the Parties or their respective regulatory or statutory bodies to

9    create new statutes or regulations." *Id.,* Art. 14. Further, like the 2013 agreement, the 2017

10    agreement expressly recognizes that each participating jurisdiction retains its "sovereign right and

11    authority to adopt, maintain, modify, repeal or revoke any of their respective program regulations

12    or enabling legislation." *Id.* at 2. The 2017 agreement also recognizes that the "Agreement does

13    not, will not and cannot be interpreted to restrict, limit or otherwise prevail over relevant national

14    obligations of each Party." *Id.* Finally, the 2017 agreement indicates that a "Party may

15    withdraw" from it "by giving written notice of intent to withdraw to the other Parties" but

16    expresses the Parties' intentions to "endeavour to give 12 months notice of intent to withdraw."

17    *Id.*, Art. 17. The 2017 agreement contains no discussion of any mechanism for its enforcement.

18    The parties entered into the agreement because they recognized "the importance of effective

19    and timely public consultation regarding their respective [cap-and-trade] program[s]," in light of

20    the fact that the parties' linkage regulations effectively established expanded markets including

21    all three jurisdictions' compliance instruments. *Id.* at 2, Art. 11. Coordination helps ensure that

22    each party understands what program changes are being considered by the other parties and

23    whether those changes might have indirect effects on the linked programs. Sahota Decl. ¶ 49.

24    Acknowledging that the parties had already "developed constructive working relationships among

25    their respective staff and officials," the parties expressed their intentions to "facilitate continued

26    consultation." ECF No. 7-2, at 2.

27    To that end, the parties stated their intentions to "continue to examine their respective

28    regulations" and, where differences in the programs exist, determine whether further

10

1  harmonization was warranted "for the proper functioning and integration of the programs,"

2  consulting with each other accordingly. *Id.,* Art. 4.  Notably, many differences in the programs

3  do *not* require harmonization, as demonstrated by numerous differences between Quebec's and

4  California's programs.  For example, Quebec's program includes emissions of high global

5  warming potential gases (such as hydrofluorocarbons), while CARB's program does not.  Sahota

6  Decl., ¶ 35.  The two programs are also set up to respond differently to the potential invalidation

7  of offset credits:  CARB's program has enforceable buyer liability provisions, while Quebec's

8  contains an "environmental integrity" buffer account.  *Id.*  Additionally, Quebec and California

9  have adopted different methodologies for distributing allowances to regulated parties.  *Id.*

10  California's methodologies include giving allowances to utilities for free but requiring the utilities

11  to consign those allowances at auction, with the auction revenues providing a climate credit to

12  California ratepayers.  *Id.*  Quebec's program does not include this feature.  *Id.*

13      The agreement also reflects the parties intentions to "discuss[] between the Parties" changes

14  a party was considering proposing to its "offset protocols" or "procedures for issuing offset

15  credits."  ECF No. 7-2, Art. 5.  As touched on briefly above, offsets are tradeable compliance

16  instruments that can be used, instead of allowances, for a limited portion of a regulated party's

17  compliance obligation.  *See, supra*, at 6 n.4.  Because the linkage of the programs effectively

18  links the markets for offsets, as well as for allowances, the agreed upon "discussion" amongst

19  linked jurisdictions regarding these protocols and procedures is important to the functioning of all

20  the programs.  Sahota Decl., ¶¶ 67-68; see also *id.* ¶¶ 47-49.

21      On these issues, and others, the parties articulated their intentions to continue their

22  consultations, aiming to constructively "resolve differences by using and building on established

23  working relationships."  ECF No. 7-2, Art. 20.  The parties would "engage through the

24  Consultation Committee" described in the agreement on any issues they were unable to resolve

25  informally.  *Id.*  That Committee was intended to be "composed of one representative from each

26  of the Parties" and to "meet as needed to ensure timely and effective consultation in support of

27  the objectives of the Agreement."  *Id.*, Art. 13.  However, to date, consultations between

28

11

Memo. of Ps & As in Support of State Defendants' Cross-Motion for Summary Judgment and Opposition to
Plaintiff's Motion for Summary Judgment (2:19-cv-02142-WBS-EFB)

1    California and Quebec have continued informally, and the Consultation Committee has never met

2    or even been formed.  Sahota Decl., ¶ 69.

3        F.    **Ontario Cancelled Its Cap-and-Trade Program, Effectively Unlinking It
              and Withdrawing from the 2017 Agreement, without Any Formal Notice**
4

5        In the lead up to a June 7, 2018 election, the Ontario Progressive Conservative Party's

6    platform called for terminating Ontario's cap-and-trade program if the Party prevailed in the

7    election.  Sahota Decl., ¶ 71.  The Ontario Progressive Conservative Party did prevail in that

8    election, winning an absolute majority in the Ontario legislature and making that Party's leader,

9    Doug Ford, the Premier-Designate of Ontario.  *Id.*, ¶ 72.  On June 15, 2018 Premier-Designate

10   Ford announced that his government's first act would be to "cancel" Ontario's cap-and-trade

11   program, including terminating the linkage between its program and California's and Quebec's.

12   *Id.*, ¶ 73.  On June 29, 2018, the Ontario cabinet approved a regulation revoking its cap-and-trade

13   regulations and prohibiting further trading of compliance instruments by Ontario entities.  *Id.*, ¶

14   74.  This was followed by the Cap and Trade Cancellation Act, enacted by the Ontario legislature,

15   effective November 15, 2018.  *Id.*, ¶ 75.  At no point during any of these revocation or

16   cancellation proceedings did Ontario provide notice to CARB of its withdrawal from the 2017

17   agreement, despite the provision expressing the parties' intentions to do so.  *Id.*, ¶ 76.

18       As reflected in CARB's regulations, the link with Ontario was effective from January 1,

19   2018 through June 15, 2018.  Cal. Code Regs., tit. 17, § 95943(a)(2).  The linkage between

20   California's and Quebec's programs remains in effect.  *Id.* § 95943(a)(1).

21   **II.    PROCEDURAL HISTORY**

22       Plaintiff filed its initial complaint against Defendants on October 23, 2019 and its amended

23   complaint on November 19, 2019.  ECF Nos. 1, 7.  The amended complaint asserts four causes of

24   action and seeks declaratory and injunctive relief.  ECF No. 7.  On November 19, 2019, the

25   parties filed, and the Court subsequently granted for good cause, a joint stipulation giving all

26   Defendants a deadline of January 6, 2020 to file responsive pleadings.  ECF Nos. 8, 11.

27

28

                                          12

1    On December 11, 2019, before responsive pleadings were filed, Plaintiff moved for

2    summary judgment as to two of its four causes of action—under the Treaty and Compact

3    Clauses.  ECF No. 12.

4    On January 6, 2020, all WCI, Inc. Defendants and Defendant Jared Blumenfeld, in his

5    official capacity as Secretary for Environmental Protection, moved to dismiss themselves as

6    Defendants.  ECF No. 25.  On that same day, the remaining State Defendants answered the

7    amended complaint.  ECF No. 24.

8    The hearing on the motion to dismiss is now set for February 24, 2020.  ECF No. 44.  The

9    hearing on the parties' cross-motions for summary judgment is set for March 9, 2020.  ECF No.

10   43.

11                      **STANDARD FOR SUMMARY JUDGMENT**

12   A party seeking summary judgment bears the initial burden of demonstrating the absence of

13   a genuine issue of material fact as to the basis for the motion.  *Celotex Corp. v. Catrett*, 477 U.S.

14   317, 323 (1986).  Material facts are those that might affect the outcome of the case, *Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), as "determined by the substantive law governing

16   the claim or defense."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

17   (9th Cir. 1987).  The court must "view[ ] the evidence in the light most favorable to the

18   nonmoving party[.]" *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).  But "[c]onclusory,

19   speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of

20   fact and defeat summary judgment."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

21   Cir. 2007).

22   Where, as here, the "parties submit cross-motions for summary judgment, each motion

23   must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside*

24   *Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks omitted).  "[W]hen

25   simultaneous cross-motions for summary judgment on the same claim are before the court, the

26   court must consider the appropriate evidentiary material identified and submitted in support of

27   both motions, and in opposition to both motions, before ruling on each of them."  *Id.* at 1134;

28   *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015).

**ARGUMENT**

Agreements between States and between States and foreign governments are far from uncommon.  According to the most recent scholarship in this area, state and local governments have entered into thousands of agreements with foreign jurisdictions, including more than four hundred between States and Canadian provinces.[10]  These agreements cover diverse subjects including trade, transportation, and environmental protection.[11]  The vast majority of these agreements attract neither legal challenges nor the attention of Congress—the body authorized to approve certain agreements under the Compact Clause.[12]  Indeed, while States frequently enter into agreements with other governments, and have done so since before the Constitution was ratified, the Supreme Court has rarely addressed the constitutional constraints on state authority established in Article I, section 10.  *See U.S. Steel Corp.*, 434 U.S. at 461 n.10, 467-69.  And, with the exception of the Civil War Confederacy, it has never invalidated a state agreement under those constraints.  *See Williams v. Bruffy*, 96 U.S. 176, 182 (1877).

The Supreme Court has recognized three categories of agreements between States and other governments: 1) the plethora of agreements involving "many matters … that can in no respect concern the United States," which are not subject to any constitutional restrictions under Article I; 2) the rare "compact" or other agreement that "increase[s] [the] political power in the states" and "encroach[es] upon … the just supremacy of the United States," which requires congressional consent under the Compact Clause; and 3) the rarer still " Treaty, Alliance, or Confederation," which so threatens national unity that not even Congress may approve it.  *See Virginia*, 148 U.S. at 518, 519 (1893); *see also Williams*, 96 U.S. at 182; *see also* U.S. Const., art. I, § 10, cl. 1, 3.

Plaintiff claims that California has entered into an agreement that fits within the second or third categories—an agreement that is either a Compact or Treaty under Article I.  Plaintiff is wrong.  Indeed, Plaintiff's arguments depend on expansive interpretations of these Clauses that

---

[10] Michael Glennon & Robert Sloane, *Foreign Affairs Federalism: The Myth of National Exclusivity* 60 (2016).  For the Court's convenience, relevant pages of this book are attached to the Dorsi Declaration as Exhibit 15.

[11] *Id.* at 60-61.

[12] William H. Taft, IV, Legal Adviser of the U.S. Dept. of State, "Memorandum," in *Digest of United States Practice of International Law* 184 (Sally J. Cummins & David P. Stewart, eds., 2001) ("Taft Memo"), attached to Dorsi Decl. as Exhibit 13.

14

1    are completely at odds with the constitutional text and structure, historical understanding, long-

2    standing practices, and Supreme Court precedent.  Moreover, although the linkage between

3    California's and Quebec's programs has been operational for more than six years, Plaintiff has

4    provided no evidence demonstrating *any* specific effects of this linkage or its related agreements,

5    let alone any evidence of infringement on federal supremacy or threat to national unity.

6           Plaintiff's causes of action under the Treaty and Compact Clauses both fail, and summary

7    judgement should be entered for Defendants.

8    I.     THE CHALLENGED AGREEMENT IS NOT AN ARTICLE I TREATY

9           A.     The Article I Treaty Clause Prohibits Only Agreements with Substantial
                  Consequences for Our Federal Structure, Such as Risks to National Unity
10

11          Plaintiff's Treaty Clause claim is highly unusual.  Indeed, although the prohibition against a

12   State entering into "any Treaty, Alliance, or Confederation" has been in Article I of the

13   Constitution since ratification, the Supreme Court has only applied it once and with little

14   discussion—to the Civil War Confederacy.  *Williams*, 96 U.S. at 182.[13]  And the precise meaning

15   of "Treaty," as used in the Clause, has been lost to history.  *See U.S. Steel*, 434 U.S. at 463.

16   Nevertheless, the text and structure of the Constitution, historical understandings, and the

17   Supreme Court's application of the Compact Clause all confirm what the dearth of Treaty Clause

18   case law itself suggests:  that the only state agreements that could rise to the level of an Article I

19   Treaty are the rarest of the rare—agreements that could have such substantial consequences for

20   the Nation, such as threatening national unity, that Congress may not authorize them.

21          The Constitution's text and structure make this clear in two ways.  The Treaty Clause

22   establishes a categorical bar against treaties, alliances, and confederations, *see* U.S. Const., art. I,

23   § 10, cl. 1, but the Compact Clause permits compacts if Congress consents, *see id*. art. 1, § 10, cl.

24   3.  Distinguishing treaties from compacts and barring the former categorically demonstrates that

25   Article I Treaties must be very rare agreements of such unusual importance and substantial

26   _____

     [13] This clause was discussed, briefly, with respect to Vermont's decision to hold and
27   extradite an individual charged with a crime in Quebec, in *Holmes v. Jennison*, 39 U.S. 540
     (1840).  But a plurality of four Justices concluded quickly that there was no Treaty and analyzed
     the issues under the Compact Clause.  *Id.* at 571.  In any event, the case produced no majority
28   opinion of the Court.  *Id.* at 561.

                                              15

1    consequences for the Nation that Congress should not be permitted to authorize them.  The

2    language of the Treaty Clause itself confirms this conclusion.  Under well-established canons of

3    construction, "the meaning naturally attaching to" the word "Treaty" should be construed "by

4    reference to associated words," namely "Alliance" and "Confederation."  *See Virginia*, 148 U.S.

5    at 519 (applying this canon of construction to the Compact Clause).  Both of those terms connote

6    consequential, indeed potentially dangerous, types of agreements.  The only "Confederation"

7    identified to date is the Civil War Confederacy," *Williams*, 96 U.S. at 182, and constitutional

8    commentaries relied upon by the Court describe "'treaties of alliance'" as arrangements for

9    "'purposes of peace and war,'" *Virginia*, 148 U.S. at 519 (quoting Justice Story's *Commentaries*

10   *on the Constitution*).  Thus, for purposes of Article I, "treaties" must be interpreted as those rare

11   agreements risking serious consequences for the Nation, including threats to national unity.

12       This interpretation is consistent with the functional view that the Supreme Court has

13   adopted of the other clause in Article I that addresses state agreements—the Compact Clause.

14   There, "[t]he relevant inquiry" concerns the "impact [an agreement might have] on our federal

15   structure."  *U.S. Steel*, 434 U.S. at 471.  Underlying that view is the Court's recognition that

16   "[t]he Constitution looked to the essence and substance of things, and not to mere form."  *Id.*

17   (internal quotation marks omitted).  Application of this functional view confirms that "treaties"—

18   which, again, are categorically barred—must have a greater impact on our federal structure than

19   Compacts.  If Congress can authorize some impact on our federal structure—and it can—

20   agreements Congress cannot authorize must pose greater, and therefore impermissible, threats to

21   the Nation, including to national unity.

22       This interpretation is likewise consistent with the concern underlying the Article I Treaty

23   Clause, which as Plaintiff recognizes (Plaintiff's Motion for Summary Judgment (MSJ) at 2:16-

24   21), included the fear that the country would "split into a number of confederacies" that could be

25   "played off against each other" by major foreign powers.  *The Federalist No. 4*, at 44 (John Jay)

26   (Clinton Rossiter ed., Signet 2003).  Accordingly, the "sound policy" underlying the Treaty

27   Clause's flat prohibition against States entering into any treaties, alliances, or confederations is

28   "the preservation of any national government."  Joseph Story, *Commentaries on the Constitution*

16

1    *of the United States* § 1349, at 217-18 (1833) (arguing that if states were at liberty to enter into

2    treaties, alliance, or confederations, "the internal peace and harmony of the Union might be

3    destroyed, or put in jeopardy" and "perpetual source of foreign corrupt influence" would be

4    created).  For all of these reasons, the Treaty Clause should be limited to state agreements

5    addressing matters of such consequence, such as threats to national unity, that they must be barred

6    without regard to congressional consent.[14]

7        Asking this Court to adopt a very different, and much broader, interpretation of the Treaty

8    Clause, Plaintiff isolates a single phrase—"of a political character"—from Justice Story's

9    *Commentaries*, asserts that the Supreme Court has adopted this as the Treaty Clause test, and

10    argues for a sweeping, though hardly crisply defined, reading of "political character."  *E.g.*, MSJ

11    at 13:12-13, 14:22-24, 15:5-9.  But the Supreme Court has not adopted a Treaty Clause test,

12    having never held that a state agreement other than the Civil War Confederacy violated this

13    Clause.  *See* MSJ at 14:17-25, 15:5-17 (relying on *Virginia* and *U.S. Steel*, both of which decided

14    *Compact Clause* claims).

15        Moreover, contrary to Plaintiff's assertions, Justice Story's *Commentaries* adopt a view of

16    the Treaty Clause wholly in line with the narrow interpretation supported by the text and structure

17    of Article I, the concerns underlying the Clause, and the Supreme Court's Compact Clause

18    decisions.  As the Supreme Court has observed, Story wrote that treaties, alliances, and

19    confederations "generally connote military and political accords."  *U.S. Steel*, 434 U.S. at 464.

20    Accordingly, Story's "treaties of a political character" included "treaties of alliance for purposes

21    of peace and war," "treaties of confederation, in which the parties are leagued for mutual

22    government," and "treaties of cession of sovereignty, or conferring internal political jurisdiction,

23    or external political dependence, or general commercial privileges."  *Commentaries*, § 1397, at

24        [14] St. George Tucker, one of the Framers who participated in the Annapolis Convention of
     1786 along with James Madison, reached a similar conclusion.  He interpreted "treaties, alliances,

25    and confederations" to "relate ordinarily to subjects of great national magnitude or importance."
     *See U.S. Steel*, 434 U.S. at 463 n.13 (internal quotation marks omitted).  The Supreme Court also

26    ascribed similar meaning to the provision of the Articles of Confederation that prohibited "any
     treaty, confederation, or alliance between the states without the consent of congress."  *Wharton v.*

27    *Wise*, 153 U.S. 155, 167 (1894) (holding this provision was "intended to prevent any union of two
     or more states, *having a tendency to break up or weaken the league between the whole*")

28    (emphasis added).

17

1  271; *see also Virginia*, 148 U.S. at 519.  Each of these examples represents a treaty of high

2  impact for our federal structure and implicates national unity.  State "treaties of alliance for

3  purposes of peace and war" are obviously important and pose a danger to national unity because

4  they may commit a state to military action or inaction unsupported or inimical to other states or

5  the federal government.  As the Civil War Confederacy tragically showed, "treaties of

6  confederation" can literally tear the nation apart.  Treaties ceding sovereignty to a foreign power

7  (as Austria did to Germany at the beginning of World War II), conferring internal political

8  jurisdiction upon a foreign power (such as Cuba did with Guantanamo Bay), or accepting external

9  political dependence (as the Republic of Texas did when it was annexed by the United States)

10  raise similarly momentous issues.

11      Story's reference to "treaties … conferring … general commercial privileges" likewise

12  refers to agreements with substantial consequences, such as those that could impair national

13  unity.[15]  The "commercial privileges" subject to treaties are, indeed, consequential ones—such as,

14  tonnage duties on ships arriving in ports, tariffs on imported goods, and the privilege for non-

15  citizens to live and pursue commercial activities in this country.  *See, e.g.,* Max Farrand, "The

16  Commercial Privileges of the Treaty of 1803," in 7 *The American Historical Review* 494

17  (1902);[16] *Chae Chan Ping v. United States*, 130 U.S. 581, 590 (1889) (describing the interest of

18  the United States in acquiring "the same commercial privileges" China had provided by treaty "to

19  British subjects," including permission "to reside [in China] for the purpose of carrying on

20  mercantile pursuits"); *The Mary & Susan*, 14 U.S. 46, 55 & n. f (1816) (similarly describing a

21  U.S. citizen as acquiring "commercial privileges" in the foreign country of his domicile).[17]

22      [15] Plaintiff may mean to suggest otherwise with its oblique contention that California lacks
   a "proprietary or quasi-proprietary interest" here.  MSJ at 14:26-27.  But Plaintiff does not
23  explain either what it means by such interests or why the presence or absence of such interests is
   relevant.
24      [16] A courtesy copy of this article is provided as Exhibit 16 to the Dorsi Declaration.
       [17] In purporting to apply Justice Story's interpretation, Plaintiff simply plucks words out
25  of Story's discussion without any regard to the overall point that he was making.  For example,
   Plaintiff asserts that the 2017 Agreement creates a "political alliance" without acknowledging that
26  Justice Story used this term to refer to "treaties of alliance *for purposes of peace and war*."  Story,
   *Commentaries*, § 1397, at 271 (emphasis added).  Indeed, most of Plaintiff's arguments consist of
27  using the word "political" in different ways, none of which sheds light on what Plaintiff means by
   the term, much less attempts to explain how that meaning comports with Story's.  *E.g.,* MSJ at

28

18

1    Thus, the text of the Article I Treaty Clause, the structure of Article I, related Supreme

2    Court precedent, the concerns underlying the Clause, and historical commentary all support the

3    conclusion that the Treaty Clause is limited to a narrow category of agreements with substantial

4    consequences for our federal structure, including threats to national unity.

5    **B.    The Challenged Agreement Is of Little to No Consequence to our Federal
6         Structure, Does Not Threaten National Unity, and Is Not an Article I
         Treaty**

7    Plaintiff claims that the 2017 agreement between Quebec and California is an Article I

8    Treaty.  MSJ at 14:6-16:12; Am. Compl., ¶ 160.  That agreement does not qualify as a Treaty

9    because it does not address a matter of substantial consequence to our federal structure, much less

10   one implicating national unity.  Indeed, the agreement does not even link the two cap-and-trade

11   programs.  That link was created through regulatory amendments made by California and

12   Quebec, pursuant to each jurisdiction's separate legal requirements for rulemakings.  The

13   agreement that Plaintiff claims is a Treaty merely expresses California's and Quebec's good-faith

14   intentions to continue communicating and collaborating, as they have been for more than six

15   years, so that the link between the two cap-and-trade programs may continue to function properly.

16   In any event, nothing about the agreement or the linkage regulations threatens the kinds of

17   consequences for the Nation that could support a Treaty Clause claim.

18   **1.    Rather than Linking the Cap-and-Trade Programs, the Agreement
19        Simply Expresses the Parties' Intentions to Continue Communicating
         and Coordinating Regarding their Respective Programs**

20

21   Plaintiff asserts that the 2017 agreement "provides that auctioning of compliance

22   instruments by Parties' respective programs shall occur jointly," MSJ at 8:13-14, authorizes

23   "covered entities in California … to trade instruments with covered entities in Quebec," *id.* 9:16-

24

25   14:19 (describing the challenged agreement as a "political alliance" without explication); *id.* at
     14:26 (using "device 'of a political character' in this sense" without explaining what "sense" is

26   meant); *id.* at 15:10 (using "freighted with 'a political character'" in a similarly unexplained
     way).  As such, Plaintiff's "test" is ill-defined and at least arguably presents no "judicially

27   discoverable and manageable standards."  *See Saldana v. Occidental Petroleum Corp.*, 774 F.3d
     544, 551 (9th Cir. 2014); *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1315

28   (11th Cir. 2001) (rejecting Article II Treaty claim in part because "the appellants themselves fail
     to offer, either in their briefs or at argument, a workable definition of what constitutes a 'treaty'").

                                        19

1    17, and constitutes California's "agree[ment] to accept instruments issued by Quebec" as a means

2    of compliance with California's program, *id.* 9:18-19.  In fact, the agreement does none of these

3    things.  All of those activities are governed by regulations, not the agreement, as the agreement

4    itself makes clear.  For example, Article 9 states that "the auctioning of compliance instruments

5    by the Parties' respective programs shall occur jointly … *as provided for under their respective*

6    *cap-and-trade programs*."  ECF No. 7-2, Art. 9 (emphasis added).  Similarly, Article 6 states that

7    "mutual recognition of the Parties' compliance instruments shall occur *as provided for under*

8    *their respective cap-and-trade program regulations*."  *Id.*, Art. 6 (emphasis added); *see also id.*,

9    Art. 7 (containing similar language regarding compliance instrument trading).

10    The California Code of Regulations confirms that it is CARB's regulatory provisions that

11    effectuate the linkage, authorizing CARB to accept Quebec-issued instruments and to jointly

12    auction allowances.  Cal. Code Regs., tit. 17, §§ 95943(a)(1), 95911(a)(5).  CARB adopted these

13    regulatory amendments, to link its program to Quebec's, on April 19, 2013, more than five

14    months before the first agreement with Quebec was signed in September 2013.  Dorsi Decl., Ex.

15    6, Sahota Decl, ¶¶ 40, 44.

16    This is not to the say that the 2017 agreement is of no import.  It expresses the parties'

17    intentions to continue communicating and coordinating with each other regarding their respective

18    programs and to provide the other party with notice before making significant changes to their

19    respective regulations.  Sahota Decl., ¶¶ 65, 67-68.  This coordination and notice are extremely

20    valuable for linked cap-and-trade programs because decisions that one party makes about its

21    program can indirectly affect the other's program.  *Id.*, ¶¶ 30, 68.  The intent of the agreement

22    was to identify those sorts of issues early, so that the parties to the agreement could attempt to

23    resolve any concerns and so that each party could take any actions it independently deemed

24    necessary.  *Id.*; see *id.*, ¶¶ 47-49.  Notably, this coordination is necessary, and important, because

25    each jurisdiction retains its independent, sovereign authority to amend, modify, or even repeal its

26    regulation, as the agreement expressly recognizes.  ECF 7-2 at 2.

27    Contrary to Plaintiff's characterization, the agreement does not knit California and Quebec

28    into a "virtually seamless regulatory body" or require California "to conform its regulations as

20

1    much as possible—and certainly in every material respect—to those of Quebec."  MSJ at 16:16-

2    22; *see also id*. at 7:18-19 (asserting that the agreement "integrates California's program with that

3    of Quebec in a virtually seamless web").  Indeed, the coordination and consultation described in

4    the agreement—which began before the first agreement was signed in 2013—has not produced

5    identical programs.  For example, Quebec's emissions cap includes high global warming potential

6    gases, and CARB's does not because CARB decided to regulate those emissions separately from

7    its cap-and-trade program.  Sahota Decl., ¶ 35.  In addition, the methods CARB and Quebec

8    chose to allocate allowances differ in several ways—such as the climate credit for California

9    ratepayers that is generated by CARB's requirement that utilities consign at auction the

10   allowances they are initially given for free.  *Id*.  This feature, which is designed to protect against

11   energy price spike impacts, is not included in the Quebec program.  *Id*.  This is only a partial list

12   of differences in the two programs, but it underscores that each jurisdiction maintains authority

13   over its own program.  Further, while communication regarding such differences is important,

14   that communication does not result in anything like identicality or "virtually seamless"

15   integration.

16           And, contrary to Plaintiff's repeated invocation of language from *Massachusetts v. EPA*,

17   549 U.S. 497, 519 (2007), the 2017 agreement is plainly not an emissions treaty.  *See* MSJ at 1:3-

18   5, 14:10-14.  As discussed, the agreement does not even link the two cap-and-trade programs, let

19   alone set emissions goals or mandates for the State or Province.  Nor do the linkage regulations

20   (which Plaintiff has not claimed are a Treaty) set emissions goals; they simply provide regulated

21   parties with greater compliance flexibility.  It is, in fact, California's *Legislature* that has

22   established the greenhouse gas emission mandates for the State, and it has done so without

23   reference to any emissions commitment from any other jurisdiction.  Cal. Health & Safety Code

24   §§ 38550, 38566.  Meanwhile, Quebec has set *different* emissions targets for itself.  Sahota Decl.,

25   ¶ 35.  While California's Legislature mandated the State reduce emissions to 1990 levels by 2020,

26   Quebec set a 2020 emissions limit of *20% below* 1990 levels.  Cal. Health & Safety Code

27   § 38550; Sahota Decl., ¶ 35.  Neither the 2017 agreement nor the linkage regulations sets

28   emissions targets or otherwise bears any resemblance to an emissions treaty.

1    As discussed below, the intention to continue coordinating and communicating, as

2    expressed in the 2017 agreement, does not implicate national unity or otherwise establish that the

3    agreement is an Article I Treaty.

4          **2.    The Agreement's Expressions of Intent to Continue Coordination
                   Regarding Independently Adopted Pollution-Control Programs Raise
5                  No Issues of Substantial Consequence for Our Federal Structure**

6          The actual function of the agreement—to express the parties' intentions to continue

7    coordinating—does not violate the Treaty Clause.  In fact, in applying the Compact Clause, the

8    Supreme Court has already held that the intent to coordinate with other jurisdictions to

9    "promot[e] uniformity and compatibility" across their respective regulatory regimes does not

10   infringe on federal supremacy, especially where regulatory proposals resulting from the

11   coordination "have no force in any member State until adopted by that State in accordance with

12   its own law." *U.S. Steel*, 434 U.S. at 456-57, 472.  As established above, the agreement does no

13   more than this: it promotes harmonization of the two programs, and both CARB and Quebec

14   retain their full authorities to decide how, whether, and when to modify or repeal their

15   regulations.[18]

16         Thus, Article 3 of the agreement expresses the parties' intentions to "consult … regularly

17   and constructively … build[ing] on existing working relationships," ECF 7-2 at 5, and Article 4

18   expresses the parties' plans to "continue to examine their respective regulations" and, where

19   differences are identified, to "determine if such elements need to be harmonized for the proper

20   functioning and integration of the programs," *id.*  Article 4 also indicates the parties' intentions to

21   discuss proposed changes and to "consult regarding changes that may affect the harmonization

22   and integration process."  *Id.*  Other articles similarly provide for cooperation concerning offsets

23   (*id.*, Art. 5) and enforcement (*id.*, Art. 11) and for notification regarding instruments to be voided

24   (*id.*, Art. 6) and investigations to be conducted (*id.*, Art. 7).

25

26         [18] Because each jurisdiction retains its full sovereign authority, even if the agreement did
     link the programs, Plaintiff's Treaty Clause claim would still fail.  As discussed below, nothing
27   about CARB's decision to provide regulated parties with increased compliance flexibility and
     cost-reduction opportunities infringes on federal supremacy, let alone threatens national unity.
28   *See, infra*, Sec. II.B, II.C.

                                        22

1   Article 14, however, plainly states that the agreement "does not modify any existing

2   statutes and regulations" or "require or commit the Parties or their respective regulatory or

3   statutory bodies to create new statutes or regulations." *Id.* at 10.  And the preamble recognizes

4   that the agreement "does not, will not and cannot be interpreted to restrict, limit, or otherwise

5   prevail over relevant national obligations of each Party" or over "each Party's sovereign right and

6   authority to adopt, maintain, modify, repeal or revoke any of their respective programs

7   regulations or enabling legislation." *Id.* at 2.

8   Thus, while the parties to the 2017 agreement clearly expressed an intent to consult with

9   each other, that intention does not prevent the parties from shaping their programs as they wish.

10   And, as discussed above, CARB and Quebec have, in fact, done so—implementing and enforcing

11   their respective and different regulations and modifying those regulations as they deem

12   warranted.  *See* Sahota Decl., ¶¶ 46, 49, 78-79.  Indeed, CARB has amended its regulation more

13   than five times, sometimes quite significantly, since 2013 when it adopted its linkage provisions

14   and signed the first agreement with Quebec.  *Id.*, ¶¶ 78-80.

15   The 2017 agreement does no more, and in some ways does far less, than the Multistate Tax

16   Compact that *United States Steel* held was not an Article I Compact.  The 2017 agreement cannot,

17   therefore, be an Article I Treaty because it does not even require congressional approval, let alone

18   implicate substantial consequences, such as threats to national unity, for which congressional

19   approval would not be available.

20   **C.    Executive Branch Practice under Article II's Treaty Clause Supports the
           Conclusion that the 2017 Agreement Does Not Fall within Article I's
21         Treaty Clause**

22

23   The conclusion that the 2017 agreement is not a treaty under the Treaty Clause is supported

24   by Executive Branch practice.  Article II grants the President the power, "by and with the Advice

25   and Consent of the Senate, to make Treaties, provided two thirds of the Senators present

26   concur . . . ."  U.S. Const., art. II, § 2, cl. 2.  Although Article II's Treaty Clause requires Senate

27   approval of any treaty, the Executive Branch routinely enters into agreements with foreign

28   governments far more consequential than the one at issue here without submitting them to

23

1   Congress.  Plaintiff admits as much.  MSJ at 15:18-20.  Notably, the President did not even treat

2   the Paris Agreement of 2015—which, unlike any action challenged here, directly addresses

3   emission reductions—as a treaty under Article II and did not submit it to the Senate.  MSJ at

4   11:2-4.  *A fortiori*, the 2017 agreement should not be considered a treaty under Article I's Treaty

5   Clause.

6          Plaintiff asserts that "the precedents and practices of the federal government under the

7   Treaty Clause of Article II do not carry over to judging what actions are barred by the Treaty

8   Clause of Article I" because of the foreign affairs authority that the Constitution "allocates to the

9   President."  MSJ at 15:22-16:2.  However, Plaintiff is unable to point to anything in the actual

10  text of the Constitution suggesting that the Treaty Clause in Article II is narrower than the Treaty

11  Clause in Article I.  Plaintiff's arguments do nothing to overcome the fact that the Executive

12  Branch's own practice supports the conclusion that the 2017 agreement is not a treaty.

13       **D.    Plaintiff's Assertions that the 2017 Agreement Is Binding Are Immaterial**
14              **and Incorrect**

15         Plaintiff also spends two full pages of its brief attempting to establish that the 2017

16  agreement is binding.  MSJ at 16:13-18:14.  It is, of course, generally true that only agreements

17  intended to be of binding character are considered treaties under international law.  *See, e.g.*,

18  Restatement (Fourth) of Foreign Relations Law § 312, reporter's note 4.  It does not follow,

19  however—and Plaintiff points to no case for the proposition—that all agreements that are binding

20  qualify as treaties under Article II, much less Article I.  And, indeed, Plaintiff's implicit argument

21  that an agreement that is binding as to *any* provision would be an Article I Treaty contravenes the

22  functional view the Supreme Court has adopted for Article I Compacts, under which the impact

23  the agreement has on our federal structure, not the formalities of the agreement, are the "relevant

24  inquiry."  *U.S. Steel*, 434 U.S. at 470-71.

25         Further, Plaintiff fails to show that the 2017 agreement is, in fact, binding.  Plaintiff points

26  to the *dissenting* opinion in *Garcia v. Texas*, 564 U.S. 940, 944 (2011), a case involving a

27  different agreement entered into by the federal government, but that cannot establish that the 2017

28

1  agreement is binding.  *See* MSJ at 17:7-10.  Plaintiff also tries to infer from the agreement's

2  withdrawal and termination provisions that the agreement is binding, MSJ at 17:1-12, but, in fact,

3  the withdrawal provision shows just the opposite.  It states that "[a] party may withdraw from this

4  Agreement by giving written notice of intent to withdraw."  ECF No. 7-2, Art. 17.  Thus, the

5  agreement grants the parties an unfettered right to withdraw and allows the parties to avoid doing

6  anything under the agreement at any time they choose.  Ontario's abrupt effective withdrawal, for

7  which Ontario provided no notice beyond general public statements, only underscores the point.

8  *See, supra*, Background, Sec. I.F.

9      In any event, as shown above, the 2017 agreement does not effectuate the linkage between

10  the programs.  Rather, it expresses the parties' intentions to continue collaborating regarding their

11  respective programs, leaving each party free to amend or repeal its own regulations.  Even if these

12  expressed intentions were binding, and Plaintiff has not established that they are, that would not

13  establish that the agreement is a Treaty because those collaborations have no impact on the

14  federal structure, let alone pose a threat to national unity.

15      Plaintiff's Article I Treaty Clause claim fails, and Defendants are entitled to summary

16  judgment on this cause of action.

17  **II.    NEITHER THE CHALLENGED AGREEMENT NOR THE REGULATORY PROVISIONS
18      THAT EFFECTUATE LINKAGE VIOLATE THE COMPACT CLAUSE**

19      Plaintiff's Compact Clause claim likewise fails.  While Plaintiff's motion for partial

20  summary judgment focuses solely on the 2017 Agreement, the Compact Clause claim asserted in

21  its Amended Complaint appears to challenge not only the 2017 agreement but also the regulatory

22  provisions, as applied, that actually effectuate the linkage between the programs.  *See* Am.

23  Compl., ¶ 164.[19]  However, neither the agreement nor the regulations can satisfy the Supreme

24      [19] Defendants understand Plaintiff's complaint as challenging the regulatory provisions
25  that effectuate linkage.  While Plaintiff mentions Section 38564 of the California Health and
   Safety Code, *e.g.*, Am. Compl., ¶ 58, Plaintiff never identifies an application of that provision it is
26  challenging.  In any event, as is plain from its title and its text, Section 38564 directs CARB to
   "*consult* with other states, and the federal government, and other nations" in support of cost-
27  effective greenhouse gas emission reductions.  Cal. Health & Safety Code § 38564.  Information
   sharing of this sort could not constitute a Compact, even if Plaintiff had identified or could
28  identify an *application* of this provision.  *E.g.*, *Gray v. North Dakota Game and Fish Dept.,* 706

25

1    Court's functional test for Compact Clause claims.[20]  Indeed, Plaintiff's Compact Clause claim is

2    squarely foreclosed by *United States Steel Corporation*.  Further, although the Court need not

3    reach the question because there is no expansion of state power here, neither the agreement nor

4    the linkage regulations bears the indicia of a Compact identified in *Northeast Bancorp, Inc. v. Bd.*

5    *of Governors of Fed. Reserve Sys.*, 472 U.S. 159 (1985).  Plaintiff's Compact Clause claim fails.

6          **A.    The Supreme Court Has Held that the Compact Clause Applies Only to**
7                  **Agreements that Expand State Authority at the Expense of Federal**
              **Authority**

8          Article I's Compact Clause provides that "No State shall, with the Consent of Congress …

9    enter into any Agreement or Compact with another State, or with a foreign Power."  U.S. Const.,

10    Art. I, § 10, cl. 3.  The Supreme Court has recognized that, in the Compact Clause, the words

11    "compact" and "agreement" are "terms of art," the meanings of which have been "lost" to history.

12    *U.S. Steel*, 434 U.S. at 462.  The Court has rejected a literal reading of the Compact Clause—one

13    that would sweep in any agreement between States or between States and foreign governments—

14    because such a broad reading "would require the States to obtain congressional approval before

15    entering into any agreement among themselves, irrespective of form, subject, duration, or interest

16    to the United States."  *Id.* at 459-60.  Recognizing that such a reading would unnecessarily

17    undermine countless constitutional agreements entered into by States, the Court adopted a

18    "functional view of the Compact Clause" under which "the relevant inquiry must be one of

19    impact on our federal structure."  *Id.* at 468, 471.

20          Under this functional test, an agreement can only constitute an Article I Compact if it is

21    "directed to the formation of any combination tending to the increase of political power in the

22    States, which may encroach upon or interfere with the just supremacy of the United States."  *Id.*

23    (internal quotation marks omitted).  Notably, an "impact on federal interests" is insufficient to

24

25    _____
N.W.2d 614, 622 (N.D. 2005); *In re Manuel P.*, 215 Cal.App.3d 48, 71 (1989).

26        [20] Although Plaintiff offers *no* argument or evidence supporting its Compact Clause
challenge to the linkage regulations, Plaintiff appears to ask this Court to declare those

27    regulations invalid. MSJ at 27:25-26.  That statement is plainly inadequate to obtain summary
judgment.  *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990) ("conclusory assertions are

28    wholly insufficient [for] summary judgment").  In any event, it is Defendants who are entitled to
summary judgment on this claim, as to both the agreement and the regulations.

1    establish that an agreement encroaches upon or interferes with federal supremacy.  *Id.* at 479

2    n.33.  Indeed, "[a]bsent a threat of encroachment or interference through enhanced state power,

3    the existence of a federal interest is irrelevant."  *Id.*  Likewise, the enhancement of state power at

4    the expense of private parties does not make an agreement an Article I Compact.  *Id.* at 473.

5    Rather, an agreement can only rise to the level of an Article I Compact if it "enhance[s] state

6    power *at the expense of federal supremacy*."  *Id.* at 472 (emphasis added).

7            Underlying this functional view of the Compact Clause is the Supreme Court's recognition

8    that States have long entered into agreements with other jurisdictions that raise no federalism

9    concerns at all.  *See U.S. Steel*, 434 at 460 n.10.  Accordingly, the Court has been "reluctant … to

10    circumscribe modes of interstate cooperation that do not enhance state power to the detriment of

11    federal supremacy," *id.* at 460, because that "broader prohibition" is "unnecessary to protect the

12    Federal Government" and thus could not have been intended by the Framers, *id.* at 466.

13            As Plaintiff recognizes, this functional test applies to foreign as well as interstate Compacts.

14    *See* MSJ at 19:6-9.  The text of Article I makes no distinction between Compacts "with another

15    State, or with a foreign Power."  U.S. Const., art. I, § 10, cl. 3.  And although the Supreme Court

16    has not had occasion to apply its functional test directly to an agreement involving a foreign

17    government, it has recognized there is no need for a different test for such agreements by

18    reconciling its functional test with an earlier plurality opinion involving an alleged compact

19    between Vermont and Quebec.  *U.S. Steel*, 434 U.S. at 465 n.15.  Accordingly, courts that have

20    considered agreements with foreign governments have applied the Supreme Court's functional

21    test.  *E.g.*, *McHenry v. Brady*, 163 N.W. 540, 545-47 (N.D. 1917) (applying functional test to

22    agreement between North Dakota and a Canadian province); *In re Manuel P.*, 215 Cal. App. 3d at

23    68-69 (applying functional test to agreement between San Diego and Mexico).  And the State

24    Department does so as well, recognizing "that U.S. states often conclude various arrangements

25    with foreign powers without congressional consent" and indicating that, when such arrangements

26    "are called to the State Department's attention, they are analyzed under" the functional test,

27    referred to as "the *Virginia [v. Tennessee]* standard."[21]

28            _____
        [21] Taft Memo at 185, attached to Dorsi Decl. at Exhibit 13.

27

Application of this functional test demonstrates that neither the 2017 agreement nor the linkage regulations are an Article I Compact.  Rather, the agreement and linkage regulations, like the Multistate Tax Compact in *United States Steel*, constitute just some of the "many matters … that can in no respect concern the United States."  *Virginia*, 148 U.S. at 518.

### B. Plaintiff Cannot Meet Its Burden of Establishing that the 2017 Agreement or the Linkage Regulations Expand California's Political Power at the Federal Government's Expense

Neither the 2017 agreement nor the linkage regulations expand California's power at all, let alone at the expense of federal supremacy.  Indeed, in *United States Steel* the Supreme Court rejected a Compact Clause challenge to an even more extensive and consequential agreement based on grounds that squarely apply here.

The Multistate Tax Compact considered in *United States Steel* was an agreement among twenty or so States from across the country.  434 U.S. at 454, n.1.  It arose out of, and was designed to address, the member States' "recognition that, as applied to multistate businesses, traditional state tax administration was inefficient and costly to both State and taxpayer."  *Id.* at 456.  The agreement, and the Commission it created, were thus intended, in part, to "promot[e] uniformity and compatibility" across the member States' respective tax laws and to "facilitat[e] taxpayer convenience and compliance."  *Id.*  The Commission created by the agreement was, accordingly, authorized "to develop and recommend proposals for an increase in uniformity and compatibility of state and local tax laws," to adopt advisory "uniform regulations" for the consideration of the member States, and, for those States that opted in, to perform tax audits on the State's behalf.  *Id.* at 456-57.  The Court easily concluded that this agreement was not a Compact under Article I because, while the Multistate Tax Compact "might incrementally increase [the] power of the member States *quoad* the corporations subject to their respective taxing jurisdictions," it did not "enhance the political power of the member States in a way that encroach[ed] upon the supremacy of the United States."  *Id.* at 472-73.

*United States Steel* forecloses Plaintiff's primary argument—that only agreements involving "intensely local cooperation" between "adjoining states" fall outside the Compact

28

1   Clause (MSJ at 19:1-20:12)—because the agreement upheld in that case included numerous

2   member States, including Hawaii and Alaska, that do not share borders.  *Id.* at 454 n.1; *see also*

3   *Northeast Bancorp*, 472 U.S. at 175 (rejecting alleged Compact that included States, Connecticut

4   and Maine, that do not share a border).  In fact, the cooperating member States were spread out

5   across the country, rendering their cooperation far from "intensely local."  *See* MSJ at 19:11; *see*

6   *also Star Scientific Inc. v. Beales*, 278 F.3d 339, 344, 360 (4th Cir. 2002) (rejecting Compact

7   Clause challenge to agreement involving 46 States, the District of Columbia, and 5 territories).[22]

8   Moreover, the subject of this cooperation—state taxation of multi-state and multi-national

9   corporations—demonstrates that, contrary to Plaintiff's suggestion, an agreement does not

10   become a Compact simply by virtue of the amount of money it implicates.  *See* MSJ at 15:11;

11   17:16-21, 25:18-23; *see also Northeast Bancorp*, 472 U.S. at 175-76 (regulation of bank

12   acquisitions); *Star Scientific Inc.*, 278 F.3d at 360 (settlement of tobacco litigation); *Tichenor v.*

13   *Missouri State Lottery Comm'n*, 742 S.W.2d 170, 176 (Mo. 1988) (multi-state lottery).

14        Notably, the Supreme Court mentioned neither of these factors—the presence of non-

15   contiguous members or the amount of money at stake—in rejecting the Compact Clause claim in

16   *United States Steel*.  Instead the Court focused on three other factors in concluding that the

17   Multistate Tax Compact did not expand state power at the expense of the federal government and

18   was not, therefore, an Article I Compact:  (1) whether the agreement in question authorized

19   member States "to exercise any powers they could not exercise in its absence"; (2) whether there

20   was any "delegation of sovereign power" to an organization; and (3) whether each State was "free

21   to withdraw at any time."  *U.S. Steel*, 434 U.S. at 473.  All of these factors support the same

22   conclusion here.[23]

23           [22] *See also  S&M Brands, Inc. v. Caldwell*, 614 F.3d 172, 175-76 (5th Cir. 2010); *Vibo*

24   *Corp., Inc. v. Conway*, 594 F. Supp. 2d 758, 786 (W.D. Ky. 2009), aff'd on other grounds by
     *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 691 (6th Cir. 2012); *PTI, Inc. v. Philip Morris Inc.*,
     100 F. Supp. 2d 1179, 1198 (C.D. Cal. 2000).

25   [23] Plaintiff erroneously contends that it could prevail if it could satisfy *one* of these
     factors.  MSJ at 24:22, 25:25-27.  What Plaintiff has to show is that the 2017 agreement or the

26   linkage regulations "enhance the political power" of California "in a way that encroaches upon
     the supremacy of the United States."  *U.S. Steel*, 434 U.S. at 472.  When, as here, none of the

27   factors discussed in *United States Steel* are present, a plaintiff cannot make that showing.  *Id.*
     That does not, however, establish that the presence of *one* of those factors would suffice to make

28

29

1    *First,* like the member States in *United States Steel*, California is not exercising "any

2    powers [it] could not exercise" in the absence of either the 2017 agreement or the linkage

3    regulations. *See id*. at 473. And neither that agreement nor those regulations "purport to

4    authorize" California to do so. *See id*.[24] Plaintiff does not, and cannot, dispute that California

5    may design, adopt and enforce a cap-and-trade regulation to constrain statewide greenhouse gas

6    emissions. "Air pollution prevention falls under the broad police powers of the states," *Exxon*

7    *Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000), and it is "well settled that the states

8    have a legitimate interest in combating the adverse effects of climate change on their residents,"

9    *American Fuel & Petrochemical Manufacturers v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018).

10   The action Plaintiff does challenge—the decision to expand compliance options for businesses

11   regulated by the State's program—fits easily within the "'great latitude'" States "'traditionally

12   have had … under their police powers to legislate as to the protection of the lives, limbs, health,

13   comfort, and quiet of all persons.'" *Exxon Mobil*, 217 F.3d at 1255 (quoting *Medtronic, Inc. v.*

14   *Lohr*, 518 U.S. 470, 475 (1996)). Indeed, the Court confirmed as much in *United States Steel*,

15   rejecting the notion that coordinated, cross-jurisdictional actions by member States to

16   "[f]acilitat[e] … convenience and compliance" for their taxpayers involved an expansion of state

17   power that could encroach upon federal supremacy. *See U.S. Steel*, 434 U.S. at 456, 472-73.

18   Plaintiff simply cannot establish that California is exercising authority it could not exercise absent

19   either the 2017 agreement or the linkage regulations.[25]

20       *Second*, California has not delegated any "sovereign power" to another organization or

21   body. *See U.S. Steel*, 434 U.S. at 473.[26] Indeed, the Multistate Tax Commission in *United States*

22   that showing.

23   [24] Plaintiff claims the 2017 agreement authorizes California to "compel Quebec" to
     discuss changes to its program with CARB. MSJ at 25:4-6. Plaintiff does not explain how this

24   purported compulsion works or could be enforced, how this interpretation is consistent with
     Ontario's repeal of its linked program without any such discussion, or how this interpretation

25   could be reconciled with the agreement's express recognition that each party retains their full
     "sovereign right and authority to adopt, maintain, modify, repeal or revoke any of their respective

26   program regulations or enabling legislation." *See* ECF 7-2 at 1.
        [25] In fact, as the agreement notes, California and Quebec were consulting and had already

27   "developed constructive working relationships" prior to signing the agreement. ECF 7-2 at 2.
        [26] This fact alone distinguishes this case from the Great Lakes Basin Compact, undermining

28   Plaintiff's reliance on State Department statements concerning that Compact. *See* MSJ at 23:10-

1   *Steel* had been authorized to draft "rules and regulations," and neither that, nor the ability to audit

2   taxpayers on the State's behalf, constituted a delegation of sovereign power.  *Id.*  The two

3   "organizations" Plaintiff identifies—WCI, Inc. and the Consultation Committee referenced in the

4   2017 agreement—have even less responsibility and plainly have no sovereign power.  *See* MSJ at

5   24:10-11.  Plaintiff concedes that WCI, Inc. provides only "administrative and technical support"

6   services to CARB and Quebec, Am. Compl. ¶¶ 136, 142; MSJ at 24:10, and Plaintiff has not even

7   attempted to establish that the development and maintenance of a compliance instrument tracking

8   system or the execution of joint auctions involve or require sovereign power.  The Consultation

9   Committee likewise exercises no sovereign power because its sole purpose is "to ensure timely

10   and effective consultation in support of the objectives of [the 2017 agreement]."  ECF 7-2, Art.

11   13.  The facilitation of consultations alone does not involve any sovereign power, *U.S. Steel*, 434

12   U.S. at 473, and, in any event, the Consultation Committee has never been established and has

13   never met.  Sahota Decl., ¶ 69.

14        Underscoring that the State has not delegated any sovereign power, CARB "retains

15   complete freedom to adopt," amend, or repeal its own regulations.  *See U.S. Steel*, 434 U.S. at

16   473.  Indeed, the 2017 agreement expressly recognizes that both California and Quebec each

17   retain their "sovereign right and authority to adopt, maintain, modify, repeal or revoke any of

18   their respective program regulations or enabling legislation."  ECF 7-2 at 2 (8th WHEREAS

19   clause); *see also id.*, Art. 14 (stating that agreement "does not modify any existing statutes and

20   regulations" and does not "require or commit the Parties or their respective regulatory or statutory

21   bodies to create new statutes or regulations").  The agreement also expressly acknowledges that it

22   is each jurisdiction's own, independently adopted regulations, and not the agreement, that

---

23   23.  The State Department stressed the Compact's establishment of an international commission
24   with authority to, among other things, assist Canada in its negotiations with the United States
which could interfere with existing U.S. treaties and international commissions.  Hearing on S.
25   2688 Before Subcomm. on the Great Lakes Basin of the S. Comm. on Foreign Relations, 84th
Cong. at 16 (1956) (statement of Willard B. Cowles, Deputy Legal Advisor, Department of State)
26   (Decl. of Rachel Iacangelo, Exh. 11).  No organization with powers remotely like those exists
here.  Further, the Supreme Court has rejected the premise of Plaintiff's discussion of this and
27   other agreements submitted to Congress—that comparison to other compacts Congress did or did
not approve—is relevant to determining the constitutionality of an agreement.  *U. S. Steel Corp.*,
28   434 U.S. at 471-72, n.24.

1    authorize the acceptance of the other jurisdiction's instruments, the trading of those instruments,

2    and the joint auctioning of allowances.  ECF 7-2, Arts. 6, 7, 9.

3    　　　Nor do CARB's linkage regulations change its authority to adopt, amend, or even repeal its

4    cap-and-trade regulations because that authority was delegated to CARB by the Legislature.  *E.g.*,

5    Cal. Health & Safety Code § 38560; *see also Cal. State Auto. Assn. Inter-Ins. Bureau v.*

6    *Garamendi*, 6 Cal. App. 4th 1409, 1422 (1992) (recognizing that "broad discretion to adopt rules

7    and regulations as necessary … also necessarily grants power to change existing rules and

8    regulations in light of experience") (internal quotation marks omitted).  And the fact that CARB

9    retains this authority, despite the agreement and the linkage regulations, is demonstrated by the

10   fact that CARB has repeatedly, and sometimes significantly, amended the cap-and-trade

11   regulation since linkage occurred.  Sahota Decl., ¶¶ 78-79.

12   　　　*Third*, California remains "free to withdraw at any time."  *See U.S. Steel*, 434 U.S. at 473.

13   This is true of the linkage regulations because, as discussed above, CARB remains free to amend

14   or even repeal its regulations.  It is just as true of the 2017 agreement, and, in fact, the agreement

15   is explicit on this point:  "A party may withdraw from this Agreement by giving written notice of

16   intent to withdraw to the other Parties."  ECF 7-2, Art. 17.  Certainly, the parties expressed their

17   intentions to "endeavour" to give each other 12 months notice before withdrawing, but the

18   intention to *try* to provide notice is less of an impediment to immediate withdrawal than the need

19   to "enact[] a repealing statute" as the Compact in *United States Steel* required.  *See* 434 U.S. at

20   457.  The intention to provide notice is also no impediment to *unilateral* withdrawal because it

21   does not condition any party's withdrawal on the approval of any other party.  Underscoring the

22   point, Ontario effectively withdrew from both linkage and the 2017 agreement without providing

23   any particular notice and without any approval or other action from CARB.  Sahota Decl., ¶¶ 75-

24   76.

25   　　　Plaintiff cannot establish that any of the factors identified in *United States Steel* is satisfied

26   here.  In addition, *United States Steel* forecloses Plaintiff's claim that CARB's decision to

27   continue consulting with Quebec in an effort to "harmonize" programs raises Article I

28   constitutional concerns.  *See* MSJ at 7:18-8:6; 16:17-23; 25:10-15.  Indeed, the promotion of

32

1   greater uniformity across jurisdictions was at the very heart of the Multistate Tax Compact, and

2   the Court concluded that agreement did not encroach on federal supremacy.  *U.S. Steel*, 434 U.S.

3   at 456, 472.  Likewise, CARB's decision to auction allowances jointly with Quebec is not

4   meaningfully different from the decision many States made to join the Multistate Tax Compact in

5   order to reduce their costs and improve the administration of their laws, *id.* at 456, or the

6   decisions several States have made to hold multi-state lotteries "to benefit the treasuries of

7   participating states," *Tichenor*, 742 S.W. 2d at 176.  Neither those interests nor the cross-

8   jurisdictional efforts to advance them infringed on federal supremacy in any way, and

9   California's joint auctions do not do so either.  *See U.S. Steel*, 434 U.S. at 476 ("[The] increased

10  effectiveness in the administration of state tax laws, promoted by [reciprocal] legislation, [does

11  not] threaten federal supremacy.").

12       As *United States Steel* demonstrates, neither the 2017 agreement nor the linkage regulations

13  is an Article I Compact.

14       **C.    The Supreme Court's Foreign Affairs Preemption Cases, Including**
            ***Garamendi*, Demonstrate that There Is No Interference with the Federal**
15          **Government's Foreign Affairs Powers**

16

17       Unable to satisfy the functional test for a Compact Clause claim, as laid out in *United States*

18  *Steel*, Plaintiff argues the 2017 agreement "could complexify the federal government's ability to

19  negotiate competitive agreements in the foreign arena with the entirety of the economy at its

20  back."  MSJ at 21:12-14.  Although Plaintiff quotes repeatedly from *Garamendi*, 539 U.S. 396

21  and *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), those cases addressed the

22  Foreign Affairs Doctrine and statutory preemption, respectively, and Plaintiff does not explain

23  how either shows the expansion of state power needed to satisfy the Compact Clause's functional

24  test.  Indeed, Plaintiff cites to no Compact Clause precedent drawing on the Foreign Affairs

25  Doctrine or statutory preemption.  Moreover, none of Plaintiff's cases suggest that either the 2017

26  agreement or the linkage regulations encroach upon or interfere with federal power.

27       The California law at issue in *Garamendi* imposed disclosure requirements on insurance

28  companies that could open them up to claims by Holocaust survivors and required the suspension

33

1   of licenses to do business in the State for companies that did not comply.  *Garamendi*, 539 U.S. at

2   409-410.  The insurance claims at which the California law was targeted were also the subject of

3   an agreement between the President of the United States and the German Chancellor under which

4   Germany had created "a voluntary compensation fund … conditioned on some expectation of

5   security from lawsuits in United States courts."  *Id.* at 405.  "As for insurance claims specifically,

6   both countries agreed that the German Foundation," funded by the German government, "would

7   work with the International Commission on Holocaust Era Insurance Claims (ICHEIC)" which

8   had "set up procedures" to settle such claims.  *Id.* at 406, 407.  This agreement with Germany had

9   "served as model for similar agreements with Austria and France, and the United States

10  Government [was continuing] to pursue comparable agreements with other countries."  *Id.* at 408.

11  The Court held that California's law was preempted.  *Id.* at 424-425.  Specifically, because "the

12  automatic sanction for noncompliance with the State's … policies on disclosure" was "exclusion

13  from a large sector of the American insurance market [i.e., California]," those state policies

14  impermissibly deprived the President of "economic and diplomatic leverage" and undermined

15  "the President's authority to provide for settling claims in winding up international hostilities."

16  *Garamendi*, 539 U.S. at 423-24.

17      *Crosby* involved a Massachusetts law that prohibited state agencies from "purchas[ing]

18  goods or services from companies doing business with Burma."  *Crosby*, 530 U.S. at 366.  The

19  Supreme Court held that this law conflicted with a federal statute by which Congress had "placed

20  the President in a position with as much discretion to exercise economic leverage against Burma,

21  with an eye toward national security, as our law will admit."  *Id.* at 375-76.  Massachusetts'

22  attempt to wall-off at least a portion of the State's economy "undermine[d] the President's

23  intended statutory authority by making it impossible for him to" utilize the entire national

24  economy as leverage to "move the Burmese regime in the democratic direction."  *Id.* at 377.

25      These cases are entirely inapposite.  First, *Garamendi* has no application here because the

26  Supreme Court has limited it, and other cases upon which Plaintiff relies, including *Dames &*

27  *Moore v. Regan*, 453 U.S. 654 (1981) and *Movsesian v. Victoria Versicherung AG*, 670 F.3d

28  1067 (9th Cir. 2012), as involving the President's authority "to settle foreign claims pursuant to

1   an executive agreement." *Medellin v. Texas*, 552 U.S. 491, 530, 532 (2008).[27]  In contrast, this

2   case does not "involve [that] narrow set of circumstances:  the making of executive agreements to

3   settle civil claims between American citizens and foreign governments or foreign nationals."  *See*

4   *id.* at 531.  This case therefore does not implicate the "'particularly longstanding practice' of

5   congressional acquiescence" to the President's authority to settle such claims.  *Id.* at 532 (quoting

6   *Garamendi*, 539 U.S. at 415).

7        Moreover, neither the 2017 agreement nor the linkage regulations reduce the federal

8   government's diplomatic leverage in any way, let alone in ways comparable to *Crosby* and

9   *Garamendi*.  Plaintiff asserts that diplomacy often is "a matter of leverage and the possession of

10  multiple options," MSJ at 21:14-15, and that California may compromise the President's ability to

11  forge agreements and other diplomatic solutions, MSJ at 22:1-4.  Plaintiff, however, does not

12  even attempt to explain what options the 2017 agreement or the linkage regulations foreclose,

13  especially as the agreement merely provides for consultation and cooperation, and the linkage

14  regulations expand compliance flexibility and cost-reduction opportunities.  Plaintiff's claim is

15  also supported by no evidence, despite the fact that linkage has been operational since January 1,

16  2014.  *See Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1187 (E.D. Ca.

17  2007) (requiring a "*showing* that California's efforts … interfere with the efforts of this

18  government or a foreign government [to comply with] a negotiated agreement, treaty, partnership

19  or the like") (emphasis added).  Plaintiff also asserts that the linkage between the two programs

20  has somehow "fenced off" an "enclave" of the national economy, MSJ at 3:1-7; 22:1-9, but fails

21        [27] In addition to rejecting application of *Garamendi* and other "claims-settlement cases"
22  outside that context, the Court also rejected the argument that a presidential memorandum could
    "reach[] deep into the heart of the State's police powers" and require state courts to give effect to
23  a decision of the International Court of Justice.  *Medellin*, 552 U.S. at 532.  This demonstrates
    that Plaintiff stretches too far when it reads *Hines v. Davidowitz*, 312 U.S. 52 (1941), as
24  suggesting that the President could, by doing nothing, occupy the field and somehow preempt
    California's police power authority to determine the means of compliance with its own regulatory
25  programs.  MSJ at 27:10-13.  Plaintiff's view is also inconsistent with *Garamendi*, in which the
    Court indicated "that *at some point* an exercise of state power that touches on foreign relations
26  must yield to the National Government's *policy*."  *Garamendi*, 539 U.S. at 413 (emphasis added).
    Plaintiff's dramatically expansive understanding of the federal government's authority would also
27  appear to invalidate hundreds of existing agreements between states and foreign governments.
    *See* Michael Glennon & Robert Sloane, *Foreign Affairs Federalism: The Myth of National*
    *Exclusivity* 60 (2016), provided as Dorsi Decl., Exh. 15.
28

1  to explain how linkage—which effectively *expands* compliance instrument markets—fences off

2  anything or limits the use of any portion of California's economy as diplomatic leverage.  Indeed,

3  it is entirely unclear how either the 2017 agreement or the linkage regulations could do so, given

4  that, unlike the state laws in both *Crosby* and *Garamendi*, neither imposes any sanctions at all.[28]

5      Finally, California is not "employ[ing] 'a different, state system of economic pressure'" on

6  international businesses than the federal government is using.  *See Garamendi*, 539 U.S. at 423

7  (quoting *Crosby*, 530 U.S. at 376).  Notably, if California's cap-and-trade program applies

8  "economic pressure" on any businesses, it does so only with respect to *California* businesses and

9  their *California* emissions, and linkage, if anything, *eases* that pressure.  Plaintiff has not

10  identified a "particular mechanism the President has chosen" in order to pressure these businesses

11  to reduce their emissions or their costs to comply with California's program.  *See id.* at 424.

12  Indeed, Plaintiff has not identified *any* mechanism that linkage "threatens to frustrate."  *See id.*

13      Plaintiff points to President Trump's initiation of the process to withdraw from the Paris

14  Agreement and statements made by Secretary of State Pompeo regarding the President's action.

15  MSJ at 26:18-27:9.  But beginning the process to end participation in an international agreement

16  is not a "particular mechanism" like the one in *Garamendi*—namely, an international commission

17  set up exclusively "to negotiate with European insurers to provide information about and

18  settlement of unpaid insurance policies" with established "procedures to that end."  *Garamendi*,

19  539 U.S. at 397.  And Plaintiff does not, and cannot, establish that California's linkage with

20  Quebec frustrates (or has anything to do with) the process to end the United States' participation

21  in the Paris Agreement.  Plaintiff likewise fails to explain how the expansion of cost-effective

22  emission reduction opportunities is at all inconsistent with Secretary Pompeo's statement that the

23  United States will "continue to … grow our economy while reducing emissions and extending a

24  helping hand to our friends and partners around the globe."  MSJ at 27:3-5.[29]

25      [28] The same is true of the other agreements and statements to which Plaintiff points in an
attempt to establish that California has a "foreign policy."  *See* MSJ at 2:4-11; 5:10-23, 20:9-23.

26  Notably, Plaintiff does not even attempt to establish that any of these other agreements or
statements are Treaties or Compacts under Article I of the Constitution.

27      [29] Plaintiff also points to the President's executive order concerning discount rates and
other factors *federal* agencies should consider when "monetiz[ing] the value of changes in

28

1    Plaintiff also contends that the link between programs interferes with the President's ability

2    to speak with "one voice."  MSJ at 21:21-24.  But Plaintiff acknowledges that the United Nations

3    Framework Convention on Climate Change (UNFCCC) "is law of the land, having been ratified

4    by the Senate."  Am. Compl., ¶ 35.  Thus, air pollution and climate change are not areas in which

5    "the President alone … determine[s] the whole content of the Nation's foreign policy."

6    *Zivotofsky v. Kerry*, 576 U.S. 1, 135 S. Ct. 2076, 2090 (2015).  And, as Plaintiff alleges, the

7    UNFCCC's objective is to stabilize "greenhouse gas concentrations in the atmosphere at a level

8    that would prevent dangerous anthropogenic interference with the climate system."  Am. Compl.,

9    ¶ 36.  Plaintiff cannot establish that linkage—which enables greenhouse gas emission reductions

10    to occur more cost-effectively—interferes with this objective.  *See Green Mountain Chrysler*

11    *Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 394-95 (D. Vt. 2007) ("The United States

12    remains committed to the UNFCCC, the UNFCCC requires parties to report on their countries'

13    strategies for addressing GHG [greenhouse gas] emissions.").  Indeed, to the extent Plaintiff

14    asserts that cost-effectively reducing greenhouse gas emissions is in conflict with the President's

15    policy, that policy itself would be in tension, if not conflict, with the "law of the land" and thus

16    could not support an argument that the Nation is speaking, or must speak, with "one voice."  In

17    truth, Plaintiff has identified no evidence of an actual foreign policy on greenhouse gas emissions,

18    other than the UNFCCC, and the 2017 agreement or the linkage regulations are entirely consistent

19    with that policy.[30]

20    Finally, Plaintiff's "concerns" regarding potential impacts to international negotiations are

21    belied by the facts.  Since 2013, the year California promulgated its linkage regulations and

22    _____

23    greenhouse gas emissions" as part of *federal* rulemakings, MSJ at 11:7-16, but fails to explain
     how this establishes a *foreign policy*, let alone one that could conflict with any *state* program.

24    [30] Plaintiff's assertion that the absence of any policy concerning international greenhouse
     gas emissions could establish foreign affairs preemption, MSJ at 27:10-20, is simply wrong.
25    Plaintiff relies on a truncated quotation from a case considering whether a federal statute, the
     Federal Power Act, "pre-empts state regulation."  *Arkansas Elec. Co-op. Corp. v. Arkansas Pub.*
26    *Serv. Comm'n*, 461 U.S. 375, 384 (1983).  That an *affirmative* act of *Congress* could amount to
     "an authoritative federal determination that [an] area is best left *un*regulated," *id.*, does not
27    establish that the absence of a defined policy from the *Executive Branch* can do the same.  In any
     event, Plaintiff expressly disclaims this argument by proclaiming that the United States does, in
28    fact, have a climate policy.

1   Quebec and California first signed an agreement to continue coordinating with respect to their

2   cap-and-trade programs, the United States has entered into hundreds of agreements with foreign

3   governments, including Canada.[31]  And, just days ago, on January 29, 2020, the President signed

4   into law the United States-Mexico-Canada Agreement.  RJN, Part I, ¶ 3.  According to the United

5   States' own press statement, this is the "largest, most significant, modern, and balanced trade

6   agreement in history."  Dorsi Decl., Exh. 14.  Plaintiff's claims of interference cannot be

7   reconciled with the actions and statements of the United States and are notably unsupported by

8   *any* evidence of *any* interference, despite six years of operational linkage.

9        Plaintiff cannot show that the 2017 agreement or the linkage regulations expand the

10  State's power at the expense of the federal government, and Defendants are entitled to summary

11  judgment on Plaintiff's Compact Clause claim.

12        **D.   Defendants Are Also Entitled to Summary Judgment Because Neither the
            Agreement nor the Linkage Regulations Bear the Indicia of a Compact**

13

14        Plaintiff also asserts that the linkage agreement has the indicia of a compact.  MSJ 24:6-21.

15  This argument, however, cannot save Plaintiff's Compact Clause claim because, even where an

16  agreement bears the "classic indicia of a compact," it must still satisfy the Clause's functional

17  test.  *Northeast Bancorp*, 472 U.S. at 175.  Moreover, the indicia provide another ground for

18  rejecting Plaintiff's Compact Clause claim because Plaintiff cannot satisfy them.

19        The classic indicia of a Compact are: (1) whether the agreement establishes a "joint

20  organization or body" with regulatory authority; (2) whether the state action was "conditioned on

21  action by" the other parties to the agreement such that the State is not "free to modify or repeal its

22  law unilaterally;" and, (3) whether the agreement requires the State to impose regulatory

23  limitations that are reciprocated by the other parties.  *Id.*  The absence of "several of the classic

24  indicia" is enough to cast "doubt" on the existence of a Compact.  *Northeast Bancorp*, 472 U.S. at

25  _____

26        [31] Office of the Legal Adviser, United States Department of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2019* (2019) (documenting that the United States and foreign countries executed approximately:

27  125 agreements in 2014, 156 agreements in 2015, 125 agreements in 2016, 111 agreements in 2017, and 73 agreements in 2018), available at www.state.gov/wp-content/uploads/2019/06/2019-

28  TIF-Bilaterals-6.13.2019-web-version.pdf (last visited February 10, 2020).

38

1    175.  Thus, the absence of all or most of the indicia would be fatal to a plaintiff's claim.  *See id.*

2    All three are absent here.

3        **1.    Neither the Agreement Nor the Linkage Regulations Create a**
            **Regulatory Organization**
4

5        The first indicia of a Compact is the establishment of a "joint organization for regulatory

6    purposes."  *Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conserv. Planning Council*,

7    786 F.2d 1359, 1363 (9th Cir. 1986); *see also Northeast Bancorp*, 472 U.S. at 175.  Plaintiff has

8    identified only two "organization[s]" that it claims support finding this indicia here:  WCI, Inc.

9    and the Consultation Committee referenced in the 2017 agreement.  MSJ at 24:10-11.  Neither

10   satisfies the "joint organization" indicia, just as neither supports the notion that California has

11   expanded its powers.  *See, supra,* at 31.  WCI, Inc. plays no role in the enforcement of the cap-

12   and-trade program, and, indeed, exercises no regulatory powers at all.  Sahota Decl., ¶ 57.  And,

13   even if it had ever met (which it has not), the Consultation Committee would provide even less

14   support because, by definition, it only facilitates consultation and plays no regulatory role.  ECF

15   No. 7-2, Art. 13; Sahota Decl., ¶ 69.  Thus, neither the 2017 agreement nor the linkage

16   regulations bears the first indicia of a Compact.

17       **2.    Neither the Agreement Nor the Linkage Regulations Limit CARB's**
            **Authority to Change or Even Repeal Its Regulations**
18

19       The second indicia involves "conditional consent by member states in which each state is

20   not free to modify or repeal its participation [or its laws] unilaterally."  *Seattle Master Builders*,

21   786 F.2d at 1363; *see also Northeast Bancorp*, 472 U.S. at 175 (describing this indicia as a

22   restriction on the State's ability to "modify or repeal its law unilaterally"); *In re Manuel P.*, 215

23   Cal. App. 3d 48, 66 (1989) (describing this indicia as "a prohibition on either government

24   terminating its participation unilaterally").  This indicia is also absent.

25       The 2017 agreement does not limit California's ability to unilaterally withdraw.  As shown

26   above, the agreement expressly provides that parties may withdraw, and no party's withdrawal is

27   conditional upon any other party's approval.  *See, supra*, at 32.  The agreement also expressly

28   recognizes that the Parties retain the "sovereign right and authority to adopt, maintain, modify,

                                           39

repeal or revoke any of their respective program regulations or enabling legislation." ECF 7-2 at 2 (first page of the agreement). Plaintiff's entire argument to the contrary amounts to the conclusory statement that the agreement "knit[s]" the two programs "into a virtually seamless regulatory apparatus," MSJ at 24:13-14, which, as shown above, is belied by the plain text of the agreement and by the numerous differences in the two programs. *See, supra*, at 11, 20-21, 31-32.

Any claim that this indicia is satisfied by the linkage regulations would fare no better. As discussed above, nothing in those regulations limits CARB's authority to amend or repeal them. *See, supra*, at 31-32. CARB has demonstrated as much, having amended the cap-and-trade regulation more than five times since it was first adopted in 2011. Sahota Decl., ¶¶ 78-79. Neither the agreement nor the linkage regulations provided any impediment to CARB doing so. Sahota Decl., ¶¶ 80, 82.

The second indicia is absent from both the agreement and the linkage regulations.

### 3.    Neither the Agreement nor the Regulations Mandate the Kind of Reciprocity that Constitutes an Indicia of a Compact

The third indicia of a Compact is reciprocal regulatory limitations. *Northeast Bancorp*, 472 U.S. at 175. For example, in *Northeast Bancorp*, two States—Massachusetts and Connecticut—had passed statutes permitting an out-of-state bank holding company to acquire in-state banks *only if* the holding company was based in a Northeast State that permitted reciprocal acquisitions (i.e., would allow a Massachusetts or Connecticut holding company to acquire its banks). But other state parties to the purported Compact had not imposed the same regional, reciprocal limitations on bank acquisitions, and thus the third indicia was missing. *Id.*; *see also In re Manuel P.*, 215 Cal. App. 3d at 66 (describing this indicia as "reciprocal enforcement"). In contrast, the Court has made it clear that reciprocal *benefits*—such as exemptions from highway taxes—are *not* the "kind of reciprocal arrangement between states [that have] been thought to violate the Compact Clause of art. I, § 10 of the Constitution." *Bode v. Barrett*, 344 U.S. 583, 586 (1953). Thus, the third indicia involves the imposition of the same, reciprocal regulatory *limitations*, as opposed to the granting of reciprocal *benefits*, by the participating States.

There are no such reciprocal limitations here. Indeed, the 2017 agreement imposes no regulatory limitations at all because, as shown above, any regulatory limitations that California and Quebec impose on businesses are determined by their respective regulations, not the agreement. *See, supra*, at 19-20. And the linkage regulations themselves do not impose reciprocal limitations on their respective regulated parties. For example, Quebec's program imposes a regulatory limitation on "high global warming potential gases," whereas CARB regulates those gases in a different way and *not* under its cap-and-trade program. Sahota Decl. ¶ 35. In addition, by expanding compliance instrument markets and access to cost-reduction opportunities, California and Quebec's decisions to accept each other's allowances provide, at most, reciprocal *benefits* to regulated parties, which is insufficient to satisfy this third indicia. *See Bode,* 344 U.S. at 586.

In sum, Plaintiff's motion for summary judgment should be denied because Plaintiff failed to meet its burden of proving the 2017 Agreement, the focus of its motion, expands California's political power at the expense of federal supremacy or bears any of the indicia of a Compact. Moreover, Defendants are entitled to summary judgment because the case law and the record demonstrate that neither the 2017 agreement nor the regulations is an Article I Compact. Plaintiff's claims fail as a matter of law.

## CONCLUSION

For the reasons discussed above, the 2017 agreement is not an Article I Treaty, and neither that agreement nor the linkage regulations are an Article I Compact. Plaintiff's motion for summary judgment, which only challenges the 2017 agreement, should be denied. Defendants' motion for summary judgment should be granted on both causes of action.

//

//

//

//

//

41

1    Dated:  February 10, 2020                          Respectfully Submitted,

2                                                        XAVIER BECERRA
                                                         Attorney General of California
3                                                        MICHAEL P. CAYABAN
                                                         Supervising Deputy Attorney General
4

5

6                                                        /s/ M. Elaine Meckenstock
                                                         M. ELAINE MECKENSTOCK
7                                                        Deputy Attorney General
                                                         Attorneys for State Defendants
8
     OK2019105727
9    91216781.docx

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo. of Ps & As in Support of State Defendants' Cross-Motion for Summary Judgment and Opposition to
Plaintiff's Motion for Summary Judgment (2:19-cv-02142-WBS-EFB)