ELLEN F. ROSENBLUM
Attorney General
J. NICOLE DEFEVER  #030929
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Nicole.DeFever@doj.state.or.us

Counsel for Proposed Amicus Curiae Oregon

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; THE CALIFORNIA AIR RESOURCES BOARD; MARY D. NICHOLS, in her official capacity as Chair of the California Air Resources Board and as Vice Chair and a board member of the Western Climate Initiative, Inc.; WESTERN CLIMATE INITIATIVE, INC.; JARED BLUMENFELD, in his official capacity as Secretary for Environmental Protection and as a board member of the Western Climate Initiative, Inc.; KIP LIPPER, in his official capacity as a board member of the Western Climate Initiative, Inc., and RICHARD BLOOM, in his official capacity as a board member of the Western Climate Initiative, Inc.,<br><br>    Defendants. | 2:19-cv-02142-WBS-EFB<br><br>**BRIEF OF AMICI CURIAE THE STATES OF OREGON, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, NEW YORK, RHODE ISLAND, VERMONT, WASHINGTON, AND THE COMMONWEALTH OF MASSACHUSETTS IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION**<br><br>Date: March 9, 2020<br>Time: 1:30 PM<br>Courtroom: 5<br>Judge: Honorable William B. Shubb<br>Trial Date: Not Set<br>Action Filed: 10/23/2019 |

## TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICI CURIAE ............................................6

SUMMARY OF ARGUMENT ...............................................................6

ARGUMENT .......................................................................8

    I.    The 2017 Agreement Does Not Require Congressional Approval Under the Compact Clause Because It Does Not Increase the Power of the States at the Expense of the Federal Government ...............................................................8

        A.    The 2017 Agreement Assists California in Exercising Its Traditional State Authority to Regulate Pollution and Does Not Interfere with the Just Supremacy of the Federal Government ...............................................9

            1.    States Are Directly Affected by Climate Change and Have Independent Authority to Address Climate Harms ...............................................10

            2.    States Have Well-Settled Authority to Administer Interjurisdictional Markets that Reduce Costs in Connection with Advancing Environmental and Other Traditional State Interests ...............................14

        B.    The Compact Clause Does Not Forbid Agreements Between Jurisdictions Merely Because They Do Not Share a Border ...............................................18

        C.    Agreements Do Not Violate the Compact Clause Merely Because the Parties Agree to Discuss Actions Affecting the Agreement, Provide for Dispute Resolution, or Provide for Advance Notice of Withdrawal or Termination ...............................................22

    II.    The 2017 Agreement Does Not Violate the Treaty Clause ...............24

CONCLUSION .......................................................................25

Page i

**Oregon Department of Justice**
100 SW Market,
Portland, OR 97201

## TABLE OF AUTHORITIES

**Cases**

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903 (9th Cir. 2018) .........11

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 .................................................14

*Central Valley Chrysler-Jeep v. Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007) ......................................................................... 13, 14

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .........................14

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907) .......................................11

*Gingery v. City of Glendale*, 831 F.3d 1222 (9th Cir. 2016).................................13

*Gray v. North Dakota Game & Fish Dep't*, 706 N.W. 2d 614 (N.D. 2005) ...........20

*Northeast Bancorp, Inc. v. Board of Govs. of the Fed. Reserve Sys.*, 472 U.S. 159 (1985) ........................................................................ 7, 9, 18

*U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452 (1978).................. passim

*Virginia v. Tennessee*, 148 U.S. 503 (1893) .................................................. passim

*Williams v. Bruffy*, 96 U.S. 176 (1877).................................................................8

**Statutes**

26 Del. C. § 354 .....................................................................................................12

26 Del. C. §§ 351 ...................................................................................................17

Alaska Stat. § 16.05.332 ........................................................................................20

Cal. Health & Safety Code, §§ 38500 ...................................................................12

Conn. Gen. Stat. §§ 16-245a, 16-245n .................................................................12

Mass. Gen. Laws c. 21N, § 4(a)............................................................................12

Mass. Gen. Laws ch. 25A, § 11F..........................................................................17

Md. Laws. ch. 757 (S.B. 516)................................................................................12

N.J. Admin. Code. §§ 14:8-2.1, -2.3......................................................................17

Page ii

N.J. Stat. Ann. § 48:3-87 ......................................................................17

N.J. Stat. Ann. §§ 26:2C-37 ................................................................12

Or. Rev. Stat. § 468A.277 ...................................................................12

Or. Rev. Stat. § 469A.052(1)(c), (h) ............................................. 12, 17

Or. Rev. Stat. §§ 468A.265 .................................................................12

Vt. Stat. Ann. tit. 10, § 4451 ...............................................................20

Wash. Rev. Code § 18.71B.200 ...........................................................23

Wash. Rev. Code § 19.285.903 ...........................................................12

Wash. Rev. Code §§ 19.285.010 .........................................................12


**Other Authorities**


Agreement Between the Government du Québec and the Government of
    the State of Vermont Concerning Phosphorous Reduction in Missisquoi
    Bay, Que.-Vt., art. 6, Aug. 26, 2002 ..................................................23

Appendix A to Comments of the Attorneys General of New York, et al. on
    EPA's Proposed Emission Guidelines for Greenhouse Gas Emissions
    from Existing Electric Utility Generating Units, EPA-HQ-OAR-2017-
    24817 (Oct. 31, 2018) .........................................................................11

Clean Energy Jobs Act, (2019) .............................................................12

*Clearing the Air: The Facts About Capping and Trading Emissions* 7
    (2002) ..................................................................................................15

*Climate Science Special Report: Fourth National Climate Assessment,
    Volume I* ............................................................................................10

*Coastal Resilience Solutions for East Boston and Charlestown: Final
    Report* (2017) ....................................................................................11

Colorado Parks & Wildlife, "Interstate Wildlife Violator Compact," ...................20

Commonwealth of Pennsylvania, Office of the Attorney General,
    Concealed Carry License Reciprocity ...............................................22

Commonwealth of Pennsylvania, Office of the Attorney General,
    Concealed Carry License Reciprocity (updated Oct. 11, 2019) ..........................19


Page iii

Council of State Governments, National Center for Interstate Compacts, "Multistate Tax Compact" ........................................................................19

*Foreign Affairs Federalism: The Myth of National Exclusivity* 60 (2016) ..............8

Global Climate Leadership Memorandum of Understanding ................................12

*Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* ............................................................10

Interstate Medical Licensure Compact .......................................... 20, 23

*Massachusetts State Hazard Mitigation and Climate Adaptation Plan* (2018)........................................................................................11

Memorandum of Agreement between the State of Texas and the State of Florida.......................................................................................20

Memorandum of Agreement between the State of Texas and The State of North Carolina concerning Concealed Handgun Permit Reciprocity (April 2004) ...............................................................................22

Memorandum of Understanding Among the States of the Ozone Transport Commission on Development of Regional Strategy Concerning the Control of Stationary Source Nitrogen Oxide Emissions (Sept. 27, 1994) .........15

Memorandum of Understanding between the Idaho Department of Environmental Quality and the British Columbia Ministry of Water, Land, and Air Protection ..................................................................24

N.Y. Environmental Conservation Law § 75-0107 (Chapter 106 of Laws of 2019, ECL Article 75) ....................................................................12

Nebraska Governor Dave Heineman, *Gov.Heineman Signs Amended Agreement with Cuba for $30 Million* (Aug. 22, 2005)......................................21

NEPOOL Generation Information System (2020) ................................17

Oil Spill Memorandum of Cooperation Between the States of Alaska, California, Hawaii, Oregon and Washington and the Province of British Columbia, June 2001 ("Oil Spill Memorandum") ................................20

Pacific States/British Columbia Oil Spill Task Force Mutual Aid Agreement, original 1976, revised 2011 ("Oil Spill Agreement") ...................20

Partnership on Global Climate Change Action Between the United Kingdom and the Commonwealth of Virginia......................................21

PJM Environmental Information Services (PJM-EIS), *About GATS [Generation Attribute Tracking System]*............................................17

*State Climate Policy Maps* ........................................................12

Page iv

*The $119 Billion Sea Wall That Could Defend New York . . . Or Not*, N.Y. Times, Jan. 17, 2020.................................................................................11

*The Constitutionality of State and Local 'Norm Sustaining' Actions on Global Climate Change: The Foreign Affairs Federalism Grey Zone* ...............10

*The Economic Impacts of the Regional Greenhouse Gas Initiative on Nine Northeast and Mid-Atlantic States* 3 (2018) ........................................16

The Regional Greenhouse Gas Initiative (2020) ......................................16

*Tools of the Trade: A Guide to Designing and Operating a Cap and Trade Program for Pollution Control* 1-1 (2003) ............................................15

U.S. Envtl. Protection Agency, *EPA Collaboration with Canada* (2019) .............21

United Nations Framework Convention on Climate Change, art. 2, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107.........................................13

Western Electricity Coordinating Council, *WREGIS Frequently Asked Questions* (2018) .................................................................17

**Regulations**

74 Fed. Reg. 66 (Dec. 15, 2009).............................................................13

**Constitutional Provisions**

U.S. Const. art. 1, § 10, cl. 3 ...............................................................7

Page v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IDENTITY AND INTERESTS OF AMICI CURIAE**

*Amici curiae* are the States of Oregon, Connecticut, Washington, Illinois, Michigan, Minnesota, Delaware, New Jersey, Maine, Maryland, New York, Vermont, Rhode Island, and the Commonwealth of Massachusetts (collectively Amici States).  The Amici States have extensive experience with the issues presented in this case, including experience developing agreements with other jurisdictions that promote efficient environmental protection and that further other important policies in traditional areas of state regulation.  The Amici States offer that collective experience to assist the Court in evaluating Plaintiff United States' arguments, which deny California's authority to enter into a cross-jurisdictional agreement that formalizes a communication process between two governments to better manage their respective regulatory programs.

The Amici States have entered into numerous cross-jurisdictional agreements and understandings with other States, and occasionally other nations, that further State and local interests without encroaching on Federal authority.  The Amici States have a compelling interest in preserving those existing agreements and their ability to enter into similar agreements in the future.  The Amici States also have a compelling interest in upholding their traditional state authority to address environmental harms within their borders and to confront other local threats to their residents' public safety, health, and welfare.

**SUMMARY OF ARGUMENT**

The agreement between California and the Canadian Province of Québec that Plaintiff challenges (2017 Agreement) simply provides a framework for communicating about the coordination of those governments' respective market-based greenhouse gas pollution-reduction programs, and does not require congressional consent under the Compact Clause of the United States Constitution.

Page 6 -   BRIEF OF AMICI STATES

**Oregon Department of Justice**
100 SW Market,
Portland, OR 97201

1    *See* U.S. Const. art. 1, § 10, cl. 3.  Nor does the 2017 Agreement rise to the level of an

2    impermissible political alliance prohibited by the Treaty Clause of the Constitution.  *See id.*

3    art. I, § 10, cl. 1.  Formalizing the communication and coordination process between two

4    governments seeking to better manage local environmental harms is an objective squarely within

5    the States' traditional regulatory sphere.

6        As Plaintiff's brief does not dispute, the Compact Clause test from *Virginia v. Tennessee*,

7    148 U.S. 503 (1893), applies here.  The 2017 Agreement does not require congressional consent

8    under this test because it does not "encroach upon or interfere with the just supremacy of the

9    United States." *Virginia*, 148 U.S. at 519; *see also Northeast Bancorp, Inc. v. Board of Govs. of*

10   *the Fed. Reserve Sys.*, 472 U.S. 159, 176 (1985); *U.S. Steel Corp. v. Multistate Tax Comm'n*,

11   434 U.S. 452, 467–68 (1978).  States have broad and well-established authority to regulate in

12   order to combat harms—including environmental harms—to their residents.  As part of this

13   authority, States have routinely entered into interjurisdictional agreements akin to the one at

14   issue in this case to coordinate solutions to problems that transcend jurisdictional boundaries.

15   States also have adopted and implemented numerous laws to address the substantial local harms

16   of climate change, and to administer interjurisdictional markets to advance environmental and

17   other traditional state interests—none of which interfere with federal prerogatives.

18       Nevertheless, Plaintiff has taken the position that certain features of the 2017 Agreement

19   make it an illegal treaty or at least a compact requiring congressional consent.  Plaintiff argues

20   that the subject matter of the 2017 Agreement is "emphatically non-local [in] character," which

21   Plaintiff takes to be self-evident from the fact that California and Québec do not share a border.

22   Pl.'s Br. Supp. Mot. Summ. J. (DOJ Br.) at 18.  Plaintiff also points out that the 2017 Agreement

23   indicates that the parties plan to have discussions with each other on issues relating to the

24   Agreement, highlighting for example, that: the parties will endeavor to give each other notice

25   before withdrawing from the Agreement; the parties express their intent to discuss potential

26

27   Page 7 -   BRIEF OF AMICI STATES

28

1    changes to each other's regulatory programs; and the Agreement has a kind of dispute resolution

2    clause (establishing a Consultation Committee to resolve differences).  *Id.* at 17, 25.

3        But such features are common to interjurisdictional agreements that, like the 2017

4    Agreement, do not threaten the "just supremacy of the United States."  Indeed, interjurisdictional

5    agreements are widespread, with agreements between States and foreign governments alone

6    numbering in the hundreds or thousands.[1] Few such agreements have been submitted for

7    congressional consent or challenged in court.  *See* Hollis, *supra*, at 1075, 1978.  And an

8    interjurisdictional agreement that rises to the level of an illegal treaty is rarer still.  *See*

9    *Williams v. Bruffy*, 96 U.S. 176, 182 (1877).  Additionally, the purportedly "offending" features

10   of the 2017 Agreement are present in numerous other cross-jurisdictional agreements—covering

11   a range of subject matters—that Plaintiff has never questioned.  The extensive history of similar

12   cross-jurisdictional agreements belies Plaintiff's claim in this case that such agreements threaten

13   federal authority.

14       For these reasons, this Court should deny Plaintiff's motion for summary judgment and

15   grant Defendant State of California's cross-motion for summary judgement.

16                                    **ARGUMENT**

17   **I.    The 2017 Agreement Does Not Require Congressional Approval Under the Compact
         Clause Because It Does Not Increase the Power of the States at the Expense of the**
18       **Federal Government.**

19       The Compact Clause allows States to enter into many kinds of inter-jurisdictional

20   agreements and arrangements without congressional approval.  As the Supreme Court has

21   explained, "[t]he application of the Compact Clause is limited to agreements that are 'directed to

22   the formation of any combination tending to the increase of political power in the States, which

23   _____

24       [1] *See, e.g.*, Michael Glennon & Robert Sloane, *Foreign Affairs Federalism: The Myth of
     National Exclusivity* 60 (2016) (noting that "state and local governments have entered into
25   thousands of compacts and agreements with national and subnational governments around the
     world"); Duncan B. Hollis, *The Elusive Foreign Compact*, 73 Missouri L. Rev. 1071, 1079–80
26   (2008) (referring to "*hundreds* of written agreements between U.S. states and foreign
     governmental entities") (emphasis in original).

27   Page 8 -   BRIEF OF AMICI STATES

28

1    may encroach upon or interfere with the just supremacy of the United States.'" *Northeast*

2    *Bancorp*, 472 U.S. at 175–76 (quoting *Virginia,* 148 U.S. at 503).  The 2017 Agreement does not

3    encroach upon federal power because its primary purpose is to formalize the communication

4    process between two governments to better manage an interjurisdictional market relating to an

5    area of traditional state concern—namely, in-state environmental harm.  *See U.S. Steel Corp.*,

6    434 U.S. at 473 (reasoning that an interjurisdictional compact is not subject to the Compact

7    Clause because it "does not purport to authorize the member States to exercise any powers they

8    could not exercise in its absence").  The regulations that link California's program to Québec's

9    allow regulated businesses to use compliance instruments issued by either jurisdiction to satisfy

10    their state-law obligations, which offers opportunities to reduce the overall cost of regulatory

11    compliance.[2]  Those regulations simply coordinate programs that are fully authorized under each

12    jurisdiction's traditional regulatory powers.  California can operate its cap-and-trade market

13    without the linkage with Québec, and indeed, it did so for a period of time.  *Cf. id.*  Plaintiff

14    ignores that States, for decades, have acted under their sovereign authority to regulate climate-

15    changing emissions, including by coordinating state-specific actions through longstanding

16    interjurisdictional agreements and market-based mechanisms that in no way intrude on federal

17    supremacy.

18         **A.**     **The 2017 Agreement Assists California in Exercising Its Traditional State**
                 **Authority to Regulate Pollution and Does Not Interfere with the Just**
19                  **Supremacy of the Federal Government.**

20       Plaintiff's core premise for this action is wrong: States *do* have a compelling "local

21    interest" in addressing the significant harms caused by climate change.  DOJ Br. at 12.  In fact,

---

22

23        [2] As California explains, the 2017 Agreement "merely expresses California's and Québec's
good-faith intentions to continue communicating and collaborating, as they have been for more
than six years, so that the link between the two cap-and-trade programs may continue to function
24    properly." Def. California's Mem. Supp. Cross-Mot. Summ. J.at 19. The coordination
contemplated by the Agreement "helps ensure that each party understands what program changes
25    are being considered by the other parties and whether those changes might have indirect effects
on the linked programs." *Id.* at 10. The Agreement's provisions and effect are described in
26    further detail in California's brief. See id. at 9-12, 19-21.

27    Page 9 -   BRIEF OF AMICI STATES

28

1  greenhouse gas regulation is firmly within the purview of state and local interests, regardless of

2  the global dimensions of climate change.  Greenhouse gases are air pollutants, which states have

3  long regulated, and their dangers, like those of other air pollutants, are affecting States and their

4  residents now.  Moreover, States possess the authority to collaborate on market-based

5  approaches to ensure that their environmental regulations are as effective as possible in reducing

6  emissions and addressing other environmental problems while minimizing compliance costs, and

7  they routinely do so.  None of these efforts interfere with federal supremacy.[3]

8

9          1.     **States Are Directly Affected by Climate Change and Have
               Independent Authority to Address Climate Harms.**

10

11         Plaintiff is simply wrong to suggest that climate change is a uniquely federal problem

12  that, because it purportedly lacks a connection to any "local interest," precludes subnational

13  jurisdictions from engaging in the type of actions and coordination they have long used to

14  address environmental harms.  *See, e.g.*, DOJ Br. at 3, 12, 20–21.  All Amici States are

15  experiencing profound and costly impacts from climate change.[4]  Within our borders, climate

16  change is causing a loss of land due to rising seas; decreased drinking water supply due to

17  diminished snowpack; reduced air and water quality, as well as agriculture and aquaculture

18  productivity; decimation of biodiversity and overall ecosystem health; and increased frequency

19

20         [3] *See generally* Sharmila Murthy, *The Constitutionality of State and Local 'Norm Sustaining'
   *Actions on Global Climate Change: The Foreign Affairs Federalism Grey Zone*, U. Penn. J. L. &
21  Pub. Aff. (forthcoming 2020), https://ssrn.com/abstract=3475475 or
   http://dx.doi.org/10.2139/ssrn.3475475 (last updated Feb. 14, 2020).
22

23         [4] *See, e.g.*, U.S. Global Change Research Program, *Climate Science Special Report: Fourth
   *National Climate Assessment, Volume I* (D.J. Wuebbles et al. eds., 2017),
24  https://www.globalchange.gov/browse/reports/climate-science-special-report-fourth-national-
   climate-assessment-nca4-volume-i (assessing the science of climate change, with a focus on the
25  United States); U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the
   *United States: Fourth National Climate Assessment, Volume II* (D.R. Reidmiller et al. eds.,
26  2018), https://nca2018.globalchange.gov/ (assessing the impacts and risks of climate change in
   the United States).

27  Page 10 -   BRIEF OF AMICI STATES

28

1    and intensity of heatwaves, insect-borne diseases, wildfires, severe storms, and flooding.[5]  If

2    climate change continues unabated, the Amici States and other state

3    and local governments will have to spend trillions of dollars in mitigation projects to safeguard

4    our borders and resources, and to protect the health of our residents.[6]

5          Those harms are exactly the types of local harms that States have authority to address as

6    sovereigns.  States have critical interests in combating threats to their residents' public safety,

7    health, and welfare, and States have inherent authority to exercise their police powers to protect

8    those interests.  The Supreme Court has recognized state authority in this area for well over a

9    hundred years.  *See Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (Holmes, J.).

10   And as the Ninth Circuit has expressly recognized, "[i]t is well settled that the states have a

11   legitimate interest in combating the adverse effects of climate change," and may use their broad

12   sovereign powers "to protect the health of citizens in the state" from the harms of climate-

13   altering air pollution.  *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir.

14   2018).

15

16

17       [5] *See generally* Appendix A to Comments of the Attorneys General of New York, et al. on
18   EPA's Proposed Emission Guidelines for Greenhouse Gas Emissions from Existing Electric
     Utility Generating Units, EPA-HQ-OAR-2017-24817 (Oct. 31, 2018),
19   https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0355-24817 (extensively
     documenting climate harms to numerous States and localities, including many of the Amici
20   States).

21   [6] For example, New York City alone has proposed spending over $100 billion on a sea wall that
     would only partially mitigate the effects of climate-driven sea-level rise for portions of the City.
22   Anne Barnard, *The $119 Billion Sea Wall That Could Defend New York . . . Or Not*, N.Y. Times,
     Jan. 17, 2020, https://www.nytimes.com/2020/01/17/nyregion/sea-wall-nyc.html.  And the City
23   of Boston estimates the costs of actions to address future flood risks created by sea-level rise
     range from $202 million to $342 million for its East Boston and Charlestown districts alone.  *See*
24   *Coastal Resilience Solutions for East Boston and Charlestown: Final Report* (2017),
     www.boston.gov/sites/default/files/climatereadyeastbostoncharlestown_finalreport_web.pdf; *see*
25   *also Massachusetts State Hazard Mitigation and Climate Adaptation Plan* (2018),
     https://www.mass.gov/service-details/massachusetts-integrated-state-hazard-mitigation-and-
26   climate-adaptation-plan (reporting that the replacement cost of state-owned facilities exposed to
     a 1% annual chance coastal flood event exceeds $500 million).

27   Page 11 -  BRIEF OF AMICI STATES

28
**Oregon Department of Justice**
100 SW Market,
Portland, OR 97201

1    States have exercised their authority by passing and implementing an array of statutes

2   and regulations to reduce greenhouse gas emissions and mitigate climate harms.[7]  Those state

3   laws apply traditional policy solutions, including the creation

4   of mandatory market-based programs, that States have long used to address a wide range of

5   transboundary environmental problems that directly harm their residents.  For example, States

6   have set benchmarks requiring utilities to transition to renewable energy according to set

7   deadlines,[8] and have enacted an array of other measures mandating emission reductions across

8   their economies.[9]  States and localities also have worked with other jurisdictions in the United

9   States and abroad to share emissions data and collaborate on emission reduction strategies.[10]

10
        [7] *See, e.g.*, Ct.r for Climate & Energy Solutions, *State Climate Policy Maps*,
11   https://www.c2es.org/content/state-climate-policy/ (documenting a wide range of state policies to
     address climate change, including carbon pricing, emission limits, renewable energy mandates,
12   energy efficiency programs, and clean fuels programs).

        [8] *See, e.g.*, Conn. Gen. Stat. §§ 16-245a, 16-245n (requiring Connecticut utilities to obtain
13   25% of their energy from renewable sources by 2020 and 40% by 2030, while also creating
     funding sources for encouraging private renewable growth); 26 Del. C. § 354 (requiring
14   Delaware utilities to obtain 25% of their energy from renewable sources1 by 2025); Clean
     Energy Jobs Act, (2019) Md. Laws. ch. 757 (S.B. 516) (to be codified at Md. Code Ann., Pub.
15   Util. § 7-702) (requiring each utility company operating in Maryland to provide at least 50% of
     its electricity from certain renewable sources by 2030); Or. Rev. Stat. § 469A.052(1)(c), (h)
16   (requiring large utilities in Oregon to achieve 20% reliance on renewables by 2020 and 50% by
     2040); *id.* § 757.518(2) (requiring large utilities in Oregon to cease reliance on coal-generated
17   electricity by 2030); Wash. Rev. Code § 19.285.010–19.285.903 (requiring large electric utilities
     in Washington to meet a series of benchmarks on the amount of renewables in their energy mix,
18   and to achieve 15% reliance on renewables by 2020).

19       [9] *See, e.g.*, Cal. Health & Safety Code, §§ 38500 *et seq*. (requiring California to reduce
     emissions 40% below 1990 levels by 2030); Or. Rev. Stat. a§ 468A.265 to 468A.277
20   (implementing a "Clean Fuels Program" to reduce the carbon intensity of fuel); Mass. Gen. Laws
     c. 21N, § 4(a) (imposing a legally binding mandate on Massachusetts to reduce its greenhouse
21   gas emissions 25% below 1990 levels by 2020 and 80% by 2050); N.J. Stat. Ann. §§ 26:2C-37 to
     -58 (requiring New Jersey to reduce carbon dioxide emissions 80% below 2006 levels by 2050
22   and establishing funding for climate-related projects and initiatives); N.Y. Environmental
     Conservation Law § 75-0107 (Chapter 106 of Laws of 2019, ECL Article 75) (requiring
23   statewide reduction of greenhouse gas emissions to 60% of 1990 level by 2030 and 15% of 1990
     level by 2050).

24       [10] For example, a bipartisan coalition of governors joined the United States Climate Alliance,
     under which States have committed to track and report carbon reductions and to achieve certain
25   emission-reduction benchmarks.  *See* www.usclimatealliance.org.  In addition, the "Under2"
     Coalition is a broad network of subnational governments whose members have agreed to
26   coordinate on information sharing, and to collaborate in developing best practices and achieving
     climate targets.  *See* Global Climate Leadership Memorandum of Understanding,

27   Page 12 -   BRIEF OF AMICI STATES

28

1    Those state- and local-driven efforts to address climate change present no inconsistency

2    with federal policy.  To the contrary, the United Nations Framework Convention on Climate

3    Change of 1992—which Plaintiff refers to as the "law of the land"—requires exactly such

4    cooperation, regional efforts, and other means to address climate change and reduce emissions of

5    greenhouse gases.  *See* DOJ Br. At 10 (United States obligated to take action to achieve

6    "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent

7    dangerous anthropogenic interference with the climate system" (quoting United Nations

8    Framework Convention on Climate Change, art. 2, May 9, 1992, S. Treaty Doc. No. 102-38,

9    1771 U.N.T.S. 107 (entered into force Mar. 21, 1994))).  Alongside those treaty obligations, the

10    federal government has repeatedly affirmed a general policy in favor of reducing climate-altering

11    emissions and mitigating climate harms at the state level.  *See, e.g.*, 74 Fed. Reg. 66,496

12    (Dec. 15, 2009) (finding that greenhouse gases endanger public health and welfare).  And the

13    States have broad authority to regulate emissions of air pollution more strictly than minimum

14    requirements under federal law.  *See Central Valley Chrysler-Jeep v. Goldstene*, 529 F. Supp. 2d

15    1151, 1187 (E.D. Cal. 2007) (regulating greenhouse gas emissions remains "within the

16    traditional powers of states to regulate under their own police powers").[11]

17

18

_____

19    https://www.theclimategroup.org/sites/default/files/under2-mou-with-addendum-english-us-
letter.pdf.  And ten state governors have committed to coordinated actions to facilitate
20    implementation of state zero-emission vehicle programs and to build a robust market for zero-
emission vehicles.  *See* State Zero-Emission Vehicle Programs Memorandum of Understanding,
21    https://www.zevstates.us/.  Plaintiff criticizes one of these efforts—the Climate Alliance—as part
of a purportedly impermissible attempt by California to set "foreign policy." DOJ Br. at 20-21.
22    But not only is state action to address air pollution "well within the traditional responsibilities of
state and local governments," *see Gingery v. City of Glendale*, 831 F.3d 1222, 1229 (9th Cir.
23    2016), Plaintiff also fails to explain how any aspect of the Climate Alliance results in an actual
conflict with the federal government's conduct of foreign affairs, *see id.* at 1230-31.

24

[11] Nothing since this Court's 2007 decision would require a different analysis today. The
25    United States Framework Convention on Climate Change remains the law of the land, continuing
to support state efforts to reduce greenhouse gases, and no federal law passed since 2007 is to the
26    contrary.

27    Page 13 -    BRIEF OF AMICI STATES

28

1    Plaintiff is also wrong to suggest that States have no authority to act together using

2    traditional state sovereign powers if doing so could reduce the federal government's "leverage"

3    in international negotiations.  DOJ Br. at 21.  The federal government's argument is premised on

4    the supposed lack of "access to the entire national economy" caused by the 2017 Agreement.  *Id.*

5    at 22 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000)).  However,

6    the President does not have "access" to this part of California's economy in any case because

7    California's statewide cap-and-trade program could continue to exist and mandate emission

8    reductions (albeit at greater cost to regulated businesses) independent of any linkage to Québec's

9    program.[12]  California's program—like other environmental regulatory programs administered

10   by the Amici States—is authorized under state law and in no way foreclosed by any federal law

11   or by the Constitution.  Likewise, in the absence of any federal law that supersedes States'

12   historic authority, general statements by the President about balancing climate aims with

13   economic interests in a future climate treaty, *see* DOJ Br. at 11-12, do not divest the States of

14   inherent authority to reduce emissions and mitigate harms now, and to use traditional tools at

15   their disposal to do so. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 425 (finding

16   foreign affairs preemption only in the presence of a "clear conflict" between state action and a

17   specific foreign policy).

18       **2.    States Have Well-Settled Authority to Administer Interjurisdictional
     Markets that Reduce Costs in Connection with Advancing
19   Environmental and Other Traditional State Interests.**

20       While the asserted focus of Plaintiff's motion is the 2017 Agreement—which merely

21   formalizes communications between California and Québec—Plaintiff's arguments are in fact

22   principally directed at the effects of regulations that link California's cap-and-trade program to

23

24       [12] As this court has explained, the type of "bargaining chip" argument now asserted by
     Plaintiff, *i.e.,* that state-led action to reduce greenhouse gas emissions impermissibly interferes
25   with federal efforts to negotiate an international climate agreement, "only makes logical sense if
     it would be a rational negotiating strategy to refuse to stop pouring poison into the well from
26   which all must drink unless your bargaining partner agrees to do likewise."  *Central Valley
     Chrysler-Jeep*, 529 F. Supp. 2d at 1187.
27   Page 14 -   BRIEF OF AMICI STATES

28

1    Québec's by allowing regulated businesses to use compliance instruments issued by either

2    jurisdiction to satisfy their state-law obligations.  Regardless, California's regulations are

3    consistent with States' well-settled authority to collaborate on interjurisdictional markets to

4    address environmental (and other) problems of local concern.

5        Amici States have considerable experience developing, facilitating, and participating in

6    regional market-based programs, collaborative auctions, and similar interjurisdictional

7    arrangements that do not encroach upon the just supremacy of the United States.  Market

8    mechanisms are a common policy tool to achieve environmental protection or other important

9    public policy goals while reducing costs for regulated parties and administrators.[13]  Where

10   jurisdictions share similar goals, harmonized markets—like the linkage of California's cap-and-

11   trade program with that of Québec—are a sensible policy solution.  Many of the Amici States

12   have been actively engaged in the development and implementation of such markets since the

13   1990s.[14]  In our experience, harmonized markets offer greater flexibility to regulated businesses,

14   provide opportunities to lower compliance and administrative costs, and promote investment in

15   cost-effective solutions to environmental problems.

16

17

18       [13] *See, e.g.*, U.S. Envtl. Protection Agency, *Tools of the Trade: A Guide to Designing and*

19   *Operating a Cap and Trade Program for Pollution Control* 1-1 (2003),
     https://www.epa.gov/sites/production/files/2016-03/documents/tools.pdf ("[E]mission trading

20   mechanisms are increasingly considered and used worldwide for the cost-effective management
     of national, regional, and global environmental problems, including acid rain, ground-level

21   ozone, and climate change.");  U.S. Envtl. Protection Agency, *Clearing the Air: The Facts About*
     *Capping and Trading Emissions* 7 (2002), https://www.epa.gov/emissions-trading-

22   resources/clearing-air-facts-about-capping-and-trading-emissions (reporting that "a cap-and-
     trade system reduces compliance costs" while "also creat[ing] incentives to reduce emissions

23   below allowable levels" and "spurring technological innovation").

24       [14] *See* Memorandum of Understanding Among the States of the Ozone Transport
     Commission on Development of Regional Strategy Concerning the Control of Stationary Source

25   Nitrogen Oxide Emissions (Sept. 27, 1994),
     https://otcair.org/upload/Documents/Memorandums/att2.htm (documenting agreement among

26   thirteen northeast and mid-Atlantic states to establish a regional cap-and-trade program for
     emissions of nitrogen oxides).

27   Page 15 -   BRIEF OF AMICI STATES

28

**Oregon Department of Justice**
100 SW Market,
Portland, OR 97201

1    A larger market for pollution allowances makes it easier for regulated entities to comply

2    with participating jurisdictions' individual legal requirements to reduce harmful emissions.

3    Broadening regulated entities' options for compliance with state law does not interfere with any

4    federal prerogative.  However, in order for a collaborative market to function properly, it is

5    essential to coordinate market rules and procedures across the participating jurisdictions.

6    Take, for instance, the ten northeastern and mid-Atlantic States (including several of the

7    Amici States) that participate in the Regional Greenhouse Gas Initiative (RGGI), a cooperative

8    effort to reduce carbon dioxide pollution from power plants.[15]  The legal basis for the RGGI

9    program is each State's own regulatory power.  The RGGI States entered into an agreement

10    memorializing the understanding that each participating State would enact its own statute or

11    regulation establishing a cap-and-trade program, while recognizing that each State

12    could customize essential program elements as matter of state law.  Based largely on a model

13    rule, each participating State has adopted independent regulations under its respective state-law

14    authority.[16]  Those regulations establish a statewide "budget" for emissions of carbon dioxide

15    pollution from each participating State's electric power plants, govern the issuance by each

16    participating state of pollution allowances (that is, limited authorizations to emit a certain

17    quantity of pollution), and establish participation in regional allowance auctions.  The market-

18    based RGGI program, now in its second decade, has dramatically and cost-effectively reduced

19    power-sector carbon dioxide pollution in participating States.[17]

20

21    [15] *See generally* The Regional Greenhouse Gas Initiative (2020), https://www.rggi.org.
      [16] *See State Statutes and Regulations*, The Regional Greenhouse Gas Initiative (2020),

22    https://www.rggi.org/program-overview-and-design/state-regulations.

23    [17] Analysis Group, *The Economic Impacts of the Regional Greenhouse Gas Initiative on Nine Northeast and Mid-Atlantic States* 3 (2018),
      https://www.analysisgroup.com/globalassets/uploadedfiles/content/insights/publishing/analysis_

24    group_rggi_report_april_2018.pdf. Notably, in recent rulemakings, including a June 2018 draft environmental impact statement for the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule,

25    the federal government has expressly relied on the emission reductions projected to occur due to RGGI in measuring and projecting future emissions and climate impacts.  *See* National Highway

26    and Traffic Safety Administration's ("NHTSA") Draft Environmental Impact Statement for the "Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule 8-20 to 8-21 (June 2018) (identifying

27    Page 16 -   BRIEF OF AMICI STATES

28

1    Likewise, all of the Amici States have adopted laws establishing "Renewable Portfolio

2    Standard" (RPS) or equivalent programs, which require certain electricity suppliers in each State

3    to provide a minimum percentage of their annual sales from renewable energy sources such as

4    wind or solar.  *See, e.g.*, 26 Del. C. §§ 351 *et seq.*; Mass. Gen. Laws ch. 25A, § 11F; N.J. Stat.

5    Ann. § 48:3-87; Or. Rev. Stat. § 469A.052.  RPS programs are a prime example of a long-

6    running effort by States to coordinate their individual efforts to solve a common problem.  In

7    general, States measure compliance with their policies through use of an

8    accounting instrument called "Renewable Energy Certificates" or "RECs," which represent a

9    unit of renewable energy and are issued by regional tracking organizations.[18]  This has facilitated

10   the creation of regional markets for the sale of RECs, where suppliers meet their RPS obligations

11   by acquiring a sufficient quantity of RECs that are traded and tracked within a certain

12   subnational area.  Even though there is no formal agreement among States, many States have

13   laws that allow RECs generated outside the State's borders to be used for compliance with the

14   State's RPS laws.  The use of regional REC markets lowers compliance costs for electricity

15   suppliers—and, ultimately, electricity consumers—while stimulating greater investment in

16   renewable energy.  *See, e.g.*, N.J. Admin. Code. §§ 14:8-2.1, -2.3.

17   The 2017 Agreement and California's linkage regulations are entirely consistent with

18   Amici States' longstanding experience in designing and administering coordinated markets,

19

20   RGGI and its emissions reductions targets among "actions in the United States [that] are already
     underway or reasonably foreseeable").

21

22   [18] *See generally, e.g.*, Western Electricity Coordinating Council, *WREGIS Frequently Asked Questions* (2018),
     https://www.wecc.org/Administrative/WREGIS%20Frequently%20Asked%20Questions.pdf

23   (describing the regional platform for issuing and tracking RECs generated in fourteen western
     States); NEPOOL Generation Information System (2020), https://www.nepoolgis.com/about/

24   (describing the regional platform for tracking and issuing RECs generated within, or imported
     into, the six New England States); PJM Environmental Information Services (PJM-EIS), *About*

25   *GATS [Generation Attribute Tracking System]*, https://www.pjm-eis.com/getting-started/about-
     GATS.aspx (describing tracking platform for RECs generated and traded within wholesale

26   electricity service area covering all or part of thirteen eastern States).

27   Page 17 -   BRIEF OF AMICI STATES

28

1  which have a proven track record of success at effectively and efficiently facilitating

2  achievement of policy goals in our States, including the goal of reducing greenhouse gas

3  pollution.  Such coordination, like other decisions related to market policy architecture, fall well

4  within the States' sovereign and traditional powers to select and implement policy tools that best

5  address local needs.  Indeed, in the very examples from *Virginia v. Tennessee*

6  quoted by Plaintiff, Justice Field described examples of "local cooperation between states that

7  would not implicate the [Compact] clause."  DOJ Br. at 19.  Two of those examples concern

8  jurisdictions uniting to address a public health emergency.  *Id.* (quoting *Virginia*, 148 U.S. at

9  518).  As detailed above, climate change is exactly such an emergency directly harming States in

10  both statewide and very localized ways.  And California has sought to address this public health

11  emergency in a way consistent with *Virginia*.

12     **B.     The Compact Clause Does Not Forbid Agreements Between Jurisdictions
13               Merely Because They Do Not Share a Border.**

14        Instead of focusing on the *Virginia* test as applied in *Northeast Bancorp* and other cases,

15  Plaintiff invents a new test for whether an interjurisdictional agreement requires congressional

16  approval.  This test—that only "intensely local cooperation between states" is permissible

17  without congressional approval—finds no support in modern Compact Clause jurisprudence.

18  *See* DOJ Br. at 19.  Plaintiff simply ignores a century of regional and nationwide administrative

19  and regulatory agreements between jurisdictions that are unchallenged by the federal

20  government, some of which courts have affirmatively found do not require Congress' approval to

21  be effective.

22        As evidence that the 2017 Agreement is not sufficiently "local" to meet its artificial test,

23  Plaintiff points out that California and Québec "do not share a border," *Id.* at 21, and that the

24  agreement has an "emphatically non-local character," *Id.* at 18.  But the legal question presented

25  here is: does the agreement extend the power of a State in such a manner as to interfere with the

26

27  Page 18 -   BRIEF OF AMICI STATES

28

1    federal government's authority?  Plaintiff is wrong to assert that the answer to that question turns

2    on whether the agreement is between noncontiguous jurisdictions or

3    neighboring jurisdictions, or whether the subject matter of the agreement concerns only a small

4    geographic region.[19]

5         The fact is that there are numerous agreements between noncontiguous jurisdictions on

6    issues of widespread significance that have never been thought to implicate the Compact Clause.

7    That commonplace feature is found in long-accepted interjurisdictional agreements covering a

8    wide range of topics that have not been approved by Congress.  For example:

9    - *Taxes*: In *U.S. Steel v. Multistate Tax Commission*, 434 U.S. 452 (1978), the
     Supreme Court upheld the Multistate Tax Compact.  That accord included States
10   as geographically diverse as Hawaii, Kansas, Alaska, and Montana,[20] and
     addressed an issue (taxation of interstate companies) that affects all States, not
11   merely one local area or circumscribed region.

12   - *Firearms*: Pennsylvania has a "concealed carry" reciprocity agreement with
     Alaska ("Reciprocity Agreement").  Pennsylvania and Alaska do not share a
13   border.[21]  Indeed, the distance between Juneau, Alaska and Harrisburg,
     Pennsylvania is hundreds of miles greater than the distance between Sacramento,
14   California and Québec City, Québec.[22] The Reciprocity Agreement provides that,
     just as California and Québec honor each other's carbon allowances,
15   Pennsylvania and Alaska will honor each other's concealed-carry licenses: "The
     Commonwealth of Pennsylvania shall recognize all valid AK Licenses issued to
16   legal residents of the State of Alaska who are 21 years of age or older … [and]
     The State of Alaska shall recognize all valid PA Licenses." [23] The Pennsylvania-

17

18   [19]  As noted above, Plaintiff does not dispute that the same test—the *Virginia* test—applies to
19   this case as well as interstate agreements. Thus, Plaintiff's "no common border" argument would
     apply to all interstate agreements.

20   [20] Council of State Governments, National Center for Interstate Compacts, "Multistate Tax
     Compact" (listing states joined and year of joinder),
21   http://apps.csg.org/ncic/Compact.aspx?id=122

22   [21] Under Plaintiff's "no common border" theory, neither Alaska nor Hawaii would be
23   allowed to forge agreements with any other state in the United States, although Alaska could
     theoretically be allowed to forge agreements with Canadian provinces.

24   [22] Plaintiff makes much of the fact that "at their closest point, [California and Québec] are
     separated by approximately 2500 miles." DOJ Br. at 12-13. Harrisburg is over 2700 miles from
25   Juneau.

26   [23] Commonwealth of Pennsylvania, Office of the Attorney General, Concealed Carry License
     Reciprocity (updated Oct. 11, 2019), https://www.attorneygeneral.gov/wp-
27   content/uploads/2018/04/Reciprocity-Summary.pdf. Similarly, as noted below, New York and

     Page 19 -   BRIEF OF AMICI STATES

28

Alaska Reciprocity Agreement is, of course, only one of many concealed carry reciprocity agreements between States that do not share borders. For example, Texas has such an agreement with Florida.[24]

- *Oil spills:* The states of Oregon, Washington, California, Hawaii, and Alaska, and the province of British Columbia, do not share a common border, but they are parties to an Oil Spill Memorandum of Cooperation, forged for the purpose of "cooperation in preventing or abating oil spills."[25] Pursuant to the Oil Spill Memorandum, the governments also have an Oil Spill Task Force which has signed a Mutual Aid Agreement to facilitate "rapidly mov[ing] spill response resources from one jurisdiction to another during spill events."[26]

- *Wildlife*: The Interstate Wildlife Violator Compact ("IWVC") includes States spanning from Alaska to the East Coast on an issue (wildlife protection) that crosses all jurisdictions. *See* Alaska Stat. § 16.05.332; Vt. Stat. Ann. tit. 10, § 4451. This accord "establishes a process whereby wildlife law violations by a non-resident from a member state are handled as if the person were a resident."[27] Notably, the IWVC has withstood a legal challenge on Compact Clause grounds, because it does "not encroach upon nor interfere with the supremacy of the United States" and therefore "does not require congressional consent under the compact clause." *Gray v. North Dakota Game & Fish Dep't*, 706 N.W. 2d 614, 622 (N.D. 2005).

- *Professional licensing*: The Interstate Medical Licensure Compact, which has been adopted by 29 States from Maine to Washington,[28] allows licensed physicians to qualify to practice medicine across state lines if they meet agreed-upon eligibility requirements. *See* Wash. Rev. Code § 18.71B (2018); Me. Stat. tit. 32, §§ 18501-18525 (2019).

- *Trade*: The Governor of landlocked Nebraska has signed agreements with the island nation of Cuba under which Cuba—through a state-owned company—

---

Québec respect each others' driver's licensing procedures, providing an expedited procedure for people moving from one jurisdiction to the other to get a driver's license. Likewise, twenty-nine states respect each other's medical licensing procedures, providing an expedited procedure for a person duly licensed in one state to obtain a license to practice in the others.

[24] Memorandum of Agreement between the State of Texas and the State of Florida, http://www.dps.texas.gov/rsd/ltc/legal/reciprocity/FlaReciprocity.pdf.

[25] Oil Spill Memorandum of Cooperation Between the States of Alaska, California, Hawaii, Oregon and Washington and the Province of British Columbia, June 2001 ("Oil Spill Memorandum"), at 1, http://oilspilltaskforce.org/wp-content/uploads/2014/06/2001-OSTF-Memorandum-of-Cooperation.pdf

[26] Pacific States/British Columbia Oil Spill Task Force Mutual Aid Agreement, original 1976, revised 2011 ("Oil Spill Agreement") at 1, http://oilspilltaskforce.org/wp-content/uploads/2013/12/FINAL-2011-Mutual-Aid-Agreement.pdf

[27] Colorado Parks & Wildlife, "Interstate Wildlife Violator Compact," https://cpw.state.co.us/aboutus/Pages/InterstateViolatorCompact.aspx )

[28] *See* Interstate Medical Licensure Compact, https://imlcc.org/.

Page 20 -   BRIEF OF AMICI STATES

Oregon Department of Justice
100 SW Market,
Portland, OR 97201

would import $30 million of Nebraska agricultural products over an 18-month period.[29]

- *Climate change:* In 2009, Virginia joined a "Climate Change Action Agreement" with the United Kingdom. Among other provisions, the agreement stated that the two parties will "aim to promote policies that cut greenhouse gas emissions," and that they will "provide information and experience through road shows, high level delegations, educational exchanges and technical assistance." [30]

As demonstrated by the examples above, States have entered into, and continue to enter into, a wide variety of agreements with other States and foreign jurisdictions, covering both environmental and other subject matter, that do not "encroach upon or interfere with the just supremacy of the United States." *Virginia,* 148 U.S. at 519.[31]  The fact that states have entered into agreements with foreign governments does not mean that they are establishing their own "foreign policy," as Plaintiff suggests.  *See* DOJ Br. at 2 ("California is continuing its own international greenhouse gas Agreement and conducting its own foreign policy").  Moreover, Plaintiff's fulminations about "foreign policy" are irrelevant to the legal standard for applicability of the Compact Clause or the Treaty Clause.

---

[29] Press release, Nebraska Governor Dave Heineman, *Gov.Heineman Signs Amended Agreement with Cuba for $30 Million* (Aug. 22, 2005), Attachment 1 hereto (stating that the Governor "signed an amendment to the memorandum of understanding that was signed with Cuban officials last week in Havana, which increase the total amount of Nebraska agricultural products Cuban commodity importer Alimport [a state-owned] intends to purchase over the next 18 months from $17 million to $30 million").

[30] Partnership on Global Climate Change Action Between the United Kingdom and the Commonwealth of Virginia (Attachment 2 hereto) at 1 (2009).

[31] And in practice, the Federal government routinely touts States' agreements with foreign jurisdictions as desirable examples of good public policy. *See, e.g.*, U.S. Envtl. Protection Agency, *EPA Collaboration with Canada* (2019), https://www.epa.gov/international-cooperation/epa-collaboration-canada (noting that there are "over 100" agreements between U.S. States and Canadian provinces on issues related to "the management and protection of environmental quality and ecosystems in the border area").

Page 21 -  BRIEF OF AMICI STATES

1

**C.    Agreements Do Not Violate the Compact Clause Merely Because the Parties Agree to Discuss Actions Affecting the Agreement, Provide for Dispute Resolution, or Provide for Advance Notice of Withdrawal or Termination.**

2

3    Another complaint leveled by Plaintiff against the 2017 Agreement is that the parties

4    expressed their intent to "discuss[]" potential changes to each other's regulatory programs (DOJ

5    Br. at 24); that the agreement has a "formal 'withdrawal' provision" (*Id.* 17); and that the

6    Agreement has a kind of dispute resolution mechanism (*Id.* at 24).

7    However, an agreement does not "impermissibly enhance state power at the expense of

8    federal supremacy," *see U.S. Steel*, 434 U.S. 472, merely because it has language suggesting that

9    the parties will confer about actions relating to the agreement, or that the parties will endeavor to

10    give notice before withdrawing from an agreement.  Provisions of this sort are common in

11    interstate agreements that have never been submitted for congressional consent, including many

12    of the agreements already noted above.

13
14
15
16
17
18
19
20
21
22

- *Firearms.* Texas has a concealed carry reciprocity agreement with North Carolina which states that "the state of Texas and the State of North Carolina will inform each other of any changes to their respective concealed carry weapons statutes that may affect the eligibility of the recognition granted by each state," and which provides that the agreement may be terminated "upon thirty (30) days' written notice."[32] The Pennsylvania–Alaska Reciprocity Agreement states that "[t[his Reciprocity Agreement may be terminated by either Party upon thirty (30) calendar days' written notice."[33]  And although the Pennsylvania-Alaska Reciprocity Agreement does not duplicate the "inform each other of any changes" language of the Texas-North Carolina agreement, in practice, the two parties consult about changes to each other's laws.  The Attorney General of Pennsylvania explains that, "the Office of Attorney General contacts each state on an annual basis to review their firearms laws and reciprocity status.  The Office of Attorney General also conducts a targeted review whenever it becomes aware that another state's laws have changed."[34]  When, as in this and other cases, States are relying on each other's licensing procedures, it is only natural that States would inform

23    [32] Memorandum of Agreement between the State of Texas and The State of North Carolina
concerning Concealed Handgun Permit Reciprocity (April 2004).
24    https://www.dps.texas.gov/RSD/LTC/legal/reciprocity/NorthCarolinaReciprocity.pdf

25    [33] Reciprocity Agreement at 2.

    [34] Commonwealth of Pennsylvania, Office of the Attorney General, Concealed Carry License
26    Reciprocity, *supra*, "Review of Reciprocity."

27    Page 22 -    BRIEF OF AMICI STATES

28

each other of changes to each other's licensing rules. The 2017 Agreement reflects the same commonsense principle.

- *Oil spills:* In the Oil Spill Agreement, referenced above, between Alaska, California, Washington, Hawaii, Oregon and British Columbia, the government agencies agreed to "[m]aintain relative equivalency among Member Agencies' approaches to mutual aid, to assure effective reciprocity; and [k]eep other Task Force Members apprised of policy and procedural changes affecting this Mutual Aid Agreement." Oil Spill Agreement at 1.

- *Wildlife*: The IWVC states that a "party state may withdraw from the compact by giving official written notice to the other party states. A withdrawal does not take effect until 90 days after the notice of withdrawal is given." Wash. Rev. Code § 18.71B.200. The Compact also has a dispute resolution provision. *Id.* § 18.71B.190.

- *Professional Licensing*: The Interstate Medical Licensure Compact, similarly, provides in Section 21 that "[w]ithdrawal from the Compact shall be by the enactment of a statute repealing the same, but shall not take effect until one (1) year after the effective date of such statute and until written notice of the withdrawal has been given by the withdrawing state to the governor of each other member state."[35] The Compact also has a dispute resolution section, Section 19, which provides that the Interstate Commission established by the Compact "shall attempt, upon the request of a member state, to resolve disputes which are subject to the Compact," and shall "promulgate rules providing for both mediation and binding dispute resolution as appropriate."

- *Drivers' Licenses*: The New York–Québec Reciprocal Agreement Concerning Drivers' Licenses and Traffic Offenses[36] provides, in Article 8, that: "Either jurisdiction may withdraw from this Agreement by written notice to the other jurisdiction, but no such withdrawal shall take effect until 90 days after receipt of such notice."

- *Pollution Prevention*: An environmental protection agreement between Vermont and Québec "Concerning Phosphorus Reduction in Missisquoi Bay" states that either party may terminate the agreement "by sending a written notice at least six (6) months in advance to the other party."[37] The

---

[35] Interstate Medical Licensure Compact, https://imlcc.org/.

[36] This agreement provides, for example, that people moving from one jurisdiction to another can exchange their driver's license for one in their new jurisdiction "without an examination other than a vision test," and that "each jurisdiction shall recognize a declaration of guilt in the other jurisdiction concerning one of its residents as if the violation were committed in the home jurisdiction." Agreement, Article 3.3. http://legisquebec.gouv.qc.ca/en/ShowDoc/cr/C-24.2,%20r.%2016/.

[37] Agreement Between the Government du Québec and the Government of the State of Vermont Concerning Phosphorous Reduction in Missisquoi Bay, Que.-Vt., art. 6, Aug. 26, 2002. https://3paj56ulke64foefopsmdbue-wpengine.netdna-ssl.com/wp-content/uploads/2012/08/missbay_agreeEN.pdf.

Page 23 -   BRIEF OF AMICI STATES

1  agreement also provides for ongoing consultation; it establishes a joint
   task force that will "meet at least once a year" and will "report annually …
2  on the progress towards attaining the mutually agreed upon target loads."
   *Id.* at art. IV.

3  •  *Environmental cooperation*: In September 2003 the Governor of Idaho
      and the Premier of British Columbia signed an Environmental
4     Cooperation Agreement. Pursuant to that agreement, the Idaho
      Department of Environmental Quality and the British Columbia Ministry
5     of Water, Land and Air Protection signed a Memorandum of
      Understanding ("MOU").[38] The MOU provides that the parties will "make
6     every effort to share information, consult with one another, and coordinate
      their work on environmental issues that affect resources and residents in
7     the border region," and outlines some specifics, such as "establish
      procedures to cooperatively respond to emergencies that could cause
8     environmental harm or damages." And the MOU states that it may be
      terminated "upon 30 days written notice."

9       The above examples illustrate Amici States' point that provisions for consultation

10  between parties on matters relating to interjurisdictional agreements, including dispute resolution

11  and notice of withdrawal provisions, are common features of interjurisdictional agreements and

12  do not render an agreement invalid.  Additionally, just as with the "no common border"

13  argument, Plaintiff has not previously sought to invalidate interjurisdictional agreements that

14  contain consultation or "notice of withdrawal" provisions.  This fact undermines its allegation

15  that such provisions threaten the "just supremacy" of the United States.

16  **II.    The 2017 Agreement Does Not Violate the Treaty Clause.**

17      Despite the many agreements between States and foreign jurisdictions, *see* Glennon &

18  Sloane, *supra*, Plaintiff has not cited a single instance of a court invalidating an

19  interjurisdictional agreement as an unlawful treaty.  The only instance where the Supreme Court

20  has identified an illegal "treaty" was the confederate alliance between the Southern States that

21  prompted the Civil War.  *See Williams v. Bruffy*, 96 U.S. 176, 182 (1877).  An agreement to

22  coordinate on the integration and harmonization of a market for pollution allowances—the form

23  of which has numerous past and present parallels (see *supra* at 12-15)—does not come close to

24

25      [38] Memorandum of Understanding between the Idaho Department of Environmental Quality
    and the British Columbia Ministry of Water, Land, and Air Protection,
26  https://www.deq.idaho.gov/media/562986-all_bc_idaho_2004_285_286_287.pdf

27  Page 24 -   BRIEF OF AMICI STATES

28

1  the type of "military [or] political accord[]" that, like the confederacy, raises issues under the

2  Treaty Clause.  *See U. S. Steel Corp.*, 434 U.S. 452, 464 (1978).  Finding the 2017 Agreement to

3  be an impermissible treaty on the grounds argued by Plaintiff here would dramatically expand

4  the scope of the doctrine, extend it well beyond its limited ambit to reach myriad commonplace

5  agreements that in no way threaten the national interest, and upset the balance of state and

6  federal power.  Such extraordinary consequences illustrate that Plaintiff's unprecedented claims

7  must fail.

8                                    **CONCLUSION**

9         For all of the foregoing reasons, this Court should deny Plaintiff's motion for summary

10  judgment and grant State Defendants' cross-motion for summary judgment.

11         DATED February  18, 2020.

12                                   Respectfully submitted,
                                      ELLEN F. ROSENBLUM
13                                   Attorney General

14
                                       *s/ J. Nicole DeFever*
15                                   J. NICOLE DEFEVER CA#191525
                                      SETH T. KARPINSKI CA#137748
16                                   Senior Assistant Attorney General
                                      Trial Attorney
17                                   Tel (971) 673-1880
                                      Fax (971) 673-5000
18                                   Nicole.DeFever@doj.state.or.us
                                      Seth.t.karpinski@doj.state.or.us
19                                   Of Attorneys for State of Oregon

20                                        WILLIAM TONG
                                           *Attorney General of Connecticut*
21                                       165 Capitol Ave.
                                           Hartford, Connecticut, 06106
22
                                           AARON M. FREY
23                                       *Attorney General of Maine*
                                           6 State House Station
24                                       Augusta, Maine 04333

25                                       ROBERT W. FERGUSON
                                           *Attorney General of Washington*
26                                       P.O. Box 40117
                                           Olympia, WA 98504
27  Page 25 -   BRIEF OF AMICI STATES

28

1

2

THOMAS J. DONOVAN JR.
*Attorney General of Vermont*
109 State Street
Montpelier, Vermont 05609

3

4

5

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

6

7

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202

8

9

10

MAURA HEALEY
*Attorney General of Massachusetts*
One Ashburton Place, 18th Floor
Boston, MA 02108

11

12

DANA NESSEL
*Michigan Attorney General*
P.O. Box 30212
Lansing, Michigan 48909

13

14

15

KWAME RAOUL
*Illinois Attorney General*
100 West Randolph St.
Chicago, IL 60601

16

17

18

GURBIR S. GREWAL
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

19

20

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 N. French Street
Wilmington, Delaware 19801

21

22

23

KEITH ELLISON
*Attorney General of Minnesota*
445 Minnesota St., Ste. 1400
St. Paul, Minnesota 55101

24

25

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

26

27

Page 26 -   BRIEF OF AMICI STATES

28

## CERTIFICATE OF SERVICE

I certify that on February __18__, 2020, I served the **BRIEF OF AMICI CURIAE THE STATES OF OREGON, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, NEW YORK, RHODE ISLAND, VERMONT, WASHINGTON, AND THE COMMONWEALTH OF MASSACHUSETTS IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION** upon the parties hereto by the method indicated below, and addressed to the following:

PAUL E. SALAMANCA                                   ___ HAND DELIVERY
PETER J. MCVEIGH                                      ___ MAIL DELIVERY
*Attorneys for plaintiff united states of America*   ___ OVERNIGHT MAIL
Environment & Natural Resources Division,            ___ TELECOPY (FAX)
United States Department of Justice                  ___ E-MAIL
                                                     X_ E-SERVE

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
JONATHAN D. BRIGHBILL
*Principal Deputy Assistant Attorney General*
MATTHEW D. ZINN                                      ___ HAND DELIVERY
Shute, Mihaly & Weinberger LLP                       ___ MAIL DELIVERY
*Attorneys for Defendant-Intervenors*                ___ OVERNIGHT MAIL
*Environmental Defense Fund and Natural*             ___ TELECOPY (FAX)
*Resources Defense Council*                          ___ E-MAIL
                                                     X_ E-SERVE

XAVIER BECERRA                                       ___ HAND DELIVERY
*Attorney General of California*                     ___ MAIL DELIVERY
                                                     ___ OVERNIGHT MAIL
                                                     ___ TELECOPY (FAX)
                                                     ___ E-MAIL
                                                     X_ E-SERVE

MICHAEL P. CAYABAN                                   ___ HAND DELIVERY
Supervising Deputy Attorney General                  ___ MAIL DELIVERY
*Attorneys for State Defendants*                     ___ OVERNIGHT MAIL
                                                     ___ TELECOPY (FAX)
                                                     ___ E-MAIL
                                                     X_ E-SERVE

M. ELAINE MECKENSTOCK                                ___ HAND DELIVERY
Deputy Attorney General                              ___ MAIL DELIVERY
*Attorneys for State Defendants*                     ___ OVERNIGHT MAIL
                                                     ___ TELECOPY (FAX)
                                                     ___ E-MAIL
                                                     X_ E-SERVE

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

MONICA HANS FOLSOM                           ___ HAND DELIVERY
Delfino, Madden, O'Malley, Coyle             ___ MAIL DELIVERY
& Koewler LLP                                ___ OVERNIGHT MAIL
*Attorneys for WCI, Inc. Defendants*         ___ TELECOPY (FAX)
                                             ___ E-MAIL
                                             _X_ E-SERVE

NICHOLAS W. VAN AELSTYN                       ___ HAND DELIVERY
Sheppard, Mullin, Richter & Hampton LLP       ___ MAIL DELIVERY
*Attorneys for Defendant-Intervenor*          ___ OVERNIGHT MAIL
*International Emissions Trading Association*  ___ TELECOPY (FAX)
                                              ___ E-MAIL
                                              _X_ E-SERVE

WILLIAM TONG                                 ___ HAND DELIVERY
*Attorney General of Connecticut*            ___ MAIL DELIVERY
165 Capitol Ave.                             ___ OVERNIGHT MAIL
Hartford, Connecticut                        ___ TELECOPY (FAX)
                                             ___ E-MAIL
                                             _X_ E-SERVE

AARON M. FREY                                ___ HAND DELIVERY
*Attorney General of Maine*                  ___ MAIL DELIVERY
6 State House Station                        ___ OVERNIGHT MAIL
Augusta, Maine 04333                         ___ TELECOPY (FAX)
                                             ___ E-MAIL
                                             _X_ E-SERVE

ROBERT W. FERGUSON                           ___ HAND DELIVERY
*Attorney General of Washington*             ___ MAIL DELIVERY
P.O. Box 40117                               ___ OVERNIGHT MAIL
Olympia, WA 98504                            ___ TELECOPY (FAX)
                                             ___ E-MAIL
                                             _X_ E-SERVE

THOMAS J. DONOVAN JR.                        ___ HAND DELIVERY
*Attorney General of Vermont*                ___ MAIL DELIVERY
109 State Street                             ___ OVERNIGHT MAIL
Montpelier, Vermont 05609                    ___ TELECOPY (FAX)
                                             ___ E-MAIL
                                             _X_ E-SERVE

LETITIA JAMES                                ___ HAND DELIVERY
*Attorney General of New York*               ___ MAIL DELIVERY
200 Saint Paul Place, 20th Floor             ___ OVERNIGHT MAIL
New York, NY 10005                           ___ TELECOPY (FAX)
                                             ___ E-MAIL
                                             _X_ E-SERVE

Page 2 -   CERTIFICATE OF SERVICE
         JND/j3b/JUSTICE-#10103564-v1-CalCapxxxxCertificate_of_Service

BRIAN E. FROSH                             ___ HAND DELIVERY
*Attorney General of Maryland*             ___ MAIL DELIVERY
200 Saint Paul Place, 20th Floor           ___ OVERNIGHT MAIL
Baltimore, Maryland 21202                  ___ TELECOPY (FAX)
                                           ___ E-MAIL
                                           _X_ E-SERVE

MAURA HEALEY                               ___ HAND DELIVERY
*Attorney General of Massachusetts*        ___ MAIL DELIVERY
One Ashburton Place, 18th Floor            ___ OVERNIGHT MAIL
Boston, MA 02108                           ___ TELECOPY (FAX)
                                           ___ E-MAIL
                                           _X_ E-SERVE

DANA NESSEL                                ___ HAND DELIVERY
*Michigan Attorney General*                ___ MAIL DELIVERY
P.O. Box 30212                             ___ OVERNIGHT MAIL
Lansing, Michigan 48909                    ___ TELECOPY (FAX)
                                           ___ E-MAIL
                                           _X_ E-SERVE

KWAME RAOUL                                ___ HAND DELIVERY
*Illinois Attorney General*                ___ MAIL DELIVERY
100 West Randolph Street                   ___ OVERNIGHT MAIL
Chicago, IL 60601                          ___ TELECOPY (FAX)
                                           ___ E-MAIL
                                           _X_ E-SERVE

GURBIR S. GREWAL                           ___ HAND DELIVERY
*Attorney General of New Jersey*           ___ MAIL DELIVERY
Richard J. Hughes Justice Complex          ___ OVERNIGHT MAIL
25 Market Street                           ___ TELECOPY (FAX)
Trenton, NJ 08625                          ___ E-MAIL
                                           _X_ E-SERVE

KATHLEEN JENNINGS                          ___ HAND DELIVERY
*Attorney General of Delaware*             ___ MAIL DELIVERY
802 N. French Street                       ___ OVERNIGHT MAIL
Wilmington, Delaware 19801                 ___ TELECOPY (FAX)
                                           ___ E-MAIL
                                           _X_ E-SERVE

KEITH ELLISON                              ___ HAND DELIVERY
*Attorney General of Minnesota*            ___ MAIL DELIVERY
445 Minnesota St., Ste. 1400               ___ OVERNIGHT MAIL
St. Paul, Minnesota 55101                  ___ TELECOPY (FAX)
                                           ___ E-MAIL
                                           _X_ E-SERVE

Page 3 -   CERTIFICATE OF SERVICE
           JND/j3b/JUSTICE-#10103564-v1-CalCapxxxxCertificate_of_Service

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

___ HAND DELIVERY
___ MAIL DELIVERY
___ OVERNIGHT MAIL
___ TELECOPY (FAX)
___ E-MAIL
 X  E-SERVE


    *s/ J. Nicole DeFever*
J. NICOLE DEFEVER CA#191525
SETH T. KARPINSKI CA#137748
Senior Assistant Attorney General
Trial Attorney
Tel (971) 673-1880
Fax (971) 673-5000
Nicole.DeFever@doj.state.or.us
seth.t.karpinski@doj.state.or.us
Of Attorneys for State of Oregon

Page 4 -   CERTIFICATE OF SERVICE
     JND/j3b/JUSTICE-#10103564-v1-CalCapxxxxCertificate_of_Service