1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11

12   THE UNITED STATES OF AMERICA,        No. 2:19-cv-02142 WBS EFB

13              Plaintiff,

14        v.                              MEMORANDUM AND ORDER RE:
                                          CROSS-MOTIONS FOR SUMMARY
15   THE STATE OF CALIFORNIA; GAVIN       JUDGMENT
     C. NEWSOM, in his official
16   capacity as Governor of the
     State of California; THE
17   CALIFORNIA AIR RESOURCES BOARD;
     MARY D. NICHOLS, in her official
18   capacity as Chair of the
     California Air Resources Board
19   and as Vice Chair and a board
     member of the Western Climate
20   Initiative, Inc.; WESTERN
     CLIMATE INITIATIVE, INC.; JARED
21   BLUMENFELD, in his official
     capacity as Secretary for
22   Environmental Protection and as
     a board member of the Western
23   Climate Initiative, Inc.; KIP
     LIPPER, in his official capacity
24   as a board member of the Western
     Climate Initiative, Inc., and
25   RICHARD BLOOM, in his official
     capacity as a board member of
26   the Western Climate Initiative,
     Inc.,
27
                Defendants.
28

                              1

1          Plaintiff United States of America ("United States")

2    brought this action against the State of California[1] and other

3    related individuals and entities[2] alleging California's cap-and-

4    trade program violates, <u>inter alia</u>, the Treaty Clause and the

5    Compact Clause of the United States Constitution.  (First Am.

6    Compl. ("FAC") (Docket No. 7).)  Presently before the court are

7    the parties' cross-motions for summary judgment on those claims.

8    (Docket Nos. 12, 46, 50.)

9    I.   <u>Facts & Procedural History</u>

10         For over half a century, the United States government

11   has tried to contain air pollution through legislation.  It

12   started in 1955, when Congress passed The Air Pollution Control

13   Act of 1955, Pub. L. 84-159, 69 Stat. 322 (1955).  The Clean Air

14   Act of 1963, 42 U.S.C. § 7401 <u>et seq.</u>, followed, which sought to

15   "protect and enhance the quality of the Nation's air resources"

16   by "encourag[ing] . . . reasonable Federal, State, and local

17   governmental actions . . . for pollution prevention."  42 U.S.C.

18   §§ 7401(b)-(c).  Over time, the Clean Air Act expanded its reach

19
_____

20        [1]    State defendants include Gavin C. Newsom, in his
     official capacity as Governor of the State of California; the
21   California Air Resources Board; Mary D. Nichols, in her official
     capacity as Chair of the California Air Resources Board; and
22   Jared Blumenfeld, in his official capacity as Secretary of
     California's Environmental Protection Agency ("CalEPA").  These
23   defendants will collectively be referred to as "State defendants"
     or "California."
24

25        [2]    The Western Climate Initiative, Inc. defendants are the
     Western Climate Initiative, Inc. ("WCI, Inc."); Mary D. Nichols,
26   in her official capacity as Vice Chair of WCI, Inc. and a voting
     board member of WCI, Inc.; and Jared Blumenfled, in his official
27   capacity as a board member of WCI, Inc.  These defendants will
     collectively be referred to as "WCI, Inc. defendants."
28

                                   2

1  through various amendments, and Congress created an agency

2  charged with its enforcement -- the Environmental Protection

3  Agency.  See, e.g., Clean Air Amendments of 1970, Pub. L. 91—604,

4  84 Stat. 1676 (1970); Clean Air Act Amendments of 1977, Pub. L.

5  95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990,

6  Pub. L. 101-549, 104 Stat. 2399 (1990).  Then, in the early

7  1990s, the United States took on a new challenge -- combatting

8  greenhouse gas emissions.[3]

9        The United States and other signatories to the United

10 Nations Framework Convention on Climate Change of 1992 ("1992

11 Convention") sought to "stabiliz[e] [] greenhouse gas

12 concentrations in the atmosphere at a level that would prevent

13 dangerous anthropogenic interference with the climate system" by

14 formulating and adopting "regional programmes containing measures

15 to mitigate climate change."  (Decl. of Rachel E. Iacangelo

16 ("Iacangelo Decl.") ¶ 3, Ex. 1 at 4, Arts. 2, 4 (Docket No. 12-

17 2).)  It was ratified by then-President, George H.W. Bush, with

18 the advice and consent of the Senate.  (Iacangelo Decl. ¶ 4, Ex.

19 2 at D1316.)  Following these national and international

20 commitments, the federal and state governments have sought to

21 combat greenhouse gas emissions in a variety of ways, including

22 through the enactment of cap-and-trade programs.

23        Cap-and-trade programs are intended to be a market-

24 based approach to reducing greenhouse gas emissions.  (Decl. of

25 Michael S. Dorsi ("Dorsi Decl.") ¶ 3, Ex. 1 at 1-1, 1-2 (Docket

26

27        [3]   The Supreme Court made clear in 2007 that greenhouse
   gases are included in the Clean Air Act's definition of "air
28 pollutant."  Massachusetts v. EPA, 549 U.S. 497, 528-29 (2007).

1  No. 50-3).)  Typically, the program's regulating authority

2  imposes a collective "cap" on the amount of pollution a group of

3  emissions sources may emit for a set period.  (Id. at 1-2.)

4  Then, the regulator divides the collective cap into individual

5  "allowances," which are distributed among the separate sources.

6  (Id.)  These allowances permit the sources to "emit a specific

7  quantity (e.g., 1 ton) of a pollutant" for the compliance period.

8  (Id.)  The sources monitor and report their emissions, and at the

9  end of the compliance period, each source surrenders the number

10  of allowances equal to its emissions output.  (Id.)  If the

11  source's emissions output exceeds the allowances it has, the

12  source may buy additional allowances on a "carbon market" to

13  avoid penalties imposed by the regulator.  (Id.)

14          A.    The Origins of California's Cap-and-Trade Program

15          In 2006, the California legislature enacted the

16  California Global Warming Solutions Act of 2006, Cal. Health &

17  Safety Code § 38500 et seq. ("the Global Warming Act"), to combat

18  the effects of global warming.  The Global Warming Act aimed to

19  assuage the "serious threat to the economic well-being, public

20  health, natural resources, and the environment of California" by

21  adopting a series of programs to limit the emissions of

22  greenhouse gases.  See Cal. Health & Safety Code § 38501(a).

23  Specifically, the legislature sought to reduce greenhouse gas

24  emissions to their 1990 levels by 2020 through "facilitat[ing]

25  the development of integrated and cost-effective regional,

26  national, and international greenhouse gas reduction programs."

27  Cal. Health & Safety Code § 38564.  This mandate was expanded in

28  2017 to reduce emissions levels to 40 percent below the statewide

4

greenhouse gas emissions limit by December 2030.  Cal. Health &
Safety Code § 38566.

The state legislature vested the California Air
Resources Board ("CARB"), an agency within the California
Environmental Protection Agency ("CalEPA"), with the power to
adopt rules and regulations to effectuate these directives.  Cal.
Health & Safety Code §§ 38560, 38561(a).  The Global Warming Act
gave CARB the power to "adopt rules and regulations . . . to
achieve the maximum technologically feasible and cost-effective
greenhouse gas emissions reductions."  Cal. Health & Safety Code
§ 38560.  This included the power to design and adopt a "market-
based" program to "achieve the maximum technologically feasible
and cost-effective reductions in greenhouse gas emissions."  Cal.
Health & Safety Code § 38562(c)(2).

In its statutorily-mandated 2008 Climate Change Scoping
Plan, see Cal. Health & Safety § 38561(a), CARB concluded that
the best way to reduce emissions limits would be to enact a "cap-
and-trade program that links with other [] programs to create a
regional market system." (Dorsi Delc. ¶ 4, Ex. 2 at ES-3.)  In
CARB's eyes, participating in a regional system had "several
advantages" for California, among them greater reduction of
emissions, greater market liquidity, and overall more stability.
(Id. at 33.)

1.   The Western Climate Initiative

In 2007, the premiers of several Canadian provinces[4]

---

[4]   The Canadian provinces included British Columbia,
Manitoba, Ontario, and Quebec.

1  and the governors of California and numerous other western

2  states[5] formed the Western Climate Initiative.  (Decl. of

3  Rajinder Sahota ("Sahota Decl.") ¶ 13 (Docket No. 50-2); see also

4  Dorsi Decl. ¶ 14, Ex. 12 at 1 n.1.)  The Western Climate

5  Initiative was intended to be a "collaboration of independent

6  jurisdictions working together to identify, evaluate, and

7  implement policies to tackle climate change at a regional level."

8  (Sahota Decl. ¶ 13 (quoting

9  http://westernclimateinitiative.org).)  Among its recommendations

10  was a regional cap-and-trade program.  (Id. ¶ 15.)

11        In 2010, the Western Climate Initiative released its

12  design recommendations for a regional program.  (Dorsi Decl. ¶

13  14, Ex. 12 at 1 n.1.)  The following year, the Western Climate

14  Initiative formed Western Climate Initiative, Inc. ("WCI, Inc."),

15  a separate entity, to "support the implementation of state and

16  provincial greenhouse gas [] emissions trading programs."  (Id.

17  at 1.)

18        2.   WCI, Inc.

19        WCI, Inc. is a non-profit corporation incorporated

20  under the laws of Delaware.  (Decl. of Greg Tamblyn ("Tamblyn

21  Decl.") ¶ 2, Ex. A (Docket No. 46-2).)  WCI, Inc.'s board of

22  directors is composed of two Class A voting members and two Class

23  B non-voting members from each participating jurisdiction.  (Id.

24  ¶ 4.)

25        WCI, Inc. provides technical support to its member

26

27        [5]   Initial member states included Washington, Oregon,
   Arizona, and New Mexico; Montana and Utah later joined.

28

1   jurisdictions by hosting joint auctions and maintaining a

2   computer system that tracks emissions allowances and other

3   compliance instruments.  (Id. ¶ 5.)  These administrative and

4   technological support services are provided under contract and

5   for remuneration.  (Id.)  However, its services are limited to

6   those alone.  (Id. ¶ 6.)  WCI, Inc. does not retain any

7   enforcement or policymaking authority and plays no role in

8   whether participating jurisdictions will accept each other's

9   compliance instruments.  (Id.)

10              3.   California's Cap-and-Trade Program

11          Fulfilling its mandate under the Global Warming Act,

12  CARB proposed a cap-and-trade program for California in October

13  2010.  (Sahota Decl. ¶¶ 16, 19-20; Dorsi Decl. ¶ 5, Ex. 3 at 2.)

14  In so doing, it substantially relied upon the design

15  recommendations promulgated by the Western Climate Initiative.

16  (Sahota Decl. ¶¶ 15-16.)  CARB formally adopted the cap-and-trade

17  program in October 2011, (Id. ¶ 20), and began using WCI, Inc.'s

18  services to facilitate the program in 2012.  (Tamblyn Decl. ¶ 5;

19  see also Agreement 11-415 Between Air Resources Board and WCI,

20  Inc. ("Agreement 11-415") (Docket No. 7-3).)  However, California

21  was careful to limit WCI, Inc.'s services to technical and

22  administrative support alone.  See Cal. Gov. Code § 12894.5(a)(1)

23  ("Given its limited scope of activities, the [WCI, Inc.] does not

24  have the authority to create policy with respect to any existing

25  or future program or regulation"); see also Cal. Gov. Code §

26  12894.5(b)(3).  Under Agreement 11-415, California agreed to pay

27  WCI, Inc. "membership dues" in exchange for its services on a

28  quarterly basis.  (Agreement 11-415 at 5.)  California paid WCI,

1   Inc. approximately $3.8 million from 2012-2013.  (Id. at 2.)

2           Like the other cap-and-trade programs described, CARB

3   establishes yearly caps, called "budgets," for the total

4   greenhouse gas emissions of all covered entities.  (Sahota Decl.

5   ¶ 21); 17 CCR § 95802(a).  CARB then issues allowances to the

6   covered entities in quantities equal to the yearly emissions

7   budget.  (Sahota Decl. ¶¶ 21-22); see also 17 CCR § 95802(a).

8   Some allowances will be directly allocated to the covered

9   entities, others may be purchased at auction, and still others

10  may be acquired through a secondary market.  See 17 CCR §§

11  95890(a), 95910, 95920-21.  Each allowance permits covered

12  entities to "emit up to one metric ton in [carbon dioxide

13  equivalent] of any greenhouse gas specified in [the California

14  Code of Regulations]."  (Sahota Decl. ¶ 22); 17 CCR § 95820(c).

15  Budgets then decrease each year to encourage covered entities to

16  reduce their emissions.  (Sahota Decl. ¶ 21.)

17          At year's end, covered entities are required to acquire

18  and surrender eligible compliance instruments equivalent to the

19  metric tons of greenhouse gas they emit.  (Sahota Decl. ¶ 22.)

20  To help regulated businesses mitigate their compliance costs

21  while maximizing impact, CARB adopted several features unique to

22  California's program.  (Id. ¶ 24.)  For example, covered entities

23  can buy allowances when prices are low and "bank" them for use in

24  future years.  17 CCR § 95922.  Covered entities can also

25  "offset" a metric ton of their emissions by sponsoring projects

26  designed to remove carbon dioxide from the atmosphere.  17 CCR §

27  95970(a)(1).  Most relevant here, California provided for an

28  opportunity to increase its program's impact and market liquidity

8

1  by "linking" its market with other jurisdictions.   17 CCR §§

2  95940-43; (Sahota Decl. ¶ 25; Dorsi Decl. ¶ 4, Ex. 2 at 33.)

3      B.   <u>The Current Controversy</u>

4          CARB adopted a "framework for linkage" to accept the

5  compliance instruments of other "states and [Canadian] provinces"

6  when it enacted the regulations to establish California's cap-

7  and-trade program.   (Dorsi Decl. ¶ 7, Ex. 5 at 193); <u>see also</u> 17

8  CCR §§ 95940-43.   After CARB adopted this framework, the

9  California legislature "establish[ed] new oversight and

10  transparency over [cap-and-trade] linkages" and set forth

11  requirements that other jurisdictions must meet before the

12  programs can be linked.   Cal. Gov. Code § 12894(a)(2).   The law

13  requires CARB to notify the Governor of its intention to link

14  California's market with another jurisdiction, and then "the

15  Governor, acting in his or her independent capacity" must make

16  four findings before linkage can take place.   Cal. Gov. Code §

17  12894(f).   The Governor must issue findings within 45 days of

18  receiving notice from CARB.   Cal. Gov. Code § 12894(g).

19          After a linkage is approved, covered entities can use

20  compliance instruments acquired through linked jurisdictions to

21  satisfy their compliance obligations in California, and vice

22  versa.   17 CCR § 95942(d)-(e).   Linked jurisdictions can also

23  participate in California's emissions auctions.   17 CCR §

24  95911(a)(5).   However, linking does not substantively alter each

25  individual jurisdiction's cap-and-trade program.   (Sahota Decl.

26  ¶¶ 25, 42); Cal. Gov. Code § 12894.5.

27          1.   <u>Quebec's Cap-and-Trade Program</u>

28          While CARB was enacting California's cap-and-trade

9

1  program, Quebec enacted its own.  In December 2011, Quebec
2  established its cap-and-trade program.  (Iacangelo Decl. ¶ 25,
3  Ex. 23.)  Like California, Quebec contracted with WCI, Inc. to
4  provide administrative and technical services for its cap-and-
5  trade program.  (Id. ¶ 26, Ex. 24; Sahota Decl. ¶ 55.)  However,
6  its program differs from California's in its aims and operation.
7  Among the differences, Quebec's province-wide greenhouse gas
8  emissions target is higher than California's, aspiring to achieve
9  emissions levels 20 percent below 1990 levels by 2020.  (Sahota
10  Decl. ¶ 35.)  Quebec's program also seeks to reduce certain
11  global warming gases that California's does not.  (Id.)  Quebec
12  allocates emissions allowances differently, and does not include
13  features in its auctions that California includes in its own.
14  (Id.)

15                2.   The Programs are Linked

16       On February 22, 2013, CARB requested that California's
17  Governor, Jerry Brown, Jr., make the findings required by law to
18  link California's cap-and-trade program with Quebec's.  (Sahota
19  Decl. ¶ 32.)  Governor Brown made the four linkage findings in
20  April 2013.  (Id. ¶ 33.)  After the programs were linked in
21  September 2013, the parties signed an agreement memorializing
22  their commitment "to work jointly and collaboratively toward the
23  harmonization and integration of [their] cap-and-trade programs
24  for reducing greenhouse gas emissions" ("2013 Agreement").  (Id.
25  ¶¶ 44-49; 2013 Agreement (Docket No. 50-4, Ex. 8).)  The 2013
26  Agreement provided in part that the parties would "consult each
27  other regularly" and notify each other of "any proposed changes
28  or additions to [their individual] programs," including if either

1  wished to discontinue using WCI, Inc.'s services.[6]  (2013

2  Agreement at 5, 6, 8.)  Additionally, the parties agreed to

3  "endeavor to provide" the other with 12 months' notice if one

4  wished to withdraw from the Agreement and to terminate the

5  agreement only upon "unanimous consent of the Parties" in

6  writing.  (2013 Agreement at 11, 13.)

7       The linkage between the two became operational by

8  regulation on January 1, 2014.  17 CCR § 95943(a)(1).

9  Thereafter, CARB began accepting Quebec-issued compliance

10  instruments, and California and Quebec began hosting joint

11  auctions for covered entities to purchase compliance instruments.

12  17 CCR §§ 95940, 95911(a)(5).  At joint auctions, "California and

13  Quebec make their respective allowances available at the same

14  time, and in the same auction venue, and conform their bidding

15  and winning parameters."  (Sahota Decl. ¶ 52.)  There have been

16  21 joint auctions over a six-year period, grossing approximately

17  $12 billion for California.  (Id. ¶¶ 58-59.)  This money is used

18  "to reduce greenhouse gas emissions and to benefit vulnerable

19  communities in the State."  (Id. ¶ 59.)

20       3.   National Policy Changes & California's Program

21           Expands

22       While California developed its cap-and-trade policy,

23  the national government was also taking affirmative steps to

24  mitigate greenhouse gas emissions.  In 2016, various parties to

25

26      [6]   Despite the 2013 Agreement's terms, California has
modified its cap-and-trade program several times.  (Sahota Decl.

27  ¶ 78.)  Through all of these modifications, "Quebec's approval or
consent was neither sought nor required in order for California

28  to amend its [program]."  (Sahota Decl. ¶ 80.)

1   the 1992 Convention -- including the United States -- entered

2   into the Paris Agreement of 2015 by executive order ("Paris

3   Accord").  (Iacangelo Decl. ¶ 5, Ex. 3 at 3.)  In furtherance of

4   the 1992 Convention, the Paris Accord aims to "hold[] the

5   increase in the global average temperature to well below 2

6   degrees Celsius" and "pursu[e] efforts to limit the temperature

7   increase to 1.5 degrees Celsius above pre-industrial levels."

8   Id.

9        On August 2, 2016, CARB initiated a rulemaking to link

10  California's cap-and-trade program with Ontario's program.

11  (Sahota Decl. ¶ 62.)  On January 30, 2017, CARB provided the

12  required notice to Governor Brown, and he made the requisite

13  findings to link the jurisdictions on March 16, 2017.  (Iacangelo

14  Decl. ¶ 27, Ex. 25; Sahota Decl. ¶ 63.)

15       On March 28, 2017, President Donald Trump issued

16  Executive Order 13,783.  (Iacangelo Decl. ¶ 6, Ex. 4.)  This

17  Order declared it was "in the national interest to promote clean

18  and safe development of our Nation's vast energy resources, while

19  at the same time avoiding regulatory burdens that unnecessarily

20  encumber energy production, constrain economic growth, and

21  prevent job creation."  (Id.)  Agencies were ordered to review

22  all of their actions that "unnecessarily obstruct, delay,

23  curtail, or otherwise impose significant costs on the siting,

24  permitting, production, utilization, transmission, or delivery of

25  energy resources."  (Id.)  Later, in June, President Trump

26  announced the United States would withdraw from the Paris Accord

27  and instead "negotiate a new deal that protects our country and

28

12

1   its taxpayers."[7]  (Iacangelo Decl. ¶ 7, Ex. 5 at 5.)

2          On September 22, 2017, after the programs had been

3   linked, the governments of California, Quebec, and Ontario signed

4   the Agreement on the Harmonization and Integration of Cap-and-

5   Trade Programs for Reducing Greenhouse Gas Emissions to

6   memorialize their commitment to harmonizing their cap-and-trade

7   programs ("the Agreement").  (Id. ¶ 28, Ex. 26.)  This Agreement

8   replaced the 2013 Agreement between California and Quebec,

9   (Agreement at 2), although the agreements mirrored each other in

10  most material respects.  The Agreement contains the following

11  provisions:

12         Articles 1 and 2 set forth the Agreement's objectives

13  and relevant definitions; Articles 3 and 4 provide for

14  consultation and regulatory harmonization to ensure the programs'

15  compatibility; Articles 5-10 discuss the compliance instruments

16  recognized by each respective cap-and-trade program and the joint

17  auction process the programs could use to sell these instruments;

18  and Articles 11-13 reinforce the parties' commitments to

19  utilizing coordinated technical and administrative support,

20  including a "Consultation Committee" composed of one member of

21  ────────────
          [7]   The United States did not submit formal notification of
22  its withdrawal from the Paris Accord until November 4, 2019.
    (Iacangelo Decl. ¶ 8, Ex. 6.)  Under the Paris Accord's
23  withdrawal provision, a party cannot withdraw until a year after
    it provides formal notice.  (Id.)  The United States' withdrawal
24  will not take effect until November 4, 2020.  (Id.)

25         The United States submitted a number of statements from
    former Governor Brown to describe California's response to
26  President Trump's withdrawal from the Paris Accord and this
    lawsuit.  (Iacangelo Decl. ¶¶ 12, 14, 19.)  The court recognizes
27  these as no more than typical political hyperbole.  As such, they
    are entitled to no legal effect.
28

1   each jurisdiction to resolve any differences between the programs

2   that could jeopardize their coordination efforts.  (See Agreement

3   at 2-8.)  Article 14's jurisdictional provision acknowledges that

4   the Agreement "does not modify any existing statutes and

5   regulations nor does it require or commit the Parties or their

6   respective regulatory or statutory bodies to create new statutes

7   or regulations in regulation to this Agreement," and Article 15

8   provides information exchanged between the parties will remain

9   confidential.  (Id. at 9.)  Article 16 commits the parties to

10  providing notice to the others before making public announcements

11  about their individual programs.  (Id.)  Article 17 provides the

12  parties "shall endeavor to provide" the other with 12 months'

13  notice before withdrawing; Article 18 requires amendments to the

14  Agreement to be in writing and with the consent of all parties;

15  and Article 19's accession provision permits additional

16  jurisdictions to join the Agreement upon the agreement of all of

17  the current parties.  (Id. at 10-11.)  Article 20 commits the

18  parties to resolving their differences by "using and building on

19  established working relationships," and the parties will

20  "communicate on matters regarding this Agreement in writing"

21  under to Article 21.  (Id. at 11.)  Finally, Article 22 provides

22  that the Agreement "may only be terminated by the written consent

23  of all of the Parties."  (Id. at 12.)  Termination of the

24  Agreement becomes effective 12 months after all parties consent,

25  but the obligations under Article 15 regarding confidentiality of

26  information would continue to remain in effect.  (Id.)

27       The linkage between California, Quebec, and Ontario

28  became operational by regulation on January 1, 2018.  17 CCR §

95943(a)(2).  However, on June 15, 2018, Ontario's then premier-designate, Doug Ford, announced his intention to cancel Ontario's cap-and-trade program and withdraw from both the Agreement and the WCI, Inc.  (Dorsi Decl. ¶ 13, Ex. 11.)  On June 29, 2018, the Ontario cabinet approved a regulation revoking its cap-and-trade regulations and enacted the Cap and Trade Cancellation Act to formally repeal its program.  (Sahota Decl. ¶¶ 74-75.)  At no point did Ontario provide notice to California or Quebec.  (Id. ¶ 76.)  While compliance instruments issued by the government of Ontario before the dissolution of its cap-and-trade program may still be used to satisfy compliance requirements in California, Ontario is no longer recognized as a linked jurisdiction or a party to the Agreement.  17 CCR § 95943(a)(2).  But even after Ontario's withdrawal, California and Quebec remain parties to the Agreement.  (Agreement at 10.)

On October 23, 2019, the United States brought this action against the state defendants and the WCI, Inc. defendants[8] seeking declaratory and injunctive relief under the Treaty Clause, the Compact Clause, and Foreign Commerce Clause of the United States Constitution and the Foreign Affairs Doctrine. (Docket No. 1.)  In its First Amended Complaint, the United States specifically requested a declaration that the Agreement is

---

[8]   The WCI, Inc. defendants and defendant Jared Blumenfeld, in his official capacity as Secretary for CalEPA, moved to dismiss the claims against them on January 6, 2020. (Docket No. 25.)  This court granted WCI, Inc.'s motion with respect to the non-voting members of WCI, Inc.'s board, Kip Lipper and Richard Bloom, on February 26, 2020.  (Docket No. 79.) The court denied the motion as to the other moving parties. (Id.)

15

1    a "treaty" in violation of the Treaty Clause of Article I,

2    Section 10, Clause 1 and that the Agreement, along with

3    California law as applied, is a "compact" in violation of Article

4    I, Section 10, Clause 3.  (FAC ¶¶ 156-164.)

5         Despite bringing additional claims under the Foreign

6    Affairs Doctrine and the Foreign Commerce Clause, the United

7    States moved for summary judgment on the Treaty Clause and

8    Compact Clause alone on December 11, 2019.  (USA Mot. for Summ.

9    J. ("USA Mot.") (Docket No. 12).)  The WCI, Inc. defendants and

10   the State defendants also filed cross-motions for summary

11   judgment on the Treaty Clause and Compact Clause alone on

12   February 10, 2020.[9]  (See WCI, Inc. Mot. for Summ. J. ("WCI, Inc.

13   Mot.") (Docket No. 46-1); State Mot. for Summ. J. ("CA Mot.")

14   (Docket No. 50).)  Because the parties did not move for summary

15   judgment on the Foreign Affairs Doctrine or the Foreign Commerce

16   Clause, the court expresses no opinion on the merits of those

17   claims in this Order.

18   II.  Legal Standard

19        A party seeking summary judgment bears the initial

20   burden of demonstrating the absence of a genuine issue of

21   material fact as to the basis for the motion.  Celotex Corp. v.

22   Catrett, 477 U.S. 317, 323 (1986).  A material fact is one that

23   could affect the outcome of the suit, and a genuine issue is one

24   that could permit a reasonable trier of fact to enter a verdict

25        [9]    The Environmental Defense Fund, Natural Resources

26   Defense Council, and International Emissions Trading Association
     were permitted to intervene as defendants on January 15, 2020.

27   (Docket No. 35.)  While they did not file independent motions for
     summary judgment, they filed briefs in opposition to the United

28   States' motion for summary judgment.  (Docket Nos. 47, 48.)

1   in the non-moving party's favor.  Anderson v. Liberty Lobby,

2   Inc., 477 U.S. 242, 248 (1986).  Summary judgment is appropriate

3   when, viewing the evidence in the light most favorable to the

4   nonmoving party, there is no genuine dispute as to any material

5   fact.  Acosta v. City Nat'l Corp., 922 F.3d 880, 885 (9th Cir.

6   2019) (citing Zetwick v. County of Yolo, 850 F.3d 436, 440 (9th

7   Cir. 2017)).  Where, as here, parties submit cross-motions for

8   summary judgment, "each motion must be considered on its own

9   merits."  Fair Hous. Council of Riverside Cty., Inc. v. Riverside

10  Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal citations and

11  modifications omitted).  "[T]he court must consider the

12  appropriate evidentiary material identified and submitted in

13  support of both motions, and in opposition to both motions,

14  before ruling on each of them."  Tulalip Tribes of Wash. v.

15  Washington, 783 F.3d 1151, 1156 (9th Cir. 2015).  Accordingly, in

16  each instance, the court will view the evidence in the light most

17  favorable to the non-moving party and draw all inferences in its

18  favor.  ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1097

19  (9th Cir. 2003) (citations omitted).

20  III. Discussion

21        A.   The Treaty Clause

22             The FAC's challenge under the Treaty Clause relates

23  only to the Agreement itself.  (See FAC ¶ 160 ("The Agreement

24  constitutes a "Treaty, Alliance or Confederation' in violation of

25  the Treaty Clause.")  In relevant part, Article I, Section 10,

26  Clause 1 of the United States Constitution provides:

27             No State shall enter into any Treaty,
               Alliance, or Confederation . . .
28

17

1   U.S. Const. Art. I, § 10, cl. 1.

2          The Constitution does not provide a definition of a

3   "treaty," nor does it distinguish a "treaty" from "alliance" or

4   "confederation."   The records of the Constitutional Convention do

5   not include any discussion of Article I, § 10, nor do the state

6   ratification conventions.   See U.S. Steel Corp. v. Multistate Tax

7   Comm'n, 434 U.S. 452, 461 n.11 (1978); see also 3 Joseph Story,

8   Commentaries on the Constitution of the United States § 1396, 270

9   (1833) ("What precise distinction is here intended to be taken

10  between treaties, and agreements, and compacts is no-where

11  explained; and has never as yet been subjected to any exact

12  judicial, or other examination.").

13         Indeed, only a handful of Supreme Court cases have

14  grappled with the meaning of the Treaty Clause, and often the

15  Treaty Clause is only considered in relation to the Compact

16  Clause of Article I, Section 10, Clause 3.   See U.S. Steel Corp.,

17  434 U.S. at 460-61 (comparing the two clauses and describing how

18  "[t]he Framers clearly perceived compacts and agreements as

19  differing from treaties," although unsure as to what extent);

20  Virginia v. Tennessee, 148 U.S. 503, 519 (1893) (defining

21  "treaties" in relation to compacts and agreements in the Compact

22  Clause); Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 570-71 (1840)

23  (plurality) (same).

24         In Holmes v. Jennison, George Holmes, a Canadian

25  citizen, was arrested in Vermont by Vermont authorities after he

26  was indicted for murder in Quebec.   39 U.S. (14 Pet.) at 561.

27  The Governor of Vermont, John Starkweather, ordered the arresting

28  sheriff to turn Holmes over to Canadian authorities.   Id.   The

18

1   central question presented was whether a state could extradite a

2   foreign national by its own authority.  Id.

3         Writing for a plurality, Chief Justice Taney rejected

4   the proposition that "treaty," "alliance," and "confederation"

5   "meant merely the same thing" and instead suggested a "treaty" is

6   "an instrument written and executed with the formalities

7   customary among nations."  Id. at 571.  Relying on Emerich de

8   Vattel's The Law of Nations,[10] Justice Taney found treaties can

9   "only be made by the 'supreme power, by sovereigns who contract

10  in the name of the state'" to serve "the public welfare" for "a

11  considerable time" through "successive execution."  Id. at 570.

12        Justice Story largely agreed with this view.  In

13  Commentaries, Justice Story suggested the "sound policy" behind

14  the Treaty Clause was to prevent subverting the power of the

15  national government.  3 Story, Commentaries § 1349, 217-18.  In

16  Story's view, treaties "ordinarily relate to subjects of great

17  national magnitude and importance, and are often perpetual, or

18  for a great length of time."  Id. § 1401, 274.  Story's

19  pontifications were given precedential effect when the Supreme

20  Court quoted Story's Commentaries in Virginia, explaining

21  "treaties" were "of a political character; such as treaties of

22  alliance for purposes of peace and war . . . in which the parties

23  are leagued for mutual government, political co-operation, and

24  the exercise of political sovereignty; and treaties of cession of

25        [10]    Vattel's treatise has been described as "the most well-
26  known work on the law of nations in England and America at the
    time of the Founding."  Anthony J. Bellia Jr. & Bradford R.
27  Clark, The Law of Nations as Constitutional Law, 98 Va. L. R. 729,
    749 (2012) (collecting sources).  It is widely thought to have
28  influenced the Constitution's construction.

1  sovereignty, or conferring internal political jurisdiction, or

2  external political dependence, or general commercial privileges."

3  148 U.S. at 519 (quoting 3 Story, Commentaries § 1397, 271)

4  (internal quotations omitted).

5          Consequently, the Supreme Court has come to understand

6  that, not all "international agreements . . . constitute treaties

7  in the constitutional sense." United States v. Curtiss-Wright

8  Export Corp., 299 U.S. 304, 318 (1936); United States v. Belmont,

9  301 U.S. 324, 330 (1937); see also Virginia, 148 U.S. at 519-20.

10  While agreements may be referred to colloquially as "treaties,"

11  they are not necessarily "treaties" violative of Article I.

12          The United States argues the Agreement is an "emissions

13  treaty" prohibited by the Treaty Clause.  (USA Mot. at 1 (quoting

14  Massachusetts v. EPA, 549 U.S. 497, 519 (2007).)  The United

15  States claims it is "of a political character" because it is

16  binding and it "confederates the laws of the two jurisdictions in

17  an important area of commercial policy."  (USA Mot. at 15-17.)

18          Conversely, California argues the Agreement does not

19  rise to the level of an Article I treaty because it "does not

20  address a matter of substantial consequence to our federal

21  structure, much less one implicating national unity."  (CA Mot.

22  at 17-19.)  California claims the Agreement is not binding, and

23  "merely expresses California's and Quebec's good-faith intentions

24  to continue communicating and collaborating . . . so that the

25  link between the two cap-and-trade programs may continue to

26  function properly."  (CA Mot. at 19.)  California primarily

27  relies upon the provisions of the Agreement that permit the

28  parties to make changes to their regulatory schemes and offers

1  Ontario's unencumbered withdrawal as evidence that California

2  could do the same.  (CA Mot. at 20-23.)

3          The United States invokes dicta from the Supreme

4  Court's decision in Massachusetts v. EPA, 549 U.S. 497 (2007), to

5  stand for the proposition that this Agreement, and those like it,

6  have already been foreclosed by the Constitution as a consequence

7  of joining the union.  (USA Mot. at 1.)  In Massachusetts, the

8  Court considered whether Massachusetts and other states had

9  standing to challenge the Environmental Protection Agency's

10  denial of their rulemaking petition.  549 U.S. at 505.  When

11  explaining why the EPA's refusal to regulate greenhouse gas

12  emissions gave Massachusetts a concrete injury sufficient for

13  Article III standing, the Court opined:

14          When a State enters the Union, it surrenders
        certain sovereign prerogatives.
15          Massachusetts cannot invade Rhode Island to
        force reductions in greenhouse gas
16          emissions, it cannot negotiate an emissions
        treaty with China or India, and in some
17          circumstances the exercise of its police
        powers to reduce in-state motor-vehicle
18          emissions might well be pre-empted.

19  549 U.S. at 519.

20          At the hearing and in the briefs, counsel for the

21  United States argued that this fleeting reference to "treaties"

22  specifically invoked Article I's Treaty Clause.  (See USA Mot. at

23  1; Docket No. 88.)  This court is at a loss to understand what

24  the Court meant by its statement that Massachusetts could not

25  negotiate an emission treaty with China or India.  There was no

26  issue of an emissions treaty, or any other treaty, with China or

27  India, or with anyone else, in the Massachusetts case.  Indeed,

28  the Court did not mention the Treaty Clause, or any other part of

1  Article I in the entirety of its opinion.  Moreover, this court

2  has not been able to find any case that has relied upon or cited

3  that reference in relation to the Treaty Clause or Article I.

4  Consequently, this court cannot regard that phrase of the Court's

5  decision as anything more than a stray comment which may not be

6  taken as binding authority.

7          As the Supreme Court has taught in other cases, in the

8  Article I context, "treaty" is a term of art.  Not all

9  international agreements may be "treaties" in the constitutional

10  sense.  Curtiss-Wright, 299 U.S. at 318; see also Virginia, 148

11  U.S. at 519-20.  In Virginia, the Supreme Court explained that

12  "treaties" within the meaning of Article I are "of a political

13  character."  148 U.S. at 519.  The Court provided examples of

14  agreements that qualified as "treaties", including "treaties of

15  alliance for purposes of peace and war," "mutual government," the

16  "cession of sovereignty," and "general commercial privileges."

17  Id.  By any metric, the Agreement between California and Quebec

18  falls short of these consequential agreements.

19          This Agreement is not a treaty creating an alliance for

20  purposes of peace and war.  See Williams v. Bruffy, 96 U.S. 176,

21  182 (1877) (finding the Confederate States of America

22  unconstitutional under the Treaty Clause).  Nor does it

23  constitute a treaty for "mutual government" or represent a

24  "cession of sovereignty."  See id.  To the contrary, the

25  Agreement explicitly recognizes that Quebec and California

26  adopted "their own greenhouse gas emissions reduction targets,

27  their own regulation on greenhouse gas emissions reporting

28  programs and their own regulation(s) on their cap-and-trade

22

1  programs." (Agreement at 1 (emphasis added).)  These programs

2  are not identical, and their different aims and structures

3  undercut any mutuality argument.  (Sahota Decl. ¶¶ 34-35.)

4         The programs, adopted independently and informed by

5  each jurisdiction's policy objectives, could (and have) run

6  independently of each other.  Furthermore, the Agreement provides

7  it is "each Party's sovereign right and authority to adopt,

8  maintain, modify, repeal, or revoke any of their respective

9  program regulations or enabling legislation." (Agreement at 1.)

10  The Agreement does not "modify any existing statutes and

11  regulations[,] nor does it require or commit the Parties or their

12  respective regulatory or statutory bodies to create new statutes

13  or regulations." (Id. at 9.)  Indeed, CARB has modified the

14  regulations governing California's cap-and-trade program more

15  than five times since it linked its program with Quebec in 2013,

16  without consulting with the province.  (Sahota Decl. ¶¶ 78-80.)

17  Accordingly, there is no "mutual government" or "cession of

18  sovereignty" representative of a treaty.

19         Finally, while both California and Quebec have

20  undeniably reaped significant monetary benefits from their

21  limited commercial privileges with one another, the cap-and-trade

22  agreement is not a "general commercial privilege" prohibited by

23  the Treaty Clause.  Treaties conferring "general commercial

24  privilege[s]" are treaties regarding amity and commerce and

25  encompass far more than the limited exchange here.[11]  See Br. of

26  ───────────────────

27         [11]  For example, the Treaty of Amity and Commerce between
   the United States and France signed in 1778 provided for mutual
   most favored nation status with regard to commerce and navigation
28  between the two countries, in addition to granting free ports and

1   Amici Curiae Professors of Foreign Relations Law (Docket No. 54)

2   at 15 n.4 (citing Sarah H. Cleveland & William S. Dodge, <u>Defining</u>

3   <u>and Punishing Offenses Under Treaties</u>, 124 Yᴀʟᴇ L. J. 2202, 2218

4   (2015).)  Consequently, this court concludes that the Agreement

5   does not represent a "treaty" within Article I of the

6   Constitution.  Defendants' motions for summary judgment on the

7   Treaty Clause claim must therefore be granted.

8        B.   <u>The Compact Clause</u>

9        The parties also move for summary judgment on the

10  Compact Clause.  (<u>See</u> USA Mot. at 18; CA Mot. at 25; WCI, Inc.

11  Mot. at 5.)  The Compact Clause of Article I, Section 10, Clause

12  3 provides:

13           No State shall, without the Consent of Congress
             . . . enter into any Agreement or Compact with
14           another State, or with a foreign Power . . .

15  U.S. Const. Art. I, § 10.

16       "Read literally, the Compact Clause would require the

17  States to obtain congressional approval before entering into any

18  agreement among themselves, irrespective of form, subject,

19  duration, or interest to the United States." <u>U.S. Steel Corp.</u>,

20  434 U.S. at 459.  Rather than adopt that interpretation, the

21  Supreme Court has limited its application to agreements that

22  encroach upon federal sovereignty.  <u>See, e.g.</u>, <u>Northeast Bancorp,</u>

23  <u>Inc. v. Bd. of Governors of Fed. Reserve Sys.</u>, 472 U.S. 159, 176

24  (1985); <u>U.S. Steel</u>, 434 U.S. at 471; <u>New Hampshire v. Maine</u>, 426

25  U.S. 363, 369 (1976); <u>Virginia</u>, 148 U.S. at 517-18.  Accordingly,

26  the court must first ascertain whether the Agreement falls within

27

28  a mutual right to trade with enemy states of the other.

1   Article I's scope.

2           In Northeast Bancorp, the Court was tasked with

3   determining whether there was an agreement between a collection

4   of New England states that amounted to a "compact."  472 U.S. at

5   175.  To do so, the Court considered whether the arrangement had

6   the "classic indicia of a compact," including: (1) provisions

7   that required reciprocal action for the agreement's

8   effectiveness; (2) a regional limitation; (3) a joint

9   organization or body for regulatory purposes; and (4) a

10  prohibition on the agreement's unilateral modification or

11  termination.  Id.  It is indisputable that there is an agreement

12  between the parties.  However, the court must ascertain whether

13  that Agreement[12] "amount[s] to a compact" first.  See id.

14          The Agreement does not contain the first indicium of a

15  compact because it does not require reciprocal action to take

16  effect.  Article 14 explicitly states that "this Agreement does

17  not modify any existing statutes and regulations nor does it

18  require or commit the Parties to their respective regulatory or

19  statutory bodies to create new statutes or regulations in

20  relation to this Agreement."  (Agreement at 9.)  While California

21  requires linking jurisdictions to have equivalent or stricter

22  enforcement goals than it does, the efficacy of the program does

23  not rise or fall with other jurisdictions adopting similar

24  _____

25          [12]   The United States challenges the Agreement and
    "supporting California law was applied" under the Compact Clause.
26  (FAC ¶ 164.)   The court will construe that to include California
    Code of Regulations, Title 17, Sections 95940-43 because those
27  mandate the general requirements for linking California's cap-
    and-trade program with other jurisdictions.  See 17 CCR §§ 95940-
28  43.

1  enforcement goals; indeed, the program could operate

2  independently of any other jurisdiction.

3         The Agreement also lacks the second indicium of a

4  compact because it does not impose a regional limitation.  While

5  each cap-and-trade program can trace its roots back the

6  recommendations for a "regional" cap-and-trade program

7  promulgated by Western Climate Initiative, (Sahota Decl. ¶¶ 15-

8  16), nothing in the Agreement or California's law limits the

9  program's efficacy to a particular region.  Quite the contrary --

10 the Agreement's "Accession" provision is written without regard

11 to geographical location.  (Agreement at 10.)

12        The third indicium of a compact is also absent.  While

13 California has adopted a "joint organization or body" in WCI,

14 Inc. to facilitate its linkage with Quebec, WCI, Inc. exercises

15 no regulatory authority under the Agreement or California law.

16 (Agreement at 8); Cal. Gov. Code § 12894.5 ("Given its limited

17 scope of activities, the [WCI, Inc.] does not have the authority

18 to create policy with respect to any existing or future program

19 or regulation"); see also Cal. Gov. Code § 12894.5(b)(3) ("[WCI,

20 Inc.] bylaws shall not allow [WCI, Inc.] to have policymaking

21 authority with respect to these programs.").

22        While WCI, Inc. admittedly provides "administrative and

23 technical support" to both jurisdictions, it "plays no role in

24 the enforcement of the cap-and-trade program of any participating

25 jurisdictions" and "exercises no regulatory powers at all."

26 (Tamblyn Decl. ¶ 6.)  Indeed, it does not exercise any

27 policymaking, regulatory, or enforcement authority emblematic of

28 other "joint bodies" found to be indicative of a compact under

26

1   the Compact Clause.  <u>See</u> <u>Seattle Master Builders Ass'n v. Pac.</u>

2   <u>Northwest Elec. Power & Conservation Planning Council</u>, 786 F.2d

3   1359, 1364 (9th Cir. 1986) (finding Council with policy-making

4   authority and the statutory power to take direct action was a

5   "joint body with regulatory authority").  Consequently, while it

6   is a "joint organization" it serves no "regulatory purpose"

7   indicative of a compact.

8        Finally, there is no enforceable prohibition on

9   unilateral modification or termination.  As in <u>Northeast Bancorp</u>,

10  "each [jurisdiction] is free to modify or repeal its law

11  unilaterally."  472 U.S. at 175.  Quebec and California retain

12  their "sovereign right and authority to adopt, maintain, modify,

13  repeal, or revoke any of their respective program regulations or

14  enabling legislation."  (Agreement at 1.)  California has

15  modified its regulations without consulting Quebec on multiple

16  occasions.  (Sahota Decl. ¶¶ 78-80.)  While modifications to and

17  termination of <u>the Agreement</u> require the consent of all parties,

18  (Agreement at 10, 12), the simple fact that California retains

19  the power to modify its enacting regulations means unilateral

20  termination of California's participation in the Agreement is

21  possible.  (<u>See</u> Sahota Decl. ¶¶ 74-76 (discussing Ontario's

22  withdrawal from the Agreement and unilateral termination of its

23  cap-and-trade program).)

24       The United States argues that the amount of money

25  invested in the cap-and-trade program would prohibit a unilateral

26  withdrawal.  (USA Mot. at 25.)  But while the practical

27  consequences of withdrawal may be steep, caselaw shows this is

28  not the relevant inquiry.  <u>Northeast Bancorp</u>, 472 U.S. at 175;

1  U.S. Steel, 434 U.S. at 473.  California is "free to withdraw at

2  any time," and this freedom defeats any characterization that the

3  Agreement is binding.  See U.S. Steel, 434 U.S. at 473.

4        For the foregoing reasons, all of the "classic indicia"

5  of a compact from Northeastern Bancorp are missing from the

6  Agreement and California law as applied.  But "[e]ven if all

7  these indicia of compacts [were] present," only agreements that

8  tend to "increase political power in the states," such that they

9  "may encroach upon or interfere with the just supremacy of the

10  United States" fall within the scope of the Compact Clause.[13]

11  Seattle Master Builders, 786 F.2d at 1364 (citing Cuyler v.

12  Adams, 449 U.S. 433, 440 (1981)).

13

14     [13]  Both sides acknowledge the Supreme Court has yet to
explicitly apply the framework used to evaluate interstate

15  agreements to those between states and foreign powers.  (See USA
Mot. at 19; CA Mot. at 27.)  However, the Court has recognized

16  that Chief Justice Taney's plurality opinion in Holmes, 39 U.S.
(14 Pet.) at 570-71, is "not inconsistent with the rule of

17  Virginia v. Tennessee."  U.S. Steel Corp., 434 U.S. at 465 n.15.
Other courts to consider agreements between foreign governments

18  and states have applied the tests from Virginia and Northeast

19  Bancorp.  See, e.g., McHenry v. Brady, 163 N.W. 540, 545-47 (N.D.
1917) (finding drainage agreement between North Dakota and

20  Monitoba did not implicate the Compact Clause under Virginia); In
re Manuel P., 215 Cal. App. 3d 48, 66-69 (4th Dist. 1989)

21  (finding program used to return nonresident minor aliens to

22  Mexico was not an Article I compact between California and Mexico
under Northeast Bancorp and did not encroach on federal supremacy

23  in violation of Virginia).  The State Department has also
suggested the Court would likely adhere to the Virginia test when

24  evaluating agreements between states and foreign powers, and both
parties rely on that memorandum.  (See Dorsi Decl. ¶ 15, Ex. 13;

25  2d Decl. of Rachel E. Iacangelo ("2d Iacangelo Decl.") ¶ 13, Ex.

26  44 (Docket No. 78-2) (both citing William H. Taft, IV, Legal
Adviser of the U.S. Dept. of State, "Memorandum," in Digest of

27  United States Practice of International Law 184 (Sally J. Cummins
& David P. Stewart, eds., 2001) ("Taft Memo").)  This court will

28  do the same.

1          The United States argues that the Supreme Court's

2    decisions in American Insurance Association v. Garamendi, 539

3    U.S. 396 (2003) and Crosby v. National Foreign Trade Council, 530

4    U.S. 363 (2000) should inform the court's federal supremacy

5    analysis.  (USA Mot. at 21-22.)  However, those cases are unique

6    to the Foreign Affairs Doctrine, which the parties have expressly

7    not asked the court to consider in this motion.  In both of those

8    cases, the Supreme Court found the state laws at issue were

9    preempted by the federal government's express foreign policy.

10   See Garamendi, 539 U.S. at 427 (invalidating California's

11   Holocaust Victim Insurance Relief Act because it conflicted with

12   the president's expressed policy); Crosby, 530 U.S. at 373-78

13   (invalidating a Massachusetts law because it compromised

14   diplomatic leverage by imposing economic sanctions against

15   Burma).

16         What is before the court now is not the question of

17   preemption but the question of whether California's power has

18   been increased such that it encroaches upon or interferes with

19   the just supremacy of the United States.  For that, the Supreme

20   Court has offered guidance in United States Steel Corporation v.

21   Multistate Tax Commission.

22         In U.S. Steel, the Supreme Court offered three factors

23   which, if present in an agreement between states, could "enhance

24   state power quoad the National Government": (1) if the agreement

25   in question authorized member states to "exercise any powers they

26   could not exercise in its absence"; (2) if there was any

27   "delegation of sovereign power" to an outside organization; and

28   (3) if each state was "free to withdraw at any time."  434 U.S.

1    at 473.  Factors two and three are not present in the Agreement,

2    as described in the court's analysis of the Northeast Bancorp

3    factors.  See supra.  The only question remaining is whether the

4    Agreement and California law as applied authorized California to

5    "exercise any powers [it] could not exercise in [the Agreement's]

6    absence."  See 434 U.S. at 473.

7              "[W]hatever else may be said of the revolutionary

8    colonists who framed our Constitution, it cannot be doubted that

9    they respected the rights of individual states to pass laws that

10   protected human welfare, and recognized their broad police powers

11   to accomplish this goal."  Rocky Mountain Farmers Union v. Corey,

12   913 F.3d 940, 945-46 (9th Cir. 2019).  As the Supreme Court has

13   acknowledged, "[l]egislation designed to free from pollution the

14   very air that people breathe clearly falls within the exercise of

15   even the most traditional concept of what is compendiously known

16   as the police power."  Huron Portland Cement Co. v. City of

17   Detroit, 362 U.S. 440, 442 (1960) (internal citations omitted).

18   It is well within California's police powers to enact legislation

19   to regulate greenhouse gas emissions and air pollution.  Am. Fuel

20   & Petrochem. Mfrs. v. O'Keeffe, 903 F.3d 903, 913 (9th Cir. 2018)

21   (citing Massachusetts, 549 U.S. at 522-23).  Accordingly, the

22   Agreement does not allow California to exercise any power it

23   would not normally have.  See U.S. Steel, 434 U.S. at 473.

24             Because each of the U.S. Steel factors weigh against

25   finding the Agreement and California law as applied enhances

26   California's power over that of the federal government, the

27   Agreement does not fall within the scope of the Compact Clause.

28             In a final attempt to persuade the court that the

1  Agreement and California law as applied violates the Compact

2  Clause, the United States argues in its reply that the court need

3  not consider the "classic indicia of a compact" from Northeast

4  Bancorp or the factors from U.S. Steel because the Clean Air Act

5  specifically provides congressional consent for "two or more

6  States to negotiate and enter into agreements or Compacts," but

7  does not explicitly provide consent to agreements between states

8  and foreign powers.  (USA Reply at 43 (Docket No. 78).)  Section

9  7402(c) of The Clean Air Act provides:

10             The consent of the Congress is hereby given
               to two or more States to negotiate and enter
11             into agreements or compacts, not in conflict
               with any law or treaty of the Untied States,
12             for (1) cooperative effort and mutual
               assistance for the prevention and control of
13             air pollution and the enforcement of their
               respective laws relating thereto, and (2)
14             the establishment of such agencies, joint or
               otherwise, as they may deem desirable for
15             making effective such agreements or
               compacts.  No such agreement or compact
16             shall be binding or obligatory upon any
               State a party thereto unless and until it
17             has been approved by Congress.

18  42 U.S.C. § 7402(c).  The United States argues that under the

19  canon of expressio unius est exclusio alterius, the court must

20  infer that the express reference to agreements between states

21  serves to preclude agreements between states and foreign powers.

22  (USA Reply at 44.)  In response, California argues the Clean Air

23  Act is irrelevant to the Compact Clause inquiry and expressio

24  unius is generally disfavored as an interpretative method.[14]  (CA

25  ───────────────

         [14]   The State defendants have also argued that the United
26  States improperly raised this argument in its reply and it did
    not allege Clean Air Act preemption in its First Amended
27  Complaint, and for those reasons, the argument should be
    precluded.  However, the United States resisted the state's
28  characterization of their argument as a preemption claim at the

1  Reply at 28-29 (Docket No. 86).)

2         The court agrees that the Clean Air Act is irrelevant

3  to the Compact Clause inquiry.  As the Supreme Court has

4  previously held, "[c]ongressional consent is not required for

5  interstate agreements that fall outside the scope of the Compact

6  Clause."  Cuyler, 449 U.S. at 440.  However, "congressional

7  consent 'transforms an interstate compact within the Compact

8  Clause into a law of the United States.'"  New Jersey v. New

9  York, 523 U.S. 767, 811 (1998) (citing Cuyler, 449 U.S. at 438)

10 (internal modifications omitted) (emphasis added).  Accordingly,

11 the court must necessarily first determine whether there is a

12 "compact" within the Compact Clause.  As the court's foregoing

13 analysis has demonstrated, the Agreement and California law as

14 applied does not qualify.  Accordingly, congressional consent is

15 not necessary.

16        Similarly, the United States' reliance on expressio

17 unius proves too much.  The canon of construction "does not apply

18 to every statutory listing or grouping; it has force only when

19 the items expressed are members of an 'associated group or

20 series' justifying the inference that items not mentioned were

21 excluded by deliberate choice, not inadvertence."  Barnhart v.

22 Peabody Coal Co., 537 U.S. 149, 168 (2003).  Critically, "[t]he

23 force of any negative implication [] depends on context."  Marx

24 v. General Revenue Corp., 568 U.S. 371, 381 (2013).  The United

25 States offers no suggestion that Congress considered state

26 _____

27 hearing, and the state had an opportunity to entertain the
   argument in its response.  Accordingly, the court finds it
   appropriate to consider the argument.

28

1    agreements with foreign entities and affirmatively chose not to

2    include them.  Even if Congress affirmatively chose to exclude

3    any mention of agreements between states and foreign entities, it

4    does not follow that withholding preemptive consent from these

5    agreements amounts to a categorical bar.

6          On the motions before the court now, the court finds

7    the Agreement and California law as applied do not rise to the

8    level of a "compact" under the Compact Clause.  Accordingly, the

9    court will grant defendants' motions for summary judgment as to

10   the Compact Clause.  Again, the court expresses no view on

11   plaintiff's other theories, including the Foreign Affairs

12   Doctrine and the Foreign Commerce Clause.

13         IT IS THEREFORE ORDERED that the United States' motion

14   for summary judgment on the first and second causes of action of

15   the Complaint (Docket No. 12) be, and the same hereby is, DENIED;

16         AND IT IS FURTHER ORDERED that the State of California

17   and WCI, Inc.'s motions for summary judgment on the first and

18   second causes of action of the Complaint (Docket Nos. 46, 50) be,

19   and the same hereby are, GRANTED.

20   Dated:  March 12, 2020

21                        WILLIAM B. SHUBB
                          UNITED STATES DISTRICT JUDGE
22

23

24

25

26

27

28