1  JEFFREY BOSSERT CLARK
   Assistant Attorney General
2  JONATHAN D. BRIGHTBILL
   Principal Deputy Assistant Attorney General
3  PAUL E. SALAMANCA
   R. JUSTIN SMITH
4  PETER J. MCVEIGH
   STEVEN W. BARNETT
5  HUNTER J. KENDRICK
   Attorneys
6  Environment & Natural Resources Division
7  U.S. Department of Justice
   950 Pennsylvania Ave., N.W., Room 2139
8  Washington, D.C. 20530
9  Attorneys for the United States

10              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF CALIFORNIA
11

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; THE CALIFORNIA AIR RESOURCES BOARD; MARY D. NICHOLS, in her official capacities as Chair of the California Air Resources Board and as Vice Chair and a board member of the Western Climate Initiative, Inc.; WESTERN CLIMATE INITIATIVE, INC.; JARED BLUMENFELD, in his official capacities as Secretary for Environmental Protection and as a board member of the Western Climate Initiative, Inc.; KIP LIPPER, in his official capacity as a board member of the Western Climate Initiative, Inc., and RICHARD BLOOM, in his official capacity as a board member of the Western Climate Initiative, Inc.,<br><br>      Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:19-cv-02142-WBS-EFB<br><br>**PLAINTIFF UNITED STATES OF AMERICA'S NOTICE OF MOTION, SECOND MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS A CLAIM, AND BRIEF IN SUPPORT THEREOF**<br><br>Date:     June 1, 2020<br>Time:    1:30 p.m.<br>Courtroom: 5 (14th Floor)<br>Judge:   Hon. William B. Shubb |

---

* The United States recognizes that this Court, in its order of February 26, 2020, granted a motion to dismiss by Defendants Lipper and Bloom. *See* ECF No. 79 at 6-7. The United States includes them in the caption only to preserve its options on appeal.

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on June 1, 2020, or as soon thereafter as the matter may be heard in Courtroom 5 of the above-entitled Court (Hon. William B. Shubb presiding), located at 501 "I" Street, Sacramento, California, 95814, or as the Court may otherwise provide, Plaintiff, the United States of America (the "United States"), will move for dismissal of its fourth claim and also for summary judgment on what would constitute its sole remaining claim, as set forth below. The United States hereafter refers to this motion as the "Second Summary Judgment Motion."

**MOTION TO DISMISS PLAINTIFF'S FOURTH CAUSE OF ACTION**

Pursuant to Federal Rule of Civil Procedure 41(a)(2), the United States moves that the Court dismiss the fourth claim in its Amended Complaint, the Foreign Commerce Clause claim. Dismissal of this claim is proper because it is largely duplicative of the United States' Foreign Affairs Doctrine claim, which is the main subject of this Second Summary Judgment Motion. In addition, dismissing this claim will conserve the resources of the Court and the parties.

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 260(a), the United States moves for summary judgment against all Defendants on Plaintiff's Foreign Affairs Doctrine claim, because there is no genuine dispute as to any material fact related to that claim, and the United States is entitled to judgment as a matter of law.

This Second Summary Judgment Motion is supported by the following brief, on the supporting evidence filed concurrently herewith, on the arguments of counsel that may be made at any hearing on this matter, and further by all relevant documents on file in this action.

1

**TABLE OF CONTENTS**

2

Page

3  NOTICE OF MOTION..................................................................................ii

4  MOTION TO DISMISS PLAINTIFF'S FOURTH CAUSE OF ACTION.........................ii

5  MOTION FOR SUMMARY JUDGMENT.....................................................ii

6  TABLE OF AUTHORITIES ........................................................................iv

7  INTRODUCTION .....................................................................................1

8  BACKGROUND ......................................................................................4

9      A.  The United States' Foreign Policy ...................................4

10      B.  California's Foreign Policy ....................................13

11      C.  Procedural History ....................................................15

12  LEGAL STANDARD................................................................................15

13  ARGUMENT....................................................................................16

14  I.  The Agreement and Arrangements conflict with and stand as an obstacle to the express foreign policy of the United States. ..........................................17

16      A.  The Agreement and Arrangements clearly conflict with the U.S. policy not to participate in the Paris Agreement to seek a better deal................................................................19

18      B.  The Agreement and Arrangements are an obstacle to the full purposes of Congress' mandate to the Executive to develop international climate policy.........................................23

20  II.  The Agreement and Arrangements intrude on a field of foreign affairs that is beyond a traditional area of state regulation. ..........................................28

22      A.  California has no traditional interest in reducing greenhouse gas emissions in foreign jurisdictions....................................29

23      B.  The Agreement and Arrangements intrude on the federal government's foreign affairs power...................................35

25  CONCLUSION...............................................................................39

26

27

28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Elec. Power v. Connecticut,*
    564 U.S. 410 (2011) ...................................................................................................32, 33

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ....................................................................................................passim

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .............................................................................................................15

*Coeur d'Alene Tribe of Idaho v. Hammond,*
    384 F.3d 674 (9th Cir. 2004) ..............................................................................................38

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ....................................................................................................passim

*Deutsch v. Turner Corp.,*
    324 F.3d 692 (9th Cir. 2003) ..............................................................................................16

*Exxon Mobil Corp. v. EPA,*
    217 F.3d 1246 (9th Cir. 2000) ............................................................................................31

*First National City Bank v. Banco Nacional de Cuba.*
    406 U.S. 759 (1972) .............................................................................................................20

*Gingery v. City of Glendale,*
    831 F.3d 1222 (9th Cir. 2016) .....................................................................................35, 36

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ......................................................................................................passim

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..............................................................................27, 31, 32, 37

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) ....................................................................................passim

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
    592 F.3d 954 (9th Cir. 2010) ......................................................................................passim

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
    754 F.3d 712 (9th Cir. 2014) ......................................................................................passim

*Sale v. Haitian Ctrs. Centers Council, Inc.,*
    509 U.S. 155 (1993) .............................................................................................................20

*Seminole Tribe of Florida v. Florida,*
  517 U.S. 44 (1996).................................................................................37

*Sprietsma v. Mercury Marine,*
  537 U.S. 51 (2002).................................................................................38

*United States v. Belmont,*
  301 U.S. 324 (1937)................................................................17, 23, 26

*United States v. Curtiss-Wright Corp.,*
  299 U.S. 304 (1936).................................................................................38

*United States v. Pink,*
  315 U.S. 203 (1942)...........................................................................17, 18

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952) ...............................................................................24

*Zschernig v. Miller,*
  389 U.S. 429 (1968)........................................................................passim

## Treaties

Kyoto Protocol to the UNFCCC, Dec. 11, 1997, 2303 U.N.T.S. 148............................6

Paris Agreement, Nov. 4, 2016, T.I.A.S. No. 16-1104..............................7, 8, 11, 21

UNFCCC, Mar. 21, 1994, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107...........5, 6, 26

## Constitutional Provisions

U.S. Const. Art. II, § 2, cl. 2....................................................................6

U.S. Const. Art. VI....................................................................................26

U.S. Const. Art. VI, § 2, cl. 2..............................................................6, 26

## Statutes

15 U.S.C. § 2901.................................................................................25, 31

15 U.S.C. §§ 2931.....................................................................................25

42 U.S.C. § 7403.......................................................................................25

42 U.S.C. § 13385.....................................................................................25

Pub. L. No. 105–276, 112 Stat. 2461, 2496 (1998) ..........................................7, 12

Pub. L. No. 106–74113 Stat. 1047, 1080 (1999) ..........................................7, 12

Pub. L. No. 106–377, 114 Stat. 1441 (2000) ................................................7, 12

Pub. L. No. 96–294, 94 Stat. 611, 774–75 (1980) ............................................25

The Global Protection Act of 1978, Pub. L. No. 100–204, Title XI, §§ 1101–1106, 101
    Stat. 1331……………………………………………….…......4, 5, 25, 31, 36

**Regulations**

17 CAL. CODE REGS § 95940………………………………………………….......13

17 CAL. CODE REGS § 95993………………………………..……………...12, 13

CAL. HEALTH & SAFETY CODE § 38501(e) ........................................................3

CAL. HEALTH & SAFETY CODE § 38564.................................................. 13, 34

**Court Rules**

Fed. R. Civ. P. 54(b) ........................................................................................37

Fed. R. Civ. P. 41(a)(2) ...............................................................................ii, 4

Fed. R. Civ. P. 56(a)...................................................................................ii, 15

Local Rule 260(a)…………………………………………………………..ii

**Federal Documents**

68 Fed. Reg. 52,922 (Sept. 8, 2008) .................................................................7

*Nomination of Hon. Mike Pompeo to be Secretary of State Before the S. Comm. On*
    *Foreign Relations*, 115th Cong., S. Hrng. 115-339 at 25 (2018)………………10, 11, 20

Press Release, The White House, President Bush Discusses Global Climate Change (June
    11, 2001), https://georgewbush-whitehouse.archives.gov/news/releases/
    2001/06/20010611-2.html…………………………………………………...32

Press Statement from Secretary of State Michael R. Pompeo, "On the U.S. Withdrawal
    from the Paris Agreement," Nov. 4, 2019, https://www.state.gov/on-the-u-s-
    withdrawal-from-the-paris-agreement/..........................................................11

Promoting Energy Independence and Economic Growth, Exec. Order No. 13,783, 82 Fed.
    Reg. 16093 (Mar. 28, 2017)……………………………...…………………………9

S. Res. 98, 105th Cong. (1997) ................................................................6, 12

Statement by President Trump on the Paris Climate Accord, Jun. 1, 2017, ("Statement on Paris Accord") https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/................................................................10, 11, 20

**Other Materials**

Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions, available at https://ww3.arb.ca.gov/cc/capandtrade/linkage/2017_linkage_agreement_ca-qc-on.pdf (last visited Apr. 20, 2020)……………………………………………………………………...2

Cal. Exec. Order No. S-20-06 (Oct. 18, 2006)....................................................13

*Climate Change Partnerships – Working Across Agencies and Beyond Borders,* CALIFORNIA ENERGY COMMISSION, https://www.energy.ca.gov/about/campaigns/international-cooperation/climate-change-partnerships...........................................14, 33

*Canada's Mid-Century, Long-Term, Low-Greenhouse Gas Development Strategy,* GOVERNMENT OF CANADA 11 (2016), https://unfccc.int/sites/default/files/resource/Canada%27s%20Mid-Century%20Long-Term%20Low GHG%20Strategy.pdf……………………………………………………………...21, 22

Certificate of Incorporation of Western Climate Initiative, Inc., § 3…………………..14

*Final Environmental Analysis for the Strategy for Achieving California's 2030 Greenhouse Gas Target,* CALIFORNIA AIR RESOURCES BOARD Attach. A at 24–25 (Nov. 30, 2017), https://ww3.arb.ca.gov/cc/scopingplan/2030 sp_appf_finalea.pdf...........................................................................................3, 33

Letter from President George W. Bush to U.S. Senators Hagel, Helms, Craig, & Roberts, (March 13, 2001)……………………………………………………………..….7, 39

*Scoping Next Steps for Evaluating the Potential Role of Sector-Based Offset Credits Under the California Cap-and-Trade Program, Including from Jurisdictional "Reducing Emissions from Deforestation and Forest Degradation" Programs,* CARB 17 (2015), https://ww3.arb.ca.gov/cc/capandtrade/sectorbasedoffsets/arb%20staff%20white%20paper%20sector-based%20offset%20credits.pdf.................14

*States React to Trump's Decision to Abandon Paris Climate Agreement*, GEORGETOWN CLIMATE CENTER (June 1, 2017), https://www.georgetownclimate.org/articles/states-react-to-trump-s-decision-to-abandon-paris-climate-agreement.html........................2, 27

Steven P. Finizio, *et al.,* "Climate Negotiations on New Global Carbon Market Postponed Until 2021 (Apr. 17, 2020), *available at* https://www.wilmerhale.com/en/insights/client-alerts/20200417-climate-negotiations-on-new-global-carbon-market-

1

postponed-until-2021..................................................................................................8

THE FEDERALIST NO. 80 (Alexander Hamilton) (J. Cooke ed., 1961)………………....23

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

This Court should be mindful of what is really at stake in this case: whether the foreign policy of the United States is to be directed by the federal government or by individual states.  The Constitution answers this question.  As the Supreme Court and Ninth Circuit have made clear, "foreign affairs and international relations" are "matters which the Constitution entrusts *solely* to the Federal Government."  *Zschernig v. Miller*, 389 U.S. 429, 436 (1968) (emphasis added).  "The Constitution gives the federal government the ***exclusive authority*** to administer foreign affairs." *Movsesian v. Victoria Versicherung AG,* 670 F.3d 1067, 1071 (9th Cir. 2012) (*Movsesian III*) (emphasis added).  Similarly, the Supreme Court wrote in *Hines v. Davidowitz* that:

> Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left ***entirely free*** from local interference.

312 U.S. 52, 63 (1941) (emphasis added).

Moreover, the form that the federal government's foreign policy takes is irrelevant to this analysis.  Thus, if the United States chooses an affirmative foreign policy agenda, and a state pursues a contrary affirmative policy, preemption applies.  Similarly, if the United States chooses to put a particular area of foreign policy on "pause" while it rethinks its options, and a state pursues an affirmative policy in that same area, once again there is preemption.

California's Governors have defied this clear constitutional structure.  They have positioned the State in open opposition to the foreign policy of the United States on greenhouse gas emissions.

> In response to President Donald Trump's decision to withdraw from the Paris Climate Agreement, Governor Edmund G. Brown Jr. issued the following statement …:
>
> > "Donald Trump has absolutely chosen the wrong course. He's wrong on the facts. America's economy is boosted by following the Paris Agreement.  He's wrong on the science. Totally wrong.  California will resist this misguided and insane course of action.  Trump is AWOL but California is

1    on the field, ready for battle."

2    Building on the global momentum to combat climate change and continuing
      California's leading role in broadening collaboration amongst subnational
3    leaders, Governor Brown will travel to China tomorrow to strengthen
      California's long-standing climate, clean energy and economic ties with the
4    nation.

5    *States React to Trump's Decision to Abandon Paris Climate Agreement*, GEORGETOWN

6    CLIMATE CENTER (June 1, 2017), https://www.georgetownclimate.org/articles/states-react-

7    to-trump-s-decision-to-abandon-paris-climate-agreement.html (2d. Iacangelo Decl., Exh.

8    35) (SUF ¶ 102).  Under the binding precedent of the Supreme Court of the United States,

9    this direct challenge cannot be discounted as mere political rhetoric.  For California's

10   conduct

11   compromise[s] the very capacity of the President to speak for the Nation with
      one voice in dealing with other governments.  We need not get into any
12   general consideration of limits of state action affecting foreign affairs to
      realize that the President's maximum power to persuade rests on his capacity
13   to bargain for the benefits of access to the entire national economy without
      exception for enclaves fenced off willy-nilly by inconsistent political tactics.
14

15   *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000).

16       More importantly, California's statements are not mere bombast.  California and its

17   leaders have been actively meeting with foreign leaders.  They are actively implementing

18   international agreements.  And these ***affirmative acts*** on the field of international relations

19   conflict with and undermine United States foreign policy.  That includes California's

20   Agreement and Arrangements[1] with the province of Quebec—which California seeks to

21   expand to bring in other foreign governments.  These formal agreements and related legal

22   acts are all preempted under the Foreign Affairs Doctrine.

23

24   _____

25   [1] The United States refers to California's and Quebec's "Agreement on the Harmonization
      and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions" as
      the "Agreement."  The Agreement, as renegotiated in 2017, is available at https://ww3.arb.
26   ca.gov/cc/capandtrade/linkage/2017_linkage_agreement_ca-qc-on.pdf (last visited April 20
      2019) (SUF ¶ 45). We refer collectively to the Agreement, together with its preparatory and
27   implementing activities, starting with the Global Warming Solutions Act of 2006 ("AB
      32"), as the "Agreement and Arrangements."
28

*First*, there is a "clear conflict between the policies adopted by" California and the United States' decision to withdraw from the Paris Agreement. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003). The President wishes to obtain a better deal in the international arena. The President is concerned with American workers and the economy of the nation as a whole. But California is undercutting the President's decision and leverage. Through the Agreement and Arrangements, Quebec (and Canada) can purchase the right to claim greenhouse gas emission reductions of California (and thus of the United States). Under the Paris Agreement, Canada can then take credit for these same reductions of the United States as reductions of its own. California's side deal with Quebec thus undercuts and circumvents the President's withdrawal from the Paris Agreement. It prejudices the President's ability to find allies for an agreement representing a better bargain for the nation as a whole, should he desire to pursue that approach in light of all international relations factors that may inform his discretion.

*Second*, California's international relations—including the Agreement and Arrangements—intrude on the field of foreign affairs outside "the backdrop of traditional state legislative subject matter." *Garamendi*, 539 U.S. at 425. Thus, even "[i]f any doubt about the clarity of the conflict remained," they are still preempted. *Id.* For California has admitted that "Climate change is a global problem. *GHGs are global pollutants, unlike criteria air pollutants and toxic air contaminants, which are pollutants of regional and local concern.*" *Final Environmental Analysis for the Strategy for Achieving California's 2030 Greenhouse Gas Target,* CALIFORNIA AIR RESOURCES BOARD Attach. A at 24–25 (Nov. 30, 2017), https://ww3.arb.ca.gov/cc/scopingplan/2030sp_appf_finalea.pdf (emphasis added) (SUF ¶¶ 25-27). And California's leaders have admitted that it is pursuing these policies and international relations out of a desire to situate itself in a position of "global leadership." CAL. HEALTH & SAFETY CODE § 38501(e) (SUF ¶ 104). Even in situations where a state policy intruding into the realm of international relations is motivated by the same aims as federal policy, the Supreme Court has said that reviewing courts "could

1    not give the State the benefit of any doubt in resolving the conflict with national policy."

2    *Garamendi*, 539 U.S. at 427 (acknowledging this where the United States and the State of

3    California were both motivated to assist Holocaust survivors).

4        The Constitution does not tolerate this kind of conflict, whether California might

5    characterize it as a difference in kind or only in degree.  "The basic fact is that California

6    seeks to use an iron fist where the President has consistently chosen kid gloves."  *Id.* There

7    must be one voice for the United States in international relations on greenhouse gas

8    emissions and agreements.  California's Agreement and Arrangements do conflict with the

9    foreign policy of the United States.  But even if they did not, California is facially intruding

10    into a field the federal government occupies through multiple federal statutes, as well as a

11    treaty, the United Nations Framework Convention on Climate Change.  The United States

12    respectfully requests that the Court grant summary judgment.[2]

13                            **BACKGROUND**

14        **A.    The United States' Foreign Policy**

15        The federal government has long been active in the area of world climate policy.

16    Congress first addressed the United States' foreign policy in this area in the Global Climate

17    Protection Act of 1987 ("Act" or "GCPA").  In the GCPA, Congress indicated four goals

18    that the United States' policy should seek to achieve.  ***First***, the United States should

19    "increase worldwide understanding of the greenhouse effect."  ***Second***, the United States

20    should "foster cooperation among nations to develop more extensive and coordinated

21    scientific research efforts with respect to the greenhouse effect."  ***Third***, the United States

22    should "identify technologies and activities to limit mankind's adverse effect on the global

23    _____

24    [2] As the Court is aware, the United States at one point contemplated asking for leave to file
      a Second Amended Complaint.  *See* ECF No. 99.  Plaintiff ultimately determined that it was

25    not necessary to do so.  The United States has also determined that the fourth claim in its
      Amended Complaint, the Foreign Commerce Clause claim, largely overlaps with its Foreign

26    Affairs Doctrine claim.  As shown in this brief, the commercial effects of the Agreement
      and Arrangements are inseparable from how these same devices conflict with and intrude

27    upon the United States' foreign policy.  Accordingly, the United States asks this Court to
      dismiss its Foreign Commerce Clause claim under Federal Rule of Civil Procedure 41(a)(2).

28

1  climate." And **fourth**, the United States should "work toward multilateral agreements." *Id.*

2  (SUF ¶ 73).

3     In the GCPA, Congress expressly assigned responsibility for the United States'

4  domestic and foreign policies on climate change. The Act assigns to President and the

5  Environmental Protection Agency ("EPA") responsibility to devise a "coordinated national

6  policy on global climate change." *Id.* (SUF ¶ 74). In that way, Congress caused the federal

7  government to occupy the field of foreign relations on this subject matter. The GCPA also

8  allocates responsibility for coordination of climate change policy "in the international

9  arena" to the President and the Secretary of State, when that policy requires "action through

10  the channels of multilateral diplomacy." *Id.* (SUF ¶ 75).

11     In 1992, consistent with Congress' direction in the GCPA, President George H.W.

12  Bush ratified, by and with the advice and consent of the Senate, the United Nations

13  Framework Convention on Climate Change ("UNFCCC"). The UNFCCC has as its

14  "ultimate objective . . . [the] stabilization of greenhouse gas concentrations in the

15  atmosphere at a level that would prevent dangerous anthropogenic interference with the

16  climate system." Mar. 21, 1994, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107, Art. 2.

17  Under the UNFCCC, "[a]ll Parties," including the United States, agreed to:

18  
19     (b) [f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate
20     climate change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases not controlled by the Montreal
21     Protocol, and measures to facilitate adequate adaptation to climate change [and]

22     (c) [p]romote and cooperate in the development, application and diffusion,
23     including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of greenhouse gases not
24     controlled by the Montreal Protocol in all relevant sectors . . . .

25  *Id.*, Art. 4.1(b), (c) (SUF ¶ 76) (paragraph break added). It further states that "[e]ach of the

26  Parties [i.e., the government of the United States] shall … coordinate as appropriate with

27  other such Parties, relevant economic and administrative instruments developed to achieve

28

1    the objective of the Convention." *Id.*, Art. 2(e) (SUF ¶ 78).  Being ratified by the President,

2    by and with the advice and consent of the Senate, the UNFCCC is the law of the land,

3    endorsed by both political branches.  *See* U.S. CONST., Art. II, § 2, cl. [2]; Art. VI, § 2, cl

4    [2].

5         Notwithstanding its broad goals, the UNFCCC does not commit its Parties to

6    specific programs for emissions reductions or limits.  Instead, as a "framework" agreement,

7    the UNFCCC sets out general obligations related to climate policy.  It also establishes a

8    Conference of the Parties and subsidiary bodies to enhance exchange among Parties and to

9    facilitate decisions to promote the implementation of the Convention.  Finally, it sets forth

10   procedures through which the Parties may later negotiate and bind themselves to future

11   multilateral agreements or protocols to the Convention in the field of climate change and

12   greenhouse gas mitigation.  UNFCCC, Arts. 7, 17 (SUF ¶ 77).  The UNFCCC is thus the

13   primary structural vehicle for the United States to engage with other nations in ongoing

14   international debate and diplomacy related to this field.  Since 1992, the UNFCCC process

15   has led to the development of two major multilateral agreements: the Kyoto Protocol and

16   the Paris Agreement.

17        The Kyoto Protocol called for mandatory reductions in greenhouse gas emissions of

18   developed nations.  *See* Kyoto Protocol to the UNFCCC, Dec. 11, 1997, 2303 U.N.T.S. 148

19   (3d. Iacangelo Decl., Exh. 1).  Under the Kyoto Protocol, developing nations, including

20   major greenhouse gas emitters like China and India, were exempt from the mandatory

21   emissions limits.  (SUF ¶ 79).  Before the Kyoto Protocol negotiations, the Senate resolved

22   by a vote of 95–0 to urge the President to oppose binding commitments that would harm the

23   economy or relieve developing nations from bearing their fair share of emissions reductions

24   as compared to those borne by developed nations like the United States.  S. Res. 98, 105th

25   Cong. (1997) (SUF ¶ 81).  The Kyoto Protocol violated both of the Senate's conditions.

26   Thus, although President Clinton signed the Kyoto Protocol, the Protocol itself was not

27   presented to the Senate for its advice and consent as an Article II treaty. (SUF ¶ 81).  In

28

response to President Clinton's endorsement of the Kyoto Protocol, Congress used subsequent appropriations bills to bar the use of any funds to implement it. *See* Pub. L. No. 105–276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106–74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106–377, 114 Stat. 1441, 1441A–41 (2000) (SUF ¶ 82).

In the next administration, President George W. Bush adopted a foreign policy consistent with the Senate's negative view of taking on commitments on greenhouse gas reductions absent comparable commitments from other major economies. For example, in 2001, President Bush wrote to the Senate to express his opposition to the Kyoto Protocol: "I oppose the Kyoto Protocol." Letter from President George W. Bush to U.S. Senators Hagel, Helms, Craig, & Roberts, (March 13, 2001) (3d. Iacangelo Decl., Exh. 2) (SUF ¶¶ 83-85).[3] The President explained that "it exempts 80 percent of the world, including major population centers such as China and India, from compliance, and would cause serious harm to the U.S. economy." *Id.* (SUF ¶ 83).

In December 2015, the 21st Conference of the Parties to the UNFCCC concluded with the adoption of the Paris Agreement. Various UNFCCC Parties, including the United States, signed the Agreement in April 2016. Paris Agreement, Nov. 4, 2016, T.I.A.S. No. 16-1104 (1st. Iacangelo Decl., Exh. 3) (SUF ¶ 5). Under the Paris Agreement, Parties are required to prepare and communicate "nationally determined contributions" that describe plans or targets related to the reduction of greenhouse gas emissions. *Id.* Art. 4.2 (SUF ¶ 6). They are also to periodically report on their progress on such contributions. *See id.* Art. 13.7 (SUF ¶ 6). President Obama entered into the Paris Agreement as a unilateral executive agreement rather than as an Article II treaty. He did not seek the advice and consent of the Senate.

---

[3] The Bush Administration also "emphasize[d] international cooperation and promote[d] working with other nations to develop an efficient and coordinated response to global climate change," which the EPA described as a "prudent . . . realistic and effective long-term approach to the global climate change issue." Control of Emissions from New Highway Vehicles and Engines, 68 Fed. Reg. 52,922, 52,933 (Sept. 8, 2003) (SUF ¶ 84).

Like the UNFCCC, the Paris Agreement does not mandate that individual Parties take any particular approach to climate mitigation. Instead, Parties undertake to adopt approaches of their own design. The goal of Paris is to hold the rise of global average temperatures to "well below" 2 degrees Celsius, and to "pursu[e] efforts" to limit the increase to 1.5 degrees Celsius. *Id.* Art. 2.1(a) (SUF ¶ 86). The primary mechanism the Paris Agreement uses to achieve this goal is through the development by each Party of nationally determined contributions ("NDCs").[4] These contain planned actions or targets to reduce emissions. The Agreement's premise is that the increase in global temperature is driven by greenhouse gas emissions. So a key metric of an NDC is a country's commitment to lowering its own emissions to a certain level, much like a "cap" in a cap-and-trade regulatory scheme.

Article 4 of the Paris Agreement describes a multitude of requirements and permissive guidelines applicable to NDCs. Another objective of the Paris Agreement is to "mak[e] finance flows consistent with a pathway towards low greenhouse gas emissions and climate-resilient development." *Id.* Art 2.1(c) (SUF ¶ 88). One avenue through which Parties can cooperate towards the achievement of their NDCs is through the use of internationally transferred mitigation outcomes ("ITMOs") (SUF ¶ 89). ITMOs operate much like emissions credits in a cap-and-trade scheme. Under the Paris Agreement, Parties may acquire ITMOs from other parties to achieve their NDC commitments. With the help of ITMOs, an acquiring Party need not actually reduce—and may even increase—greenhouse gas emissions within its borders. ITMOs allow one country to take credit for the greenhouse gas emission reductions of a second country—or to pay a second country not to produce such emissions. The Paris Agreement's ITMO provisions thus incentivize

---

[4] "Nationally determined contributions" might seem like somewhat confusing terminology. One group of legal commenters closely following developments in Paris implementation prefer the term "national climate action plans," which is much less opaque. *See* Steven P. Finizio, *et al.,* "Climate Negotiations on New Global Carbon Market Postponed Until 2021 (Apr. 17, 2020), *available at* https://www.wilmerhale.com/en/insights/client-alerts/20200417-climate-negotiations-on-new-global-carbon-market-postponed-until-2021.

the international trade of emissions credits generated by various domestic greenhouse gas reduction programs. And they allow some Parties to achieve their NDC commitments under the Paris Agreement without necessarily reducing such emissions domestically.

On March 28, 2017, in Executive Order 13,783, President Trump set forth the United States' position that it would seek to reconcile the nation's environmental, economic, and strategic concerns, both domestically and at the international level, by applying the best practices for comparing the costs and benefits of proposed policies. Under this approach, the discipline of cost-benefit analysis, including adjusting for the time value of economic flows, is deployed to formulate current U.S. policy. In that order, consistent with such a rigorous consideration of costs and benefits, the President announced that:

> Effective immediately, when monetizing the value of changes in greenhouse gas emissions resulting from regulations, ***including with respect to the consideration of domestic versus international impacts*** and the consideration of appropriate discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis), which was issued after peer review and public comment and has been widely accepted for more than a decade as embodying the best practices for conducting regulatory cost-benefit analysis.

Promoting Energy Independence and Economic Growth, Exec. Order No. 13,783, §5(c), 82 Fed. Reg. 16093, 16096 (Mar. 28, 2017) (emphasis added) (1st. Iacangelo Decl., Exh. 4) (SUF ¶ 7).

Thereafter, President Trump announced the foreign policy of his Administration regarding the Paris Accord and other agreements to address greenhouse gas emissions:

> [T]he United States will withdraw from the Paris Climate Accord … but begin negotiations to reenter either the Paris Accord or a really entirely new transaction on terms that are fair to the United States, its businesses, its workers, its people, its taxpayers. So we're getting out. But we will start to negotiate, and we will see if we can make a deal that's fair.

(SUF ¶ 93). The President's stated reasons were many. They included that the Paris Agreement:

- "could cost America as much as 2.7 million lost jobs by 2025,"
- "punishes the United States . . . while imposing no meaningful obligations

on the world's leading polluters,"

- "[allows] China . . . to increase these emissions [for] a staggering number of years — 13,"

- "makes [India's] participation contingent on receiving billions and billions and billions of dollars in foreign aid from developed countries," and

- "disadvantages the United States to the exclusive benefit of other countries, leaving American workers … and taxpayers to absorb the cost in terms of lost jobs, lower wages, shuttered factories, and vastly diminished economic production . . . ."

Statement by President Trump on the Paris Climate Accord, Jun. 1, 2017, ("Statement on Paris Accord") https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (1st. Iacangelo Decl., Exh. 5) (SUF ¶ 9).  For these reasons, among others, President Trump declared the United States would "negotiate a new deal that protects our country and its taxpayers."  *Id.* (SUF ¶ 10).

Similarly, in Mr. Pompeo's confirmation hearing to be Secretary of State, the then-Director of the Central Intelligence Agency informed the Senate Committee on Foreign Relations that he "share[d] the President's position precisely, which is that the Paris Agreement put an undue burden on the United States of America and that we should work to find a place where that is not the case.  And when that moment arrives, we will be part of that discussion and reenter that agreement. . . . [I] believe I am speaking for the administration's view."  *Nomination of Hon. Mike Pompeo to be Secretary of State Before the S. Comm. On Foreign Relations*, 115th Cong., S. Hrng. 115-339 at 25 (2018) (3d. Iacangelo Decl., Exh. 4).  In response to Questions for Record, Mr. Pompeo also noted that "[t]he President has made clear that he does not want to commit the United States to a set of actions, policies, and measures that produce burdens specific to the United States that other countries do not face." *Id.* at 216.

On November 4, 2019, the United States formally submitted its notification of withdrawal from the Paris Agreement.  In announcing the United States' withdrawal, Secretary of State Michael Pompeo articulated the United States' new approach to

international climate policy:

> As noted in his June 1, 2017 remarks, President Trump made the decision to withdraw from the Paris Agreement because of the unfair economic burden imposed on American workers, businesses, and taxpayers by U.S. pledges made under the Agreement.****
>
> The U.S. approach incorporates the reality of the global energy mix and uses all energy sources and technologies cleanly and efficiently, including fossil fuels, nuclear energy, and renewable energy. In international climate discussions, we will continue to offer a realistic and pragmatic model – backed by a record of real world results – showing innovation and open markets lead to greater prosperity, fewer emissions, and more secure sources of energy. We will continue to work with our global partners to enhance resilience to the impacts of climate change and prepare for and respond to natural disasters. Just as we have in the past, the United States will continue to research, innovate, and grow our economy while reducing emissions and extending a helping hand to our friends and partners around the globe.

Press Statement from Secretary of State Michael R. Pompeo, "On the U.S. Withdrawal from the Paris Agreement," Nov. 4, 2019, https://www.state.gov/on-the-u-s-withdrawal-from-the-paris-agreement/ (1st. Iacangelo Decl., Exh. 7) (SUF ¶ 12). In accordance with the terms of the Paris Agreement, the United States' withdrawal will become effective on November 4, 2020. (SUF ¶ 98).

As the Secretary of State said in 2018, federal foreign policy, as expressed by the President, is to not "commit the United States to *a set of actions, policies, and measures that produce burdens specific to the United States that other countries do not face*." *Nomination of Hon. Mike Pompeo to be Secretary of State Before the S. Comm. On Foreign Relations*, 115th Cong., S. Hrng. 115-339 at 216 (2018) (3d. Iacangelo Decl., Exh. 4) (SUF ¶ 101) (emphasis added). The Executive Branch determined this to be one of the key problems with the Paris Agreement. For example, under the agreement China could "increase emissions [for] a staggering number of years — 13 [during which] China will be allowed to build hundreds of additional coal plants." Statement on the Accord; *see also* Paris Agreement, Art 4.4 ("Developed country Parties should . . . undertak[e] economy-wide absolute emission reduction targets. Developing country Parties should continue enhancing their mitigation efforts, and are encouraged to more over time towards economy-

1    wide emission reduction or limitation targets . . . .") (SUF ¶ 92).  The President has made

2    clear that the Paris Agreement is flawed in this regard, and that no future deal should include

3    such faults.  Both the federal legislative and executive branches have long recognized that

4    the United States, as a developed nation, would suffer great economic harm if it were to

5    unilaterally reduce economic activity while China and India were left to increase (or even

6    simply not similarly reduce) their greenhouse gas emissions as they saw fit.[5]  *See* S. Res.

7    98, 105th Cong. (SUF ¶81).

8         Similarly, under the Paris Agreement, "developing nations" are excused, unlike the

9    United States, from contributing to a "Green Fund."   (SUF ¶ 91).   As the President

10   explained, "the world's top polluters have no affirmative obligations" to bankroll this fund.

11   Statement on Paris Accord (SUF ¶ 94).  Thus, developed nations pay the concentrated costs

12   for climate-resilient projects, enjoy only a slice of the dispersed and purported benefits from

13   those projects, yet developing nations make no similar commitment.    California's

14   contemplated "REDD plans" raise a similar problem.  California—a state of the United

15   States, part of a developed nation (or, in Governor Schwarzenegger's conception, its own

16   "nation state")—is currently taking steps to implement linkages between its own emissions

17   program and initiatives in developing countries to protect tropical forests.  *See, e.g.*, CAL.

18   CODE REGS. ("CCR") 17 § 95993 (providing that credits "may be generated from . . .

19   Reducing Emissions from Deforestation and Forest Degradation (REDD) Plans").  These

20   linkages would result in California companies paying millions to foreign jurisdictions to

21   create "sinks" to absorb greenhouse gases.  (SUF ¶ 44).  This bears a close resemblance to

22   the dynamics of the Green Fund, which is part of the reason the President chose to withdraw

23   the United States from the Paris Agreement.

24

25   _____

26   [5] In addition to the Senate's 95-0 vote, Congress as a whole effectively prohibited the Kyoto
     Protocol from becoming this nation's foreign policy by denying, via several statutes, the
     Clinton Administration the financial means to implement it.  *See* Pub. L. No. 105–276, 112

27   Stat. 2461, 2496 (1998); Pub. L. No. 106–74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106–
     377, 114 Stat. 1141, 1441A–41 (2000) (SUF ¶ 82).

28

**B.    California's Foreign Policy**

Notwithstanding the Constitution, and notwithstanding the federal government's many initiatives in this area, California seeks to chart its own foreign climate policy. The United States described the vastness of this effort in its reply in support of its previous motion for summary judgment and incorporates that evidence here.[6] This process began as early as 2006, with the enactment of AB 32. (SUF ¶ 23). In AB 32, the legislature of California called upon the state to "facilitate the development of integrated and cost-effective regional, national, ***and international*** greenhouse gas reduction programs." CAL. HEALTH & SAFETY CODE § 38564 (emphasis added). Later in 2006, Governor Schwarzenegger ordered Defendant California Air Resources Board ("CARB") to "collaborate with the Secretary for Environmental Protection [the position now held by Defendant Jared Blumenfeld] and the Climate Action Team to develop a comprehensive market-based compliance program with the goal of creating a program that permits trading ***with the European Union***, the Regional Greenhouse Gas Initiative and other jurisdictions." Cal. Exec. Order No. S-20-06 (Oct. 18, 2006) (emphasis added) (SUF ¶ 105). Five years afterwards, in 2011, CARB adopted regulations that explicitly contemplate that "compliance instrument[s] issued by an ***external greenhouse gas emissions trading system*** . . . may be used to meet" the state's regulatory requirements. CCR 17 § 95940 (2011) (emphasis added) (SUF ¶ 43). Also in 2011, CARB adopted regulations—the "Tropical Forest Standard"—to facilitate links between California's emissions program and initiatives in developing countries to protect tropical forests. *See*, *e.g.*, *id.* § 95993 (providing that credits "may be generated from . . . Reducing Emissions from Deforestation and Forest

---

[6] *See* ECF No. 78 at 3-4. The United States hereby incorporates by reference its Statement of Undisputed Facts in support of its first motion for summary judgment, ECF No. 12-1, as well as its Concordance of the Statements of Undisputed Fact in support of that same motion, ECF No. 78-1. To the extent the United States relies on new undisputed facts, the second Statement of Undisputed Facts filed with these papers supplements the existing record before the Court.

1  Degradation (REDD) Plans") (SUF ¶ 44)[7]

2        In addition, California itself acknowledges that the state is a party to seventy-two

3  active bilateral and multilateral "agreements" with national and subnational foreign and

4  domestic governments relating to environmental policy alone.  *See Climate Change*

5  *Partnerships – Working Across Agencies and Beyond Borders,* CALIFORNIA ENERGY

6  COMMISSION,  https://www.energy.ca.gov/about/campaigns/international-cooperation/clim

7  ate-change-partnerships (amalgamating agreements) ("Climate Change Partnerships")

8  (SUF ¶ 16).  California states that the purpose of these agreements is "to strengthen the

9  global response to the threat of climate change and to promote a healthy and prosperous

10  future for all citizens."  *Id.*

11        Finally, part of Defendant WCI, Inc.'s mission is to accommodate an expansion of

12  California's Agreement and Arrangements with Quebec to include additional foreign

13  jurisdictions.  Although it has only two fully active participants now, WCI's declared

14  purpose is "to provide technical and scientific advisory services to States of the United

15  States and ***Provinces*** and ***Territories*** of Canada in the development and collaborative

16  implementation of their respective greenhouse gas emissions trading programs."  Certificate

17  of Incorporation of Western Climate Initiative, Inc., § 3 (emphasis added) (2d. Iacangelo

18  Decl., Exh. 55).  Similarly, in its 2018 Tax Return, WCI observes that "[c]urrently, the

19  Board of Directors includes officials from the Provinces of Quebec, Nov[a] Scotia and the

20  State of California. ***The support provided can be expanded to other jurisdictions that join***

21  ***in the future.***" (emphasis added) (2d. Iacangelo Decl., Exh. 41).

22

23  _____

24  [7] Although CARB has yet to formally link with a REDD plan, Defendant CARB noted in a
   2015 Staff Report that "California has signed several non-binding Memoranda of
25  Understanding (MOU) related to REDD with other subnational jurisdictions, including
   separate MOUs between California, Illinois, and Wisconsin of the United States on the one
26  hand, and the Indonesian States of Aceh and Papua, and the Brazilian States of Acre,
   Amapá, Mato Grosso, and Pará on the other."  *Scoping Next Steps for Evaluating the*
27  *Potential Role of Sector-Based Offset Credits Under the California Cap-and-Trade*
   *Program, Including from Jurisdictional "Reducing Emissions from Deforestation and*
27  *Forest Degradation" Programs,* CARB 17 (2015), https://bit.ly/3cKPuGT.

28

### C.    Procedural History

The United States filed its Complaint on October 23, 2019, ECF No. 1, and an Amended Complaint on November 19, 2019, ECF No. 7. Each of these complaints stated four causes of action. They are predicated upon the Article I Treaty Clause, the Compact Clause, the Foreign Affairs Doctrine, and the Dormant Foreign Commerce Clause, respectively.

On December 11, 2019, the United States moved for summary judgment only on its first two causes of action: the Article I Treaty Clause and the Compact Clause. ECF No. 12. At the time, the United States stated that it saw its remaining two causes of action as "equally dispositive and likewise sufficient to justify the relief requested." *Id.* at 12.

On February 10, 2020, the State Defendants filed a cross-motion for summary judgment on the Article I Treaty and Compact Clause Claims, ECF No. 50, which was joined by the WCI, Inc. Defendants who had not been dismissed from the case, ECF No. 46. On March 12, 2020, the Court denied the United States' motion for summary judgment and granted Defendants' cross-motion for summary judgment on these claims. ECF. No. 91.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Here, as elaborated below, there is no genuine dispute as to any material fact regarding California's Agreement and Arrangements or the United States' foreign policy. The conflict between them is clear, and the United States is entitled as a matter of law to judgment declaring that the international aspects of the Agreement and Arrangements are preempted

under the Foreign Affairs Doctrine.

## ARGUMENT

The foreign policy of the United States preempts California's Agreement and Arrangements with Quebec. In the context of the Foreign Affairs Doctrine, state law can be preempted by federal law or policy in two ways: by conflict preemption or by field preemption. *See Movsesian III*, 670 F.3d at 1071. As the Ninth Circuit noted in *Movsesian III*, "[u]nder conflict preemption, a state law must yield when it conflicts with an express federal foreign policy." *Id.* (citing *Garamendi*, 539 U.S. at 421; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (*Von Saher I*)). Yet "even in the absence of any express federal policy, a state law still may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign affairs without addressing a traditional state responsibility. This concept is known as field preemption or 'dormant foreign affairs preemption.'" *Movsesian III,* 670 F.3d at 1072 (quoting *Deutsch v. Turner Corp.*, 324 F.3d 692, 709 n.6 (9th Cir. 2003)). Thus, if the United States can establish *either*: (1) that the Agreement and Arrangements "conflict[] with an express federal foreign policy," *id.*; *or* (2) that the Agreement and Arrangements "intrude[] on the field of foreign affairs without addressing a traditional state responsibility," *id.* at 1072, then it is entitled to summary judgment. The United States can do both.

This Court should take note of the extensiveness of California's foreign policy in the area of climate change. As the Ninth Circuit has emphasized, devices like the Agreement and Arrangements must be assessed in light of the totality of their history, and not in isolation. *See Von Saher I*, 592 F.3d at 965–84 (examining the totality of evidence to conclude that California law extended beyond areas of traditional state competence into foreign affairs); *Movsesian III*, 670 F.3d at 1076–77 (same). When seen in light of California's many international initiatives over the last fourteen years, the role of the Agreement and Arrangements in California's foreign policy is unmistakable.

1  **I.  The Agreement and Arrangements conflict with and stand as an obstacle to the**

2  **express foreign policy of the United States.**

3          There are two forms of conflict preemption under the Foreign Affairs Doctrine.

4  Each has its own test.  If either test is satisfied, the law is preempted.

5          ***First***, federal foreign policy preempts state law "where . . . there is evidence of clear

6  conflict between the policies adopted by the two."  *Garamendi*, 539 U.S. at 421.  But

7  because foreign affairs is the "exclusive responsibility" of the federal government, *Hines*,

8  312 U.S. at 63—as compared to the domestic sphere, where federal and state authority is

9  shared through federalism—the threshold for establishing such a conflict is low.  As the

10  Ninth Circuit observed in *Von Saher II*, the mere "'***likelihood*** that state legislation will

11  produce ***something more than incidental effect*** in conflict with express foreign policy'"

12  requires preemption.  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d

13  712, 720 (9th Cir. 2014) (*Von Saher II*) (quoting *Garamendi*, 539 U.S at 420) (emphasis

14  added).

15          ***Second***, even absent the likelihood of a more than incidental effect as described

16  above, state law is preempted "'where under the circumstances of [a] particular case, [the

17  challenged state law] ***stands as an obstacle*** to the accomplishment and execution of the full

18  purposes and objectives of' federal policy."  *Von Saher II*, 754 F.3d at 720 (quoting *Crosby*,

19  530 U.S. at 373 (2000) (emphasis added; brackets original)).

20          Importantly, a wide variety of federal actions can reflect a foreign policy that triggers

21  foreign affairs preemption.  *See Von Saher I*, 592 F.3d at 960.  For example, federal policy

22  can be enshrined in a treaty, such as the UNFCCC.  *Id.*  Or it can be set by a statute, such as

23  the GCPA.  *Id.*  And it can even be the actions and agreements of the President, either using

24  his Article II powers in foreign affairs that do not require Congressional imprimatur or by

25  acting under authority delegated to him by Congress.  *See*, *e.g.*, *United States v. Belmont*,

26  301 U.S. 324, 330-31 (1937); *United States v. Pink*, 315 U.S. 203, 229 (1942); *Garamendi*,

27  539 U.S. at 421 (relying on "the consistent Presidential foreign policy . . . to encourage

28

European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions"). Moreover, the triggering treaty, statute, or executive action need not itself state an exact 'foreign policy' that the state law conflicts with. Instead, it is enough if the Constitution, treaty, or statute authorizes the President to act on behalf of the nation, and the President takes a formal position that state action disturbs. *See Crosby*, 530 U.S. at 381.

Thus, a triggering "foreign policy" for preemption can be a formal position that the President and other senior federal officials have undertaken in their area of responsibility, even in the absence of statutory authority. *See Von Saher I*, 592 F.3d at 960 ("federal action" can simply be an "express executive branch policy"). In *Garamendi*, for example, the Supreme Court applied the Foreign Affairs Doctrine even though the President was "acting without express congressional authority." 539 U.S. at 424 n.14. This is because "the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues." *Id.* (citing *Crosby*, 530 U.S. at 381); *see also Pink*, 315 U.S. at 229. And this authority extends beyond the President to senior executive officials, whom courts presume to act on behalf of the President. *See Garamendi*, 539 U.S. at 421; *Von Saher II*, 754 F.3d at 724–25 (taking into account the brief of the Solicitor General). As the Supreme Court observed in *Crosby*, "the nuances of the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court." 530 U.S. at 386 (internal citations and quotations omitted). The foregoing principles, as applied to the facts of this case, establish that California's Agreement and Arrangements with Quebec demonstrably conflict with express federal foreign policy—but, at a minimum, are an obstacle to the present policy.

//

//

//

//

**A. The Agreement and Arrangements clearly conflict with the U.S. policy not to participate in the Paris Agreement so as to seek a better deal.**

As the Supreme Court observed in *Garamendi*, federal foreign policy preempts state law "where there is evidence of clear conflict between the policies adopted by the two." 539 U.S. at 421. But the threshold for application of this aspect of the Foreign Affairs Doctrine is low, to protect the Executive Branch's scope of discretion. As the Ninth Circuit noted in *Von Saher II*, the mere "'***likelihood*** that state legislation will produce something more than ***incidental*** effect in conflict with express foreign policy … require[s] preemption of the state law.'" 754 F.3d at 720 (quoting *Garamendi*, 539 U.S at 420) (emphasis added).

The Agreement and Arrangements present a "clear conflict" with the United States' foreign policy in two respects. ***First***, they are inconsistent with the President's withdrawal of the United States from the Paris Agreement, which is precisely why California railed against this presidential decision to all the world. California's international emissions trading regime is a back door to the Paris Agreement because it facilitates Canada's participation in that agreement and because it could, and indeed is designed to, further spawn to embrace the participation of many other foreign jurisdictions. It also advances cross-border emissions mitigation strategies that the United States has rejected. ***Second***, the Agreement and Arrangements undermine the federal government's ability to develop a new international mitigation arrangement. This U.S. subnational, state-level "side deal" diminishes the incentive of various nations to come to the table to negotiate a more favorable agreement with the singular federal government.

Because California's Agreement and Arrangements with Quebec facilitate Canada's participation in the Paris Agreement, they are in clear conflict with the President's lawful decision to withdraw the United States from that agreement. The Agreement and Arrangements are therefore preempted.

The Constitution vests substantial authority over foreign relations in the President. As the Supreme Court recognized in *First National City Bank v. Banco Nacional de Cuba*,

"[t]he President has "the lead role … in foreign policy."  406 U.S. 759, 767 (1972).  *See also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (the President has "unique responsibility" for the conduct of "foreign and military affairs").  In addition, the GCPA and UNFCCC grant the President and Secretary of State expansive authority to represent the United States with respect to foreign policy in the field of greenhouse gas emissions and climate change.  To this end, the President declared that

> the United States will *cease all implementation of the non-binding Paris Accord and the draconian financial and economic burdens [of] the agreement* . . . . This includes *ending the implementation of the nationally determined contribution* and, very importantly, *the Green Climate Fund* which is costing the United States a vast fortune.

Statement on Paris Accord (SUF ¶ 94).[8]

In *Garamendi*, the Supreme Court held that California could not insist on an "iron fist" approach to Holocaust-era insurance claims where the federal government had chosen instead to use "kid gloves."  539 U.S. at 427.  Similarly, here, California is not free to act in a way that facilitates the very agreement the President has chosen to withdraw the United States from.  In other words, President Trump is free to select a more-calibrated approach that weighs avoiding harm to the United States economy more heavily than California prefers.

California facilitates Canada's participation in the Paris Agreement by reducing Canada's cost of complying with that agreement.  Specifically, Article 6 of the Paris Agreement—to which Canada is a party—contemplates exchanges between nations to achieve their "nationally determined contributions" or "NDCs."  *See* Art 6.1–2.  *See also* ECF No. 78 at 22-23.  In particular, Article 6 contemplates the use of emissions credit trading schemes, using linkages through which "internationally transferred mitigation

---

[8] Likewise, as the Secretary of State said in 2018, the President does not want to "commit the United States to a set of actions, policies, and measures that produce burdens specific to the United States that other countries do not face."  *Nomination of Hon. Mike Pompeo to be Secretary of State Before the S. Comm. On Foreign Relations*, 115th Cong., S. Hrng. 115-339 at 216 (2018).

outcomes" or "ITMOs" would flow.  *See* Paris Agreement, Art. 6.2.  These are functionally the same device as the net flow of emissions reductions transferred through compliance allowances in the integrated carbon market that California and Quebec have created under the auspices of Defendant WCI, Inc..

Canada is cognizant of Quebec's agreement with California and the allowances that brings.  In fact, Canada has expressed interest in using California to meet that country's commitments in the Paris Agreement.  In a 2016 report to the UNFCCC, Canada articulated a long-term strategy to meet its NDC obligations under the Paris Agreement.  Canada cited California's Agreement and Arrangements as an example of a subnational cap-and-trade regime that would meet Canada's need for ITMOs—and thus be a mechanism by which Canada can meet is Paris Agreement NDCs.  *Canada's Mid-Century, Long-Term, Low-Greenhouse Gas Development Strategy,* GOVERNMENT OF CANADA 11 (2016), https://unfccc.int/files/focus/long-term_strategies/application/pdf/canadas_mid-century_long-term_strategy.pdf ("For example, the province of Quebec has linked its emission trading system to California's through the Western Climate Initiative, **with other subnational regions planning or considering doing the same**.") (3d. Iacangelo Decl., Exh. 6) (SUF ¶¶ 107-08).  Canada explained that it would "consider internationally transferred mitigation outcomes as a short-to-medium term complement to reducing emissions at home." *Id.*

In other words, Canada joined with foreign nations in the Paris Agreement.  It continues to be a partner in an international regime to reduce greenhouse gas emissions that the United States has rejected and exited as unfair and insufficient.  But to nevertheless avoid physically reducing greenhouse gas emissions within its actual borders more than it might otherwise, Canada has stated that it "intends to take into account internationally transferred mitigation outcomes arising from **cross-border subnational emission trading** as part of its international contribution to addressing climate change." *Id.* (SUF ¶ 109).  So by means of the Agreement and arrangements with Quebec, California is selling greenhouse

gas emissions **of the United States** that Canada can use to support its commitments under the Paris Agreement. This is in "clear conflict" with—and has much more than an "incidental effect" upon—the President's announced federal policy. *Garamendi*, 539 U.S. at 421; *Von Saher II*, 754 F.3d at 720 (quoting *Garamendi*, 539 U.S. at 420). California's actions undercut the United States' ability to sever itself from the international Paris Accord and exert international pressure that will achieve meaningful reductions from all major-emissions nations.

Indeed, the expansion of the California program to other states and foreign governments could defeat federal foreign policy regarding climate policy in its entirety. Under California's theory of the law, any and all of the fifty states may enter into agreements that sell their emissions to support a foreign government's goals of reducing the costs on that foreign nation of implementing the Paris Agreement. Each state could, for example, establish state-level NDCs and sell emission credits under state-level programs to parties to the Paris Agreement. This is what California has done. And California is continuing to do this.[9]

The implication of this state of affairs, left unchecked by this Court, is clear. If California has the legal ability to maintain its Agreement and Arrangements in the face of federal foreign policy, then the capability of the United States to decide, **in an efficacious fashion**, that the country must hold out from such arrangements in favor of a better deal is negated. Instead of ultimately leveraging to a better deal for the United States and its workers and economy as a whole, foreign powers would be allowed to re-route their efforts to strike deals with the individual states, or simply to California, as many nations may prefer. This is exactly what the Constitution was established to prohibit. *Belmont*, 301 U.S. at 331

---

[9] In fact, through REDD plans, California could establish links with developing countries that are Parties to the Paris Agreement. With these links in place, regulated entities in California could pay entities in the developing country to maintain forest in a pristine state, or to take similar "offsetting" action, and thereby earn credits under California's cap-and-trade scheme. This too would become permissible if this Court were to uphold California's Agreement and Arrangements with Quebec.

1  ("[C]omplete power over international affairs is in the national government and is not and

2  cannot be subject to any curtailment or interference on the part of the several states . . . . In

3  respect of all international negotiations and compacts, and in respect of our foreign relations

4  generally, state lines disappear" (internal citation omitted)).  "The peace of the WHOLE

5  ought not to be left at the disposal of a PART."  *Id.*; *see also* THE FEDERALIST NO. 80, at

6  535-36 (Alexander Hamilton) (J. Cooke ed., 1961).

7         California's continued sale of emission reductions made by United States citizens

8  acting under coercive state-law legal regimes—allowing foreign governments to satisfy

9  their NDCs under the Paris Agreement—further complicates foreign relations in another

10  respect.  It puts the government of the United States in the diplomatic Catch-22 of either

11  disappointing a close ally of the United States, or undercutting the United States' negotiating

12  posture as against the world as a whole.  Specifically, if Canada asks the United States to

13  authorize ITMOs from California to meet Canada's NDCs (per Canada's previous

14  indication), foreign relations with one of the United States' foremost allies in the world

15  would become stressed.  The United States must either (1) authorize those transfers—thus

16  undermining its own declared foreign policy of withdrawing from the Paris Agreement to

17  pursue a better deal—or (2) disappoint one of its foremost trading partner and ally by

18  denying those transfers.  Either way, California's ongoing Agreement and Arrangements

19  pose a direct and clear conflict with foreign policy at the federal level.

20  **B. The Agreement and Arrangements are an obstacle to the full purposes of**

21     **Congress' mandate to the Executive to develop international climate policy.**

22         Because California's Agreements and Arrangements produce current, as well as

23  likely future, conflicts with the foreign policy of the United States to obtain better and more

24  equitable deals on climate mitigation for the American people, the Agreement and

25  Arrangements are preempted.  As *Youngstown Sheet & Tube Co. v. Sawyer* teaches, the

26  President's authority, and thus the Executive Branch's ability to preempt state law, is at its

27  apex "when the President acts pursuant to an express or implied authorization from

28

1  Congress, [because there] his authority is at its maximum, for it includes all he possesses in

2  his own right plus all that Congress can delegate." 343 U.S. 579, 635 (1952).

3      *Crosby v. National Foreign Trade Council* is a case in point.  In *Crosby*, Congress

4  had directed the President to develop a "comprehensive, multilateral strategy to bring

5  democracy to and improve human rights practices and the quality of life in Burma."  530

6  U.S. at 369.  Massachusetts, meanwhile, had adopted a law prohibiting its state agencies

7  from conducting business with Burmese companies.  *Id.* at 366–67.  Although the state and

8  federal sanctions were in many ways similar and even aligned (just as in *Garamendi* the

9  federal-and-state objectives of assisting Holocaust survivors were also aligned), the

10  Supreme Court nevertheless emphasized that "a common end hardly neutralizes conflicting

11  means."  *Id.* at 379.  The Supreme Court went on to hold that the Massachusetts statute was

12  unconstitutional.  Massachusetts undermined the federal statute that gave the President

13  express control over the subject.  *Id.* at 380.  The Court explained that Congress' direction

14  to the President "to take the initiative for the United States among the international

15  community invest[s] him with the maximum authority of the National Government . . . in

16  harmony with the President's own constitutional powers."  *Id.* at 381 (internal citations

17  omitted).  The Court reasoned that such a "clear mandate" defeated any argument that

18  "Congress intend[s] the President's effective voice to be obscured by state or local action."

19  *Id.*

20      In the field of greenhouse gas regulation, Congress has, at many times, in many

21  ways, and with no less force than in *Crosby*, delegated authority to the Executive Branch to

22  develop and advance this nation's international policy and relations.[10]  In the Global Climate

23  Protection Act ("GCPA"), Congress gave the Executive Branch express authority to set

24  national and international climate change policy for the United States.  Pub. L. No. 100–

25  204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407, *as amended by* Pub. L. No. 103–199,

---

[10] Congress has, to be sure, objected to Presidents going too far, too fast, and insufficiently considering American workers and the American economy.  *Supra* note 5.

1    Title VI, § 603, 107 Stat. 2317, 2327, *reprinted as note to* 15 U.S.C. § 2901 (SUF ¶¶ 72-

2    75).  The GCPA gives the President and the EPA responsibility for a "coordinated national

3    policy on global climate change," which should include "work[ing] toward international

4    agreements."  *Id.* (SUF ¶ 74).  Concerning "coordination of United States foreign policy in

5    the international arena," the GCPA provides:

> The Secretary of State shall be responsible to coordinate those aspects of
> United States policy requiring action through the channels of multilateral
> diplomacy . . . . In the formulation of these elements of ***United States policy***,
> the Secretary of State shall, ***under the direction of the President***, work
> jointly with the Administrator of the Environmental Protection Agency and
> other United States agencies concerned with environmental protection,
> consistent with applicable Federal law.[11]

10   The GCPA is but one example among many of Congress' directions and delegations to the

11   Executive.[12]  Congress has thus spoken clearly to the federal government and its Executive's

12   authority to develop and make international climate and greenhouse gas policy for the

13   United States.

14           Not only has Congress spoken through statutes to the Executive's authority to

15   develop this policy, the two branches have also worked together to enact such policies into

16   law by treaty—and treaties, as much as statutes, qualify as "the supreme Law of the Land"

17   under the Supremacy Clause.  U.S. Const. Art. VI, cl. 2.  .  As the Supreme Court observed

18   in *United States v. Belmont*, [t]he supremacy of a treaty in this respect has been recognized

---

[11] Pub. L. 100-204, § 1103(c).  Of course, because the Secretary of State is a subordinate officer of the President, the ultimate responsibility for this nation's domestic and foreign climate policy would lie with the Chief Executive, even if the statutory text did not expressly provide that the Secretary must work "under the direction of the President" in formulating the United States' policy.

[12] *See, e.g.*, National Climate Program Act of 1978, 15 U.S.C. §§ 2901, *et seq*; the Energy Security Act, Pub.L. No. 96–294, tit. VII, § 711, 94 Stat. 611, 774–75 (1980) (directing the "study of the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities"); Global Change Research Act of 1990, 15 U.S.C. §§ 2931 *et seq* (directing the President to, among other things, establish a research program to "improve understanding of global change," and provide for scientific assessments every four years that "analyze[] current trends in global change,"); 42 U.S.C. § 7403 (directing EPA to conduct research on global climate change issues); 42 U.S.C. § 13385 (directing the Secretary of Energy to develop an inventory on the national aggregate emissions of greenhouse gases).

from the beginning . . . if a treaty does not supersede existing state laws, as far as they contravene its operation, the treaty would be ineffective." 301 U.S. at 331 (citations omitted). *See also id.* ("Plainly, the external powers of the United States are to be exercised without regard to state laws or policies"). The United Nations Framework Convention on Climate Change ("UNFCCC") is a treaty that was ratified by the Executive with the advice and consent of the Senate. (SUF ¶ 2). Thus, the UNFCCC is reflection of the will of both the President and the Senate of the federal government and binding law. The treaty commits its signatory *nations* to "adopt *national* policies and take corresponding measures on the mitigation of climate change[.]" Art. 4, ¶ 2(a) (emphasis added). Since at least the adoption of the UNFCCC, the United States has been entering into international negotiations with foreign governments on this very issue. Indeed, the Paris Agreement is an international agreement negotiated pursuant to the terms of the UNFCCC.

California's Agreements and Arrangements with Quebec "obscure" the President's singular and "effective voice" and obstruct his congressionally delegated ability "to take the initiative for the United States among the international community." *Crosby*, 530 U.S. at 381. As the United States has noted, California's efforts to create its own working international climate regime reach back to 2006 with the passage of AB 32. California spent the next few years gathering together a consortium of smaller states and provinces. It developed a cap-and-trade model to serve as an international greenhouse gas emissions credit trading platform designed to attract multiple national or subnational governments. Its efforts to intrude on the exclusive sphere of federal foreign policy should not get a free pass simply because only Quebec is accepting California's offer as of now.

Then, upon hearing of the United States' withdrawal from the Paris Agreement and its announcement of a new federal foreign policy, California's political leadership denounced the policy announced by the President, who is empowered to act for the nation as a whole. California's Governor openly declared that the state would work to undermine the President's decision: "It cannot stand," said Governor Brown, in response to hearing the

1   United States would withdraw from the Paris Agreement.  *States React to Trump's Decision*

2   *to Abandon Paris Climate Agreement* (emphasis added) (2d. Iacangelo Decl., Exh. 35) (SUF

3   ¶103).  "[I]t's not right and California will do everything it can to not only stay the course,

4   but to [also] build more support—***in other states, in other provinces, in other countries***."

5   *Id.*  And then, as a crowning slap in the face to the federal government, Governor Brown

6   immediately flew to China to pursue further agreements regarding international climate

7   policy.  (SUF ¶¶ 14, 102)

8       If California is allowed to keep in force the Agreement and Arrangements, and make

9   similar agreements with other foreign jurisdictions[13]—which California is pursuing—"the

10   President has less to offer and less economic and diplomatic leverage . . . ."  *Garamendi,*

11   539 U.S. at 424 (quoting *Crosby*, 530 U.S. at 377) (bracket insert original)).   The United

12   States is one of the world's largest emitters of greenhouse gases.  *See Massachusetts v. EPA*,

13   549 U.S. 497, 524-25 (2007).  It therefore has significant leverage in climate negotiations.

14   Canada, specifically, could be a logical place for the President to turn for an ally to negotiate

15   a more favorable agreement on climate change.  But this natural opportunity is compromised

16   to the extent that California is permitted to slice off parts of Canada through its own side

17   deals.   Through REDD plans, for example, California could integrate links between

18   jurisdictions in developing countries, such as Brazil, and jurisdictions in developed

19   countries, such as Quebec, thus potentially leaving the cupboard bare for the federal

20   government to negotiate on behalf of the nation as a whole.

21       As the Supreme Court explained in *Crosby*, this Court "need not get into any general

22   consideration of limits of state action affecting foreign affairs to realize that the President's

23   maximum power to persuade rests on his capacity to bargain for the benefits of access to

24   ***the entire national economy*** without exception for ***enclaves fenced off willy-nilly by***

25

26   _____

27   [13] Oregon is currently debating adoption of the California cap-and-trade model so that it
     may link to the existing international WCI carbon market.  (3d. Iacangelo Decl., Exh. 13)
28   (SUF ¶ 141).

1    *inconsistent political tactics*." 530 U.S at 381 (emphasis added). The President is fully

2    entitled to wield "the coercive power of the national economy" as a tool of diplomacy. *Id.*

3    at 376. California has acted here to sap the force of that coercive tool.

4        California's Agreement and Arrangements "stand as an obstacle to the

5    accomplishment and execution of the full purposes and objectives of'" federal policy. *Von*

6    *Saher II*, 754 F.3d at 720 (quoting *Crosby*, 530 U.S. at 373). They are thus preempted.

7    **II. The Agreement and Arrangements intrude on a field of foreign affairs that is**

8        **beyond a traditional area of state regulation.**

9        Even if California's Agreement and Arrangements with Quebec did not expressly

10   conflict with declared foreign policy of the United States—and they do—the Constitution

11   gives the federal government exclusive domain over the field of foreign affairs. *See*

12   *Zschernig*, 389 U.S. at 436; *Hines*, 312 U.S. at 63; *Movsesian III*, 670 F.3d at 1071 ("The

13   Constitution gives the federal government the ***exclusive authority*** to administer foreign

14   affairs.") (emphasis added). California's mere entry and operation in this field occupied by

15   the federal government is preempted—and would be preempted even if its policies did not

16   conflict.

17       But the Agreement and Arrangements are California's attempt to fashion its own

18   climate foreign policy. California did so because of its declared dissatisfaction with how

19   the federal government is addressing this subject. And even where the federal government

20   has taken ***no action*** on a particular aspect of foreign affairs—which is not the case here—

21   the states are still not free to go it alone and fashion their own foreign policy and plans.

22   *Movsesian III*, 670 F.3d at 1072 (state action that interferes with foreign policy can be

23   preempted even when the United States has not affirmatively fashioned a policy).[14]

24       The Ninth Circuit has adopted a two-part test for determining when a state law is

25   _____

26   [14] Because the United States need not have an affirmative policy for this form of preemption
     doctrine to apply, courts often refer to this aspect of the doctrine's preemptive effect as
27   "dormant foreign affairs preemption." *See*, *e.g.*, *Movsesian III*, 670 F.3d at 1072.

28

preempted by what can be called dormant foreign affairs preemption. *See Movsesian III*, 670 F.3d at 1074. Under the *Movsesian* test, a state action is preempted when: (1) it has no serious claim to be addressing a traditional state responsibility; and (2) it intrudes on the foreign affairs power of the federal government. *See id.* By entering into the Agreement with Quebec, and by seeking to replicate the Agreement with other foreign jurisdictions, California is fashioning its own climate foreign policy in a field beyond the traditional area of state environmental regulation and responsibility.

**A. California has no traditional interest in reducing greenhouse gas emissions in foreign jurisdictions.**

Regulating greenhouse gas emissions to address global climate change is not a traditional state responsibility. For even state laws that are wholly domestic in their direct application can intrude into foreign affairs. *See Von Saher I*, 592 F.3d at 961. But, here, California is expressly acting internationally to deliberately advance an outward-facing foreign policy of its own devising. This is why the State criticizes withdrawal from Paris, why it flies to China to seek birds of a feather, and why it built a climate agreement with Quebec fully expandable to other nations or subnational foreign governments.

California purports to be pursuing a traditional state interest. But the Court must look to California's "real purpose." *See Movsesian III*, 670 F.3d at 1075. *See also Zschernig*, 389 U.S. at 437 (noting that "foreign policy attitudes, the freezing or thawing of the 'cold war,' and the like [were Oregon's] real desiderata"). Because California is entering into international agreements to address an inherently international issue that is well beyond the scope of traditional state responsibility, California's Agreements and Arrangements are preempted.

When determining whether a state action is taken pursuant to a "traditional state responsibility," courts must look beyond the broad categorization of a state action. It is not enough to say that "probate," or "insurance," or the "environment" are areas in which states traditionally regulate. In *Zschernig v. Miller*, for example, the Supreme Court held that even purportedly domestic state laws of wholly local application can be preempted by the foreign

affairs doctrine.  An Oregon probate law prohibited inheritance within that state by foreign nationals whose home countries did not protect property from confiscation and give reciprocal rights to citizens of the United States.  *See id*. at 430–31.

Although property law and probate *is* traditionally and clearly a domain of state concern for many purposes, the Court struck down the Oregon law.  The Supreme Court recognized that, in relevant respect, Oregon state courts would necessarily be sitting in judgment on foreign governments.  *See id*. at 434–35.  Thus, even this distant, incidental influence over the affairs of other countries was held invalid.  *Id*.  The Court reasoned that Oregon's law would deny the federal government its "one voice" in foreign affairs and bring "great potential for disruption or embarrassment" to our country.  *Id*.  Thus, state laws and regulations, even in areas that the states have "traditionally regulated," "must give way if they impair the effective exercise of the Nation's foreign policy."  *Id*. at 440–41 (citation omitted).

In *Movsesian III*, the Ninth Circuit invalidated a California law.  The law granted California state courts jurisdiction over life insurance policies that had not been paid to the heirs of the victims of the Armenian genocide.  670 F.3d at 1071–77.  Much of the Ninth Circuit's decision turned on the significance of the state law purportedly regulating insurance, a traditional state interest for many purposes as well.  *See id*. at 1074–75.  Ultimately, the Ninth Circuit concluded that the "real purpose" of the law, however, was to "send a political message."  *Id*. at 1076, 1077.  The Ninth Circuit further noted that the issue on which California was sending this message was an issue that the federal government had been careful *not* to take a position on because it did not want to offend an ally.  *Id*. at 1077.  *Movesian III* thus stands for the proposition that even if President Trump had withdrawn from Paris announcing a non-policy on international climate agreements—a policy of silence akin to the Armenian genocide policy at issue in *Movesian III*—California's actions here would still be preempted.  Therefore, the fact that President Trump has announced a nuanced policy (albeit one California equally disagrees with) only makes the need for

1    preemption to be applied against the Agreement and Arrangements even stronger.

2    California argues that "environmental" regulation—such as that which relates to

3    greenhouse gases and is covered by the Agreement and Arrangements—is a "traditional"

4    area of state responsibility and so is of no concern to United States foreign affairs. *See* ECF

5    No. 50-1 at 30 (describing this area of regulation as "traditionally" within the state's "police

6    powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all

7    persons" (citation omitted)). That is incorrect. Many aspects of environmental regulation

8    involve areas of state responsibility (just like *Zschernig* inheritance regulation, just like

9    *Movesian III* insurance regulation). *See, e.g., Exxon Mobil Corp. v. EPA*, 217 F.3d 1246,

10   1255 (9th Cir. 2000). But participating in schemes of regulation involving greenhouse gas

11   emissions in foreign jurisdictions and engaging in global climate diplomacy are

12   emphatically ***not*** traditional state responsibilities.

13   ***First***, the federal government began actively regulating, and engaging in foreign

14   relations regarding, greenhouse gas emissions and climate change well before the States did.

15   In 1978, Congress passed the National Climate Program Act, which required the President

16   to work with the international community to "understand and respond to natural and man-

17   induced climate processes and their implications." *See Massachusetts*, 549 U.S. at 507–08

18   (citing 92 Stat. 601). Nine years later, Congress directed the President, through the EPA, to

19   develop a national policy on climate change and directed the Secretary of State, under the

20   President's direction, to address climate change "'through the channels of multilateral

21   diplomacy.'" *Id*. at 508 (quoting GCPA, Pub. L. No. 100-124, Title XI, §§ 1103(b), (c), 15

22   U.S.C. § 2901 note). The multilateral diplomacy gained more momentum in the early

23   1990s. The first President Bush represented the United States at 1992's Earth Summit in

24   Rio de Janeiro and ratified the UNFCCC. *See id*. at 509. The United States has participated

25   in this area of global diplomacy ever since.

26   ***Second***, climate change is a global issue that exceeds the competence or capacities

27   of individual states to resolve. The dispersion of greenhouse gases into the atmosphere is a

28

global phenomenon, and cannot be regulated in any meaningful way at the state level. "[E]missions in New Jersey may contribute no more to flooding in New York than emissions in China." *Am. Elec. Power v. Connecticut*, 564 U.S. 410, 422 (2011). The practical futility of one government curtailing its emissions without a worldwide commitment is why the second Bush Administration determined that the Kyoto Protocol was "fatally flawed." Press Release, The White House, President Bush Discusses Global Climate Change (June 11, 2001), https://georgewbush-whitehouse.archives.gov/news/releases/2001/06/20010611-2.html (3d. Iacangelo Decl., Exh. 3) (SUF ¶ 85). President Bush recognized that climate change was "a challenge that requires a 100 percent effort; ours, and the rest of the world's." *Id.* For this reason, among others, the Kyoto Protocol was a bad deal. It sought to subject some of the world's countries—like the United States and Germany—to curtailing their emissions, while exempting other top emitters like China and India. *See id.* President Trump, as discussed more fully above, likewise decided to withdraw the United States from the Paris Agreement because, among other things, it "[allows] China . . . to increase these emissions [for] a staggering number of years — 13," and "makes [India's] participation contingent on receiving billions and billions and billions of dollars in foreign aid from developed countries."

*Third*, California itself has admitted that greenhouse gas regulation is not a traditional area of state responsibility. Indeed, California has, through CARB, recognized that greenhouse gas emissions is a "global problem." This refutes its claim that this regulation is a traditional area of state concern. As CARB put it:

> Climate change is a global problem. ***GHGs are global pollutants, unlike criteria air pollutants and toxic air contaminants, which are pollutants of regional and local concern.*** Whereas pollutants with localized air quality effects have relatively short atmospheric lifetimes (about one day), GHGs have long atmospheric lifetimes (one to several thousand years). GHGs persist in the atmosphere for long enough time periods to be dispersed around the globe. . . . The quantity of GHGs in the atmosphere that ultimately result in climate change is not precisely known, but is enormous; ***no single project alone would measurably contribute to an incremental change in the global average temperature, or to global, local, or micro climates***.

1    *Final Environmental Analysis for the Strategy for Achieving California's 2030 Greenhouse*

2    *Gas Target* Attach. A at 24–25 (emphasis added) (SUF ¶¶ 24-26).

3        **Fourth**, California's own political leaders have been crystal clear that their "real

4    purpose" is not just to act domestically.  California wishes to have and pursue an alternative

5    climate foreign policy to that of the United States, and thereby not only to repudiate but to

6    act against the President's foreign policy, precisely because California deems the

7    President's foreign policy decision mistaken and harmful.  California is a party to **seventy-**

8    **two** active bilateral and multilateral "agreements" with national and subnational foreign and

9    domestic governments relating to environmental policy alone.  *See* Climate Change

10   Partnerships (amalgamating agreements) (SUF ¶¶ 13, 16).  On this website, California says

11   that the purpose of these agreements is "to **strengthen the global response** to the threat of

12   climate change[.]"  *Id.*  In addition, and for the explicit reason of showing its disagreement

13   with the President's decision to withdraw from the Paris Agreement, California formed the

14   United States Climate Alliance with other states to "accelerate climate policy efforts across

15   North America, Canada, and Mexico."  *Id.* (SUF ¶ 13).  Under Ninth Circuit case law,

16   extrinsic evidence of this sort proves that, even when a state superficially claims to pursue

17   a traditional purpose, the real purpose of the law must be examined for intrusion into foreign

18   affairs.  *See Von Saher I*, 592 F.3d at 965 (considering a Governor's memorandum to

19   discover the real purpose behind a state law).  All of this history reveals California to be a

20   systematic and repeat offender interjecting itself unlawfully into a field reserved to the

21   federal government alone.  The federal government cannot speak with one voice effectively

22   in the area of climate change if California relentlessly undermines the President and other

23   branches of the federal government with its own contrary and counterproductive policies,

24   diverting the attention of the international audience of nations from where it should be: on

25   the utterances and legal acts of the federal government of the United States alone.

26       With the Agreement and Arrangements, California is attempting to do what the

27   Ninth Circuit rejected in *Von Saher I* and *Movsesian III*—pursue a foreign policy of its own.

28

In *Von Saher I*, California was dissatisfied with how the federal government was handling Holocaust restitution claims over stolen art. *See* 592 F.3d at 964–65. It tried to go its own way. California passed a statute that would allow anyone in the world to sue a museum or gallery within or without the state. *See id*. at 965. In *Movsesian III*, California was dissatisfied with how the federal government dealt with heirs of the victims of the Armenian genocide. *See* 670 F.3d at 1075–76. Again, California tried to go its own way, extending the statute of limitations to bring claims to the proceeds of life insurance policies. *See id*. Each time, the Ninth Circuit concluded that the laws were beyond any traditional state area and that California had ventured into foreign affairs. *See Von Saher I*, 592 F.3d at 965–68; *Movsesian III*, 670 F.3d at 1076–77. Likewise, in *Garamendi*, the Supreme Court rejected California's attempts to enter the field of Holocaust remedies in the guise of mere localized "insurance" regulation. *See* 539 U.S. at 425–26. All of these unlawful state measures addressed important problems. In each instance, California strayed not because the problem was unimportant, but because the problem was a foreign affairs problem outside any individual state's purview.

Here as well, California is dissatisfied with the federal government. In California's estimation, the federal government is ***not*** sufficiently addressing climate change, a global problem and field, subject to numerous states and treaties. Again, California is trying to go its own way, negotiating with foreign jurisdictions to create "regional, national, ***and international*** greenhouse reduction programs." CAL. HEALTH & SAFETY CODE § 38564 (emphasis added). As in *Garamendi*, *Von Saher I*, and *Movsesian III*, California has blasted itself and projected its regulatory powers far out beyond a proper area of traditional state interest. There is no doubt what California's "real purpose" is.

//

//

//

//

**B. The Agreement and Arrangements intrude on the federal government's foreign affairs power.**

International relations relating to climate change is unquestionably ***not*** a traditional area of state responsibility.  Since California's ventures into this area intrude into a field of foreign affairs occupied by the federal government, they are preempted.  *See Movsesian III*, 670 F.3d at 1071.  Indeed, this case is far clearer than *Hines*, *Zschernig*, *Crosby*, or *Garamendi*.  California is not just taking local action that incidentally affects federal foreign relations, as occurred in those other cases.  California is expressly advancing the Agreement, Arrangements, and other policies with foreign governments in declared opposition to the foreign policy of the United States.

The Supreme Court has held that "foreign affairs and international relations" are "matters which the Constitution entrusts ***solely*** to the Federal Government." *Zschernig*, 389 U.S. at 436 (emphasis added).  The "interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left ***entirely free*** from local interference." *Hines*, 312 U.S. at 63 (emphasis added); *see also Movsesian III*, 670 F.3d at 1071 ("The Constitution gives the federal government the ***exclusive authority*** to administer foreign affairs.") (emphasis added).[15]  Yet California is quite expressly entering this sphere of responsibility. Governor Schwarzenegger claimed California to be a modern day Greek city-state, with the

---

[15] California may attempt to downplay the Agreement and Arrangements by characterizing them as mere expressions of policy rather than an intrusion into foreign affairs, as in *Gingery v. City of Glendale*, 831 F.3d 1222 (9th Cir. 2016).  There, the Ninth Circuit declined to preempt Glendale's erection of a statue honoring the Korean "comfort women" of the Second World War in the face of Japanese protests.  The Ninth Circuit decided that erecting the statue was a mere statement of policy that did not intrude on foreign affairs because it did not impact any "legal rights and responsibilities."  *Id.* at 1229–31.  By contrast, the Agreement and Arrangements are designed by their very nature to rearrange "legal rights and responsibilities."  Additionally, the Agreement and Arrangements are implemented through contractual arrangements worth billions of dollars, meaning that the legal rights and responsibilities at issue are not purely symbolic but of great practical commercial moment. The Agreement and Arrangements do not operate at the purely symbolic level of a statue.

population, technological savvy, and economic weight necessary to forge its own foreign policy. *See* 1st Iacangelo Decl., Exh. 14 (SUF ¶ 20). Governor Brown decided to meet with China's President Xi Jinping on environmental issues just ***days after*** President Trump announced that the United States would withdraw from the Paris Accord. 1st Iacangelo Decl., Exh. 9 (SUF ¶ 14). And Governor Newsom more recently declared, including specifically of the Agreements and Arrangements:

> Carbon pollution knows no borders, and the Trump administration's abysmal record of denying climate change and propping up big polluters makes cross-border collaboration all the more necessary. … California's landmark cap-and-trade program has inspired the creation of dozens of businesses, ***is a model for similar policies around the world***, and puts California ***well ahead of the pack [i.e., of other governments on the world stage]*** as we prepare for a low-carbon future.

(SUF ¶ 27) (emphasis added). Moreover, California formed the United States Climate Alliance for the very purpose of expressing displeasure with the federal government's stance on climate issues. (SUF ¶ 13)

This Court, in its previous decision on cross-motions for summary judgment concerning other claims asserted in this case, described these statements as "no more than typical political hyperbole" that were "entitled to no legal effect." ECF No. 91 at 13 n.7. The United States submits respectfully that, although such statements may have no *legal* effect (in the sense that they do not establish any enforceable obligations), such statements do have ***legal significance*** for purposes of the Foreign Affairs Doctrine under Supreme Court and Ninth Circuit precedent. California's public statements and broader conduct "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments. We need not get into any general consideration of limits of state action affecting foreign affairs to realize that the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly ***by inconsistent political tactics***." *Crosby,* 530 U.S. at 381 (emphasis added); *see also Von Saher I,* 592 F.3d at 965 (applying the Governor's memorandum as evidence of the State's real international purpose

1    to preempt a state law); *Movsesian III*, 670 F.3d at 1076, 1077 (invalidating state law whose
2    "real purpose" was to "send a political message").

3        In fact, the Supreme Court has already recognized, in *Massachusetts*, 549 U.S. at
4    519, that the field of global climate regulation and greenhouse gas emissions is occupied by
5    the federal government.  "When a State enters the Union, it surrenders certain sovereign
6    prerogatives.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse
7    gas emissions [and] ***it cannot negotiate an emissions treaty with China or India***."  *Id.*
8    Because states have no "sovereign prerogative" to engage in this field, the Court granted the
9    states a novel "special solicitude" in its standing jurisprudence.  *Id.* at 520.  The Court thus
10   allowed states to challenge decisions of EPA to that point regarding the regulation of
11   greenhouse gases.  *See id.* at 526.

12       Critically, this language is not mere dicta, as this Court previously concluded in an
13   interlocutory opinion it is free to reassess.  *See* Fed. R. Civ. P. 54(b).  For "it is not only the
14   result but also those portions of the opinion necessary to that result by which we are bound."
15   *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996).  The Supreme Court's decision
16   to grant "special solicitude" to states, and thus to conclude that Massachusetts had Article-
17   III standing, traced directly from, and depended upon, the Supreme Court's reasoning that
18   states "cannot negotiate an emissions treaty" or take other actions themselves to address
19   climate change internationally.  *Massachusetts*, 549 U.S. at 519–20.  In other words, this
20   reasoning was necessary to the Court's conclusion (its *ratio decidendi*) that Massachusetts
21   had standing to sue.  Analyzing the Constitution and various international agreements
22   relating to climate change (including the UNFCCC), the Court relied upon this reasoning to
23   reach the result that states had standing.  In any event, "[e]ven if it could be considered a
24   dictum," the courts in the Ninth Circuit must give "great weight to dicta of the Supreme
25   Court." *Coeur d'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004).

26       California's Governors do, of course, accuse the United States of abandoning the
27   field, rather than occupying it.  But that is not so.  The President is delegated the authority

28

to engage in international deal making on behalf of the United States as he deems appropriate. *See United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 319 (1936) (quoting with approval the statement of the great Chief Justice John Marshall when he was in Congress that "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations."). Indeed, the President's action need not even be enshrined in an affirmative agreement in order to obtain judicial deference and preemption. As the Supreme Court put it in the domestic context—where there is shared authority through federalism, as opposed to the exclusive" authority of the federal government in foreign affairs—"a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 66 (2002) (citation omitted) (emphasis in original). So, too, in the international sphere. Cases like *Zschernig*, *Garamendi*, *Movsesian III*, and *Von Saher I* establish that state action in the foreign policy sphere can be preempted even in the face of federal **inaction** (which is not the case here).

If California's Agreement and Arrangements are not preempted, then such international arrangements can be entered into by fifty states, not just one. They can be entered into with China, or India, not merely with Quebec. In this way, California's actions, unless overridden in the courts, could create a dangerous precedent. President Trump withdrew from the Paris Agreement because he determined it was not a good deal for the United States. As with President Bush's stance on the Kyoto Protocol, President Trump decided to exit the Paris Agreement because he determined that it would disproportionately harm the United States in comparison to other nations, such as China and India, because our country would shoulder too much of a global load to solve a global issue. *See* Letter from President George W. Bush to U.S. Senators Hagel, Helms, Craig, & Roberts, (March 13, 2001) (SUF ¶ 83). But President Trump's efforts—and the efforts of future Presidents—to enter into climate agreements would be undercut if individual states, like California, pursue

their own foreign policies and agreements.  China or India could enter into agreements with individual states—arrangements that may be in the best interest of the state, but that may not be in the best interest of the nation as a whole.

California has not just ventured into foreign affairs, it has plunged deep into that forbidden field.  That is the exclusive domain of the federal government.  Our country must speak "with one voice."  *See Garamendi*, 539 U.S. at 424; *Hines*, 312 U.S. at 63 (internal quotation marks omitted) ("For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.").  California's concrete actions in the Agreement and Arrangements are preempted.

## CONCLUSION

The Constitution makes foreign affairs the exclusive domain of the United States.  The individual states—no matter their size, influence, or economic heft—have no rightful claim to pursue their own foreign policies.  When the United States speaks to the world, the Founders intended it to speak with one voice, not thirteen in the year 1787, not fifty in the year 2020.  No exception was made for New York State by the Founders, though it was the stand-out commercial hub of the young nation.

California, through its Agreement and Arrangements with Quebec, has usurped the federal government's powers over foreign relations.  Its actions directly and demonstrably conflict with the express foreign policy of the Executive Branch.  And, even if the Agreement and Arrangements did not directly conflict with federal foreign policy, California has impermissibly intruded on the field of foreign affairs occupied by the federal government.  The Constitution assigns this policy role solely to the United States.  California's actions are therefore preempted.  This Court should declare the Agreement and Arrangements invalid, grant the United States motion for summary judgment, and enjoin further implementation of California's ***ultra vires*** actions.

Dated:  April 20, 2020.

1

2      Respectfully submitted,

3      /s/ Paul E. Salamanca
       JEFFREY BOSSERT CLARK
4      Assistant Attorney General
       JONATHAN D. BRIGHTBILL
5      Principal Deputy Assistant Attorney
       General
6      PAUL E. SALAMANCA
7      R. JUSTIN SMITH
       PETER J. MCVEIGH
8      STEVEN W. BARNETT
       HUNTER J. KENDRICK
9

10     Attorneys
       Environment & Natural Resources
11     Division
       U.S. Department of Justice
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28