SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
NICHOLAS W. VAN AELSTYN, Cal. Bar No. 158265
nvanaelstyn@sheppardmullin.com
ZACHARY NORRIS, Cal. Bar No. 268616
znorris@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.774.2970
Facsimile:    415.434.3947

Attorneys for Intervenor-Defendant
INTERNATIONAL EMISSIONS TRADING
ASSOCIATION

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; THE CALIFORNIA AIR RESOURCES BOARD; MARY D. NICHOLS, in her official capacities as Chair of the California Air Resources Board and as Vice Chair and a board member of the Western Climate Initiative, Inc.; WESTERN CLIMATE INITIATIVE, INC.; JARED BLUMENFELD, in his official capacities as Secretary for Environmental Protection and as a board member of the Western Climate Initiative, Inc.; KIP LIPPER, in his official capacity as a board member of the Western Climate Initiative, Inc., and RICHARD BLOOM, in his official capacity as a board member of the Western Climate Initiative, Inc.,<br><br>        Defendants. | Case No. 2:19-cv-02142-WBS-EFB<br><br>The Hon. William B. Shubb<br><br>**INTERVENOR-DEFENDANT INTERNATIONAL EMISSIONS TRADING ASSOCIATION'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        June 29, 2020<br>Time:        1:30 p.m.<br>Courtroom:    5 (14th Floor) |

SMRH:4820-1131-7180.5    IETA'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION.................................................................................................. 5

II.  STATEMENT OF FACTS ...................................................................................... 8

III. ARGUMENT ........................................................................................................ 9

   A.   Standard of Review.......................................................................................... 9

   B.   The Motion Impermissibly Exceeds the Scope of Relief Sought in the
      Complaint.......................................................................................................... 9

   C.   The Foreign Affairs Doctrine Does Not Preempt the Linkage. ........................ 10

        1.   Environmental and Economic Regulations Fall Squarely Within
            California's Traditional Field of Competence............................................. 11

        2.   The Linkage Does Not Conflict With United States Foreign Climate
            Policy....................................................................................................... 15

            a.   The United States Does Not Identify Any Express Federal
                Policy That Might Preempt the Linkage...................................... 15

            b.   The Linkage Is Not An Obstacle To the United States'
                Negotiation of a New Climate Deal............................................. 17

            c.   The Linkage Is Designed To Mitigate the Cost of
                Greenhouse Gas Emission Reductions, Which Is Consistent
                With the United States' Stated Reasons For Withdrawing
                From the Paris Accord. ................................................................ 18

            d.   Canada May Not Utilize California's Emission Reductions
                 Without the Express Authorization Of the United States. .............. 19

   D.   Judicial Restraint is Warranted to Avoid Disruption of the Robust Market
      that Has Arisen Under California's Cap-And-Trade Program. .............................. 21

IV.  CONCLUSION ..................................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*
    134 F. Supp. 3d 1270 (D. Or. 2015), aff'd *sub nom.*, 903 F.3d 903 (9th Cir.
    2018) ........................................................................................................ 13

*Am. Ins. Ass'n v. Garamendi*
    539 U.S. 396 (2003) .......................................................... 6, 7, 8, 12, 16, 24

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ................................................................................. 10

*Barclays Bank Plc v. Franchise Tax Bd*
    512 U.S. 298 (1994) ................................................................................. 17

*Cal. Trucking Ass'n v. Su*
    903 F.3d 953 (9th Cir. 2018) ................................................................... 16

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
    529 F. Supp. 2d 1151 (E.D. Cal. 2007) .......................................... 8, 14, 17

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*
    690 F.2d 1240 (9th Cir. 1982) ................................................................. 10

*Day-Brite Lighting, Inc. v. Missouri*
    342 U.S. 421 (1952) ................................................................................. 15

*Farley v. Healey*
    67 Cal. 2d 325 (Cal. 1967) ...................................................................... 16

*Georgia v. Tennessee Copper Co.*
    206 U.S. 230 (1907) ................................................................................. 14

*Gingery v. City of Glendale*
    831 F.3d 1222 (9th Cir. 2016) ................................................................. 15

*Home Bldg. & Loan Ass'c v. Blaisdell*
    290 U.S. 398 (1934) ................................................................................. 15

*Made in the USA Foundation v. U.S.*
    242 F.3d 1300 (9th Cir. 2001) ................................................................. 22

*Moeller v. Taco Bell Corp.*
    966 F. Supp. 2d 899 (N.D. Cal. 2013) .................................................... 11

*Movsesian v. Victoria Versicherung AG*
    670 F.3d 1067 (9th Cir. 2012) ................................................................. 12

Case No. 2:19-cv-02142-WBS-EFB

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996) ........................................................................ 10

*Rocky Mountain Farmers Union v. Corey*
    913 F.3d 940 (9th Cir. 2019) ..................................................................... 7, 13

*Von Saher v. Norton Simon Museum of Art Pasadena*
    592 F.3d 954 (9th Cir. 2010) .................................................................12, 18

Statutes

17 Cal. Code Regs. § 95840 ............................................................................... 23

17 Cal. Code Regs. §§ 95940-43 ....................................................................... 11

17 Cal. Code Regs. § 95943 ............................................................................... 23

Cal. Health & Safety Code § 38564 .................................................................. 11

Other Authorities

Second Biennial Report of the United States of America Under the United Nations
    Framework Convention on Climate Change, 2016, available at:
    https://unfccc.int/files/national_reports/biennial_reports_and_iar/submitted_bie
    nnial_reports/application/pdf/2016_second_biennial_report_of_the_united_stat
    es_.pdf .......................................................................................................... 23

*The Economic Potential of Article 6 of the Paris Accord and Implementation*
    *Challenges*, IETA, University of Maryland, and Carbon Pricing Leadership
    Corporation (2019), available at:
    https://www.ieta.org/resources/International_WG/Article6/CLPC_A6%20repor
    t_no%20crops.pdf .........................................................................20, 21, 22

Fed. R. Civ. Proc. 8................................................................................................ 11

Fed. R. Civ. Proc. 56(c) ...................................................................................... 10

CARB Final Statement of Reasons (May 10, 2013), Available at
    https://ww3.arb.ca.gov/regact/2012/capandtrade12/linkfsor.pdf ........................... 14

Inlandsis Fund, About Inlandsis
    https://fondsinlandsis.com/en/about-us/ (last visited May 11, 2020) ...................... 23

International Emission Trading Association, Member List
    https://www.ieta.org/Our-Members ........................................................................ 10

*Tools of the Trade: A Guide to Designing and Operating a Cap and Trade*
    *Program for Pollution Control*, U.S. Evtl. Prot. Agency (2003)
    https://www.epa.gov/sites/production/files/2016-03/documents/tools.pdf.............................. 20

# I.
## INTRODUCTION

The United States has tried to characterize this lawsuit as yet another dispute between the economy and the environment – with California's environmental protection efforts intruding upon the President's foreign policy to defend the country's economic well-being.  The undisputed facts show otherwise.  Here, the United States' Second Motion for Summary Judgment (the "Second Motion") seeks to set aside California regulations linking its cap-and-trade program to that of Québec (the "Linkage," defined more fully below).  The Linkage is designed to *reduce the cost* of greenhouse gas ("GHG") emission reductions to regulated entities in California.  If successful in invalidating the Linkage, the United States would drive up the cost of emission reductions on the American economy, which is precisely the opposite of its purported foreign policy goals.  The United States' lawsuit injects significant uncertainty into a thriving market that has matured over six years and threatens to undermine the reasonable expectations of many that have invested billions of dollars in that market.  As such, this is not a dispute between the interests of environmental protection and the economy; the United States' position is adverse to *both* the economy *and* the environment.

Fortunately, the United States Supreme Court has fashioned a Foreign Affairs Doctrine standard that affirms the states' right to enact valid police power regulations, such as the Linkage, that do not conflict with an express foreign policy of the United States.  Under that standard, state law is preempted if either (1) the state has intruded upon the field of foreign affairs without any "serious claim" to be addressing a subject of "traditional state responsibility," or (2) the state has acted within its traditional domain and there is a "conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003) ("*Garamendi*").  The undisputed facts show that the United States has not satisfied either test and therefore the Second Motion fails as a matter of law.

California's Linkage addresses matters of pollution control and economic regulation at the core of its traditional police powers.  Although the United States asserts, without authority, that the regulation of GHGs is not a traditional state concern, binding Ninth Circuit precedent holds

1    otherwise. *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 946 (9th Cir. 2019) ("*Rocky*

2    *Mountain*") (GHG regulation "clearly falls within the exercise of even the most traditional concept

3    of . . . the police power"). Furthermore, the Linkage is a cost-cutting measure intended to reduce

4    compliance costs for California entities regulated under the State's Cap-and-Trade program. It

5    thereby serves a market regulation function that also is central to the State's traditional powers.

6        The United States suggests that California had an ulterior motive in promulgating the

7    Linkage – that its "real purpose" was to regulate GHG emissions "in foreign jurisdictions" and to

8    "engage in global climate diplomacy." It supports this argument by reference to statements by

9    certain California officials disapproving of the United States' decision to withdraw from the Paris

10   Agreement of 2015 (the "Paris Accord") *made in 2019*, six years *after* the Linkage regulations

11   were promulgated. The Court was correct to reject the relevance of similar such statements as "no

12   more than typical political hyperbole" in denying the First Motion and should do so again here.

13   More substantively, the United States' "ulterior motive theory" is easily disproven by reference to

14   the California Air Resource Board's ("CARB's") Statement of Reasons accompanying the Linkage

15   regulations, which support the Linkage by stating that "[e]xpanding the number of sources that are

16   able to trade allowances will reduce the overall cost of achieving the desired level of emission

17   reductions." The purpose of California's GHG regulations generally, and of the Linkage

18   specifically, fall squarely within the State's "traditional responsibility."

19       As such, the Linkage must be upheld under the Foreign Affairs Doctrine unless it is in

20   "clear conflict" with "an express federal policy." *Garamendi*, 539 U.S. at 419 n.11. Here, too, the

21   Second Motion falls short. The United States offers two theories of conflict: (1) that the Linkage

22   conflicts with the United States' decision to withdraw from the Paris Accord, and (2) that it

23   undermines the Federal Government's ability to negotiate a "better deal." At the outset, the United

24   States' withdrawal from the Paris Accord and its desire, however sincere, to negotiate a new

25   agreement are not "express federal policy" that can preempt state law. Our federalist system does

26   not permit the federal Executive to unilaterally preempt duly-enacted state law by merely

27   expressing its intent to negotiate. *See Cent. Valley Chrystler-Jeep, Inc. v. Goldstene*, 529 F. Supp.

28   2d 1151, 1174 (E.D. Cal. 2007) ("*Goldstene*") ("In order to conflict or interfere with foreign

1 policy within the meaning of *Zschernig*, *Garamendi* or related cases, the interference must be with

2 a policy, not simply with the means of negotiating a policy.")

3      But even accepting that the United States' withdrawal from the Paris Accord constitutes an

4 "express federal policy" with preemptive force, there is no conflict here. The Second Motion

5 affirms the United States' commitment to reduce GHG emissions under the United Nations

6 Framework Convention on Climate Change (the "UNFCCC"), but states that the President aims to

7 negotiate a new agreement to lower the costs of those reductions to the United States economy.

8 The Linkage is not in conflict with that foreign policy goal. Indeed, the Linkage expands the

9 market for emission allowances under California's Cap-and-Trade program, increasing the

10 liquidity of those instruments and reducing the cost of emission reductions within the State. It

11 follows that this lawsuit, and not the Linkage, conflicts with the United States' foreign policy

12 goals. By seeking to invalidate the Linkage this lawsuit aims to undermine the United States'

13 express goal to minimize the cost of emission reductions to the United States economy.

14      The Second Motion's other contention that the Linkage facilitates Canada's participation in

15 the Paris Accord is pure fallacy. It is true that the Paris Accord contemplates exchanges of

16 emission reduction credits (defined below as "ITMOs") for use toward Parties' individually

17 established emission reduction goals under the Paris Accord (defined below as "NDCs"). But it

18 does not follow, as the United States claims, that through the Linkage "California is selling

19 greenhouse gas emission *of the United States* that Canada can use to support its commitments

20 under the Paris Accord." ECF No. 102 at 21-22 (emphasis original). Rather, under Paragraph 6.3

21 of the Paris Accord, the use of ITMOs to satisfy a nation's NDC must be "authorized by

22 participating Parties" – that is, the Parties to the Paris Accord participating in the ITMO

23 transaction. In other words, Canada cannot use ITMOs generated in California towards its NDC

24 unless the transaction is expressly authorized by the United States. Furthermore, if the United

25 States' withdrawal from the Paris Accord becomes effective in November 2020, as a non-Party it

26 will no longer have the authority to authorize a transfer of ITMOs for use towards a Party's NDC.

27 California's Linkage with Québec thus has no bearing upon Canada's participation in the Paris

28 Accord and does not conflict in any way with the United States' withdrawal from that Agreement.

1          Lastly, the Linkage risks no interference with the United States' ability to negotiate a

2    "better deal."  California's efforts to reduce emissions actually enhance the United States'

3    credibility as a serious negotiating partner committed to addressing climate change as a Party to

4    the UNFCCC, the United States' support for which is affirmed in the Second Motion.  This is

5    borne out by the fact that while the Linkage has been in place for over six years, the United States

6    has alleged no interference until the filing of this action.  Most fundamentally, though, there

7    simply can be no interference because the United States' authority over foreign affairs is and

8    remains plenary – as evidenced most dramatically by the President's withdrawal from the Paris

9    Accord despite the political opposition of the leaders of many states.  The United States may

10   someday enter into an international treaty or adopt an express policy that preempts the Linkage,

11   but that potentiality is far too speculative to have preemptive force here.

12         The contours of the Foreign Affairs Doctrine were set out of respect for the states' right to

13   regulate within their traditional police powers.  The Court should be particularly reluctant to upset

14   this balanced federalism here, based on a vaguely defined foreign policy, because invalidation of

15   the Linkage would upset the stability of a market in which many dozens of private entities have

16   invested many billions of dollars.  The United States' Second Motion should be denied.

17                                                    **II.**
                                       **STATEMENT OF FACTS**

18

19         Intervenor-Defendant International Emissions Trading Association ("IETA") is a non-

20   profit trade organization representing over 125 businesses worldwide, including numerous entities

21   that have compliance obligations under California's and Quèbec's cap-and-trade programs.

22   IETA's members include some of North America's, and the world's, largest power, industrial, and

23   financial corporations, including leaders in the oil and gas, electricity, manufacturing, mining,

24   chemicals, and paper industries.[1]  In addition to those members with GHG-reduction obligations

25   under California and Québec law, IETA's members include others that offer a variety of services

26   in the carbon market that has emerged under the linkage of California's and Québec's cap-and-

27

28   _____

[1] An up-to-date list of IETA's members is available at https://www.ieta.org/Our-Members.

SMRH:4820-1131-7180.5    IETA'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT

1   trade systems, including allowance-trading brokerages and generators of offsets.  IETA and its

2   members have a shared goal of developing an emission trading regime that results in real and

3   verifiable GHG emission reductions, thereby balancing economic efficiency with environmental

4   integrity and social equity in a way that is both more efficient and more effective than traditional

5   command-and-control regulatory regimes.

6         IETA submitted a comprehensive Statement of Facts in its Opposition to Plaintiff's Motion

7   for Summary Judgment filed on February 10, 2020.  ECF No. 47 at 8-12.  Rather than restate

8   those facts here, IETA refers the Court to that filing, as well as the Statement of Facts submitted

9   by the State Defendants, the WCI Defendants, and Intervenor-Defendants Environmental Defense

10  Fund ("EDF") and Natural Resources Defense Council ("NRDC").  ECF No. 49 at 3-12 (State

11  Defendants); ECF No. 46-1 st 2-3 (WCI Defendants); ECF No. 48 at 3-9 (EDF/NRDC).

12  **III.**
    **ARGUMENT**

13

14  **A.**      **Standard of Review.**

15        Summary judgment is appropriate "only if no genuine issue of material fact exists," and

16  only if the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c);

17  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Clipper Express v. Rocky Mountain Motor*

18  *Tariff Bureau, Inc*., 690 F.2d 1240, 1250 (9th Cir. 1982).  "In considering a motion for summary

19  judgment, the court may not weigh the evidence or make credibility determinations, and is

20  required to draw all inferences in a light most favorable to the non-moving party."  *Anderson v.*

21  *Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).

22  **B.**      **The Motion Impermissibly Exceeds the Scope of Relief Sought in the Complaint.**

23        As a threshold issue, this Court should reject the United States' effort to broaden the object

24  of this lawsuit beyond the scope of the pleadings.  The United States' operative First Amended

25  Complaint (the "FAC") seeks declaratory and injunctive relief against operation and

26  implementation of the Agreement between California and Québec (the "Agreement"), Agreement

27  11-415 Between Air Resources Board and Western Climate Initiative, Incorporated ("Agreement

28  11-415"), and "supporting California law as applied (including Cal. Health & Safety Code

-9-

§ 38564 and 17 CCR §§ 95940-43)."  ECF No. 7 at 31-32 (Prayer for Relief).[2]  "The United States for the first time introduced the term "Agreement and Arrangements" in its Reply Brief In Support of its First Motion for Summary Judgment, defining the latter vaguely to include unspecified "preparatory and implementing activities."  ECF No. 78 at 1, n.2."

In denying the First Motion, the Court reasonably construed the phrase "the Agreement and supporting California law" in the FAC "to include California Code of Regulations, Title 17, Sections 95940-43 because those mandate the general requirements for linking California's cap-and-trade program with other jurisdictions."  ECF No. 91 at 25, n.12.  Undeterred, the United States' Second Motion for Summary Judgment aims to significantly broaden the scope of this lawsuit,  this time defining the "Agreement and Arrangements" to include unspecified "preparatory and implementing activities, **starting with the Global Warming Solutions Act of 2006**."  ECF No. 102 at 2, n.1 (emphasis added).

The United States should not be permitted, through its Second Motion, to expand the scope of the relief that it seeks in this lawsuit, and this Court cannot grant relief beyond the scope of what is stated in the operative pleading.  Fed. R. Civ. P. 8; *Moeller v. Taco Bell Corp.*, 966 F. Supp. 2d 899, 902 (N.D. Cal. 2013).  The defendants in this lawsuit should not be left to guess at what "preparatory and implementing actions" the United States here challenges.  It certainly cannot be the case that the entirety of California's climate policy, "starting with the Global Warming Solutions Act of 2006," is now at issue in this lawsuit.  ECF No. 102 at 2, n.1.  The scope of this lawsuit must be limited to the provisions challenged in the FAC:  the Agreement, Agreement 11-415, California Health & Safety Code Section 38564, and California Code of Regulations Sections 95940-43 (referred to herein as the "Linkage").

C.      <u>The Foreign Affairs Doctrine Does Not Preempt the Linkage.</u>

Preemption under the Foreign Affairs Doctrine can take the form of either "field preemption" or "conflict preemption."  *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012).  Under the doctrine of field preemption, state action is preempted where the

_____

[2] Note that this language is virtually identical to that used in the United States' Third Cause of Action under the Foreign Affairs Doctrine.  ECF No. 7 at ¶ 174.

1    state intrudes on foreign affairs with no "serious claim" to be addressing "a traditional state

2    responsibility." *Id.* at 1074-75.  When a state acts within its "traditional competence," however,

3    state law will not be preempted under the Foreign Affairs Doctrine unless there is "a conflict, of a

4    clarity or substantiality that would vary with the strength or the traditional importance of the state

5    concern asserted." *Garamendi*, 539 U.S. at 419 n. 11, 420.  Under *Garamendi*, the "traditional

6    importance of the state concern" informs the "clarity or certainty" of the conflict required, and

7    thus the field preemption analysis should occur first.  Here, the Linkage falls squarely within

8    California's traditional state powers to protect its citizens and regulate its marketplace.  Because

9    the Linkage does not conflict with any express federal policy of the United States federal

10   government, the State's interests must prevail and the Linkage is not preempted.

         **1.    Environmental and Economic Regulations Fall Squarely Within California's
11              Traditional Field of Competence.**

12

13        "At times, albeit seldomly, the Supreme Court has found a state law to be preempted

14   because it infringes upon the federal government's exclusive power to conduct foreign affairs,

15   even though the law does not conflict with a federal law or policy." *Von Saher v. Norton Simon*

16   *Museum of Art Pasadena*, 592 F.3d 954, 963 (9th Cir. 2010).  This "field preemption" does not

17   apply where a state acts within its ""traditional competence." *Garamendi*, 539 U.S. at 419 n.11,

18   420.  "The central question, then is this:  in enacting [the Linkage], has California addressed a

19   traditional state responsibility, or has it infringed on a foreign affairs power reserved by the

20   Constitution exclusively to the national government?" *Von Saher*, 592 F.3d at 964.

21        California's Linkage implicates two core areas of traditional state competence –

22   environmental protection and market regulation – and therefore field preemption does not apply.

23   The United States' arguments fail to refute this nearly tautological deduction.  ***First***, the United

24   States' Second Motion baldly asserts, with no supporting authority, that "[r]egulating greenhouse

25   gas emissions to address global climate change is not a traditional state responsibility."  ECF No.

26   102 at 29.  Contrary to the United States' threadbare claim, the Ninth Circuit has squarely held

27   that greenhouse gas regulation "clearly falls within the exercise of even the most traditional

28   concept of . . . the police power." *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 946

1   (9th Cir. 2019) ("*Rocky Mountain*"), quoting *Huron Portland Cement Co. v. City of Detroit*, 362

2   U.S. 440, 442 (1960).  Upholding CARB's regulation of fuel sales in California under the Global

3   Warming Solutions Act, the court explained that:

> The California legislature is rightly concerned with the health and
> welfare of humans living in the State of California.  These persons
> may be subjected, for example, to crumbling or swamped coastlines,
> rising water, or more intense forest fires caused by higher
> temperatures and related droughts, all of which many in the scientific
> communities believe are caused or intensified by the volume of
> greenhouse gas emissions.  The California legislators and regulators
> who created the CARB regulation of greenhouse gas emissions were
> clearly concerned with such dreadful environmental impacts.  And,
> **whatever else may be said of the revolutionary colonists who**
> **framed our Constitution, it cannot be doubted that they**
> **respected the rights of individual states to pass laws that**
> **protected human welfare**, *see, e.g., The Federalist No. 45* at 289
> (James Madison) (Clinton Rossiter ed., 2003) ("The powers reserved
> to the several States will extend to all the objects, which, in the
> ordinary course of affairs, concern the lives, liberties, and properties
> of the people; and the internal order, improvement, and prosperity of
> the State."), and recognized their broad police powers to accomplish
> this goal.  *See, e.g., Metro. Life Ins. Co. v. Massachusetts*, 471 U.S.
> 724, 756, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985) ("The States
> traditionally have had great latitude under their police powers to
> legislate as 'to the protection of the lives, limbs, health, comfort, and
> quiet of all persons.'" (quoting *Slaughter-House Cases*, 83 U.S. 36,
> 62, 21 L. Ed. 394 (1873))); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S.
> 27, 36, 100 S. Ct. 2009, 64 L. Ed. 2d 702 (1980) ("[T]he States retain
> authority under their general police powers to regulate matters of
> 'legitimate local concern,' even though interstate commerce may be
> affected."); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S.
> 440, 442, 80 S. Ct. 813, 4 L. Ed. 2d 852 (1960) ("Legislation
> designed to free [the air] from pollution . . . clearly falls within the
> exercise of even the most traditional concept of . . .
> the police power.").

21  *Rocky Mountain*, 913 F.3d at 945-46 (emphasis added); *Am. Fuel & Petrochemical Mfrs. v.*

22  *O'Keeffe*, 134 F. Supp. 3d 1270 (D. Or. 2015), aff'd *sub nom.*, 903 F.3d 903 (9th Cir. 2018)

23  (greenhouse gas regulation "is within the states' traditional authority – for which there is a general

24  presumption against preemption absent a clear and manifest expression of intent by Congress").

25  Indeed, the United States Congress recognized that "California has exercised its police power to

26  regulate pollution emissions from motor vehicles since before March 30, 1966" when it granted

27  California a waiver to the Clean Air Act's preemption of state motor vehicle emission standards.

28  *Cent. Valley Chrystler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007).  In

1   the face of these authorities, the United States' assertion that greenhouse gas regulations somehow

2   fall outside of California's traditional regulatory expertise is rendered baseless.[3]

3        ***Second***, the Second Motion contends that the "real purpose" of the Linkage is to regulate

4   "greenhouse gas emissions in foreign jurisdictions" and to "engage in global climate diplomacy."

5   ECF No. 102 at 29-34.  But this assertion ignores the evidence that is most instructive in

6   determining the purpose of the Linkage.  To discern the "real purpose" of the Linkage, this Court

7   need look no further than CARB's Statement of Reasons for promulgating the Linkage regulations.

8   When CARB promulgated its framework regulations for the Linkage in 2011, it recognized that

9   linking with other programs would "provide an additional cost containment mechanism" for

10  covered entities.[4]  ECF No. 49-2, Exh. 5 at 193.  In promulgating the regulations for the Linkage

11  with Québec in 2013, CARB observed that "[e]xpanding the number of sources that are able to

12  trade allowances will reduce the overall cost of achieving the desired level of emission

13  reductions."  Cal. Evtl. Prot. Agency Air Res. Bd., Amendments to California's Cap-and-Trade

14  Program: Final Statement of Reasons 27, 67, 95 (May 10, 2013).[5]  That clear and

15  contemporaneous evidence establishes that the "real purpose" of the Linkage is to mitigate the

16  costs of compliance for regulated entities in California by expanding the market for allowances.

17  This type of market regulation is a central component of California's "traditional competence."

18  *See*, *e.g.*, *Home Bldg. & Loan Ass'c v. Blaisdell*, 290 U.S. 398, 423 (1934) (Minnesota law was

19  reasonable exercise of police power over economic matters); *Day-Brite Lighting, Inc. v. Missouri*,

20  342 U.S. 421, 424-24 (1952) ("The public welfare is a broad and inclusive.  The moral, social,

---

22  [3] The United States contends that because CARB openly acknowledges that climate change is a
    global problem it somehow falls outside the State's "traditional competence."  ECF No. 102
23  at 31-33.  But the United States does not cite any authority for the novel proposition that a
    state's police power does not extend to evils, international in scope, that have a deleterious effect
24  within the state.  Rather, the Supreme Court has long recognized that states have the power to
    regulate air pollution, irrespective of its refusal to obey political boundaries.  *Georgia v.*
25  *Tennessee Copper Co.*, 206 U.S. 230, 237 (1907).

26  [4] Indeed, numerous entities, including IETA members, supported the framework Linkage
    regulations as a prudent cost-containment measure.  ECF No. 50-2, ¶¶ 26-27; ECF No. 49-2,
27  Exh. 5 at 142, 167, 175, 191, 192.

28  [5] Available at https://ww3.arb.ca.gov/regact/2012/capandtrade12/linkfsor.pdf.

1   economic and physical well-being is one part of it; the political well-being, another.  The police

2   power which is adequate to fix the financial burden for one is adequate for the other.")

3     Rather than pointing to the clear and contemporaneous evidence of CARB's Statement of

4   Reasons in promulgating the Linkage regulations, the Second Motion asks this Court to discern its

5   purpose based on public statements made by California public officials several years *after* the

6   Linkage was established.  ECF No. 102 at 29, 33.  One simply cannot discern the "real purpose" of

7   the Linkage regulations promulgated in 2011 and 2013 by reference to the disapproval of some

8   California officials to the President's decision in 2019 to withdraw from the Paris Accord – years

9   later and after several changes in administration in California.  This Court was absolutely correct

10   when it ruled on the First Motion that it should not set aside the Linkage based on statements that

11   constitute "no more than typical political hyperbole."  ECF No. 91 at 13 n.7.  This logic is even

12   more compelling here where the "political hyperbole" that purportedly reveals the "real purpose"

13   of the Linkage occurred many years after any of the many State actions that make up the Linkage.

14     Even further afield, the United States also asserts that this Court should look to several

15   other agreements that California has entered into with "foreign and domestic governments"

16   relating to "environmental policy."  ECF No. 102 at 33.  Those agreements are not at issue in this

17   lawsuit, and the United States does not explain how they might be relevant to determining what

18   California's "real purpose" was in promulgating the Linkage.  Nor can the Linkage's "real

19   purpose" be understood by reference to any hortatory statements made by the California

20   Legislature in enacting the Global Warming Solutions Act.  *Id*. at 3.  Those statements indicate that

21   California wishes to serve as an international model and to facilitate or foster international climate

22   programs.  As such, they are consistent with the states' traditional role in public discourse.

23   *Gingery v. City of Glendale*, 831 F.3d 1222, 1230 (9th Cir. 2016) (acknowledging "the role local

24   governments have traditionally played in public discourse related to foreign affairs"); *see also*

25   *Farley v. Healey*, 67 Cal. 2d 325 (Cal. 1967) ("Even in matters of foreign policy it is not

26   uncommon for local legislative bodies to make their positions known.").

27     The Linkage is designed to lower compliance costs by expanding the market for emissions

28   trading, thereby enabling California-regulated entities to make greater emission reductions at a

lower cost. Both environmental protection and market regulation are core areas of traditional state competence, and therefore the Linkage cannot be preempted unless there is a "clear conflict" with an "express federal policy." *Garamendi*, 539 U.S. at 421. As discussed below, there is no such conflict.

        **2.     The Linkage Does Not Conflict With United States Foreign Climate Policy.**

Because California was well within its traditional police powers in promulgating the Linkage, it is entitled to a strong presumption of validity. *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 961 (9th Cir. 2018). The Linkage will only yield under the Foreign Affairs Doctrine if there is a clear conflict" with an "express federal foreign policy." *Garamendi*, 539 U.S. at 420, 425.

        a.     <u>The United States Does Not Identify Any Express Federal Policy That Might Preempt the Linkage.</u>

In arguing that the Linkage serves as an obstacle to the realization of the purposes of United States foreign policy, the Second Motion struggles to identify any actual "foreign policy" of the United States with which the Linkage conflicts. *See* ECF No. 102 at 23-28. For example, it is not a "foreign policy" that the Global Climate Protection Act authorized the President to "pursue coordinated national policy on climate change" and to "work toward international agreements." ECF No. 102 at 24-25. Nor is the United States' commitment, as a party to the United Nations Framework Convention on Climate Change (the "UNFCC"), to "adopt national policies and take corresponding measures on the mitigation of climate change" a "policy." *Id*. at 26. Nor is it a "policy," as is repeated throughout the Second Motion, that the United States speak with a "singular and effective voice." *Id*. As this Court held in rejecting precisely the same argument over a decade ago:

> **'Speaking with one voice' does not constitute an actual *policy*** within the meaning of any of the cases heretofore cited. The "policy" in evidence in *Garamendi* was evinced by the **results** of the President's negotiations and was embodied in an agreement; in *Crosby*, the "policy" was embodied in an act of Congress setting forth specific limited sanctions against a country; in *Zschernig* the "policy" was evinced by a negotiated treaty that covered the same subject as the state law. **What Plaintiffs label as a policy in this case is actually nothing more than a commitment to negotiate under certain conditions and according to certain principles**.

Rather, **what Plaintiffs contend is United States "policy" is more accurately described as a strategy; that is, a means to achieve an acceptable policy but not the policy itself**. It is the agreements, or partnerships themselves that are the results of the Administration's negotiation that are or can be evidence of the President's exercise of foreign policy. When the court looks for conflict or interference, the question necessarily arises as to the object of the interference. **In order to conflict or interfere with foreign policy within the meaning of *Zschernig*, *Garamendi* or related cases, the interference must be with a policy, not simply with the means of negotiating a policy**. Thus, in order to prove conflict in the instant case, Plaintiffs must make a showing that California's efforts to implement regulations limiting the emission of greenhouse gasses from automobiles will interfere with the efforts of this government or a foreign government to reduce the intensity of their greenhouse gas emissions pursuant to a negotiated agreement, treaty, partnership or the like.

*Goldstene*, 529 F. Supp. at 1186-87 (emphases added).

The Second Motion also looks to statements made to the press by the President and the Secretary of State regarding the reasons why the President decided to withdraw from the Paris Accord.[6] ECF No. 102 at 20. Those statements lack the force of law and cannot preempt state enactments. *Barclays Bank Plc v. Franchise Tax Bd*, 512 U.S. 298, 329-30 (1994) ("Executive Branch communication that express federal policy but lack the force of law cannot render unconstitutional California's otherwise valid" actions.")

The Ninth Circuit has interpreted the "express federal policy" requirement as encompassing federal actions such as "a treaty, federal statute, or express executive branch

---

[6] It should be noted that the President's purported reasons for withdrawing from the Paris Accord are detached from reality. Specifically, while the President claimed the Paris Accord was unfair to the United States because of the "*draconian financial and economic burdens*" imposed by the "*nationally determined contribution* and, very importantly, *the Green Climate Fund*," ECF No. 102 at 20 (emphases original), both the NDC and "Green Climate Fund" commitments are entirely voluntary. The Paris Accord sets no emission reduction goals for any nation, nor does it set the amount of any financial contribution; the amounts of both are of determined by each nation individually (hence the term "*nationally determined* contribution" or "NDC"). See Paris Agreement (ECF No. 12-2, Ex. 3) at Art. 4.2 ("Each Party shall prepare, communicate and maintain successive [NDCs] *that it intends to achieve*."), 4.3 (each Party's NDC will reflect its "common but differentiated responsibilities and respective capabilities, *in the light of different national circumstances*"), 4.11 ("A Party may at any time adjust its existing [NDC]"), and 9.3 (the "mobilization of climate finance *should* represent a progression beyond previous efforts") (emphases added). The United States could, and still can, unilaterally adjust its NDC or Green Climate Fund commitments at any time.

1    policy." *Von Saher*, 592 F.3d at 960.  That provides a sound rule, as it would create an

2    unworkable standard to subordinate the state police power to every verbal statement made by the

3    President or a senior Executive official, especially as the persons occupying those positions tend

4    to change with every election.

5                      b.    The Linkage Is Not An Obstacle To the United States' Negotiation of a
                            New Climate Deal.

6

7            Even if the Court were to find that the United States' mere desire to negotiate an

8    international climate deal, without more, could constitute a "policy" that might preempt

9    conflicting state law, the Linkage does not diminish the United States' negotiation leverage in any

10   way.  Here, we defer to the experts in international negotiation.  In opposition to the United

11   States' First Motion, thirteen former United States diplomats and government officials submitted

12   an *Amici Curiae* brief that addressed all four of the claims in the FAC.  ECF No. 65-1.  Those

13   diplomats and government officials "worked under presidents from both major political parties to

14   shape U.S. foreign and climate policy over many decades, including by negotiating treaties and

15   international climate agreements."  *Id.*, p. 1.  Those experienced negotiators concluded as follows:

16              Plaintiff's argument has it exactly backwards:  **in our experience as
                **climate negotiators, state and local efforts to reduce emissions**
17              ***enhanced* our effectiveness** by increasing the credibility of the
                United States as a negotiating partner genuinely determined to
18              address climate change.  For *amici* whose time as climate negotiators
                overlapped with California's linkage policy, that policy never
19              interfered with our work under the UNFCCC.  **Linking California's**
                **emissions to Quebec's does not reduce federal negotiating**
20              **leverage; it simply expands cost-reduction opportunities for**
                **parties regulated under those programs**.    Any impact that
21              California's policy might have on the United States' "leverage"
                within the UNFCCC framework would be attributable not to the
22              linkage regulations and memorandum, but to a 14-year-old state law,
                California's [Global Warming Solutions Act of 2006], and a state
23              cap-and-trade program that could not—and have never before been
                found by any court to—have the effect Plaintiff seeks to attribute to
24              them.

25              Indeed, Plaintiff's own briefing reveals that, as a party to the
                UNFCCC, the United States' official policy is to continue cutting
26              emissions to stabilize greenhouse gas concentrations.  Given that
                policy, it makes little sense for the federal government to now
27              suggest that California must do the opposite.  **Holding states'**
                **emission reductions in abeyance, or making cuts more**
28              **expensive, in order to increase federal negotiating "leverage"**

1  **would be inconsistent with the United States' own official
   policy**.

2

3  ECF No. 65-1 at 4-5 (internal footnote citations omitted) (emphases added).

4      The Linkage does not frustrate the United States' desire to negotiate a new international

5  climate agreement, even if we assume that desire is genuine.  "If anything, state programs like

6  California's which reduce operating costs and increase compliance flexibility for businesses,

7  bolster the United States' climate negotiating posture."  ECF No. 65-1 at 10.  In its Second Motion,

8  the United States confirmed its commitment to the UNFCCC's goal of reducing greenhouse gas

9  emissions to stabilize the global climate.  ECF No. 102 at 26.  It is its effort to invalidate the

10 Linkage that is inconsistent with that express foreign policy goal.

11      c.   <u>The Linkage Is Designed To Mitigate the Cost of Greenhouse Gas Emission
             Reductions, Which Is Consistent With the United States' Stated Reasons For</u>

12           <u>Withdrawing From the Paris Accord</u>.

13      To the extent that there is any tangible foreign policy described in the Second Motion, it

14 would be found in the United States' decision to withdraw from the Paris Accord.[7]  The Second

15 Motion reaffirms the United States commitments under the UNFCCC with respect to the

16 "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent

17 dangerous anthropogenic interference with the climate system."  ECF No. 102 at 5 (quoting the

18 UNFCCC, art. 2).  But the Second Motion contends that the United States withdrew from the

19 Paris Accord due to the purported negative impacts to the United States economy, the perceived

20 unfairness of permitting China to continue to increase its emissions, and purported foreign aid

21 payments to India.  ECF No. 102 at 9-10.  Thus, if there is any United States foreign policy

22 articulated in the Second Motion, it is that the United States stands by its commitment to reduce

23 greenhouse gas emissions through the UNFCCC, but seeks to negotiate better cost-containment

24 measures to reduce the impact of those reductions on the United States economy.

25

26

27 [7] The Second Motion does not cite any authority for the proposition that conflict preemption
   applies "if the United States chooses to put a particular policy on 'pause' while it rethinks it
28 options, and a state pursues an affirmative policy in that same area."  ECF No. 102 at 1.

1    The Linkage is in lock-step with that articulated foreign policy of the United States.

2    Emission trading, and cap-and-trade programs in particular, is widely considered to be among the

3    most effective cost-cutting tools for achieving emission reductions.  U.S. Evtl. Prot. Agency,

4    *Tools of the Trade: A Guide to Designing and Operating a Cap and Trade Program for Pollution*

5    *Control* (2003), https://www.epa.gov/sites/production/files/2016-03/documents/tools.pdf.  The

6    Linkage, in turn, is based on the sound economic principle that the broader and more liquid the

7    marketplace for allowances, the greater the cost savings realized from a cap-and-trade program.

8    *See*, CARB Statement of Reasons, 27, 67, 95 ("Expanding the number of sources that are able to

9    trade allowances will reduce the overall cost of achieving the desired level of emission

10   reductions.")[8]  In sum, the Linkage permits California businesses to achieve the greenhouse gas

11   emission cuts at a lower cost to the State, and consequently to the national economy.

12   If the United States' articulated foreign policy goals are sincere, then it simply does not

13   make sense that it now seeks to invalidate the Linkage.  Invalidation of the Linkage will contract

14   the market for allowances and decrease their liquidity, making compliance with California's Cap-

15   and-Trade program more expensive.  It thus would undermine the United States' express goal of

16   minimizing the cost of emissions reduction to the United States economy.  There is no conflict

17   between the Linkage and the United States' foreign policy.

18          d.     <u>Canada May Not Utilize California's Emission Reductions Without the</u>
              <u>Express Authorization Of the United States</u>.

19

20   Indirectly recognizing the cost-cutting effect of the Linkage, the Second Motion's

21   contention that the Linkage is inconsistent with the United States' withdrawal from the Paris

22   Accord is almost entirely based on the fallacy that the Linkage will somehow "facilitate Canada's

23

---

24   [8] A recent technical paper prepared by IETA in conjunction with the University of Maryland and
     the Carbon Pricing Leadership Coalition estimates that emission trading under the Paris Accord

25   would reduce global compliance costs by 50% per unit of carbon dioxide equivalent, assuming
     the United States withdraws; if the U.S. participated, the cost savings could be greater.  *See The*

26   *Economic Potential of Article 6 of the Paris Accord and Implementation Challenges* (2019),
     available at:

27   https://www.ieta.org/resources/International_WG/Article6/CLPC_A6%20report_no%20crops.p

28   df.

1   participation in the Paris Accord."  ECF No. 102 at 19.  The United States correctly observes that

2   Article 6 of the Paris Accord permits exchanges between nations that are Parties of emission

3   reduction credits (called "internationally transferred mitigation outcomes" or "ITMOs") in order to

4   achieve their emission reduction goals.  *Id.* at 20-21.  As discussed in note 6, *supra*, these goals are

5   voluntary; the Paris Accord describes them as the Parties' "nationally determined contributions

6   [NDCs] to the global response to climate change."  Paris Agreement, Nov. 4, 2016, T.I.A.S. No.

7   16-1104 (ECF No. 12-2, Ex. 3) at Art. 3.  The United States then jumps to the conclusion, easily

8   refuted, that through the Linkage "California is selling greenhouse gas emissions *of the United*

9   *States* that Canada can use to support its commitments under the Paris Accord."  *Id.* at 21-22

10  (emphasis in original).  Relying on that faulty premise, the United States trots out a parade of

11  horribles that will flow from California's transfer of ITMOs to Canada under the Paris Accord.  *Id.*

12  at 21-23.

13       Paragraph 6.3 of the Paris Accord expressly provides that "[t]he use of internationally

14  transferred mitigation outcomes to achieve nationally determined contributions under this

15  Agreement shall be voluntary and **authorized by participating Parties**."  Paris Agreement, Nov.

16  4, 2016, T.I.A.S. No. 16-1104 (ECF No. 12-2, Ex. 3) at Art. 6.3 (emphasis added).  This provision

17  undermines the United States' position entirely.  Under Paragraph 6.3, any and all ITMO

18  transactions to be used towards a Party's NDC must be authorized by the "participating Parties" –

19  that is, the Parties participating in the transaction.  It follows that the Paris Accord does not permit

20  Canada, or any other nation, to utilize California's emission reductions to satisfy its NDC without

21  the United States' express authorization.  California is not, and could not possibly be, a Party to

22  the Paris Accord with the authority to authorize the use of ITMOs towards another Party's NDC.

23  In fact, if the United States completes its withdrawal from the Paris Accord in November 2020 it

24  will cease to be a Party and it too will lack the authority to authorize the use of ITMOs purchased

25  from California towards another nation's NDC.

26       Paragraph 6.3 of the Paris Accord brings the United States' house of cards tumbling down.

27  *First*, it is of no consequence whether Canada intends to use ITMOs generated in California to

28  meet its NDC (ECF No. 102 at 21), because Canada cannot do so unless the United States

-20-

1    authorizes it.  *Second*, even if all fifty states create their own cap-and-trade regimes and enter into

2    linkages with other subnational governments, *id.* at 22, there would be no effect on any foreign

3    nations' ability to implement the Paris Accord.  *Third*, the United States has no ground for concern

4    that those foreign powers would have any incentive to "re-route their efforts to strike deals with

5    individual states."  *Id.* at 22-23.  Simply stated, California's Linkage does not affect the United

6    States' ability to withdraw from the Paris Accord.

7        Lastly, the "diplomatic Catch-22" proposed in the Second Motion is a fiction.  ECF

8    No. 102 at 23.  As noted above, under Paragraph 6.3 of the Paris Accord the United States must

9    authorize the use of any ITMOs purchased from the United States (which by definition includes

10    the individual states) in the NDC of another country.  It thus holds all the cards under the Paris

11    Accord.  Similarly, if the United States' withdrawal from the Paris Accord becomes effective in

12    November 2020, the United States then will no longer be a Party and thus unable to be one of the

13    "participating Parties" required to authorize the use of any purchased ITMOs in the other

14    participating Party's NDC.  It follows that unless the United States changes its foreign policy, the

15    "diplomatic Catch-22" offered in the Second Motion is fantasy.  Further, even if foreign nations

16    such as Canada were to request authorization to use ITMOs generated in California towards their

17    NDCs, the United States could use the promise of that authorization as leverage to bring parties to

18    the table in its effort to negotiate a "better deal," as it claims is its goal.  As discussed above,

19    California's Cap-and-Trade program and the Linkage are entirely consistent with, and pose no

20    conflict to, the United States' purported foreign policy.

21    **D.    Judicial Restraint is Warranted to Avoid Disruption of the Robust Market that Has
          Arisen Under California's Cap-And-Trade Program.**

22

23        Judicial restraint is warranted in the present case to avoid destabilization of the robust

24    market that has arisen under California's Cap-and-Trade program in reliance upon the Linkage.

25    *Made in the USA Foundation v. U.S.*, 242 F.3d 1300, 1318 (9th Cir. 2001) (marketplace decisions

26    made in reliance on NAFTA "militate in favor of judicial restraint, given that a decision declaring

27    NAFTA unconstitutional would be likely to have a destabilizing effect on governmental relations

28    and economic activity across the North American continent.")

1    California's Cap-and-Trade program has been operational since January 1, 2013.  17 Cal.

2    Code Regs. § 95840(a).  Its Linkage with Québec became effective one year later, on January 1,

3    2014.  17 Cal. Code Regs. § 95943(a)(1).  In over seven years since the Cap-and-Trade program

4    became effective, a robust market has developed for the purchasing and trading of compliance

5    instruments under the program – including both emission allowances and offsets.  As the United

6    States has emphasized, billions of dollars are invested in this market.  ECF No. 12 at 15, 17.

7    Those investments were made on the reasonable belief that programmatic costs would be

8    contained under CARB's regulations, including California's ability to link its Cap-and-Trade

9    market to those administered by other jurisdictions.  As just one of many examples of investments

10   made in reliance on these regulations, the Inlandsis Fund, an IETA member based in Québec, has

11   invested in over 30 CARB compliance offset projects.  *See* https://fondsinlandsis.com/en/about-us/

12   (last visited May 11, 2020).  Given the relative maturity of the market that has arisen under

13   California's Cap-and-Trade regulations, judicial restraint is warranted to avoid destabilizing this

14   market and upsetting those reasonable expectation-backed investments.

15        Economic policy should not be built on shifting sands; it requires stability and

16   predictability.  As recently as 2016, the United States was publicizing California's Cap-and-Trade

17   system up as a shining example of state efforts that would assist the United States in meeting its

18   commitment to reduce greenhouse gas emissions as a party to the UNFCCC.  *See*, *e.g.*, Second

19   Biennial Report of the United States of America Under the United Nations Framework

20   Convention on Climate Change, 2016 at 27-28.[9]  The United States commended the involvement

21   of California and other sub-national jurisdictions in international agreements related to climate

22   change.  *Id.* at 29.

23        Now, less than four years later, the United States seeks to destabilize that very market.

24   The United States argues that the Linkage is preempted because the Federal Government has put

25

26   _____

27   [9] Available at:
     https://unfccc.int/files/national_reports/biennial_reports_and_iar/submitted_biennial_reports/app

28   lication/pdf/2016_second_biennial_report_of_the_united_states_.pdf, last accessed May 11,
     2020.

1   international climate negotiations "on pause while it rethinks its options."  ECF No. 102 at 1.  In

2   Section III.C above, IETA shows that the Linkage is not preempted under the Foreign Affairs

3   Doctrine because the Linkage falls squarely within California's traditional police powers and does

4   not conflict with any express foreign policy of the United States.  But this Court also should

5   recognize that sound economic policy requires stability and predictability.  That is one important

6   reason why the United States Supreme Court requires a "clear conflict" with "an express federal

7   policy" before it will find preemption under the Foreign Affairs Doctrine.  *Garamendi*, 539 U.S. at

8   420, 425.  In *Garamendi*, the Court required evidence of a "longstanding" and "consistent" foreign

9   policy encouraging voluntary, rather than coercive, settlement of Holocaust-era insurance claims

10  before it found preemption in the absence of any formal federal enactment evidencing preemptive

11  intent.  *Id.* at 415, 420, 421.  That same level of restraint is warranted here.  If the economic

12  policies of the states can be preempted by the mere political whims of the federal Executive, likely

13  to change every four years, the American economy will suffer the consequences of the resulting

14  instability.

**IV.**
**CONCLUSION**

16      For the foregoing reasons, the United States' Second Motion for Summary Judgment

17  should be denied.

18  Dated:  May 18, 2020                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

19

20

                        By    _____
21                                  */s/ Nicholas W. van Aelstyn*
                                 NICHOLAS W. VAN AELSTYN
22                               ZACHARY M. NORRIS

23                               Attorneys for Intervenor
                              INTERNATIONAL EMISSIONS TRADING
24                                    ASSOCIATION

25

26

27

28