MATTHEW D. ZINN (State Bar No. 214587)
PATRICK L. WOOLSEY (State Bar No. 32989)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:    (415) 552-7272
Facsimile:    (415) 552-5816
Zinn@smwlaw.com
Pwoolsey@smwlaw.com

Attorneys for Defendant-Intervenors
ENVIRONMENTAL DEFENSE FUND and
NATURAL RESOURCES DEFENSE COUNCIL

TIMOTHY J. O'CONNOR (State Bar No. 250490)
ERICA A. MOREHOUSE MARTIN (State Bar No. 274988)
ENVIRONMENTAL DEFENSE FUND
123 Mission Street, Floor 28
San Francisco, California 94105
Telephone:    (415) 293-6050
Facsimile:    (415) 293-6051
Toconnor@edf.org
Emorehouse@edf.org

Attorneys for Defendant-Intervenor
ENVIRONMENTAL DEFENSE FUND

(additional counsel listed on the following page)

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; THE CALIFORNIA AIR RESOURCES BOARD; MARY D. NICHOLS, in her official capacity as Chair of the California Air Resources Board and as Vice Chair and board member of the Western Climate Initiative, Inc.; JARED BLUMENFELD, in his official capacity as Secretary for Environmental Protection and as a board member of the Western Climate Initiative, Inc.; KIP LIPPER, in his official capacity as a board member of the Western Climate Initiative, Inc.; and RICHARD BLOOM, in his official capacity as a board member of the Western Climate Initiative, Inc.,<br><br>          Defendants, | Case No. 2:19-cv-02142-WBS-EFB<br><br>**DEFENDANT-INTERVENORS ENVIRONMENTAL DEFENSE FUND AND NATURAL RESOURCES DEFENSE COUNCIL'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     June 29, 2020<br>Time:     1:30 p.m.<br><br>The Hon. William B. Shubb |

ENVIRONMENTAL DEFENSE FUND and
NATURAL RESOURCES DEFENSE
COUNCIL; and INTERNATIONAL
EMISSIONS TRADING ASSOCIATION,

Defendant-Intervenors

(additional counsel)

DAVID R. PETTIT (State Bar No. 67128)
NATURAL RESOURCES DEFENSE COUNCIL
1314 2nd Street
Santa Monica, California 90401
Telephone: (310) 434-2300
Facsimile: (310) 434-2399
Dpettit@nrdc.org

Attorneys for Defendant-Intervenor
NATURAL RESOURCES DEFENSE COUNCIL

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................10

BACKGROUND ..................................................................................................................12

    I.    California's efforts to mitigate climate change.................................................12

    II.    California's emissions-market coordination ....................................................13

    III.    The Paris Agreement and the United States' withdrawal ...............................14

SUMMARY JUDGMENT STANDARD ............................................................................16

ARGUMENT .......................................................................................................................16

    I.    California's market coordination with Quebec does not create a "clear conflict" with any express executive foreign policy............................................................16

        A.    Plaintiff has failed to identify a concrete foreign policy that could preempt California's market coordination with Quebec.....................................17

        B.    Plaintiff has failed to show that California's actions present a "clear conflict" with the Administration's purported foreign policy on climate change. ..................................................................................................23

            1.    California has done nothing—and can do nothing—to prevent or impede withdrawal from the Paris Agreement. .........................................23

            2.    Statements by California officials remain irrelevant, as this Court held in denying Plaintiff's last motion.........................................................25

            3.    California has not facilitated Canada's compliance with the Paris Agreement.........................................................................................26

            4.    Plaintiff's bargaining-power argument proves too much: it would invalidate *all* state efforts to reduce GHG emissions...............................28

        C.    The importance of California's interest in efficiently controlling GHG emissions means that Plaintiff must identify an especially stark conflict—a showing it has not come close to making. ...............................................28

        D.    Plaintiff improperly asserts a new, and meritless, statutory preemption claim.........................................................................................................31

    II.    California's market coordination with Quebec does not offend the "rarely invoked" dormant aspect of the foreign affairs doctrine. .................................33

        A.    California's market coordination is one part of a program in an area of traditional state responsibility: air pollution control..................................34

            1.    This Court has correctly recognized that control of GHG emissions is a core exercise of California's police power despite the fact that climate change is a global problem...........................................................35

2.    The "real purpose" of California's market coordination is to cost-effectively reduce California GHG emissions. ...........................35

3.    Plaintiff's reliance on statements by individual politicians to show the real purpose of California's program conflicts with decades of settled law. .................................................................................38

B.    California's market coordination with Quebec does not "intrude" into foreign policy. ..........................................................................39

III.    Plaintiff's arguments far exceed the narrow confines that courts have established for foreign affairs preemption. ......................................................43

CONCLUSION ....................................................................................................46

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1

## TABLE OF AUTHORITIES

2

3 **FEDERAL CASES**

4 *Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*,
903 F.3d 903 (9th Cir. 2018) ............................................................ 30, 35

5

6 *Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .......................................................................... passim

7 *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................... 16

8

9 *Arizona v. United States*,
567 U.S. 387 (2012) .......................................................................... 45

10 *In re Assicurazioni Generali, S.P.A.*,
592 F.3d 113 (2d Cir. 2010) ............................................................. 20, 43

11

12 *Atay v. Cty. of Maui*,
842 F.3d 688 (9th Cir. 2016) ........................................................... 45

13 *Bell Atl. Corp. v. Twombly*,
550 U.S. 544 2007) ........................................................................... 40

14

15 *Cassirer v. Thyssen-Bornemisza Collection Found.*,
737 F.3d 613 (9th Cir. 2013) ........................................................... 40

16 *Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................... 16

17

18 *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
529 F. Supp. 2d 1151 (E.D. Cal. 2007) ............................................ passim

19 *Chamber of Commerce of U.S. v. Whiting*,
563 U.S. 582 (2011) .......................................................................... 45

20

21 *City of Las Vegas v. Foley*,
747 F.2d 1294 (9th Cir. 1984) ......................................................... 39

22 *Connecticut v. Am. Elec. Power Co.*,
582 F.3d 309 (2d Cir. 2009) ............................................................. 32

23

24 *Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) .......................................................... 31, 32, 43

25 *Cruz v. United States*,
387 F. Supp. 2d 1057 (N.D. Cal. 2005) ........................................... 43

26

27 *Cty. of San Mateo v. Chevron Corp.*,
294 F. Supp. 3d 934 (N.D. Cal. 2018) ............................................. 30

28

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) .................................................................................... 20, 22

*Deirmenjian v. Deutsche Bank, A.G.,*
    526 F. Supp. 2d 1068 (C.D. Cal. 2007) ...................................................... 20, 43

*Deutsch v. Turner Corp.,*
    324 F.3d 692 (9th Cir. 2003) ..................................................................... 43, 45

*Exxon Mobil Corp. v. EPA,*
    217 F.3d 1246 (9th Cir. 2000) ......................................................................... 29

*Faculty Senate of Fla. Int'l Univ. v. Winn,*
    616 F.3d 1206 (11th Cir. 2010) .................................................................. passim

*Gingery v. City of Glendale,*
    831 F.3d 1222 (9th Cir. 2016) ................................................................... passim

*Hadacheck v. Sebastian,*
    239 U.S. 394 (1915) ......................................................................................... 29

*Huron Portland Cement Co. v. City of Detroit,*
    362 U.S. 440 (1960) .................................................................................... 29, 30

*Kansas v. Garcia,*
    140 S. Ct. 791 (2020) ....................................................................................... 45

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .......................................................................... 11, 30, 35

*Mayor & City Council of Baltimore v. BP P.L.C.,*
    388 F. Supp. 3d 538 (D. Md. 2019) .................................................................. 30

*McCreary County v. ACLU,*
    545 U.S. 844 (2005) ......................................................................................... 39

*Medellin v. Texas,*
    552 U.S. 491 (2008) .......................................................................... 19, 20, 43

*Moon v. Rush,*
    69 F. Supp. 3d 1035 (E.D. Cal. 2014) .............................................................. 16

*Mount Olivet Cemetery Ass'n v. Salt Lake City,*
    164 F.3d 480 (10th Cir. 1998) ......................................................................... 25

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) ................................................................... passim

*Museum of Fine Arts, Boston v. Seger-Thomschitz,*
    623 F.3d 1 (1st Cir. 2010) ..................................................... 18, 20, 21, 29

*New State Ice v. Liebmann,*
    285 U.S. 262 (1932) ......................................................................................... 44

6

*P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
   485 U.S. 495 (1988) .................................................................................. 45

*Pac. Merch. Shipping Ass'n v. Goldstene*,
   639 F.3d 1154 (9th Cir. 2011) ............................................................. 29, 30

*Pain v. Prof'l Mortg. Assoc. Ltd., Inc.*,
   No. CV-12-1181-PHX-SMM, 2014 WL 12647749 (D. Ariz. Sept. 30, 2014) .......................... 33

*People of the State of N.Y. v. O'Neill*,
   359 U.S. 1 (1959) ..................................................................................... 44

*Puente Arizona v. Arpaio*,
   821 F.3d 1098 (9th Cir. 2016) .................................................................... 25

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) .................................................................................. 45

*Rocky Mountain Farmers Union v. Corey*,
   730 F.3d 1070 (9th Cir. 2013) .................................................................... 31

*Rocky Mountain Farmers Union v. Corey*,
   913 F.3d 940 (9th Cir. 2019) ............................................................. 30, 31, 35

*Saleh v. Titan Corp.*,
   580 F.3d 1 (D.C. Cir. 2009) ....................................................................... 20

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) .................................................................... 16

*Siltronic Corp. v. Emp'rs. Ins. Co. of Wausau*,
   No. 3:11-CV-1493-YY, 2018 WL 415928 (D. Or. Jan. 2, 2018) ................................. 33

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007) ................................................................. 16, 21

*United States v. Belmont*,
   301 U.S. 324 (1937) ............................................................................ 20, 22

*United States v. Pink*,
   315 U.S. 203 (1942) ................................................................. 17, 20, 22, 45

*Va. Uranium, Inc. v. Warren*,
   139 S. Ct. 1894 (2019) ....................................................................... 25, 32, 45

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010) ................................................................. passim

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   754 F.3d 712 (9th Cir. 2014) ................................................................. passim

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ..................................................................... 33

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

*Washington v. General Motors Corp.,*
    406 U.S. 109 (1972).................................................................................... 30

*Wyeth v. Levine,*
    555 U.S. 555 (2009).................................................................................... 45

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952).................................................................................... 46

*Zschernig* and *Clark v. Allen,*
    331 U.S. 503 (1947)............................................................................. 40, 41

*Zschernig v. Miller,*
    389 U.S. 429 (1968)....................................................... 17, 40, 41, 43


**STATE CASES**

*Farley v. Healey,*
    67 Cal. 2d 325............................................................................................. 39

*Steinberg v. Int'l Com. on Holocaust Era Ins. Claims,*
    133 Cal. App. 4th 689 (2005) ............................................................... 20, 43


**FEDERAL STATUTES**

42 U.S.C. § 7401 ................................................................................................ 30

Global Climate Protection Act of 1987,
    Pub. L. No. 100–204 (HR 1777, December 22, 1987), Title XI, §§ 1101–1106, 101 Stat.
    1331, 1407*,*
    *as amended by* Pub. L. No. 103–199, Title VI, § 603, 107 Stat. 2317, 2327 ........................ 31, 32


**FEDERAL LEGISLATIVE HISTORY**

California Bill Analysis, AB 32, Assembly (Sept. 5, 2006) ...................................... 37

California Bill Analysis, AB 32, Senate (Aug. 30, 2006 ........................................... 37

H.R. Conf. Rep. 100-475, 171, 1987 U.S.C.C.A.N. 2370, 2432 ............................. 32


**STATE STATUTES**

Cal. Health & Safety Code § 38500 *et seq*. .......................................................... 12

Cal. Health & Safety Code § 38501 ................................................................... 31, 36

Cal. Health & Safety Code § 38560 ...................................................................... 12

Cal. Health & Safety Code § 38562....................................................................12, 30, 36, 37

Cal. Health & Safety Code § 38570..................................................................................12

**STATE REGULATIONS**

Cal. Code Regs., tit. 17, § 95801 ....................................................................................37

Cal. Code Regs., tit. 17, §§ 95801-96022.3 ...............................................................12, 30

Cal. Code Regs., tit. 17, § 95802 ....................................................................................12

Cal. Code Regs., tit. 17, § 95811 ....................................................................................12

Cal. Code Regs., tit. 17, § 95812 ....................................................................................12

Cal. Code Regs., tit. 17, § 95820 ....................................................................................12

Cal. Code Regs., tit. 17, § 95841 ....................................................................................12

Cal. Code Regs., tit. 17, §§ 95910-95923 .......................................................................12

Cal. Code Regs., tit. 17, §§ 95940-45 .......................................................................13, 37

Cal. Code Regs., tit. 17, § 95943 .............................................................................13, 14

**RULES**

Fed. R. Civ. P. 56..........................................................................................................16

**TREATIES**

Kyoto Protocol to the UNFCCC, Dec. 11, 1997, 2303 U.N.T.S. 148 ...............................14

United Nations Framework Convention on Climate Change
     1771 U.N.T.S. 107; S. Treaty Doc No. 102-38 (1992).................................................12

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

# INTRODUCTION

Having failed in its attempt to make new law under the Compact and Treaty Clauses, Plaintiff now tries for a massive expansion of preemption under the foreign affairs preemption doctrine. California's coordination of its greenhouse gas ("GHG") emissions market with Quebec bears no resemblance to the few cases in which courts have invalidated state law under the conflict or dormant threads of the doctrine. Those cases uniformly involve state hostility to or officious interference in the affairs of foreign nations— the state's wielding an "iron fist," in the Supreme Court's parlance. *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 427 (2003). No court has ever invalidated state law under the doctrine on the grounds that the state has acted to advance domestic interests in *cooperation* with, as Plaintiff has called Canada, "one of the United States' foremost allies in the world." Dkt. 102 at 31.

Unsurprisingly, Plaintiff cannot satisfy the established tests for either form of preemption. First, Plaintiff has failed to show a concrete, express executive foreign policy. It claims the Administration abandoned the Paris Agreement to seek a "better deal" on climate change mitigation. But even assuming that is correct, and Plaintiff has put on no evidence of any such seeking, it is an aspiration to a new policy, not a policy itself that would justify invalidating state law. Even if Plaintiff's hoped-for Better Deal is itself a policy, it cannot show that California's coordination with Quebec creates the "clear conflict" with that policy necessary to preempt. California has not entered a mini-Paris Agreement of its own. Rather, it has adopted a program to reduce emissions from *California* sources and agreed to coordinate a portion of the program with that of Quebec. And the goal of California's program and coordination is consonant with the President's own stated rationale for leaving the Paris Agreement: reducing the cost of emission reductions for American businesses. Plaintiff's argument that California is impairing the President's bargaining leverage is a preposterous overreach, as it would preempt any activity taken by any state that would reduce the state's GHG emissions.

Moreover, although ignored by Plaintiff, the weight of the state interest determines the severity of the conflict that a plaintiff must show to support preemption. This Court has already recognized California's strong interest in its program to regulate domestic sources of the GHGs that cause climate change and to do so in the most economically efficient manner. Given that weighty interest, it was incumbent on Plaintiff to show a particularly stark conflict with Administration foreign policy. It has not come close.

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1     Plaintiff's arguments that California's program would be preempted even without any express Executive foreign policy on climate also fail. Although a dormant preemption theory is the better fit for this situation given the foreign policy vacuum here, it cannot invalidate California's emissions market coordination. That "rarely invoked" theory has even narrower application than conflict preemption. The first of its two independent requirements demands that the state lack a bona fide local interest. California's substantial interest in cost-effectively controlling GHG emissions demolishes that claim. Although climate change is a global crisis, California both contributes to it and acutely suffers its severe consequences. As the Supreme Court recognized in *Massachusetts v. EPA*, California has a domestic interest in reducing its GHG emissions regardless of the contributions of other nations. 549 U.S. 497, 526 (2007).

But Plaintiff also cannot show the second indispensable element of its claim: that California has "intruded" into foreign relations. Plaintiff mistakes this to mean that the state action merely implicates foreign relations. On the contrary, the few dormant preemption cases that have invalidated state action have all involved some kind of state hostility to or outright meddling in the affairs of foreign nations. Here, California and Quebec have both voluntarily agreed to coordinate their domestic emissions markets under their respective cap-and-trade programs.

Whatever the form of preemption, courts demand a clear justification to undo a state's exercise of its police power. With preemption by statute, treaty, or executive agreement, the court has the benefit of a text that expressly lays out—and delimits—the federal policy and to which the court can compare the effects of the challenged state action. Lacking that relative clarity, the conflict preemption of *Garamendi* and the dormant foreign affairs doctrine present a far greater risk of unnecessarily limiting a state's quasi-sovereign authority. They also risk empowering the President to effectively veto state laws with which he or she simply disagrees, merely by asserting their inconsistency with inchoate foreign policy goals—precisely what Plaintiff is attempting here. To avoid that, courts have cabined the doctrine by requiring *clear* conflicts with *clear* executive foreign policy or a *clear* showing that the state law does not advance a bona fide domestic purpose and that it *clearly* interferes with the affairs of foreign countries. No court has found preemption on a record nearly as insubstantial as Plaintiff has presented here.

Plaintiff spins a tale of a rogue state that reaches out to form an alliance with a foreign nation against its own federal government. That pulp fiction bears no resemblance to the facts of this case.

California and Quebec began their cooperation *years* before this Administration came to power and decided to abandon the Paris Agreement. California did so to improve the efficiency and liquidity of the State's innovative market-based program to reduce GHG emissions from California sources. The State should be applauded, not censured, for its efforts.

## BACKGROUND

## I.    California's efforts to mitigate climate change

California has long been at the forefront of efforts to address the threat of climate change. As explained in greater detail in Defendants' and Intervenors' briefs in opposition to Plaintiff's first motion for summary judgment, California has led the nation in taking action to reduce GHG emissions. *See* Dkt. 50-1 at 12-15 (State brief); Dkt. 47 at 8-11 (IETA brief); Dkt. 48 at 13-15 (EDF and NRDC brief). Those innovative programs include the following:

- In 2006, the California Legislature adopted AB 32, the Global Warming Solutions Act, which mandates ambitious statewide reductions of GHG emissions. Cal. Health & Safety Code ("HSC") § 38500 *et seq.*; 2006 Cal. Stat. ch. 488; *see* Dkt. 91 at 4; Dkt. 50-1 at 12; Dkt. 48 at 13.

- The Legislature authorized the California Air Resources Board ("CARB") to design and adopt a "market-based" program to "achieve the maximum technologically feasible and cost-effective reductions in greenhouse gas emissions." HSC § 38562(c)(2); *see* Dkt. 91 at 5. After extensive consultation with experts and stakeholders, CARB concluded that the best means of reducing GHG emissions was a cap-and-trade program. *See* Dkt. 48 at 13; Dkt. 50-1 at 13.

- In 2011, CARB established California's cap-and-trade program under AB 32. Cal. Code Regs., tit. 17 ("CCR"), §§ 95801-96022.3; *see* Dkt. 91 at 7; Dkt. 50-1 at 13; Dkt. 48 at 14. The program sets an annual statewide cap for GHG emissions from the largest individual GHG emitters in the state. HSC §§ 38560, 38562; CCR §§ 95802(a), 95811-95812, 95841. Each year CARB distributes and sells allowances which authorize regulated entities to emit a certain amount of GHGs. CCR §§ 95802(a), 95820(a)(1); *see* Dkt. 91 at 8; Dkt. 48 at 14. Regulated sources may trade those emissions allowances on a private market. HSC § 38570; CCR §§ 95910-95923; *see* Dkt. 50-1 at 13-14. The emissions cap declines each year, so that statewide GHG emissions decrease over time. CCR § 95841. *See* Dkt. 48 at 14-15; Dkt. 50-1 at 13.

California's efforts to regulate GHG emissions are consistent with the federal government's recognition that climate change presents an urgent threat and that GHG reductions are necessary to mitigate its effects. These are reflected in the United States' ratification of the United Nations Framework Convention on Climate Change ("UNFCCC") in 1992. 1771 U.N.T.S. 107; S. Treaty Doc No. 102-38 (1992). At the same time, a variety of states for nearly two decades have taken actions to address climate change,

---

12

1  including coordination with the eastern Canadian provinces and the provinces of British Columbia and

2  Manitoba,[1] and Congress has never legislated to pre-empt these actions.

3  **II.    California's emissions-market coordination**

4       CARB included in the cap-and-trade regulations provisions authorizing coordination of the State's

5  market in emission allowances with similar markets in other jurisdictions. *See* CCR §§ 95940-45; *see* Dkt.

6  91 at 8-9. With the Governor's authorization, CARB may decide to accept emission allowances issued by

7  other jurisdictions, treating them as equivalent to CARB-issued allowances. CCR § 95940. However, that

8  market coordination does not change the statewide emissions cap and does not alter the compliance obli-

9  gations imposed on regulated entities in California under sections 95850 *et seq.*  *See* Dkt. 48 at 15.

10      In June 2013, California amended its cap-and-trade regulations to coordinate the State's carbon

11 market with that of Quebec, effective January 1, 2014.[2] *See* CCR § 95943(a)(1). Quebec made equivalent

12 changes to its own regulations. Civil Code of Québec, Regulation Respecting a Cap-and-Trade System

13 for Greenhouse Gas Emission Allowances (chapter Q-2, r. 46.1), 78, App. B.1. Through these regulatory

14 changes, each jurisdiction determined it would accept allowances from both programs for compliance

15 purposes, allowing covered sources in each jurisdiction to trade compliance instruments with each other.

16 After amending their regulations, in September 2013, California and Quebec signed an agreement memo-

17 rializing coordination of their programs. *See* Dkt. 48 at 16; Dkt. 7 ¶ 57; Dkt. 26-1, Exh. F; Dkt. 91 at 10.

18 In 2017, they entered a replacement agreement along with the Canadian province of Ontario. *See* Dkt. 48

19 at 16; Dkt. 7-2 (hereinafter "2017 agreement" or "agreement").

20      Like its 2013 predecessor, the 2017 agreement highlights that harmonization and integration of

21 California and Quebec's cap-and-trade programs is to be carried out independently by "each Party under

22 its own statutory and regulatory authority." Dkt. 7-2 at 3 (Art. 1).

23

24

25 [1] *See, e.g.,* Pew Center on Global Climate Change, *Learning from State Action on Climate Change*, (2007), *available at* <http://climateknowledge.org/figures/Rood_Climate_Change_AOSS480_Docu-
26 ments/Pew_State_Climate_Change_Update_2007_.pdf>; *see also* International Carbon Action Partnership, *available at* <https://icapcarbonaction.com/en/partnership/members>.

27 [2] Quebec launched a GHG cap-and-trade program in 2012, which took effect in 2013. Civil Code of Qué-
bec, Regulation Respecting a Cap-and-Trade System for Greenhouse Gas Emission Allowances (chapter
28 Q-2, r. 46.1), available at <http://legisquebec.gouv.qc.ca/en/pdf/cr/Q-2,%20R.%2046.1.pdf>.

California began accepting Quebec-issued emission allowances on January 1, 2014, CCR § 95943(a)(1), and it began holding joint allowance auctions with Quebec on November 25, 2014, *see* CARB, *Auction Notices and Reports*, *available at* <https://ww3.arb.ca.gov/cc/capandtrade/auction/auction_notices_and_reports.htm>. Since California and Quebec agreed to coordinate, there have been 21 joint allowance auctions held under the 2013 and 2017 agreements. *Id*.

Until this lawsuit was filed, the federal government had provided no comments on California and Quebec's coordination, and never suggested that California's acceptance of Quebec-issued allowances was somehow harmful to the United States.

## III.    The Paris Agreement and the United States' withdrawal

The Paris Agreement is a multilateral climate change agreement concluded by the Parties to the UNFCCC at the 21st Conference of the Parties on December 12, 2015. *See* Paris Agreement, Dkt. 12-2, Ex. 3; Dkt. 91 at 12; Dkt. 48 at 21. The goal of the Paris Agreement is to limit global average temperature increases to less than 2 degrees Celsius above pre-industrial levels and to seek to further limit the increase to 1.5 degrees Celsius. *Id*., Art. 2(1)(a); Dkt. 7 ¶ 42; Dkt. 12-2, Ex. 3. Each Party to the Agreement must develop and submit to the UNFCCC a "Nationally Determined Contribution" ("NDC"), a national plan for reducing GHG emissions and adapting to the effects of climate change. *Id*., Art. 4.2; Dkt. 7 ¶ 43; Dkt. 48 at 21. Unlike the Kyoto Protocol to the UNFCCC, Dec. 11, 1997, 2303 U.N.T.S. 148; Dkt. 102-2 Ex. 1, which imposed binding GHG reduction commitments on economically developed countries in light of their historical role in causing climate change, but did not require developing countries to reduce emissions, *Id.*, Art. 10, the Paris Agreement calls on both developed and developing countries to reduce emissions.[3] Also unlike the Kyoto Protocol, the Paris Agreement does not impose specific, binding GHG reduction targets on any country. Instead, it employs a "bottom-up" approach, in which Parties set their own GHG reduction targets and adopt their own climate change strategies as set forth in their NDCs. *Id*., Art. 4.2; see Dkt. 48 at 21. The agreement also does not specify what strategies countries should use to

---

[3] Paris Agreement, Art. 3 ("all Parties are to undertake and communicate ambitious efforts" to reduce GHG emissions). 186 Parties have submitted Nationally Determined Contributions, including the European Union and nearly all of the world's economically developed countries as well as developing nations such as China and India. UNFCCC NDC Registry, *available at* <https://www4.unfccc.int/sites/NDCStaging/Pages/All.aspx>.

14

meet their own nationally-determined targets and does not require countries to achieve the targets they have set for themselves. Thus, the Agreement does not require the United States to implement any specific policy in its efforts to achieve its own self-determined GHG reduction target.

The United States submitted its NDC to the UNFCCC on March 31, 2015, before the Paris Agreement was finalized. Dkt. 48 at 21. President Obama signed the Paris Agreement on September 3, 2016. Dkt. 7 ¶ 44. The United States' NDC called for the United States to reduce emissions 26-28 percent below 2005 levels by 2025. Intended Nationally Determined Contribution of the United States of America (March 31, 2015), *available at* <https://www4.unfccc.int/sites/ndcstaging/PublishedDocuments/United%20States%20of%20America%20First/U.S.A.%20First%20NDC%20Submission.pdf>. However, this emissions reduction pledge is not legally binding, and the Paris Agreement does not prohibit the United States from adjusting its existing NDC based on shifting domestic priorities. Paris Agreement, Art. 4.11. The only provisions of the Paris Agreement that are legally binding on individual Parties are procedural provisions requiring countries to submit NDCs, conduct monitoring and verification of national GHG emissions, and submit regular reports to the UNFCCC Secretariat on national emissions and progress toward meeting their NDCs. *Id*., Art. 4.2, 4.8, 4.9, 4.13.

The Paris Agreement permits a Party to unilaterally withdraw from the agreement one year after providing formal legal notice of intent to withdraw and provides that such notice may be given three years after the Agreement has entered into force for that Party. *Id*., Art. 28; Dkt. 7 ¶ 43; Dkt. 91 at 13 n.7. In a June 1, 2017 press conference, President Trump indicated his intention to withdraw from the Paris Agreement. Dkt. 12 at 19-20; Dkt. 7 ¶¶ 47-48; Dkt. 91 at 12-13. However, the United States did not give formal notice of its intent to withdraw until November 4, 2019, three years after the Agreement's entry into force, when Secretary of State Pompeo announced that the United States was depositing notification of the planned withdrawal with the United Nations. Dkt. 12 at 34-35; Dkt. 7 ¶ 50; Notice of United States' Notification of Withdrawal from the Paris Agreement of 2015, *available at* <https://treaties.un.org/doc/Publication/CN/2019/CN.575.2019-Eng.pdf>. The United States' withdrawal will become effective on November 4, 2020. Dkt. 7 ¶ 49; Dkt. 12 at 20, Dkt. 91 at 13 n.7.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Moon v. Rush*, 69 F. Supp. 3d 1035, 1039 (E.D. Cal. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where [it] will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Only if the moving party meets its initial burden must the opposing party show a genuine issue for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[E]vidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011); *Zetwick v. County of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017). A decision to grant summary judgment may be based only on facts that would be admissible in evidence at trial. Fed. R. Civ. P. 56(c).

## ARGUMENT

### I.     California's market coordination with Quebec does not create a "clear conflict" with any express executive foreign policy.

Under the conflict preemption aspect of the foreign affairs doctrine, "state law must give way where . . . there is evidence of a clear conflict" with "express foreign policy of the National Government." *Von Saher v. Norton Simon Museum of Art at Pasadena* ("*Von Saher II*"), 754 F.3d 712, 720 (9th Cir. 2014) (quoting *Garamendi,* 539 U.S. at 420, 421) (internal quotation marks omitted). Conflict preemption requires an "exercise of the federal executive authority" resulting in an "express federal policy," and there must be "evidence of clear conflict between the policies adopted" by the state and federal governments. *Garamendi*, 539 U.S. at 420-21, 425; *accord Gingery v. City of Glendale*, 831 F.3d 1222, 1228-29 (9th Cir. 2016). The conflict between state and federal policy must be "more than incidental." *Garamendi*, 539 U.S. at 419-20; *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1188 (E.D. Cal. 2007). The conflicting state action must "impair the effective exercise of the Nation's foreign policy."

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

*Garamendi,* 539 U.S. at 419 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440 (1968)); *see also United States v. Pink*, 315 U.S. 203, 230-31 (1942).

Plaintiff has failed to show that the Administration has an express foreign policy on climate change. At most, it has shown that it harbors a hope of some future, as-yet-undefined policy or seeks a "pause" to determine whether to adopt one. *See* Dkt. 102 ("MSJ") at 9. Even if that were sufficient, Plaintiff has utterly failed to show any conflict, let alone the necessary "clear conflict" with that policy. Given California's strong interest in cost-effective control of GHG emissions—as already recognized by this Court—Plaintiff's burden is especially heavy. It has not come close to carrying it.

### A.    Plaintiff has failed to identify a concrete foreign policy that could preempt California's market coordination with Quebec.

Plaintiff's recitation of the history of federal pronouncements on climate change does an excellent job of demonstrating that a robust foreign policy is crucial to achieve the GHG emissions reductions necessary to tackle the climate crisis. MSJ at 12-20. It lays out efforts by the Legislative and Executive Branches going back to the 1970s to study, and to a lesser extent address, the climate crisis. EDF and NRDC wholeheartedly agree that climate change demands international cooperation to reduce GHG emissions, but that hardly precludes state and local governments from making their own contributions to reducing emissions.

What Plaintiff fails to do is to identify and evidence an *existing, concrete, and coherent* foreign policy of *this Administration* on climate change. Hortatory statutes from the 1970s and 1980s and a smattering of carefully curated statements by some prior administrations and congresses do not evince a current policy. Although Plaintiff is vague in the extreme in describing this Administration's allegedly preemptive foreign policy, it appears to be withdrawal from the Paris Agreement to seek a "better deal" on climate. MSJ at 11, 27, 30-31. This alleged policy lacks the substance required to displace California's exercise of its police power to regulate GHG emissions.

*Garamendi* and its successors stand for the proposition that express executive foreign policy reflected in sources such as executive agreements may preempt conflicting state law. The plaintiff must show a specific federal policy with which the state action clearly conflicts. There must be an "express foreign policy." *Von Saher II*, 754 F.3d at 720 (quoting *Garamendi*, 539 U.S. at 420). In *Von Saher II*, for

17

1   example, the Ninth Circuit identified six specific elements of the federal policy on restitution of Nazi-

2   looted art. *Id.* at 721. In *Garamendi*, the Court found that the state statute "frustrate[d] the operation of the

3   *particular mechanism* the President has chosen" for resolution of Holocaust-era insurance claims. 539

4   U.S. at 424 (emphasis added); *see Faculty Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1211 (11th

5   Cir. 2010) (per curiam) (distinguishing *Garamendi* as involving "a clear federal foreign policy position"

6   and "clear and express foreign policy" and rejecting the preemption claim because the court could find no

7   "definite substantive foreign policy position"); *Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623

8   F.3d 1, 13 (1st Cir. 2010) ("None of this language is sufficiently clear and definite to constitute evidence

9   of an express federal policy.").

10      Here, there is nothing of comparable "particularity" to the policy frustrated in *Garamendi*. Plaintiff

11   repeatedly emphasizes "the foreign policy of the United States to obtain better and more equitable deals

12   on climate mitigation for the American people." MSJ at 31; *see also id.* at 11 ("The President wishes to

13   obtain a better deal in the international arena."); *id.* ("better bargain"); *id.* at 27 ("the U.S. policy not to

14   participate in the Paris Agreement so as to seek a better deal"), *id.* at 30 ("the country must hold out from

15   such arrangements in favor of a better deal"); *id.* ("leveraging to a better deal [*sic*]"); *id.* at 31 ("withdraw-

16   ing from the Paris Agreement to pursue a better deal"). This putative Better Deal policy is insubstantial

17   and far too vague to form the basis of a conflict with California's exercise of its police power. The Presi-

18   dent has merely expressed an interest in some future, unspecified international arrangement. *See* MSJ at

19   17 (repeating the President's assertion that the United States would "begin negotiations to reenter either

20   the Paris Accord or a really entirely new transaction on terms that are fair to the United States") (Dkt. 102-

21   1 (Plaintiff's Statement of Undisputed Facts ("PSUF") ¶ 93); MSJ at 27 (claiming that California's actions

22   "undermine the federal government's ability to develop a new international mitigation arrangement"). The

23   Administration's claimed desire to potentially strike a better deal is not a foreign policy; it is, at most, a

24   mere aspiration to a future, as-yet-undetermined policy.

25      In fact, Plaintiff seems unwilling to commit even to the search for a Better Deal as Administration

26   policy. It argues that California's program "prejudices the President's ability to find allies for an agree-

27   ment representing a better bargain for the nation as a whole, *should he desire to pursue that approach* in

28   light of all international relations factors that may inform his discretion." MSJ at 11 (emphasis added).

Plaintiff's hedging demonstrates that its challenge is properly analyzed under the even more restrictive standards governing the dormant aspect of the foreign affairs doctrine—preemption where there is *no* current executive foreign policy. *See infra* Section II. Indeed, it anticipates that conclusion by claiming that dormant preemption applies "if the United States chooses to put a particular area of foreign policy on 'pause' while it rethinks its options." MSJ at 9. An argument, like Plaintiff's, that state action interferes with the potential future exercise of foreign policy sounds in the dormant area, not in conflict preemption, which requires a material impairment of a tangible, coherent, and *existing* federal policy. *Cf. Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 963 (9th Cir. 2010) ("*Von Saher I*") (rejecting conflict preemption claim because court found that alleged federal policy was "no longer in effect").

In *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, Judge Ishii of this Court rejected the Better Deal theory under similar circumstances: a conflict preemption challenge under the foreign affairs doctrine to California's motor vehicle GHG emission standards. "What Plaintiffs label as a policy in this case is actually nothing more than a commitment to negotiate under certain conditions and according to certain principles." 529 F. Supp. 2d at 1186. The court held, "The term 'policy' as used in *Zschernig* and its progeny refers to *a concrete set of goals, objectives and/or means to be undertaken to achieve a predetermined result." Id.* (emphasis added). The court thus rejected a similar Better Deal theory:

> A commitment to negotiate falls short of this definition. The President's commitment to engage in negotiations that include developing nations does not set any particular goals or means, does not guide the actions of any actors with respect to greenhouse gas reduction, and imparts no information to guide future actions that may increase or decrease greenhouse gas production. It is merely a statement of an intent to negotiate on the terms specified. [¶] Rather, what Plaintiffs contend is United States "policy" is more accurately described as a strategy; that is, a means to achieve an acceptable policy but not the policy itself.

*Id.*; *see also id.* at 1186-87 (holding "the interference must be with a policy, not simply with the means of negotiating a policy"). As just discussed, however, Plaintiff here cannot show even a "commitment to engage in negotiations."

Moreover, since *Garamendi*, the Supreme Court has taken a restrictive view of the sort of presidential foreign policy that will support conflict preemption. In *Medellin v. Texas*, 552 U.S. 491 (2008), the Court characterized the President's power to preempt state law under the foreign affairs doctrine as limited to "a narrow set of circumstances: the making of executive agreements to settle civil claims

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

between American citizens and foreign governments or foreign nationals." *Id.* at 530-31 (citing *Gara-mendi*, 539 U.S. at 415; *Dames & Moore v. Regan,* 453 U.S. 654, 679-80, 686 (1981); *Pink*, 315 U.S. at 229; *United States v. Belmont*, 301 U.S. 324, 327, 330 (1937)). The few lower court decisions that have found conflict preemption have involved the same "narrow set of circumstances." *See, e.g., In re Assicura-zioni Generali, S.P.A.,* 592 F.3d 113, 118-19 (2d Cir. 2010) (state laws authorizing claims arising from Holocaust-era insurance policies were preempted by executive branch policy favoring resolution of claims by international commission); *Saleh v. Titan Corp.*, 580 F.3d 1, 11-13 (D.C. Cir. 2009) (extraterritorial application of District of Columbia tort law to injuries suffered in Iraq preempted by federal foreign policy); *Deirmenjian v. Deutsche Bank, A.G.*, 526 F. Supp. 2d 1068, 1076-77 (C.D. Cal. 2007) (California statute extending statute of limitations governing claims arising from Armenian Genocide was preempted by executive agreement with Turkey on settlement of claims); *Steinberg v. Int'l Com. on Holocaust Era Ins. Claims*, 133 Cal. App. 4th 689, 699-701 (2005) (California statute authorizing claims arising out of Holocaust-era insurance policies was preempted by United States foreign policy favoring settlement of claims by international commission). Plaintiff's purported Better Deal policy falls *far* short of such for-eign-claims-resolution policies. *Medellín* reveals what a radical expansion of the doctrine Plaintiff seeks.[4]

Finally, in repeatedly complaining that California is facilitating Canada's participation in and com-pliance with the Paris Agreement, MSJ at 27-30, Plaintiff implies that, having withdrawn from the Paris Agreement, it is the United States' policy to *undermine the remaining parties' compliance with and par-ticipation in the Agreement*. That would be a striking assertion if made openly, but it is hard to avoid that implication from Plaintiff's motion.[5] It is thus unsurprising that Plaintiff has declined to say it openly, let alone to introduce any evidence that this is, in fact, the policy of the United States. It is one thing for the Administration to desire to negotiate another international "deal" more favorable to the United States, as

---

[4] In *Museum of Fine Arts*, the First Circuit noted the argument, without deciding, that *Medellín* "may have cast doubt on the continuing vitality of *Garamendi*." 623 F.3d at 12 n.12. One need not go that far, how-ever, as *Medellín* clarifies that state law can be preempted by executive foreign policy only in the most limited circumstances.

[5] As noted below in rebutting Plaintiff's farcical suggestion that California's coordination with Quebec could jeopardize the United States' relations with Canada, MSJ at 31, in fact this lawsuit and the implica-tions of Plaintiff's arguments here present a greater potential threat to that relationship. *See infra* Section I.B.3.

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1    it claims, and quite another to desire that the existing international agreement among its allies should fail.

2    Because there is no evidence that is the "express foreign policy of the National Government," *Garamendi*,

3    539 U.S. at 420, let alone one "expressed unmistakably," *id.* at 421, it cannot be the basis of a conflict

4    preemption claim. *See Von Saher II*, 754 F.3d at 720 (quoting *Garamendi,* 539 U.S. at 420); *Faculty*

5    *Senate of Fla. Int'l Univ.*, 616 F.3d at 1211 (refusing to apply *Garamendi* without the "*clear and express*

6    *foreign policy*" present in that case: "On this record, nothing shows to us that a definite substantive foreign

7    policy position exists." (emphasis added)).

8         Even if the Administration's professed hope for a Better Deal on climate change could constitute

9    a policy that could preempt state law, Plaintiff points to no evidence to show that the Administration is in

10    fact pursuing it. As the plaintiff and movant, Plaintiff bears the burden of putting on sufficient evidence

11    for a reasonable trier of fact to find the existence of an executive foreign policy. *See Faculty Senate of*

12    *Fla. Int'l Univ.*, 616 F.3d at 1211 (holding "we do not have that kind of powerful evidence of a clear and

13    express foreign policy" present in *Garamendi*); *Cent. Valley Chrysler-Jeep, Inc.*, 529 F. Supp. 2d at 1187-

14    88; *see also Soremekun*, 509 F.3d at 984 (movant bears the burden of production). Its failure to put on

15    sufficient evidence of the alleged Better Deal policy is thus fatal to its motion.

16         Plaintiff points, of course, to the announced withdrawal from the Paris Agreement. But abandoning

17    an agreement is quite different from *entering* an agreement (or three, as was the case in *Garamendi; see*

18    *infra*). Withdrawal shows only dissatisfaction with that particular agreement. It cannot show that the Ad-

19    ministration is in fact seeking a new and better Deal, let alone that it has any concrete notion of what that

20    deal would entail.

21         Beyond the simple fact of withdrawal, Plaintiff points to a few conclusory assertions by the Pres-

22    ident and the now-Secretary of State.[6] MSJ at 17-19 (citing PSUF ¶¶ 10, 12, 93). It points to no evidence

23    of contemporaneous or subsequent efforts by the Administration to strike a Better Deal. It points to no

24

---

25    [6] Plaintiff relies on remarks made by now-Secretary Pompeo at his Senate confirmation hearing. MSJ at

26    18, 19, 28 n.8. Because these remarks were made before he was confirmed, they were "delivered in the speaker's personal capacity and so do[] not represent the position of the executive branch." *Museum of*

27    *Fine Arts*, 623 F.3d at 12 n.13. Although he was at the time Director of the Central Intelligence Agency, he was plainly not speaking for the CIA, but for himself. *See* Hon. Michael Pompeo, *Statement for the*

28    *Record before the U.S. Senate Committee on Foreign Relations* (April 12, 2018), *available at* <https://www.foreign.senate.gov/imo/media/doc/041218_Pompeo_Statement.pdf>.

statements of criteria for the hoped-for deal, no negotiations, no meetings, nor even statements by the Administration, or foreign officials, in furtherance of the hypothetical deal. Instead Plaintiff emphasizes Executive Order 13,783. MSJ at 17; PSUF ¶ 7. The order, which merely directs federal agencies in their performance of cost-benefit analysis of federal actions, is irrelevant to show any kind of foreign policy. It requires agencies to refer to an OMB Circular on "best practices for conducting regulatory cost-benefit analysis," but Plaintiff neglects to mention anything about what that Circular says or does. MSJ at 17 (quoting Executive Order 13,783 § 5(c), 82 Fed. Reg. 16,093, 16,096 (Mar. 28, 2017)). Even if the unexplained OMB Circular says something about reducing the cost of emission reductions, such platitudes can hardly displace state law. *See, e.g., Faculty Senate of Fla. Int'l Univ.*, 616 F.3d at 1211 ("indistinct desire on the part of the Executive Branch" to "encourage generally" a policy goal is insufficient to preempt state law).

The conflict preemption cases require far more evidence of the asserted policy. In *Faculty Senate of Florida International University*, the Eleventh Circuit distinguished *Garamendi* because it had "involved a clear federal foreign policy position on Holocaust-era claims evidenced by, among other things, international agreements by our country's Executive Branch, official correspondence by a high-level member of the Executive Branch, and the historical role of the Executive Branch in dealing with wartime claims resolution." 616 F.3d at 1211; *see also Garamendi,* 539 U.S. at 405-08, 421, 422 (noting the three "agreements are exemplars" of the federal policy), 423 n.13. By contrast, the court there found a lack of "that kind of powerful evidence of a clear and express foreign policy." 616 F.3d at 1211. In *Von Saher II*, in which the Ninth Circuit found an executive policy (but no conflict), the court relied on the 1943 London Declaration entered by the United States, the Solicitor General's brief in *Von Saher I* taking the position that the Administration had an ongoing policy to protect the finality of resolutions under that Declaration, and the United States' participation in 1998 and 2009 conferences on Holocaust-era assets, from all of which the court derived six elements of the United States' policy on restitution of Nazi-looted art. 754 F.3d at 715-16, 720, 721. Finally, the cases that *Garamendi* relied on—*Belmont, Pink*, and *Dames & Moore*—all involved express executive agreements. *See* 539 U.S. at 415.

1    Plaintiff has not put on any evidence comparable to that relied on in *Garamendi* or any other case

2    in which a court found state law impliedly preempted by executive foreign policy. It has thus failed to

3    carry its moving burden to show that the search for a Better Deal represents a bona fide foreign policy.

**B.    Plaintiff has failed to show that California's actions present a "clear conflict" with the Administration's purported foreign policy on climate change.**

4

5    Even if Plaintiff had shown a concrete, express foreign policy, it could not show that California's

6    actions in coordinating its emissions market with Quebec create a "clear conflict." Plaintiff's arguments

7    about and evidence of a conflict are as threadbare as its alleged policy.

8

**1.    California has done nothing—and can do nothing—to prevent or impede withdrawal from the Paris Agreement.**

9

10    Plaintiff alleges that California's actions are "inconsistent with the President's withdrawal of the

11    United States from the Paris Agreement." MSJ at 27. It cannot demonstrate that California's actions con-

12    flict—clearly or otherwise—with withdrawal.

13    California has done nothing to prevent or complicate the United States' withdrawal from the Paris

14    Agreement, nor could it do so. The President has taken the necessary steps to begin the withdrawal pro-

15    cess, MSJ at 18-19; Dkt. 12-2, Exh. 6, and California cannot alter the timing, process, or result of the

16    process: the United States will no longer be a Party to the Paris Agreement effective November 4, 2020.

17    PSUF ¶ 98; Dkt. 48 at 21.

18    Nor has California "advance[d] cross-border emissions mitigation strategies that the United States

19    has rejected," as Plaintiff alleges without elaboration. MSJ at 27. Assuming that the "cross-border . . .

20    strategies that the United States has rejected" refers to the Paris Agreement, California's market coordi-

21    nation with Quebec is not, as Plaintiff appears to imply, a subnational equivalent of that Agreement. The

22    Paris Agreement does not establish a cap-and-trade program and does not establish linkage of multiple

23    cap-and-trade programs. As this Court has already concluded, California's market coordination with Que-

24    bec merely coordinates the emission-allowance markets created under each jurisdiction's respective cap-

25    and-trade programs. It does not commit either jurisdiction to adopt or implement any "mitigation

26    strateg[y]" as Plaintiff suggests. *See* Dkt. 91 at 9 (finding that "linking does not substantively alter each

27    individual jurisdictions' cap-and-trade program"); *id.* at 23 ("The programs, adopted independently and

28    informed by each jurisdiction's policy objectives, could (and have) run independently of each other."). If

Plaintiff's contention is instead that the President's decision to withdraw from the Paris Agreement reflects a policy against any and all coordination with any foreign nation or subnational government on any subject pertaining to climate change, it has failed to provide any evidence of that sweeping policy.

Nor does California's market coordination create a clear conflict with the ostensible rationale for the President's withdrawal from the Paris Agreement. *See* MSJ at 19-20 (providing stated reasons for withdrawal). Plaintiff claims that the President refuses to "commit the United States to a set of actions, policies, and measures that produce burdens specific to the United States that other countries do not face." *Id.* at 19 (quoting personal statement by now-Secretary Pompeo). More specifically, it emphasizes the treatment of China and India under the Paris Agreement, complaining that the United States was required to reduce its emissions under the Agreement while developing nations were free to increase theirs. *Id.* at 19-20. But all of this is irrelevant to California's agreement with Quebec for the coordination of their respective cap-and-trade programs. Long before its agreement with Quebec, California determined to reduce *its own* emissions and is not compelled in any way to do so by its agreement with Quebec—as this Court has already determined. Dkt. 91 at 9, 23. Any "burdens" have been imposed *on California alone* by its duly elected government in the exercise of its police power. And China and India are simply irrelevant to the program.

More fundamentally, insofar as the President was concerned that the Paris Agreement would impose excessive costs on American businesses, not only is California's market coordination with Quebec not inconsistent with the Administration's position, it is fully "in concert with" it. *See Von Saher II*, 754 F.3d at 723. As Intervenors and Defendants explained in opposition to the prior motion for summary judgment, California adopted its cap-and-trade program precisely to reduce the cost of emission control for sources subject to California's GHG regulatory program. *See* Dkt. 48 at 13-15; Dkt. 50-1 at 14. Linkage of that program with other jurisdictions provides a variety of additional efficiency benefits for the operation of the California program. *See* Dkt. 50-1 at 14-15 (State brief); Dkt. 47 at 11 (IETA brief); Dkt. 48 at 40-43 (EDF and NRDC brief). Indeed, as this Court concluded in its prior order, "[t]o help regulated businesses mitigate their compliance costs while maximizing impact, CARB adopted several features unique to California's program." Dkt. 91 at 8. Specifically, "California provided for an opportunity to increase its program's impact and market liquidity by 'linking' its market with other jurisdictions." *Id.* at

24

8-9. Linkage thus *reduces* the cost of emission reductions for GHG sources in the United States (California)—emission reductions that California would require regardless of the market coordination attacked in this lawsuit.

### 2.    Statements by California officials remain irrelevant, as this Court held in denying Plaintiff's last motion.

Plaintiff also again trots out statements made by California officials disagreeing with the Administration's decision to withdraw from the Paris Agreement. MSJ at 9-10, 27, 34-35. Those statements, however, do not show a conflict between California's *actions* and the Administration's withdrawal. No court has ever found mere statements by state officials to create a conflict with executive foreign policy, even if they expressly disagree with that policy.

This Court has already rejected Plaintiff's reliance on these same statements. In denying Plaintiff's first motion for summary judgment, the Court noted that "The United States submitted a number of statements from former Governor Brown to describe California's response to President Trump's withdrawal from the Paris Accord and this lawsuit. The court recognizes these as no more than typical political hyperbole. *As such they, are entitled to no legal effect.*" Dkt. 91 at 13 n.7 (emphasis added). That conclusion is as true here as it was for the Treaty and Compact Clause claims.

Indeed, in the preemption context, courts ignore the motives of state or local officials in determining whether the actions of state or local governments are preempted. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1906-07 (2019) (lead opinion of Gorsuch, J.); *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016) ("[I]t does not matter if Arizona passed the identity theft laws for a good or bad purpose—what matters is whether the legislature succeeded in carrying out that purpose."); *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 488 n.3 (10th Cir. 1998) (disregarding plaintiff's argument that "the City intentionally acted to 'nullify the federal scheme'" and holding that "in making a preemption determination, it is not appropriate to consider the motive underlying the . . . decision").

Moreover, the statements that Plaintiff emphasizes are utterly irrelevant here because they were made *years after* California adopted its cap-and-trade rule, including the linkage provisions; its agreement with Quebec; and the implementation of that agreement. Those statements thus could not show any

improper motivation for California's linkage of its emissions market with Quebec or any other jurisdiction. *See infra* Section II.A.3.

### 3. California has not facilitated Canada's compliance with the Paris Agreement.

Plaintiff alleges that California's actions conflict with the Administration's desired Better Deal by facilitating Canada's compliance with the Paris Agreement. MSJ at 27-30. It contends that California has done so "by reducing Canada's cost of complying with that agreement," *id.* at 28, by allegedly allowing Canada to take credit for emission reductions occurring in California, *id.* at 29-30. Not so.

As a matter of law, Article 6 of the Paris Agreement provides that a Party to the Agreement may use a GHG reduction from another Party to meet its own NDC only if both Parties authorize it. Article 6.3 provides, "The use of internationally transferred mitigation outcomes to achieve nationally determined contributions under this Agreement shall be *voluntary* and *authorized* by participating Parties." *Id.*, Art. 6.3 (emphases added).

If Canada wanted to use GHG reductions originating in California to meet its NDC, it would need to obtain authorization from the United States to do so, as Plaintiff acknowledges. MSJ at 31. Plaintiff has put on no evidence that this has happened or will happen. It cites a 2016 document in which Canada stated vaguely it "intends to take into account internationally transferred mitigation outcomes arising from cross-border subnational emission trading as part of its international contribution to addressing climate change."[7] MSJ at 29 (quoting Government of Canada, *Canada's Mid-Century, Long-Term, Low-Greenhouse Gas Development Strategy* (2016) at 11, *available at* <https://unfccc.int/files/focus/long-term_strategies/application/pdf/canadas_mid-century_long-term_strategy.pdf>). But this statement hardly suggests that Canada intends to circumvent the plain language of Article 6.3's requirement that Canada obtain authorization from the host Party—here, the United States—to use such reductions. Nor

---

[7] The only mention of California's linkage is as an example:

> Some regions of the world, including subnational governments, are already working cooperatively, or link carbon markets. These "bottom-up" type approaches could continue to develop and grow moving forward. For example, the province of Quebec has linked its emission trading system to California's through the Western Climate Initiative, with other subnational regions planning or considering doing the same.

*Canada's Mid-Century, Long-Term, Low-Greenhouse Gas Development Strategy* at 11.

26

has Plaintiff put on any evidence that Canada has taken steps in the intervening years to use such reductions, with or without the United States' authorization.

Even if, despite the lack of evidence in the record, this Court were to find that the United States is actually undertaking negotiations to try to obtain a Better Deal, California's coordination with Quebec could not disadvantage the United States in those negotiations precisely because the plain language of Paris Agreement Article 6.3 requires authorization of both Parties—Canada and the United States—for Canada to use California emission reductions toward its NDC under the Paris Agreement. If Canada were to seek authorization from the United States to use California-based emission reductions, the United States could simply say no. Paris Agreement, Art. 6.3.

Plaintiff implicitly recognizes this, contending that doing so could cause tension between the United States and Canada. MSJ at 31. This argument misplaces the blame. Any impairment of our relationship with Canada in this context will come not from California's actions but rather from (1) the Administration's unilateral repudiation of the Paris Agreement, an agreement to which Canada and virtually all of the United States' other trading partners belong, and (2) the Administration's filing of this lawsuit to invalidate a voluntary arrangement involving one of Canada's provinces. Plaintiff has the only "iron fist" here, MSJ at 12 (quoting *Garamendi*, 539 U.S. at 427), which it brandished in withdrawing from the Paris Agreement.

Finally, even if California's linkage with Quebec could facilitate Canada's compliance with the Paris Agreement, Plaintiff has not shown that it conflicts with the Administration's foreign policy. To create such a conflict, Plaintiff would need to show that it is the Administration's foreign policy to *impede* Canada's compliance with the Paris Agreement by maximizing its cost of reducing GHG emissions. But as noted above, Plaintiff has never claimed that it has such a policy. *See supra* Section I.A. To the contrary, it emphasizes that Canada is "a close ally of the United States"; indeed, it is "one of the United States' foremost allies in the world," and "one of its foremost trading partner [*sic*]." MSJ at 31. Surely then it is not the Administration's policy to raise that ally's cost of implementing its own policy choices.

### 4.    Plaintiff's bargaining-power argument proves too much: it would invalidate *all* state efforts to reduce GHG emissions.

Plaintiff's contention that California's actions reduce the Administration's bargaining power in some hypothetical future international negotiation (MSJ at 11, 30) also fails because it proves too much. The court in *Central Valley Chrysler-Jeep* recognized this as well. *See* 529 F. Supp. 2d at 1187-88. Under Plaintiff's theory, *anything* that a state does to reduce its GHG emissions, or to reduce the cost of those emission reductions, could limit the President's bargaining leverage.[8] Plaintiff offers no principle to draw a line between California's market coordination and the full array of other steps that California has taken to reduce its GHG emissions. Those include not only its regulatory measures, such as its cap-and-trade program, Low Carbon Fuel Standard, and requirements for regulated utilities to purchase renewable energy, but also its incentive programs to encourage residential solar installations, adoption of low- and zero-emission vehicles, or investment in energy efficiency improvements in buildings. Plaintiff's theory would even implicate the State's own purchasing decisions, such as purchasing fleets of hybrid or electric vehicles. All of these measures reduce the state's, and thus the nation's, GHG emissions, and thus, by Plaintiff's logic, all of them could be preempted as reducing the menu of options the Administration might offer, or withhold, at the international bargaining table. *See id.*

### C.    The importance of California's interest in efficiently controlling GHG emissions means that Plaintiff must identify an especially stark conflict—a showing it has not come close to making.

Even if Plaintiff could show that California's market coordination with Quebec created some tension with Executive policy, which it does not, the strength of California's interest in reducing GHG emissions and the weakness of the alleged conflict would preclude preemption. In *Garamendi*, the Court held that the conflict preemption analysis requires a court "to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." 539 U.S. at 420. The greater the state interest at stake, the greater the

---

[8] In fact, for the first time, Plaintiff seeks to greatly enlarge its challenge to include AB 32, the landmark statute adopted in 2006 that authorizes the State's cap-and-trade program generally. *See* MSJ at 10 n.1 (including in the category of "Agreement and Arrangements" challenged in the motion, "the Agreement, together with its preparatory and implementing activities, *starting with the Global Warming Solutions Act of 2006 ('AB 32')*" (emphasis added)).

28

conflict required to justify preemption. *Id.* at 419 n.11 ("clarity or substantiality" of required conflict "would vary with the strength or the traditional importance of the state concern asserted").

Lower courts have thus rejected conflict preemption claims where a strong state interest is at stake and there is not "powerful evidence" of a "clear conflict" with federal policy. *See, e.g., Faculty Senate of Fla. Int'l Univ.*, 616 F.3d at 1211 (even if a conflict between state and federal policy could be shown, "the strength of Florida's traditional state interest in managing its own spending and the scope of its academic programs is sufficient to overcome the conflict given the lack of the conflict's clarity and severity"); *Museum of Fine Arts*, 623 F.3d at 13-14 ("Even if there were an express federal policy," there would be no conflict preemption because "states have a substantial interest in preventing their laws from being used to pursue stale claims."). Where an asserted conflict with federal policy is "indirect, minor, incidental, [or] peripheral," it can be more easily outweighed by a substantial state interest. *Faculty Senate of Fla. Int'l Univ.*, 616 F.3d at 1208. California's state interests here are at least as strong as those at stake in *Faculty Senate* and *Museum of Fine Arts* and should receive similar weight.

Plaintiff's arguments on conflict preemption entirely ignore this aspect of the conflict preemption analysis. In arguing for dormant preemption, however, Plaintiff contends that "greenhouse gas regulation is not a traditional area of state responsibility." MSJ at 40. The argument is fatuous, and this Court has already rightly and roundly rejected it.

The Court recognized that "[i]t is well within California's police powers to enact legislation to regulate greenhouse gas emissions and air pollution." Dkt. 91 at 30. Indeed, the cases recognizing air pollution as a traditional target for the police power are legion.[9] Accordingly, in the Clean Air Act, Congress found that "air pollution control at its source is the primary responsibility of States and local

---

[9] *E.g., Washington v. General Motors Corp.,* 406 U.S. 109, 114 (1972) ("Air pollution is, of course, one of the most notorious types of public nuisance in modern experience."); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free [the air] from pollution . . . clearly falls within the exercise of even the most traditional concept of . . . the police power."); *Hadacheck v. Sebastian*, 239 U.S. 394, 408-10 (1915) (county's police power supported ordinance that prohibited brickmaking because of its production of "fumes, gases, smoke, soot, steam, and dust"); *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1181 (9th Cir. 2011) (upholding California regulations on maritime fuels as valid exercise of state's police power to combat air pollution); *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states" and "[e]nvironmental regulation traditionally has been a matter of state authority.").

governments." 42 U.S.C. § 7401(a)(3); *see also Washington,* 406 U.S. at 114. California's interest in pro-
tecting its residents from the adverse effects of air pollutant emissions extends to the effects of GHG
emissions: "It is well settled that the states have a legitimate interest in combating the adverse effects of
climate change on their residents." *Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir.
2018) (citing *Massachusetts*, 549 U.S. at 522-23); *accord Rocky Mountain Farmers Union v. Corey*
("*Rocky Mountain II*"), 913 F.3d 940, 945-46, 953 (9th Cir. 2019) (upholding California's Low Carbon
Fuel Standard, which limits GHG emissions associated with motor vehicle fuels, as "a classic exercise of
police power"); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538, 571 (D. Md.
2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020) (city's action against oil companies for injuries resulting from
climate change fell squarely within city's police power to protect public safety and welfare) (citing *Cty.
of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 939 (N.D. Cal. 2018)). California's regulations are
not preempted where, as here, "the state of California clearly has an especially powerful interest in con-
trolling the harmful effects of air pollution." *Pac. Merch. Shipping Ass'n,* 639 F.3d at 1180-81 (citing
*Huron*, 362 U.S. at 442, 445-46, 448).

Plaintiff emphasizes that California has recognized climate change as a global problem and argues
that it is therefore not an issue of local concern. MSJ at 11, 39-40. On the contrary, it is both. The GHG
emissions regulated by California are produced by emitters in California, and as the Supreme Court rec-
ognized in *Massachusetts,* "[a] reduction in domestic emissions would slow the pace of global emissions
increases, no matter what happens elsewhere." 549 U.S. at 526. Along with the rest of its cap-and-trade
program, California's market coordination with Quebec directly advances California's interest in reducing
GHG emissions from *California sources* in an economically efficient manner. AB 32, the Global Warming
Solutions Act, authorized CARB "to design and adopt a 'market-based' program to 'achieve the maximum
technologically feasible and cost-effective reductions in [GHG] emissions.'" *See* Dkt. 91 at 5 (quoting
HSC § 38562(c)(2)). California adopted its cap-and-trade program, including the program's linkage pro-
visions, to reduce the cost of GHG emission control for sources subject to AB 32. CCR §§ 95801-96022.
*See* Dkt. 48 at 40-42. As Intervenors explained in opposition to Plaintiff's first motion for summary judg-
ment, CARB concluded that a cap-and-trade program results in lower compliance costs than traditional
"command-and-control" regulation in which regulators specify emission reductions that each source must

30

achieve. Dkt. 48 at 13. Linkage of California's cap-and-trade program with other jurisdictions provides a variety of efficiency benefits for the operation of the California program. *See* Dkt. 50-1 at 14-15 (State brief); Dkt. 47 at 11 (IETA brief); Dkt. 48 at 40-43 (EDF and NRDC brief). This Court concluded in its prior order that CARB adopted provisions enabling linkage of California's cap-and-trade market with other jurisdictions to "help regulated businesses mitigate their compliance costs while maximizing [the] impact," of the cap-and-trade program and increasing "market liquidity." Dkt. 91 at 8-9.

Further, California's strong interest in reducing GHG emissions is rooted in the "tremendous risks from climate change," including worsening wildfires, droughts, and extreme heat events, which California is already experiencing. *Rocky Mountain Farmers Union v. Corey* ("*Rocky Mountain I*"), 730 F.3d 1070, 1106 (9th Cir. 2013)*; see also Rocky Mountain II,* 913 F.3d at 945, 957-58. The State's actions target a problem that poses a direct and imminent danger to the state's air quality and water supply and threatens to displace thousands of coastal businesses and residences, increase the incidence of infectious disease, and inflict economic harm on some of California's largest industries. HSC § 38501.

Because California has a strong interest in addressing climate change by reducing GHG emissions, and because California's GHG emissions regulations clearly fall within the State's police power, preemption is inappropriate unless there is a "clear conflict" with a "clear and express foreign policy" demonstrated by "powerful evidence." *Faculty Senate of Fla. Int'l Univ.*, 616 F.3d at 1211. Plaintiff fails to demonstrate that California's market coordination with Quebec in any way conflicts with federal policy, but even if there were some minor conflict, it would be outweighed by California's substantial interest in reducing GHG emissions as cost-effectively as possible.

### D.     Plaintiff improperly asserts a new, and meritless, statutory preemption claim.

Plaintiff's motion attempts to bring in an unpleaded statutory preemption claim by the back door. It argues that the Global Climate Protection Act of 1987 ("GCPA"), Pub. L. No. 100–204 (HR 1777, December 22, 1987), Title XI, §§ 1101–1106, 101 Stat. 1331, 1407*, as amended by* Pub. L. No. 103–199, Title VI, § 603, 107 Stat. 2317, 2327, preempts California's market coordination with Quebec. MSJ at 31-36. Indeed, Plaintiff bases that argument on *Crosby v. National Foreign Trade Council,* 530 U.S. 363 (2000). MSJ at 32, 34-36. The *Crosby* Court rested its decision solely on the preemptive effect of a federal statute and expressly refused to reach application of the foreign affairs doctrine, on which the First Circuit

31

1    had rested its decision. 530 U.S. at 374 n.8 ("Because our conclusion that the state Act conflicts with

2    federal law is sufficient to affirm the judgment below, we decline to . . . pass on the First Circuit's rulings

3    addressing the foreign affairs power . . . ."); *see also Garamendi*, 539 U.S. at 423 (referring to "the statu-

4    tory preemption case, *Crosby v. National Foreign Trade Council*"); *Faculty Senate of Fl. Int'l Univ.*, 616

5    F.3d at 1209 ("*Crosby* is a case in which a state statute conflicted with definite and identifiable federal

6    laws on the same subject.").

7           This claim is meritless; the GPCA has no preemptive effect. It was adopted as an appropriations

8    rider in 1987. Pub. L. No. 100–204 (HR 1777, December 22, 1987), Title XI, §§ 1101–1106, 101 Stat.

9    1331, 1407. The statute is purely hortatory. The Second Circuit characterized the GCPA as consisting

10   "almost entirely of mere platitudes" and concluded that the Act "appears to require no action of any kind"

11   beyond a requirement that EPA and the Secretary of State submit a single report to Congress assessing

12   scientific understanding of climate change and "assess[ing]" and "describ[ing]" the United States' "ef-

13   forts" and "strategy" to further international cooperation in limiting global climate change. *Connecticut v.

14   Am. Elec. Power Co.*, 582 F.3d 309, 382-83 (2d Cir. 2009), *rev'd on other grounds,* 564 U.S. 410 (2011).

15   The statute's sponsors took pains to emphasize that it could not be "construed . . . as authorizing or re-

16   quiring the adoption of any regulatory or control measures." H.R. Conf. Rep. 100-475, 171, 1987

17   U.S.C.C.A.N. 2370, 2432. This plainly cannot preempt California's cap-and-trade coordination; "if Con-

18   gress did not provide for regulation . . ., it is hard to see how or why state law on the subject would be

19   preempted . . . ." *Va. Uranium*, 139 S. Ct. at 1912 (Ginsburg, J., concurring).

20          The GPCA is distinctly unlike the statute in *Crosby*. That statute imposed congressionally estab-

21   lished sanctions on Burma, established criteria for the President's imposition of additional sanctions, and

22   directed the President to work with Asian nations to develop a multilateral strategy to alter the political

23   system in Burma. 530 U.S. at 368-70. The President then adopted an executive order to implement the

24   statute by imposing additional sanctions and directing the Secretary of State to develop the required mul-

25   tilateral strategy. *Id.* at 370. By contrast, the GPCA merely sets forth general goals for United States policy

26   to address climate change, directs the President to develop such a policy, and directs the Secretary of State

27   to coordinate United States policy with other nations. Pub. L. No. 100–204 § 1103. The GPCA imposes

28   no requirements with which California's actions could conflict.

The claim's obvious lack of merit may explain why Plaintiff never pled it. Having failed to do so, its request for summary judgment on that newly asserted claim is improper.[10] *See, e.g., Siltronic Corp. v. Emp'rs. Ins. Co. of Wausau*, No. 3:11-CV-1493-YY, 2018 WL 415928, at *3-4 (D. Or. Jan. 2, 2018); *Pain v. Prof'l Mortg. Assoc. Ltd., Inc.*, No. CV-12-1181-PHX-SMM, 2014 WL 12647749, at *1-2 (D. Ariz. Sept. 30, 2014); *see also Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.").

The operative complaint, Dkt. 7, includes no statutory preemption claim. Indeed, after this Court rejected Plaintiff's Compact and Treaty Clause claims, Plaintiff considered amending its complaint again to allege a statutory preemption claim under the Clean Air Act. Dkt. 99, ¶¶ 6, 8, 10 (stipulation). It declined to do so and instead moved forward with the present motion. The Court should therefore disregard Plaintiff's new preemption claim based on the GPCA and *Crosby*.

## II. California's market coordination with Quebec does not offend the "rarely invoked" dormant aspect of the foreign affairs doctrine.

Plaintiff also argues that California's market coordination is preempted under the "dormant" aspect of the foreign affairs doctrine. MSJ at 36-47. Under that theory, "even in the absence of any express federal policy, a state action may be preempted where (1) its 'real purpose' does not concern an area of traditional state responsibility, and (2) it intrudes on the federal government's foreign affairs power." *Gingery*, 831 F.3d at 1229 (quoting *Movsesian v. Victoria Versicherung AG* ("*Movsesian*"), 670 F.3d 1067, 1074-75 (9th Cir. 2012) (en banc)); *Movsesian*, 670 F.3d at 1072 (dormant preemption may apply "when the federal government has taken no action on a particular foreign policy issue"). Dormant foreign affairs preemption is "a rarely invoked doctrine" that "may be appropriate when a state intrudes on a matter of foreign policy with no real claim to be addressing an area of traditional state responsibility." *Movsesian*, 670 F.3d at 1075.

Plaintiff cannot show either requisite of dormant foreign affairs preemption. As explained above, California has been acting well within the boundaries of its police power: control of air pollution with

---

[10] It is also of a piece with Plaintiff's constantly shifting theories in this litigation. On Plaintiff's first motion for summary judgment, it asserted a wholly new theory in its reply brief: that the Clean Air Act demonstrated that California's agreement with Quebec was an impermissible compact. Dkt. 78 at 51-53.

profound local consequences. Its patent "real purpose" for doing so is to reduce the risks to its residents from climate change and to do so efficiently. Nor has California "intruded" on the federal government's foreign affairs power. "Intrusion" requires more than mere "involvement" with another country; it requires interference with United States foreign relations. California's coordination of its emissions market with Quebec involves no such interference.

**A.** **California's market coordination is one part of a program in an area of traditional state responsibility: air pollution control.**

California's purpose in coordinating its cap-and-trade program with Quebec is to protect the state from the impacts of climate change by regulating air pollution, a traditional state responsibility which is not subject to dormant foreign affairs preemption. A traditional state responsibility exists where a state has a "legitimate interest" in a matter "traditionally regulated by the state." *Von Saher I*, 592 F.3d at 964-65. This of course includes "the traditional powers of states to regulate under their own police powers for the health and welfare of their own citizens." *Cent. Valley Chrysler-Jeep, Inc.*, 529 F. Supp. 2d at 1187. Plaintiff contends that "greenhouse gas regulation is not a traditional area of state responsibility," MSJ at 40, but this Court has already recognized that GHG regulation is "well within California's police powers," Dkt. 91 at 30.

Plaintiff asserts that California's "real purpose" linking its emissions market with Quebec is to "pursue an alternative climate foreign policy to that of the United States" and to "repudiate . . . the President's foreign policy." MSJ at 41; *see also id.* at 43 (asserting that California is supposedly acting "in declared opposition to the foreign policy of the United States"). However, Plaintiff fails to produce any cognizable evidence of this supposed purpose and in fact the evidence shows otherwise. To determine a state action's "real purpose," courts examine the traditional indicia of legislative intent: the statute's text, scope, and legislative history. *Movsesian*, 670 F.3d at 1075 (citing *Garamendi*, 539 U.S. at 425-26; *Von Saher I*, 592 F.3d at 964-65). Here, the text and legislative history of AB 32 and California's cap-and-trade regulations make clear that the purpose of California's market coordination with Quebec is to cost-effectively reduce GHG emissions from California sources to mitigate climate impacts on California.

1            **1.     This Court has correctly recognized that control of GHG emissions is a core**

2                   **exercise of California's police power despite the fact that climate change is a global problem.**

3        This Court has already held that "[i]t is well within California's police powers to enact legislation

4  to regulate greenhouse gas emissions and air pollution," Dkt. 91 at 30, acknowledging that courts have

5  long found air pollution control to be a traditional exercise of state police power, *see supra* Section I.D.

6  The Supreme Court has confirmed that GHGs are air pollutants. *Massachusetts*, 549 U.S. at 528-29; Dkt.

7  91 at 3 n.3. Like state regulation of any other air pollutant, regulation of GHG emissions falls within a

8  state's traditional police power. *See Rocky Mountain II*, 913 F.3d at 945-46, 953; *Am. Fuel & Petrochem.*

9  *Mfrs.*, 903 F.3d at 913 (citing *Massachusetts*, 549 U.S. at 522-23); *Cent. Valley Chrysler-Jeep*, 529 F.

10  Supp. 2d at 1187. Regulation of GHG emissions is therefore a "traditional state responsibility" not subject

11  to dormant foreign affairs preemption. *See Gingery*, 831 F.3d at 1229 (citing *Movsesian*, 670 F.3d at 1074-

12  75).

13        Plaintiff asserts that climate change is a global problem and therefore not an issue of local concern.

14  MSJ at 11, 39-40. The premise is plainly correct, but as shown above in Section I.D, the conclusion hardly

15  follows from it. Although climate change is occurring worldwide due to worldwide pollution, GHGs are

16  produced by California emitters and reducing this pollution "would slow the pace of global emissions

17  increases[] no matter what happens elsewhere." *Massachusetts*, 549 U.S. at 526. In *Rocky Mountain II*,

18  the Ninth Circuit upheld California's Low Carbon Fuel Standard ("LCFS"), which was designed to reduce

19  the GHG emissions associated with production and use of motor vehicle fuels, because "the regulated

20  parties, the regulated transactions, and the harms California intended to prevent are all within the state's

21  borders." 913 F.3d at 953. The court "squarely reject[ed]" the argument that "California's interest in the

22  LCFS is merely a concern for the environmental harms that are properly subject to the police power of

23  other states." *Id.* As with the other (many) forms of transboundary pollution, the dispersion of GHG emis-

24  sions across state or international boundaries does not make their local impacts any less of a local concern.

25            **2.     The "real purpose" of California's market coordination is to cost-effectively**

26                   **reduce California GHG emissions.**

27        To establish dormant foreign affairs preemption, Plaintiff must show that California's "real pur-

28  pose" is to advance a goal outside an area of traditional state responsibility. *Gingery*, 831 F.3d at 1229

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1   (quoting *Movsesian*, 670 F.3d at 1074-75). Plaintiff asserts that California's real purpose in coordinating

2   its cap-and-trade program with Quebec is to "pursue an alternative climate foreign policy to that of the

3   United States, and thereby not only to repudiate but to act against the President's foreign policy." MSJ at

4   41. This argument is both illogical and unsupported.

5          The notion that California's real purpose in working with Quebec is to "repudiate" or "act against"

6   the Administration's withdrawal from the Paris Agreement is simply absurd. California decided to coor-

7   dinate its cap-and-trade market with Quebec *years before* the President took office, let alone announced

8   his intention to withdraw from the Paris Agreement, both in 2017. California promulgated the cap-and-

9   trade rule, which authorizes market coordination, in 2011. It entered the agreement with Quebec in 2013,

10  and the linkage with Quebec took effect in 2014. Dkt. 48 at 14, 16. The Paris Agreement was not even

11  negotiated until 2015, and President Obama signed it in 2016. Dkt. 48 at 21. President Trump took office

12  in 2017, and in June of that year he announced that the United States would abandon the Paris Agreement.

13  *Id*. at 21-22. California's market coordination with Quebec could not have been intended to "repudiate"

14  the policies of a President who had not yet been elected, let alone adopted those policies.

15         Putting aside the blatant illogic of Plaintiff's argument, the relevant evidence demonstrates that

16  California's real purpose has in fact been to cost-effectively reduce GHG emissions, a core state concern.

17  To determine the state's real purpose, courts examine the traditional, formal indicia of legislative intent:

18  a state statute's text, scope, and legislative history. *Movsesian*, 670 F.3d at 1075 (looking to the "text and

19  legislative history" of the statute and noting that "just as in *Garamendi*, the legislative findings accompa-

20  nying the statute plainly reveal its true purpose").

21         Here, the text and legislative history of AB 32 make clear that its purpose is to cost-effectively

22  reduce GHG emissions to mitigate climate impacts on California. *See* HSC § 38501 (legislative findings

23  and declarations);[11] HSC § 38562(c)(2) (adoption of GHG emissions limits and regulations); California

24

---

25  [11] California Health & Safety Code section 38501(h) states, "It is the intent of the Legislature that the

26  State Air Resources Board design emissions reduction measures to meet the statewide emissions limits
    for greenhouse gases established pursuant to this division in a manner that minimizes costs and maximizes

27  benefits for California's economy, improves and modernizes California's energy infrastructure and main-
    tains electric system reliability, maximizes additional environmental and economic cobenefits for

28  California, and complements the state's efforts to improve air quality."

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1  Bill Analysis, AB 32, Assembly (Sept. 5, 2006) (outlining purposes of statute); California Bill Analysis,

2  AB 32, Senate (Aug. 30, 2006) (same). The same purpose is evident in the cap-and-trade regulations

3  adopted under AB 32. *See* CCR § 95801. As discussed above, CARB adopted regulations authorizing

4  linkage of California's cap-and-trade program with those of other jurisdictions, CCR §§ 95940-45, to

5  accomplish AB 32's statutory mandates to "achieve the maximum technologically feasible and cost-ef-

6  fective reductions in greenhouse gas emissions" via "market-based" programs, HSC § 38562(c)(2), and

7  to "consult with other states, and the federal government, and other nations to identify the most effective

8  strategies and methods" to reduce GHG emissions, HSC § 38564; *see supra* Background Section I. CARB

9  found that linkage of California's cap-and-trade program with those of other jurisdictions would further

10  the State's emission-reduction goals and reduce compliance costs for regulated entities in California.

11  CARB, California's Cap and Trade Program: Final Statement of Reasons (October 2011), Dkt. 50-4 at 68

12  (linkage would "provide an additional cost containment mechanism" for covered entities). California then

13  decided to link its cap-and-trade program with Quebec's program for precisely these reasons: to further

14  the State's GHG reduction goals and reduce compliance costs for regulated entities in California. Califor-

15  nia Air Resources Board Resolution 13-7, Amendments to California Cap-and-Trade Program – Linkage

16  (April 19, 2013), Dkt. 50-4 at 71. The text and legislative history of AB 32 and the regulations authorizing

17  market coordination with other jurisdictions make it plain that California's real purpose has been well

18  within the traditional state responsibility of air pollution control.

19       Plaintiff also asserts that California's market coordination with Quebec is motivated by an im-

20  proper purpose because it seeks to facilitate the reduction of GHG emissions in foreign jurisdictions, in

21  this case Canada. MSJ at 37, 39, 42. As explained above in Background Section III, Quebec established

22  its cap-and-trade program independently of California's program. Dkt. 48 at 16. California and Quebec

23  have independently set their own emission reduction caps, and the market coordination between the two

24  cap-and-trade programs does not change these caps. Dkt. 91 at 9; Dkt. 50-1 at 15; Dkt. 48 at 16. Indeed,

25  as this Court has recognized, the agreement between California and Quebec binds neither party. Dkt. 91

26  at 28. However, even if California's market coordination did have the indirect effect of further reducing

27  GHG emissions in Quebec beyond the level that Quebec would otherwise achieve, such effects would be

28  merely incidental to California's main purpose of cost-effectively reducing in-state emissions.

Plaintiff also asserts in its conflict preemption argument that "California facilitates Canada's participation in the Paris Agreement by reducing Canada's cost of complying with that agreement." MSJ at 28; *see also id*. at 29-30. As discussed above in Section I.C.3, this assertion is incorrect. Moreover, to the extent Plaintiff suggests that California's *purpose* in pursuing market coordination was to reduce compliance costs for Canada or Canadian emitters, this claim is totally unsupported. As discussed above, California's purpose in pursuing cap-and-trade market coordination with Quebec was to make emissions reductions more cost-effective for regulated entities *in California* and achieve efficiency benefits for the California cap-and-trade market. Dkt. 50-4 at 68; Dkt. 50-4 at 71. There is no evidence whatsoever to suggest the (frankly odd) notion that California's real purpose in pursuing linkage was to benefit Canadian emitters by reducing their compliance costs.

### 3. Plaintiff's reliance on statements by individual politicians to show the real purpose of California's program conflicts with decades of settled law.

Ignoring the traditional evidence of legislative and regulatory intent, Plaintiff relies instead on statements made by California officials exercising their rights to disagree with the Administration's decision to withdraw from the Paris Agreement as purported evidence that California's purpose was to repudiate the Administration's foreign policy.[12] MSJ at 9-10, 34-35, 43-44. This Court has already rejected Plaintiff's reliance on those statements, finding that they are "no more than typical political hyperbole" and "are entitled to no legal effect." Dkt. 91 at 13 n.7; *see also supra* Section I.B.2. Such statements are not evidence of California's "real purpose" in coordinating its cap-and-trade program with Quebec's program, and are therefore irrelevant to the dormant foreign affairs preemption analysis.

Courts examine a state statute's text, scope, and legislative history to determine a state's real purpose under the dormant foreign affairs doctrine. *Movsesian*, 670 F.3d at 1075. The court in *Movsesian* declined to consider extrinsic evidence of purpose because these sources clearly expressed the statute's purpose. *Id*. at 1075 n.3. Courts have consistently taken this approach when confronted with the need to

---

[12] Plaintiff also cites California's participation in the United States Climate Alliance and language from a State website about California's participation in various partnerships and agreements relating to climate change as supposed evidence of California's "real purpose." MSJ at 41. Neither is relevant evidence of California's purpose in pursuing market coordination with Quebec for the same reason that statements by state officials do not qualify.

determine governmental purpose: it is "determined by objective indicators as taken from the face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment of the statute, the stated purpose, and the record of proceedings." *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984); *see also McCreary Cty. v. ACLU*, 545 U.S. 844, 862 (2005) (courts consider only the "text, legislative history and implementation of the statute, or comparable official act").

Public statements by California politicians disagreeing with the Administration's decision to withdraw from the Paris Agreement are thus not evidence that the State's "real purpose" in coordinating its emissions market with Quebec is to establish its own foreign policy on climate change. In *Gingery*, the Ninth Circuit held that a city's public statements expressing a political position on a matter related to foreign affairs were not preempted under the dormant foreign affairs doctrine because they concerned "an area of traditional state responsibility" and did not indicate that the city's "real purpose" was to "insert itself into foreign affairs." *Gingery*, 831 F.3d at 1230. The court held that a city's memorial commemorating human rights abuses suffered by World War II Korean "comfort women" was "entirely consistent with a local government's traditional function of communicating its views and values to its citizenry." *Id*. The court noted that even if the city's purpose was to "put [itself] on the international map, this purpose does not conflict with the role local governments have traditionally played in public discourse related to foreign affairs." *Id*. (citing *Farley v. Healey,* 67 Cal. 2d 325). California politicians' participation in public discourse about the Paris Agreement is mere political expression and cannot support a claim of dormant foreign affairs preemption.

### B. California's market coordination with Quebec does not "intrude" into foreign policy.

Even if Plaintiff had demonstrated that California is not acting to advance a well-established, legitimate state interest, it would also need to prove that California has "intrude[d] on the federal government's foreign affairs power." *Gingery*, 831 F.3d at 1230. Plaintiff contends California has done so because the State "is expressly advancing the Agreement, Arrangements, and other policies with foreign governments in declared opposition to the foreign policy of the United States." MSJ at 43. Plaintiff's attempts to greatly enlarge the scope of "intrusion." It in fact requires officious meddling in the affairs of

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1  foreign nations. Here, California has acted in concert with Quebec to improve the operation of the State's

2  own cap-and-trade program.

3      Plaintiff assumes that "intrude" means merely "involve" or "relate to." The dormant foreign affairs

4  preemption cases require far more to bar state action: they require *interference* with foreign affairs. "To

5  intrude on the federal government's foreign affairs power," the state's action must have "an *effect* on

6  foreign affairs" that is "more than . . . incidental or indirect." *Gingery*, 831 F.3d at 1230 (emphasis added)

7  (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613, 617 (9th Cir. 2013)). The

8  intrusion must be direct and substantial, as when a state "disturb[s] foreign relations." *Movsesian,* 670

9  F.3d at 1072 (quoting *Zschernig,* 389 U.S. at 440-41). State intrusion into the federal foreign affairs power

10  must be "plausibly allege[d]" via "specific allegations" regarding the effect of the state action on foreign

11  affairs. *Gingery*, 831 F.3d at 1230–31 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

12      Each of the (very few) cases in which courts have applied dormant foreign affairs preemption to

13  invalidate state law has involved serious potential interference with foreign affairs, not mere involvement

14  by states in issues of international concern. The matched pair of *Zschernig* and *Clark v. Allen*, 331 U.S.

15  503 (1947), demonstrates the difference. The cases involved closely similar statutes conditioning foreign

16  nationals' inheritance of property on the foreign nation's reciprocal recognition of rights of inheritance

17  for United States citizens. *Clark* upheld the California statute against a facial challenge (finding the claim

18  "far-fetched"), 331 U.S. at 516-17, but *Zschernig* invalidated the Oregon equivalent as applied, 389 U.S.

19  at 432.[13] The statutes both plainly implicated foreign matters: they called on state courts to determine

20  whether to allow foreign nationals to inherit property based on attributes of the political and legal systems

21  of their home countries. *See Zschernig,* 389 U.S. at 435-40; *Clark*, 331 U.S. at 516. The difference between

22  the two results lay in the history of application that was available to the Court in *Zschernig*, which revealed

23  that the Oregon courts were not giving controlling effect to foreign nations' representation of their legal

24  rules, but instead were determining whether Eastern Bloc nations were in fact following their paper guar-

25  antees about property inheritance. 389 U.S. at 432, 435-36 & n.6; *see also id.* at 433 n.5 (explaining the

26  difference). The Court thus found that application of the Oregon statute created "great potential for

27  _____

28  [13] The Court in *Zschernig* expressly refused to overrule *Clark*. 389 U.S. at 432. Both cases thus remain
    good law; the *effects* of the law recognized in *Zschernig* explain the different outcomes.

1  disruption or embarrassment." *Id.* at 435, 440. The Court held that the statute "has a direct impact upon

2  foreign relations and may well adversely affect the power of the central government to deal with those

3  problems." *Id.* at 441. It thus held that state laws "must give way if they *impair* the effective exercise of

4  the Nation's foreign policy." *Id.* at 440 (emphasis added); *see id.* at 441 (state policy may be preempted if

5  it "disturb[s] foreign relations").

6        In *Movsesian*, the State was taking—and implementing—a position on a controversial issue that

7  threatened the United States' relations with Turkey: the statute "imposes the politically charged label of

8  'genocide' on the actions of the Ottoman Empire (and, consequently, present-day Turkey)." 670 F.3d at

9  1076. But as the court emphasized, it also implemented that political position "by providing relief and a

10  friendly forum to a perceived class of foreign victims," *id.* at 1077, which, like the statute in *Zschernig*,

11  "would require a highly politicized inquiry into the conduct of a foreign nation," *id.* at 1076. In short, the

12  statute had potential tangible *impact* on the United States' relations with Turkey on a "hotly contested

13  matter of foreign policy." *Id.* at 1077.

14        Like the contrast of *Clark* with *Zschernig*, the Ninth Circuit's decision in *Gingery v. City of Glen-*

15  *dale* provides an instructive contrast with *Movsesian.* In *Gingery*, the court upheld the city's statue

16  depicting Korean comfort women despite the fact that it was plainly a statement by the city on an issue

17  related to foreign affairs, and indeed on an active controversy involving Japan. 831 F.3d at 1230-31; *id.*

18  at 1231 (finding that Japanese officials had objected to the monument). Nevertheless, the court held that

19  the plaintiffs had failed to make "specific allegations that Glendale's actions have had, or are likely to

20  have, any *appreciable effect* on foreign affairs." *Id.* at 1230-31 (emphasis added). The plaintiffs failed to

21  allege that Japan's "disapproval has in any way *affected* relations between the United States and Japan."

22  *Id.* at 1231 (emphasis added). The court distinguished *Movsesian* on the grounds that the statue at most

23  reflected "exercise[ of] the expressive powers of a local government" without tangible impact. *Id.* ("Glen-

24  dale has taken no action that would affect the legal rights and responsibilities of any individuals or foreign

25  governments."). In *Movsesian*, by contrast, the court rejected the notion that "the statute [is] merely ex-

26  pressive." 670 F.3d at 1077.

27        California's market coordination with Quebec bears no resemblance to the examples of state in-

28  terference with the Nation's foreign affairs that courts have invalidated under the dormant foreign affairs

doctrine. As in *Gingery*, Plaintiff has offered no argument or evidence to show that California's program has "any appreciable *effect* on foreign affairs." 831 F.3d at 1230-31 (emphasis added). Rather, it merely rehashes its argument, based on irrelevant statements by individual officials, about California's alleged "declared opposition to the foreign policy of the United States." MSJ at 43-45. Those arguments have been disposed of above.[14] *See supra* Sections I.B.1, II.A. In any event, as also noted above, the contention that California's market coordination is animated by hostility to the Administration's management of foreign affairs on climate change is risible: California's agreement with Quebec, its regulations implementing it, and its implementation of the program all occurred long before the President decided to abandon the Paris Agreement in 2017. *See supra* Section II.A. California's program is "in opposition" to nothing.[15]

California's coordination with Quebec plainly involves "foreign relations" in some sense—it includes an agreement with a foreign jurisdiction—but that does not make it preempted. Plaintiff's apparent theory—that any state action that relates to or involves foreign relations is preempted—is not only inconsistent with the precedent just discussed, it makes no sense in constitutional context. Such a sweeping view of preemption would swallow the Compact Clause, which accepts that agreements between states and foreign jurisdictions can be perfectly legitimate, some only with congressional approval but also some without. And of course this Court has already concluded that the instant agreement is allowable under the Clause without congressional approval. Dkt. 91 at 33. Any such agreement is likely to implicate the relationship between the United States and a foreign nation. But it will not necessarily *interfere* with foreign relations, and therefore will not "intrude" on them for purposes of dormant foreign affairs preemption.

As discussed above, California's coordination with Quebec does nothing to threaten the United States' relationship with Canada. On the contrary, it can only solidify that relationship with what Plaintiff

---

[14] In fact, Plaintiff's argument collapses the distinction between the two prerequisites for dormant preemption. It tries to make California's supposed purpose dispositive of both the "real purpose" and the "intrusion" requirements.

[15] Once again, Plaintiff's arguments sweep far too broadly. It complains about AB 32's declared intent that California show "global leadership" on climate change. MSJ at 11. AB 32 of course was adopted before the cap-and-trade program, and long before linkage with Quebec. Does California's "global leadership" invalidate all of California's programs targeting GHG emissions? Does dormant foreign affairs preemption require California to track the global lowest common denominator, lest it be accused of unconstitutional "leadership"?

42

has referred to as "a close ally of the United States" and "one of the United States' foremost allies in the world," MSJ at 31, by coordinating California and Quebec's emissions markets. California is not "sitting in judgment" over Quebec, *Garamendi*, 539 U.S. at 439; it is cooperating with Quebec to advance the State's domestic interest in economically efficient pollution control.

## III. Plaintiff's arguments far exceed the narrow confines that courts have established for foreign affairs preemption.

Courts have applied the foreign affairs doctrine in only a "narrow set of circumstances." *Medellin*, 552 U.S. at 531. *All* of the cases in which courts have found preemption involve clear and concrete interference with foreign affairs. In the conflict preemption context, all of those cases have involved "executive agreements to settle civil claims between American citizens and foreign governments or foreign nationals."[16] *Id.* The cases finding dormant preemption are similarly limited. The Ninth Circuit cases, *Movsesian, Von Saher I*, and *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003), all involved a state's effort to insert itself into claims arising in foreign countries. And the Supreme Court's only case in the area, *Zschernig*, involved a clearly established history of states' open *hostility* toward foreign nations. These cases have in common officious state action that intrudes into the domestic affairs of foreign nations without the consent or cooperation of those countries or in direct opposition to those nations' positions or interests. *See Cruz v. United States*, 387 F. Supp. 2d 1057, 1076 (N.D. Cal. 2005) (collecting dormant preemption cases and finding that they all "articulated state condemnation of a foreign nation's conduct"). Likewise, *Crosby*, although not a foreign affairs preemption case (*see supra* Section I.D), involved an effort to target a foreign nation based on the state's judgments about that nation's political system and to implement that judgment by "fenc[ing] off" the state's economy against that foreign nation. 530 U.S. at 381.

California has done nothing like any of that; it is hardly wielding an "iron fist" in its interactions with Quebec. *See Garamendi*, 539 U.S. at 427, *quoted in* MSJ at 12. On the contrary, Plaintiff can point to no case in which a court has invalidated *cooperation* between a state and a "close ally of the United

---

[16] *Medellin* focuses on the Supreme Court's decisions, but the lower court cases finding conflict preemption also uniformly involve foreign claims. *See Deirmenjian*, 526 F. Supp. at 1077; *In re Assicurazioni Generali, S.P.A.*, 592 F.3d at 118–19; *Steinberg*, 133 Cal. App. 4th at 689.

States" (MSJ at 31) under the foreign affairs preemption doctrine. California's market coordination with Quebec is a collaborative relationship which benefits both jurisdictions by reducing cap-and-trade compliance costs, and California's actions do not interfere in any way with the domestic affairs of Quebec or Canada.

Plaintiff's foreign affairs preemption claim infringes on California's police powers and undercuts the benefits of state innovation that federalism fosters.[17] California's novel collaboration with Quebec to optimize operation of the State's cap-and-trade program is akin to the interstate cooperation that the Supreme Court has recognized as one of federalism's benefits. *See People of the State of N.Y. v. O'Neill*, 359 U.S. 1, 6 (1959). Notably, entrepreneurial state efforts to develop such cooperative relationships with foreign jurisdictions have proven essential in states' responses to the current COVID-19 pandemic. Facing a national shortage of medical supplies needed to protect public health during the crisis, many states have negotiated directly with foreign governments and have brokered agreements to obtain purchased or donated medical masks or ventilators.[18] Plaintiff's overbroad view of the foreign affairs doctrine would threaten this vital state cooperation with foreign jurisdictions, along with hundreds of state agreements on

---

[17] As discussed in Intervenors' prior brief, California's cap-and-trade program and the coordinated market are classic examples of the genius of federalism. Dkt. 48 at 37. The Founders intended that states be allowed to experiment in developing legislative and regulatory solutions that might prove appropriate for adoption at the national level or by other states. *New State Ice v. Liebmann*, 285 U.S. 262, 287 (1932) (Brandeis, J., dissenting). Since the mid-twentieth century, California has led the way in developing innovative methods of air pollution control, and the federal government was heavily influenced by California's example in adopting national air pollution standards. *See* Dkt. 48 at 37. Plaintiff's claim would stifle states' development of new approaches to address the urgent challenge of climate change.

[18] *See, e.g.,* Jesse Paul, *Here's how Colorado competes with the world to secure coronavirus tests and supplies*, The Colorado Sun (April 27, 2020), *available at* <https://coloradosun.com/2020/04/27/colorado-coronavirus-supplies-asia/>; Brian Witte, *Maryland Receives Shipment of 500,000 Coronavirus Tests From South Korea*, Time (April 20, 2020), *available at* <https://time.com/5824524/south-korea-maryland-coronavirus-tests/>; Madeleine Carlisle, *Gov. Cuomo Says Chinese Government Delivering 1,000 Ventilators to New York*, Time (April 6, 2020), *available at* <https://time.com/5815687/cuomo-ventilators-china-coronavirus/>; Nick Reynolds, *Wyoming receives 50,000 protective face masks from Taiwanese government*, Wyoming Tribune-Eagle (April 25, 2020), *available at* <https://www.wyomingnews.com/news/local_news/wyoming-receives-50-000-protective-face-masks-from-taiwanese-government/article_267791b6-7e02-5ffc-bae7-bb5fbdd2fcc5.html>.

EDF AND NRDC'S OPPOSITION TO PLAINTIFF'S SECOND MSJ
Case No. 2:19-cv-02142-WBS-EFB

1  trade, energy, environmental protection, and a multitude of other topics. *See* Dkt. 48 at 38-40 (collecting

2  examples of state agreements).

3       The courts' reticence in applying both aspects of the foreign affairs doctrine reflects caution about

4  trenching on the states' police powers. *See supra* Sections I.C, II.A. Even in the context of statutory

5  preemption—where both the Legislative and Executive have considered and approved the statute alleged

6  to preempt—courts "assume that a federal law does not preempt the states' police power absent a 'clear

7  and manifest purpose of Congress.'" *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting

8  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *see also Arizona v. United States*, 567 U.S. 387, 400 (2012)

9  ("In preemption analysis, courts should assume that 'the historic police powers of the States' are not su-

10  perseded 'unless that was the clear and manifest purpose of Congress.'" (quoting *Rice v. Santa Fe Elevator*

11  *Corp.,* 331 U.S. 218, 230 (1947))). Similarly, treaties and formal executive agreements "will be carefully

12  construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly

13  necessary to effectuate the national policy." *Pink*, 315 U.S. at 230. By contrast, both *Garamendi*, which

14  relies on implications from sources of policy likely to be less clear and direct than a statute, treaty, or

15  executive agreement, and dormant preemption, which bars state action even in the absence of *any* preempt-

16  ing policy, pose a far greater risk that the state's police power will be too readily disabled. Courts have

17  accordingly applied the doctrine only where the record clearly dictated it.

18       By contrast, Plaintiff's vague policy of seeking an undefined Better Deal is an excellent example

19  of the kind of goal that is far too nebulous to preempt. "Invoking some brooding federal interest . . . should

20  never be enough to win preemption of a state law." *Va. Uranium*, 139 S. Ct. at 1901 (lead opinion of

21  Gorsuch, J.); *see also Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) ("'There is no federal preemption *in*

22  *vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United

23  States." (quoting *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

24  Plaintiff asks this Court to make "a 'freewheeling judicial inquiry into whether [California's program] is

25  in tension with federal objectives.'" *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011)

26  (citation omitted).

27       The President's constitutional authority to conduct foreign affairs does not justify preemption here.

28  The President has broad power to negotiate international agreements on behalf of the country that pertain

1  to war and peace, including the resolution of international conflicts and foreign claims arising from them.

2  *Von Saher I*, 592 F.3d at 966; *Deutsch*, 324 F.3d at 709, 712. But the President is not the "Commander-

3  in-Chief of the country" and his military powers do not "supersede representative government of internal

4  affairs." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644 (1952) (Jackson, J., concurring).

5  The President cannot direct states to enact legislation that could potentially help his bargaining position

6  in international negotiations, whether they concern trade, the environment, or any other topic. For the

7  same reason, the President cannot demand that courts invalidate lawful measures within the scope of state

8  police power merely because he believes it could potentially enhance his bargaining leverage in some

9  future international negotiation. States are not precluded from enacting legislation merely because it con-

10  cerns a topic which is a subject of international negotiations. If the President could invalidate any state

11  law in the absence of a federal statute simply by claiming that it might adversely affect his flexibility to

12  negotiate internationally on some subject, then almost any state action could be preempted by executive

13  fiat. Plaintiff's overzealous application of the dormant foreign affairs doctrine runs the risk of erroneously

14  barring the states' rightful exercise of sovereign authority without any basis in statute, concrete executive

15  policy, or constitutional principles.

16                                      **CONCLUSION**

17          For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny Plain-

18  tiff's motion for summary judgment.

19  DATED:  May 18, 2020                    SHUTE, MIHALY & WEINBERGER LLP

20

21                                         By:    /s/Matthew D. Zinn

22                                                MATTHEW D. ZINN

23                                                Attorneys for Defendant-Intervenors
24                                                ENVIRONMENTAL DEFENSE FUND and
                                                  NATURAL RESOURCES DEFENSE COUNCIL
25

26

27

28