1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12   UNITED STATES OF AMERICA,          No. 2:19-cv-02142 WBS EFB

13              Plaintiff,

14       v.                            MEMORANDUM AND ORDER RE:
                                       SECOND CROSS-MOTIONS FOR
15   STATE OF CALIFORNIA; GAVIN C.     SUMMARY JUDGMENT
     NEWSOM, in his official capacity
16   as Governor of the State of
     California; CALIFORNIA AIR
17   RESOURCES BOARD; MARY D.
     NICHOLS, in her official
18   capacity as Chair of the
     California Air Resources Board
19   and as Vice Chair and a board
     member of the Western Climate
20   Initiative, Inc.; WESTERN
     CLIMATE INITIATIVE, INC.; JARED
21   BLUMENFELD, in his official
     capacity as Secretary for
22   Environmental Protection and as
     a board member of the Western
23   Climate Initiative, Inc.; KIP
     LIPPER, in his official capacity
24   as a board member of the Western
     Climate Initiative, Inc., and
25   RICHARD BLOOM, in his official
     capacity as a board member of
26   the Western Climate Initiative,
     Inc.,
27
                Defendants.
28

                              1

1    Plaintiff United States of America ("United States")

2  brought this action against the State of California[1] and other

3  related individuals and entities[2] alleging, <u>inter alia</u>,

4  California's cap-and-trade program is preempted under the Foreign

5  Affairs Doctrine.  (First Am. Compl. ("FAC") (Docket No. 7).)

6  Presently before the court are the parties' cross-motions for

7  summary judgment on that claim alone.  (Docket Nos. 102, 108,

8  110.)

9  I.   <u>Summary of Facts and Procedural History</u>

10   The court exhaustively set forth relevant facts in its

11  previous Order granting defendants' summary judgment on the

12  Treaty Clause and Compact Clause.  (<u>See</u> MSJ Order at 2-16 (Docket

13  No. 91).)  For purposes of this Order, the court will offer brief

14  summaries of the relevant treaties, statutes, agreements, and

15  actions directly bearing on the Foreign Affairs Doctrine claim.

16   A.   <u>Relevant Policies</u>

17   Beginning in the 1950s, "Congress enacted a series of

18

19   [1]   State defendants include Gavin C. Newsom, in his
official capacity as Governor of the State of California; the
20  California Air Resources Board; Mary D. Nichols, in her official
capacity as Chair of the California Air Resources Board; and
21  Jared Blumenfeld, in his official capacity as Secretary of
California's Environmental Protection Agency ("CalEPA").  These
22  defendants will collectively be referred to as "State defendants"
or "California."
23

24   [2]   The Western Climate Initiative, Inc. defendants are the
Western Climate Initiative, Inc. ("WCI, Inc."); Mary D. Nichols,
25  in her official capacity as Vice Chair of WCI, Inc. and a voting
board member of WCI, Inc.; and Jared Blumenfled, in his official
26  capacity as a board member of WCI, Inc.  These defendants will
collectively be referred to as "WCI, Inc. defendants."  The court
27  dismissed non-voting board members Kip Lipper and Richard Bloom
from the action on February 26, 2020.  (Docket No. 79.)
28

2

1 statutes designed to encourage and to assist the States in
2 curtailing air pollution."  Chevron, U.S.A., Inc. v. Nat. Res.
3 Def. Council, Inc., 467 U.S. 837, 845 (1984).  Among these was
4 the Clean Air Act, 42 U.S.C. § 7401 et seq., which provided that
5 "pollution control at its source is the primary responsibility of
6 States and local governments."  42 U.S.C. § 7401(a)(3).  Since
7 then, regulation of air pollution -- including greenhouse gases,
8 see Massachusetts v. EPA, 549 U.S. 497, 532 (2007) -- has been
9 viewed as a "joint venture" between "the States and the Federal
10 Government" as "partners in the struggle against air pollution."
11 In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods.
12 Liab. Litig., 959 F.3d 1201, 1214 (9th Cir. 2020) (quoting Gen.
13 Motors Corp. v. United States, 496 U.S. 530, 532 (1990)).

14       In 1987, Congress passed the Global Climate Protection
15 Act of 1987 ("GCPA"), Title XI of Pub. L. 100-204, 101 Stat.
16 1407, note following 15 U.S.C. § 2901.  Its ultimate aims were to
17 "increase worldwide understanding of the greenhouse gas effect"
18 and "foster cooperation among nations to develop more extensive
19 and coordinated scientific research efforts with respect to the
20 greenhouse effect."  Id. §§ 1103(a)(1)-(2).  The GCPA directed
21 the Environmental Protection Agency ("EPA") to author a report to
22 Congress detailing a "coordinated national policy on global
23 climate change" and ordered the Secretary of State to work
24 "through the channels of multilateral diplomacy" to combat global
25 warming.  Id. §§ 1103(b)-(c); see also Massachusetts, 549 U.S. at
26 508.

27       In conformity with the GCPA, President George H.W. Bush
28 signed, and the Senate ratified, the United Nations Framework

1  Convention on Climate Change of 1992 ("1992 Convention").  (First

2  Decl. of Rachel E. Iacangelo ("First Iacangelo Decl.") ¶ 4, Ex. 2

3  at D1316 (Docket No. 12-2).)  The 1992 Convention sought to

4  "stabiliz[e] [] greenhouse gas concentrations in the atmosphere

5  at a level that would prevent dangerous anthropogenic

6  interference with the climate system" by adopting "regional

7  programmes containing measures to mitigate climate change."  (Id.

8  at ¶ 3, Ex. 1 at 4, Arts. 2, 4.)  Following these national and

9  international directives, the federal and state governments have

10  sought to combat greenhouse gas emissions in a variety of ways,

11  including through cap-and-trade programs.

12       In 2006, the California legislature enacted the

13  California Global Warming Solutions Act of 2006, Cal. Health &

14  Safety Code § 38500 et seq. ("the Global Warming Act").  The

15  Global Warming Act aimed to assuage "serious threat[s] to the

16  economic well-being, public health, natural resources, and the

17  environment of California" by adopting a series of programs to

18  limit the emissions of greenhouse gases.  See Cal. Health &

19  Safety Code § 38501(a).  The legislature charged the California

20  Air Resources Board ("CARB") with the task of designing an

21  "integrated and cost-effective regional, national, and

22  international . . . program[]" to "achieve the maximum . . .

23  reductions in greenhouse gas emissions."  Cal. Health & Safety

24  Code §§ 38560, 38561(a), 38562(c)(2), 38564.

25       CARB promulgated regulations to implement a cap-and-

26  trade program in October 2011.  (Decl. of Rajinder Sahota

27  ("Sahota Decl."), ¶ 20 (Docket No. 50-2); First Decl. of Michael

28  S. Dorsi ("First Dorsi Decl."), Ex. 4 (Docket No. 50-3).)

1  California's cap-and-trade program was intended to provide a

2  market-based approach to reducing greenhouse gas emissions.  CARB

3  establishes yearly caps, called "budgets," to limit the amount of

4  emissions a group of particular sources, called "covered

5  entities," may emit for a set period.  (Sahota Decl. ¶ 21); Cal.

6  Code Regs. tit. 17, § 95802(a).  At year's end, covered entities

7  are required to acquire and surrender "compliance instruments"

8  equivalent to the metric tons of greenhouse gas they emit.

9  (Sahota Decl. ¶ 22.)  Budgets then decrease each year to

10 encourage covered entities to reduce their emissions.  (Id. ¶

11 21.)

12        California's cap-and-trade program includes a

13 "framework for linkage" to accept the compliance instruments of

14 other "states and [Canadian] provinces" to "provide an additional

15 cost containment mechanism . . . and secure additional

16 [greenhouse gas emission] reductions."  (First Dorsi Decl. ¶ 7,

17 Ex. 5 at 193); see also Cal. Code Regs. tit. 17, §§ 95940-43.

18 After an external trading system is approved by the legislature

19 and California's Governor, see Cal. Gov. Code § 12894(f), covered

20 entities can use compliance instruments acquired through linked

21 jurisdictions to satisfy their compliance obligations in

22 California, and vice versa.  Cal. Code Regs. tit. 17, §§

23 95942(d)-(e).  California contracted with Western Climate

24 Initiate, Inc. ("WCI, Inc."), a non-profit corporation, to

25 facilitate linkages by tracking ownership of the compliance

26 instruments.[3]  (First Decl. of Greg Tamblyn ("First Tamblyn

27

28        [3]   WCI, Inc.'s services are limited to technical and
   administrative support alone.  See Cal. Gov. Code § 12894.5(a)(1)

5

1   Decl.") ¶ 5 (Docket No. 46-2); <u>see also</u> Agreement 11-415 Between

2   Air Resources Board and WCI, Inc. ("Agreement 11-415") (Docket

3   No. 7-3).)

4        On February 22, 2013, CARB requested that California's

5   Governor, Edmond G. Brown, Jr., make the findings required by law

6   to link California's cap-and-trade program with Quebec's.

7   (Sahota Decl. ¶ 32.)  Governor Brown made the four linkage

8   findings in April 2013.  (<u>Id.</u> ¶ 33.)  After the programs were

9   linked in September 2013, the parties signed an agreement

10  memorializing their commitment "to work jointly and

11  collaboratively toward the harmonization and integration of

12  [their] cap-and-trade programs for reducing greenhouse gas

13  emissions" ("2013 Agreement").  (<u>Id.</u> ¶¶ 44-49; First Dorsi Decl.,

14  ¶ 10, Ex. 8.)  The linkage between California and Quebec became

15  operational by regulation on January 1, 2014.  Cal. Code Regs.

16  tit. 17, § 95943(a)(1).

17       In 2016, various parties to the 1992 Convention --

18  including the United States -- entered into the Paris Agreement

19  of 2015 by executive order ("Paris Accord").  (First Iacangelo

20  Decl. ¶ 5, Ex. 3 at 3.)  In furtherance of the 1992 Convention,

21  the Paris Accord aims to "hold[] the increase in the global

22  average temperature to well below 2 degrees Celsius" and

23  "pursu[e] efforts to limit the temperature increase to 1.5

24  degrees Celsius above pre-industrial levels." (<u>Id.</u>)  In June

25  

26  ("California's participation in the [WCI, Inc.] requires that its
    sole purpose be to provide operational and technical support to
27  California . . . [g]iven its limited scope of activities, the
    [WCI, Inc.] does not have the authority to create policy with
28  respect to any existing or future program or regulation.").

1   2017, President Trump announced the United States would withdraw

2   from the Paris Accord and instead "negotiate a new deal that

3   protects our country and its taxpayers."[4]  (Id. ¶ 7, Ex. 5 at 5.)

4          President Trump's announcement did not deter California

5   from expanding its cap-and-trade program.  A linkage between

6   California, Quebec, and Ontario became operational by regulation

7   on January 1, 2018, although the relationship with Ontario ended

8   shortly thereafter.  See Cal. Code Regs. tit. 17, § 95943(a)(2).

9   Despite Ontario's withdrawal, California and Quebec remain

10  parties to the Agreement on the Harmonization and Integration of

11  Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions

12  ("the Agreement"), signed by each jurisdiction following the

13  linkage in 2017.[5]  (First Iacangelo Decl. ¶ 28, Ex. 26.)

14         The Agreement memorializes each jurisdiction's

15  commitment to harmonizing their cap-and-trade programs to ensure

16  compatibility while respecting each jurisdiction's individual

17  sovereignty.  (See generally Agreement.)  It "does not modify any

18  existing statutes and regulations nor does it require or commit

19  the Parties or their respective regulatory or statutory bodies to

20  create new statutes or regulations."  (Id. at 9.)  While Article

21  17 provides that parties "shall endeavor to provide" other

22  signatories with 12 months' notice before withdrawing, (id. at

23  _____

24         [4]   The United States did not submit formal notification of
    its withdrawal from the Paris Accord until November 4, 2019.

25  (First Iacangelo Decl. ¶ 8, Ex. 6.)  Under the Paris Accord's
    withdrawal provision, a party cannot withdraw until a year after

26  it provides formal notice.  (Id.)  The United States' withdrawal
    will not take effect until November 4, 2020.  (Id.)

27
           [5]   This Agreement replaced the 2013 Agreement between
28  California and Quebec.  (See Agreement at 2.)

1   10), the jurisdictions are effectively "free to withdraw at any

2   time."  (See MSJ Order at 28.)

3       B.   Procedural History

4           The United States initially filed this action in

5   October 2019, asserting that the Agreement, Agreement 11-415, and

6   "supporting California law"[6] operationalizing California's cap-

7   and-trade agreement are unconstitutional under Article I's Treaty

8   and Compact Clauses[7] and the Foreign Affairs Doctrine.[8]  (See

9

10          [6]   Both sides understand that the "Agreement" is the 2017
    Agreement on the Harmonization and Integration of Cap-and-Trade
11  Programs for Reducing Greenhouse Gas Emissions and "Agreement 11-
    415" refers to the contract between California and WCI, Inc.
12  (See USA Second Mot. for Summ. J. ("USA Second MSJ") at 2 n.1
    (Docket No. 102).)  However, the United States now asks the court
13  to broaden the scope of its challenge to "start[] with"
    California's Global Warming Act and include the "preparatory and
14  implementing activities" from that point on.  (Id.)  The court
    declines to do so.  Instead, the court will confine its analysis
15  to the challenged provision of the Global Warming Act explicitly
    mentioned in the complaint, California Health & Safety Code §
16  38564, as well as California Code of Regulations, Title 17,
    Sections 95940-43 pursuant to the complaint's prayer for relief.
17  (See FAC at 31-32; see also MSJ Order at 25, n.12.)
18

19          [7]   The Treaty Clause of Article I, Section 10 of the
    United States Constitution provides in relevant part that "[n]o
20  State shall enter into any Treaty, Alliance, or Confederation . .
    ."  U.S. Const. Art. I, § 10, cl. 1.  Later in that section, the
21  Compact Clause provides "[n]o State shall, without the Consent of
    Congress . . . enter into any Agreement or Compact with another
22  State, or with a foreign Power . . ."  U.S. Const. Art. I, § 10,
    cl. 3.
23

24          [8]   The United States moved to dismiss its fourth cause of
    action under the Foreign Commerce Clause in its second motion for
25  summary judgment.  (USA Second MSJ at ii.)  Defendants do not
    oppose its dismissal.  (Docket Nos. 108 & 109.)  Accordingly, the
26  court will GRANT plaintiff's motion to dismiss its claim under
    the Foreign Commerce Clause pursuant to Federal Rule of Civil
27  Procedure 15(a).

28
                              8

1   Compl. (Docket No. 1).)   After filing an amended complaint, the

2   United States moved for summary judgment on its Treaty and

3   Compact Clause claims on December 11, 2019.   (USA First Mot. for

4   Summ. J. (Docket No. 12).)   The WCI, Inc. defendants and

5   California in turn moved for summary judgment on those claims,[9]

6   (see WCI, Inc. First Mot. for Summ. J. (Docket No. 46); CA First

7   Mot. for Summ. J. (Docket No. 50)), and this court granted

8   defendants' motions and denied summary judgment for the United

9   States on March 12, 2020.   (See MSJ Order.)   Before the court now

10   are the parties' cross-motions for summary judgment on the United

11   States' sole remaining claim, under the Foreign Affairs Doctrine.

12   (Docket Nos. 102, 108, 110.)

13   II.   Standard

14          A party seeking summary judgment bears the initial

15   burden of demonstrating the absence of a genuine issue of

16   material fact as to the basis for the motion.   Celotex Corp. v.

17   Catrett, 477 U.S. 317, 323 (1986).   A material fact is one that

18   could affect the outcome of the suit, and a genuine issue is one

19   that could permit a reasonable trier of fact to enter a verdict

20   in the non-moving party's favor.   Anderson v. Liberty Lobby,

21   Inc., 477 U.S. 242, 248 (1986).   Summary judgment is appropriate

22   when, viewing the evidence in the light most favorable to the

23   _____

24          [9]     The Environmental Defense Fund, Natural Resources
     Defense Council, and International Emissions Trading Association
25   were permitted to intervene as defendants on January 15, 2020.
     (Docket No. 35.)   While they did not file independent motions for
26   summary judgment, they filed briefs in opposition to the United
     States' first motion for summary judgment.   (Docket Nos. 47, 48.)
27   The organizations have also filed oppositions to the United
     States' second motion for summary judgment.   (Docket Nos. 105,
28   106.)

1  nonmoving party, there is no genuine dispute as to any material

2  fact.  Acosta v. City Nat'l Corp., 922 F.3d 880, 885 (9th Cir.

3  2019) (citing Zetwick v. Cty. of Yolo, 850 F.3d 436, 440 (9th

4  Cir. 2017)).

5       Where, as here, parties submit cross-motions for

6  summary judgment, "each motion must be considered on its own

7  merits."  Fair Hous. Council of Riverside Cty., Inc. v. Riverside

8  Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal citations and

9  modifications omitted).  "[T]he court must consider the

10  appropriate evidentiary material identified and submitted in

11  support of both motions, and in opposition to both motions,

12  before ruling on each of them."  Tulalip Tribes of Wash. v.

13  Washington, 783 F.3d 1151, 1156 (9th Cir. 2015).  Accordingly, in

14  each instance, the court will view the evidence in the light most

15  favorable to the non-moving party and draw all inferences in its

16  favor.  ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1097

17  (9th Cir. 2003) (citations omitted).

18  III. Discussion

19       "[T]he Constitution entrusts [the nation's foreign

20  affairs] solely to the Federal Government."  Zschernig v. Miller,

21  389 U.S. 429, 436 (1968); see also United States v. Pink, 315

22  U.S. 203, 233 (1942).  Accordingly, under the Foreign Affairs

23  Doctrine, the Supremacy Clause of Article VI, Clause 2, of the

24  United States Constitution preempts state laws that intrude on

25  the federal government's exclusive power over foreign affairs.

26  See U.S. Const. Art. VI, cl. 2; Movsesian v. Victoria

27  Versicherung AG, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc)

28  (citing Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 418-20

10

1    (2003)).

2           The Foreign Affairs Doctrine encompasses "two related,

3    but distinct, doctrines: conflict preemption and field

4    preemption."  Id. (citing Garamendi, 539 U.S. at 418-20.)  Under

5    conflict preemption, "a state law must yield when it conflicts

6    with an express federal foreign policy."  Id. (citing Garamendi,

7    539 U.S. at 421).  Conversely, under field preemption, a state

8    law may be preempted "even in the absence of any express federal

9    policy" if it "intrudes on the field of foreign affairs without

10   addressing a traditional state responsibility."  Id. at 1072

11   (citing Deutsch v. Turner Corp., 324 F.3d 692, 709 n.6 (9th Cir.

12   2003)).  The United States argues that the Agreement, Agreement

13   11-415, and supporting California law are preempted under either

14   theory.  (USA Second MSJ at 16; FAC ¶¶ 174-75, 178.)  Each will

15   be examined in turn.

16        A.   Conflict Preemption

17           "The exercise of the federal executive authority means

18   that state law must give way where . . . there is evidence of

19   clear conflict between the policies adopted by the two."

20   Garamendi, 539 U.S. at 421.  "[T]he likelihood that state

21   legislation will produce something more than incidental effect in

22   conflict with express foreign policy of the National Government

23   would require preemption of the state law."  Id. at 420 (emphasis

24   added); see also Clark v. Allen, 331 U.S. 503, 517 (1947).

25   Foreign policy may be expressed through a "federal action such as

26   a treaty, federal statute, or express executive branch policy."

27   Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d

28   954, 960 (9th Cir. 2010) (citations omitted).  A federal statute

                                   11

1   can also preempt state law when the state law "stands as an

2   obstacle to the accomplishment and execution of the full purposes

3   and objectives of Congress."  Crosby v. Nat'l Foreign Trade

4   Council, 530 U.S. 363, 373 (2000) (citing Hines v. Davidowitz,

5   312 U.S. 52, 67 (1941)).

6          The United States argues California's cap-and-trade

7   program is preempted on multiple fronts.  First, the United

8   States contends that the program creates an obstacle to the

9   effectuation of the GCPA and the 1992 Convention.  (USA Second

10  MSJ at 17, 24-26.)  Second, separate and apart from any statute

11  or treaty, the United States argues that the program is

12  "inconsistent" with President Trump's withdrawal from the Paris

13  Accord and should be preempted for that reason.  (Id. at 19.)

14  California responds that its program is consistent with both the

15  GCPA and the 1992 Convention and, and if anything, acts in

16  furtherance of their ultimate goals.  (CA Second Mot. for Summ.

17  J. ("CA Second MSJ") at 16 (Docket No. 110).)  Additionally,

18  California contends that its program has little to no effect on

19  the President's ability to withdraw from the Paris Accord.  (Id.

20  at 18-19.)

21          First, the court will consider the GCPA's preemptive

22  effect on California's cap-and-trade program.[10]  The United States

23  _____

24          [10]  California, WCI, Inc., and defendant-intervenors EDF
    and NRDC argue plaintiff's GCPA claim was not properly raised in
25  its First Amended Complaint.  (CA Second Mot. for Summ. J. ("CA
    Second MSJ") at 29 (Docket No. 110); WCI, Inc. Second Mot. for
26  Summ. J. ("WCI, Inc. Second MSJ") at 10-11 (Docket No. 108);
    Environmental Defense Fund & Natural Resources Defense Council
27  Opp'n to USA Second MSJ ("EDF & NRDC Second Opp'n") at 31-32
    (Docket No. 106).)  Much like the dispute over the Clean Air Act
28  claim raised in the plaintiff's reply during the first motion for

                                  12

1  argues that the GCPA presents an "obstacle" to the President's

2  ability to develop international climate policy under Crosby v.

3  National Foreign Trade Council, 530 U.S. 363, 366-69 (2000).

4  (USA Second MSJ at 23-24.)

5         In Crosby, Massachusetts attempted to impose its own

6  trade sanctions on Burma[11] by banning state entities from buying

7  goods or services from any person doing business with the

8  country.  530 U.S. at 367.  Three months after Massachusetts'

9  restrictions came into force, Congress passed a law "imposing a

10 set of mandatory and conditional sanctions on Burma" that were to

11 remain in effect "[u]ntil such time as the President determine[d]

12 and certifie[d] to Congress that Burma has made measurable and

13 substantial process in improving human rights practices."  Id. at

14 368 (citation omitted).  The Supreme Court held Massachusetts'

15 ban on trade with Burma stood as an obstacle to the federal

16 government's more tempered approach by "fenc[ing] off" the

17 President's "access to the entire national economy" and this

18 effectively negated Congress' "delegation of effective

19 discretion" to the President.  Id. at 373, 381.

20        Crosby does not support a finding of obstacle

21 preemption in this case because plaintiff is ascribing power to

22

23 summary judgment, (see MSJ Order at 31-32 n.14), the state and
   other parties had an opportunity to entertain and properly
24 respond to the argument.  Accordingly, the court finds it
   appropriate to consider the GCPA claim.
25

26      [11]   The Supreme Court noted that while the military
   government of "Burma" changed its country's name to "Myanmar" in
27 1989, the parties, state law, and federal law all continued to
   refer to the country as "Burma" at the time of the case.  530
28 U.S. at 366 n.1.  This court will use the opinion's language.

13

1   the GCPA that Congress itself did not.  The GCPA was an

2   appropriations rider adopted in 1987.  As the Second Circuit

3   noted, it "consists almost entirely of mere platitudes."

4   Connecticut v. Am. Elec. Power Co., Inc., 582 F.3d 309, 382-83

5   (2d Cir. 2009), rev'd on other grounds, 564 U.S. 410 (2011).

6   Beyond requiring the Secretary of State and the EPA to submit a

7   report to Congress within a two-year period, "the 1987 Act

8   appears to require no action of any kind."  Id. at 383.  The GCPA

9   only articulates abstract goals that the United States "should

10  seek to" accomplish, including "increas[ing] worldwide

11  understanding of the greenhouse effect" or "work[ing] toward

12  multilateral agreements" to assuage climate change.  Title XI of

13  Pub. L. 100-204, 101 Stat. 1407, note following 15 U.S.C. § 2901,

14  §§ 1103(a)(1)-(4).  The Agreement, Agreement 11-415, and the

15  provisions of California law challenged by the United States do

16  not stand as an obstacle to the GCPA's general aims.

17       Furthermore, the 1992 Convention does not preempt the

18  challenged agreements and regulations because they are entirely

19  consistent with its objectives.  The "ultimate objective" of the

20  1992 Convention is "to achieve . . . stabilization of greenhouse

21  gas concentrations in the atmosphere at a level that would

22  prevent dangerous anthropogenic interference with the climate

23  system."  (First Iacangelo Decl. ¶ 3, Ex. 1 at 4, Art. 2.)

24  Article 3 of the 1992 Convention explicitly provides that

25  "policies and measures [] deal[ing] with climate change should be

26  cost-effective so as to ensure global benefits at the lowest

27  possible cost," and Article 4 echoes the same.  (Id. at Art. 3, ¶

28  3; see also Art. 4, ¶ 1(f).)  The Agreement, Agreement 11-415,

1   and the challenged regulations act in harmony with these goals by

2   regulating greenhouse gas emissions in a cost-effective manner.

3   Without a "clear conflict between the policies adopted," conflict

4   preemption is inappropriate.  See Garamendi, 539 U.S. at 421.

5           Finally, the United States contends that California's

6   cap-and-trade program directly conflicts with President Trump's

7   withdrawal from the Paris Accord.  (USA Second MSJ at 19.)  Its

8   argument is twofold.  First, it argues that the program is

9   inconsistent with the President's withdrawal because it

10  "facilitates Canada's participation in [the Paris Accord]."

11  (Id.)  Second, it contends the contested agreements "undermine

12  the federal government's ability to develop a new international

13  mitigation arrangement."  (Id.)  These arguments, too, fall short

14  of meeting the requirements of conflict preemption.

15          First, under the current form of Article 6 of the Paris

16  Accord,[12] member jurisdictions can set national greenhouse gas

17  emission reduction targets, called "nationally determined

18  contributions."  (First Iacangelo Decl. ¶ 5, Ex. 3 at 7, Art. 6

19  ¶¶ 1-2.)  These operate like California's "budgets" in its cap-

20  and-trade program, capping a party's overall emissions.  In order

21  to comply with these contribution requirements, Article 6

22  provides that parties can acquire "internationally transferred

23  mitigation outcomes" from other participating jurisdictions.

24  (Id. ¶¶ 2-3.)  This is functionally equivalent to California

25          [12]   The court recognizes the ongoing debates regarding
26  Article 6's implementation guidelines.  (CA Request for Judicial
    Notice ¶ 3 (Docket No. 111); see also Br. of Amicus Nature
27  Conservancy at 17 (Docket No. 119-1).)  The court relies on the
    text of Article 6 included in the Paris Accord rather than any of
28  the proposed implementation proposals.

1  businesses using compliance instruments acquired from linked

2  jurisdictions to fulfill emissions obligations under California

3  law.

4       The United States claims that California could

5  "facilitate[] Canada's participation in the Paris Agreement" by

6  providing Canada with mitigation outcomes to satisfy its

7  contribution obligation.  (USA Second MSJ at 20.)  However, that

8  argument suffers from several flaws.  Article 6 cabins the

9  exchange of internationally transferred mitigation outcomes to

10  "Parties" to the Paris Accord.  (First Iacangelo Decl. ¶ 5, Ex. 3

11  at 7, Art. 6 ¶ 2.)  Specifically, "[t]he use of [] mitigation

12  outcomes to achieve nationally determined contributions under

13  this Agreement shall be voluntary and <u>authorized by participating</u>

14  <u>Parties</u>."  (<u>Id.</u> at ¶ 3 (emphasis added).)

15       Neither California nor Quebec are "[p]arties" to the

16  Paris Accord, and therefore they are incapable of authorizing

17  compliance instruments to be used in this way.  While Canada will

18  remain a party to the Paris Agreement, the United States'

19  withdrawal will be complete on November 4, 2020.  (First

20  Iacangelo Decl. ¶ 8, Ex. 6.)  Even if Canada were to ask the

21  United States to authorize the use of mitigation outcomes

22  acquired from California, (USA Second MSJ at 23), the United

23  States will presumably be unable to authorize the use after

24  November.  This is well before Canada's 2030 contribution target

25  is due, a target for which they intend to "explore" the use of

26  mitigation outcomes.  (<u>See, e.g.,</u> Second Decl. of Michael Dorsi

27  ("Second Dorsi Decl."), Exs. 26-27, 29 (Docket No. 110-1).)

28  Consequently, California's cap-and-trade program cannot

1   facilitate Canada's participation in the Paris Accord in the way

2   the United States alleges.

3        Second, the United States argues the contested

4   agreements "advance[] cross-border emissions mitigation

5   strategies that the United States has rejected" and "undermine

6   the federal government's ability to develop a new international

7   mitigation arrangement."  (USA Second MSJ at 19.)  These

8   arguments, however, do not point to any specific federal policy,

9   either on the record or in development.  While the United States

10  argues the "triggering treaty, statute, or executive action need

11  not itself state an exact 'foreign policy' that the state law

12  conflicts with," (USA Second MSJ at 18), case law holds

13  otherwise.

14       To support conflict preemption, foreign policy must be

15  expressed through a "federal action such as a treaty, federal

16  statute, or express executive branch policy."  Von Saher, 592

17  F.3d at 960 (citations omitted).  To find otherwise would

18  endanger the "system of dual sovereignty between the States and

19  the Federal Government."  Gregory v. Ashcroft, 501 U.S. 452, 457

20  (1991).  Accordingly, the Supreme Court, as well as the Ninth

21  Circuit, have recognized conflict preemption only in the face of

22  a clear and definite foreign policy.  See, e.g., Garamendi, 539

23  U.S. at 420-21 ("The issue of restitution for Nazi crimes has in

24  fact been . . . formalized in treaties and executive agreements

25  over the last half century."); Crosby, 530 U.S. at 378 ("The

26  State has set a different course, and its statute conflicts with

27  federal law at a number of points by penalizing individuals and

28  conduct that Congress was explicitly exempted or excluded from

1  sanctions."); <u>Movsesian</u>, 670 F.3d at 1071; <u>Von Saher</u>, 592 F.3d at

2  960.

3           The United States cites no authority for the

4  proposition that an intent to negotiate for a "better deal" at

5  some point in the future is enough to preempt state law.  Indeed,

6  there is a clear distinction between the act of negotiation and

7  the resulting policy.  <u>Cent. Valley Chrysler-Jeep, Inc. v.</u>

8  <u>Goldstene</u>, 529 F. Supp. 2d 1151, 1186 (E.D. Cal. 2007), <u>as</u>

9  <u>corrected</u> (Mar. 26, 2008) (Ishii, J.) ("[A] means to achieve an

10 acceptable policy" is not "the policy itself.").[13]  "In order to

11 conflict or interfere with foreign policy . . . the interference

12 must be with a policy, not simply with the means of negotiating a

13 policy."  <u>Id.</u> at 1186-1187.  Consequently, plaintiff's arguments

14 that California's program undermines the federal government's

15 ability to negotiate new agreements are more properly addressed

16 under field preemption.

17          Overall, the United States has failed to identify a

18 clear and express foreign policy that directly conflicts with

19 California's cap-and-trade program.  Accordingly, the court finds

20

21          [13]  <u>Central Valley</u> involved a challenge to regulations
   setting limits on carbon dioxide emissions for cars and certain
22 trucks in California.  The court concluded that the regulations
   were not expressly preempted by the Energy Policy and
23 Conservation Act because its preemptive scope "encompass[ed] only
   those state regulations that are explicitly aimed at the
24 establishment of fuel economy standards."  529 F. Supp. 2d at
   1175.  In so doing, the court rejected "the President's avowed
25 intent to seek . . . agreements with foreign countries" because
   the Supreme Court's guidance concerned cases with tangible
26 agreements and treaties.  529 F. Supp. 2d at 1186 (discussing
   <u>Garamendi</u>, <u>Crosby</u>, and <u>Zschernig</u>).  Accordingly, the court found
27 the President's comments were "more accurately described as a
   strategy" rather than "the policy itself."  <u>Id.</u>
28

1   California's program is not barred by conflict preemption.

2        B.    Field Preemption

3             "Unlike its traditional statutory counterpart, foreign

4   affairs field preemption may occur even in the absence of a

5   treaty or federal statute, because a state may violate the

6   Constitution by establishing its own foreign policy." Von Saher,

7   592 F.3d at 964 (quoting Deutsch, 324 F.3d at 709 (internal

8   modifications omitted)).  To discern whether the law

9   impermissibly impacts foreign affairs, the court must consider

10  whether the state law "(1) has no serious claim to be addressing

11  a traditional state responsibility and (2) intrudes on the

12  federal government's foreign affairs power." Movsesian, 670 F.3d

13  at 1074 (citing Garamendi, 539 U.S. at 426).  A plaintiff must

14  show both elements to prevail.  See id.; see also Cassirer v.

15  Thyssen-Bornemisza Collection Found., 737 F.3d 613, 617 (9th Cir.

16  2013).  The court will consider each in turn.

17             1.   Traditional State Responsibility

18             To determine whether the state law addresses a

19  traditional state responsibility, "the required inquiry cannot

20  begin and end . . . with the area of law that the state statute

21  addresses." Movsesian, 670 F.3d at 1075; see also Von Saher, 592

22  F.3d at 964-65.  Instead, the court must assess the "real purpose

23  of the state law" by considering the regulation's text and

24  history.[14]  Id. (quoting Von Saher, 592 F.3d at 964).

25             [14]   Despite the court's previous admonition to the United
26  States that it would not consider statements from California's
    governors, past or present, because they are "no more than
27  typical political hyperbole," (MSJ Order at 13 n.7), the United
    States heavily relies on these statements to "prove" the "real
28  purpose" of California's cap-and-trade program.  (See USA Second

1         Section 38564 and the challenged regulations were

2  passed as part of (or in furtherance of) California's Global

3  Warming Act.  <u>See</u> Cal. Health & Safety Code § 38500 <u>et seq</u>.  In

4  the Act's legislative findings and declarations, the California

5  legislature found that global warming posed "a serious threat" to

6  the state's "economic well-being, public health, natural

7  resources, and [] environment," noting it was likely to have

8  "detrimental effects on some of California's largest industries."

9  <u>Id.</u> §§ 38501 (a)-(b).  While it recognized "[n]ational and

10 international actions" would be "necessary to fully address the

11 issue of global warming," California hoped to "exercise a global

12 leadership role" by reducing its greenhouse gas emissions and

13 "encouraging other states, the federal government, and other

14 countries to act."  <u>Id.</u> §§ 38501(d)-(e).  Accordingly, Section

15 38564 provides:

16         [CARB] shall consult with other states, and the
           federal government, and other nations to
17         identify the most effective strategies and
           methods to reduce greenhouse gases, manage
18         greenhouse gas control programs, and to
           facilitate the development of integrated and
19         cost-effective regional, national, and
           international greenhouse gas reduction programs.
20

21 Cal. Health & Safety Code § 38564.  Pursuant to this mandate,

22 California Code of Regulations, Title 17, Sections 95940-43

23 sought to "facilitate . . . regional, national, and international

24 _____

25 MSJ at 33-34, 36-37.)  Neither <u>Movsesian</u> nor <u>Von Saher</u> considered
   similar statements, instead confining their inquiry to the text,
26 legislative history, or an official government publication.  <u>See</u>
   <u>Movsesian</u>, 670 F.3d at 1075-76; <u>Von Saher</u>, 592 F.3d at 965.  As
27 the court previously recognized, these statements are "entitled
   to no legal effect" and they will not be considered.  (MSJ Order
28 at 13 n.1.)

                                  20

1    greenhouse gas reduction programs" by setting forth procedures to

2    accept compliance instruments "issued by an external greenhouse

3    gas emissions trading system."  Cal. Code Regs. tit. 17, §§

4    95940-43.  This design was intended in part to "minimize[] costs"

5    for California businesses and "maximize[] benefits for

6    California's economy."  Cal. Health & Safety Code § 38501(h);

7    (see also MSJ Order at 8-9).

8            California argues its cap-and-trade program regulates

9    emissions and in-state businesses in a fashion that is consistent

10   with its traditional police power.  (CA Second MSJ at 34-37.)  As

11   this court has previously recognized, it is well within

12   California's power to enact legislation to regulate greenhouse

13   gas emissions and air pollution.  (See MSJ Order at 30); see

14   also, e.g., Rocky Mountain Farmers Union v. Corey, 913 F.3d 940,

15   945-46, 953 (9th Cir. 2019); Am. Fuel & Petrochem. Mfrs. v.

16   O'Keeffe, 903 F.3d 903, 913 (9th Cir. 2018).  California can also

17   "subject[] both in and out-of-jurisdiction entities to the same

18   regulatory scheme to make sure that out-of-jurisdiction entities

19   are subject to consistent environmental standards."  Rocky

20   Mountain Farmers, 913 F.3d at 952 (finding California's low

21   carbon fuel standards did not violate the Commerce Clause).

22           However, a state's police power is not without limits.

23   Section 38564's plain text contemplates "facilitat[ing] the

24   development of" programs with "other nations."  Cal. Health &

25   Safety Code § 38564.  This invokes an exercise of power typically

26   reserved to the federal government.  See, e.g., Pink, 315 U.S. at

27   233 ("Power over external affairs is not shared by the States; it

28   is vested in the national government exclusively."); Hines, 312

21

1   U.S. at 63 ("The Federal Government, representing as it does the
2   collective interests of the . . . states, is entrusted with full
3   and exclusive responsibility for the conduct of affairs with
4   foreign sovereignties.").

5        "Courts have consistently struck down state laws which
6   purport to regulate an area of traditional state competence, but
7   in fact, affect foreign affairs."  Von Saher, 592 F.3d at 964
8   (citations omitted).  This practice is particularly prevalent
9   when the focus of a state law extends beyond the enacting state's
10  borders.  See, e.g., id.; Movsesian, 670 F.3d at 1075-77.
11  California contends that its cap-and-trade program is "expressly
12  targeted" at mitigating compliance costs for California
13  businesses.  (CA Second MSJ at 35, 41.)  While the court has
14  previously recognized that this is one effect of linkage (see MSJ
15  Order at 8-9), an ancillary benefit conferred on in-state
16  entities does not absolve a state from acting outside of its
17  traditional state responsibility.  See Movsesian, 670 F.3d at
18  1076 (quoting Von Saher, 592 F.3d at 965).

19       In its current form,[15] California's cap-and-trade
20  program has extended beyond an area of traditional state

21       ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
           [15]   It would, however, likely be within California's power
22  to participate in a purely domestic market, so long as the
    agreement does not violate the requirements of the Compact
23  Clause.  (See generally MSJ Order III(B).)  Indeed, "external"
    compliance instruments are defined as those from any program
24  "other than the California Cap-and-Trade Program."  Cal. Code
    Regs. tit. 17, § 95942 (defining "external greenhouse gas
25  emissions trading system").  Compliance instruments need not be
    from international sources.  Domestic programs, such as the
26  Regional Greenhouse Gas Initiative ("RGGI") in the Northeast and
    Mid-Atlantic, have facilitated a comparable cap-and-trade program
27  since 2009.  (Second Dorsi Decl. ¶ 7, Ex. 21 at 61.)  The court
    is unaware of any legal challenges to the RGGI.
28

1  competence by creating an international carbon market.  The Ninth

2  Circuit's decisions in Von Saher and Movsesian are particularly

3  pertinent here.

4       In Von Saher, the Ninth Circuit held a statute creating

5  a cause of action for "any owner, or heir or beneficiary of any

6  owner, of Holocaust-era artwork" against "any museum or gallery"

7  that displayed or sold the artwork exceeded California's

8  traditional state responsibilities.  592 F.3d at 958-59 (citation

9  omitted).  While the court recognized California had an interest

10 in regulating property and museums "within its borders," the

11 statute's broad scope "belie[d] California's purported interest

12 in protecting its residents and regulating its art trade" because

13 it permitted suit against entities "whether [they were] located

14 in the state or not."  Id. at 965 (citation omitted).

15      Similarly, in Movsesian, the en banc Ninth Circuit

16 overturned an insurance regulation permitting Armenian Genocide

17 victims and their heirs to recover in California because it

18 applied "only to a certain class of insurance policies . . . and

19 specifie[d] a certain class of people . . . as its intended

20 beneficiaries."  670 F.3d at 1075.  As "laudable" as California's

21 attempts were to "provide potential monetary relief and a

22 friendly forum for those who suffered from certain foreign

23 events," it did not concern an area of traditional state

24 responsibility.  Id. at 1076.

25      Although there were likely individuals in California

26 who would have been subject to the laws and policies preempted in

27 Von Saher and Movsesian, in each case, the laws' external focus

28 and application signaled that their "real purpose" was to control

23

1  behavior beyond California's borders.  California's cap-and-trade

2  program exceeds a traditional state interest in a similar way.

3  While linkage will help businesses fulfill their compliance

4  obligations within California, the program was created with the

5  expressed intent to have "far-reaching effects" including

6  "encouraging other . . . countries to act."  <u>See</u> Cal. Health &

7  Safety Code §§ 38501(c)-(e).  The regulations and the Agreement

8  were enacted in order to effectuate this broad purpose.

9  Accordingly, the court finds California's cap-and-trade program

10 extends beyond the area of traditional state responsibility.

11             2.   <u>Intrusion on Federal Government's Power</u>

12             The court must next address the question of whether

13 California's cap and trade program intrudes on the United States'

14 foreign affairs power.  The Constitution "entrusts" power over

15 foreign affairs "to the President and the Congress."  <u>Zschernig</u>,

16 389 U.S. at 432 (citing <u>Hines</u>, 312 U.S. at 63).  These powers are

17 enumerated and delegated in Article I, Section 8, and Article II,

18 Section 2 of the Constitution.  In part, Congress can declare

19 war, punish international crimes, and maintain an army and

20 navy.  U.S. Const., art. I, § 8.  The President alone is vested

21 with the authority to receive ambassadors and other public

22 ministers, and the President and Congress together share the

23 power to "make Treaties" and "appoint Ambassadors" by and through

24 the Senate's "Advice and Consent."[16]  <u>Id.</u>, art. II, § 2.  In

25 "making" a treaty, however, "[the President] alone negotiates . .

26
       [16]   The President's power to "make Treaties" under Article
27 II is separate and apart from Article I's prohibition on states
   from entering into a "Treaty, Alliance, or Confederation"
28 discussed in this court's previous order.  (MSJ Order at 17-24.)

                                  24

1  . . . the Senate cannot intrude; and Congress itself is powerless

2  to invade it." United States v. Curtiss-Wright Exp. Corp., 299

3  U.S. 304, 319 (1936); see also Zivotofsky v. Kerry, 576 U.S. 1,

4  13–14 (2015).

5       "To intrude on the federal government's foreign affairs

6  power, a [state's action] must have more than some incidental or

7  indirect effect on foreign affairs." Gingery v. City of

8  Glendale, 831 F.3d 1222, 1230 (9th Cir. 2016) (quoting Cassirer,

9  737 F.3d at 617) (alterations in original).  To have more than

10 some incidental or indirect effect, state laws must "impair the

11 effective exercise of the Nation's foreign policy" or have some

12 "great potential for disruption." Zschernig, 389 U.S. at 435,

13 440.

14      The United States principally argues California's cap-

15 and-trade program diminishes the President's power to "engage in

16 international deal making on behalf of the United States." (USA

17 Second MSJ at 38.)  Again, the United States relies on Crosby to

18 suggest the President's power to negotiate is impeded by

19 California's "inconsistent political tactics." (USA Second MSJ

20 at 36 (quoting Crosby, 530 U.S. at 381.)  However, Crosby's facts

21 differ from the case here in three material respects: first, in

22 Crosby, the President's power was at its "maximum"; second, the

23 scope of the laws are markedly different; and third, there was

24 actual evidence that the President's power to negotiate had been

25 impeded.  See 530 U.S. at 374-75, 381-84.

26      First, as the Supreme Court explained in Crosby,

27 "[w]hen the President acts pursuant to an express or implied

28 authorization of Congress, his authority is at its maximum, for

25

1  it includes all that he possesses in his own right plus all that

2  Congress can delegate." Id. at 375 (quoting Youngstown Sheet &

3  Tube. Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J.,

4  concurring)).  There, Congress provided the President "with

5  flexible and effective authority over economic sanctions against

6  Burma" through the Foreign Operations, Export Financing, and

7  Related Programs Appropriations Act.  Id. at 374.  This

8  delegation gave the President the power to exercise as much

9  "economic leverage against Burma . . . as our law will admit."

10  Id. at 375-76.

11      "[I]n the absence of either a congressional grant or

12  denial of authority" there is a "zone of twilight" in which the

13  President's authority is less clear.  Youngstown, 343 U.S. at

14  637.  Here, unlike in Crosby, there has not been a comparable

15  statutory grant.  Consequently, the President's authority is not

16  at its maximum.  While the President can, to an extent, "act in

17  external affairs without congressional authority," id. at 635,

18  absent an express delegation of power from Congress, "[i]t is not

19  for the President alone to determine the whole content of the

20  Nation's foreign policy."  See Zivotofsky, 576 U.S. at 21; (see

21  also Br. of Amici Curiae Professors of Foreign Relations Law at

22  9-14 (Docket No. 113).)  Accordingly, Crosby is distinguishable

23  in this respect.

24      Second, unlike Crosby, California's cap-and-trade

25  agreement as applied concerns agreements between sub-national

26  actors, rather than a state-wide prohibition on trade with an

27  entire nation.  In Crosby, Massachusetts' law broadly prohibited

28  "doing business" with the nation of Burma, making it "impossible"

1  for the President to fully exercise the "coercive power of the

2  national economy."  530 U.S. at 367, 377.  Here, the United

3  States provides no evidence that an agreement between a state and

4  a province of a foreign nation could "fence[] off" portions of

5  the national economy in a similar way.  See id. at 377, 381.

6  Instead, California's program mirrors the many thousands of

7  agreements individual states have entered into with foreign

8  jurisdictions, including those addressing climate change.  (See

9  Br. of Amici States (Docket No. 116) & First Dorsi Decl. ¶ 17,

10  Ex. 15 (citing Michael J. Glennon & Robert D. Sloane, Foreign

11  Affairs Federalism: The Myth of National Exclusivity 60-61 (2016)

12  (noting "[m]ore than four hundred agreements exist between the

13  states and Canadian provinces").)

14        The third, and most critical, difference between Crosby

15  and this case is the absence of concrete evidence that the

16  President's power to speak and bargain effectively with other

17  countries has actually been diminished.  In Crosby, the Court

18  cited three specific examples to demonstrate how Massachusetts's

19  law threatened the President's power to negotiate: (1) a number

20  of allies/trading partners had filed formal complaints protesting

21  Massachusetts's law with the federal government; (2) Japan and

22  the European Union had filed formal complaints against the United

23  States in the World Trade Organization ("WTO") claiming the

24  United States had violated a plurilateral agreement among members

25  of the WTO; and (3) the Executive "consistently" represented that

26  the Massachusetts's law "has complicated its dealing with foreign

27  sovereigns and proven an impediment to accomplishing objectives

28  assigned to it by Congress."  530 U.S. at 382-84.  As the Court

found, "this evidence in combination" was "more than sufficient" to show that Massachusetts's law stood as an obstacle to the president effectuating his congressional obligation.  Id. at 385. Here, in contrast, the United States has failed to offer similar evidence that California's cap-and-trade program interferes with the President's powers.

The United States continually stresses that the President withdrew from the Paris Accord in order to negotiate for a "better deal."  (USA Second MSJ at 19-23.)  However, the United States offers no concrete evidence that California's cap-and-trade program has interfered with either negotiations for a better deal or the nation's imminent withdrawal from the Paris Accord.  (See Part III(A) at 15-16, supra.)  The United States repeatedly suggests California's program would incentivize other countries to negotiate with California to the exclusion of the federal government.  (See USA Second MSJ at 38; USA Reply in Support of Second MSJ at 23-24, 35 (Docket No. 125).)  That is a distinct possibility, but the United States offers no evidence that this has happened or will happen.

These arguments also plainly ignore the limiting principles provided by California law and Article 6 of the Paris Accord.  See, e.g., Cal. Gov. Code § 12894(f)(1) ("The jurisdiction with which [CARB] proposes to link has adopted program requirements for greenhouse gas reductions . . . that are equivalent to or stricter than those required [by California law].");  Cal. Code Regs. tit. 17, § 95942(i) (permitting CARB to terminate linkage if the linked jurisdiction falls out of compliance with California law);  First Iacangelo Decl. ¶ 27, Ex.

1  25 at 9 ("Any jurisdiction that wishes to link with the

2  California Program . . . will need to be a member of WCI, Inc.");

3  (see Part III(A) at 15-16, supra).

4         Finally, while individuals in the executive branch in

5  Crosby "consistently" maintained that Massachusetts law

6  jeopardized the President's power, 530 U.S. at 383-84, concerns

7  about the effect of California's cap-and-trade program on the

8  President's negotiation power are of recent vintage.  (Compare

9  Second Dorsi Decl., Ex. 22 at 127, 129 (discussing California's

10  cap-and-trade program as "complementary" to federal policies

11  working to reduce emissions in 2014), with FAC ¶ 3 (describing

12  California's cap-and-trade program an "intrusion[]" into "the

13  federal sphere" in 2019).)

14         While the President indisputably has "a unique role in

15  communicating with foreign governments," Zivotofsky, 576 U.S. at

16  21, the United States has failed to demonstrate that the power to

17  do so has been substantially circumscribed or compromised by

18  California's cap-and-trade program.  As California recognizes, a

19  future treaty would have "appropriate preemptive effect over

20  inconsistent state laws."  (CA Reply in Support of Second MSJ at

21  15 (Docket No. 127).)  But in the interim, hypothetical or

22  speculative fears cannot support a finding that this state

23  program has more than an incidental effect on foreign affairs.

24  See Gingery, 831 F.3d at 1230; see also Incalza v. Fendi North

25  Am., Inc., 479 F.3d 1005, 1010 (9th Cir. 2007) ("A hypothetical

26  conflict is not a sufficient basis for preemption.").

27         The United States has failed to show that California's

28  program impermissibly intrudes on the federal government's

1   foreign affairs power.  Because the court must find both that a

2   state law has exceeded a traditional state responsibility and

3   intrudes on the federal government's foreign affairs power to be

4   preempted, Movsesian, 670 F.3d at 1074, the court will grant

5   defendants' motions for summary judgment on plaintiff's field

6   preemption claim.

7         IT IS THEREFORE ORDERED that the State of California

8   and WCI, Inc.'s motions for summary judgment (Docket Nos. 108,

9   110) be, and the same hereby are, GRANTED.  Plaintiff's motion

10  for summary judgment (Docket No. 102) is DENIED.  The Clerk of

11  Court is instructed to enter judgment in favor of all defendants

12  and against the United States.

13  Dated:  July 16, 2020

14                        WILLIAM B. SHUBB
                          UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28